## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**PAUL PIZZUTO**

                              **Plaintiff,**

**vs.**

**AIRBORNE EXPRESS, INC., STEVEN
CROSSKEN, JOSEPH HAMILTON,
GREG SWEATT, AND ARTHUR
LEVERIS,**

                              **Defendants.**

**Civil Action No. 04-12492 GAO**

### AFFIDAVIT OF C. MAX PERLMAN

I, C. Max Perlman, hereby depose and state as follows:

1.      I am a principal at the law firm of Sullivan Weinstein and McQuay, P.C. My firm and I represent the defendants in the above-captioned action.

2.      The document set forth as Exhibit 1 is a true and accurate copy of pages of the transcript of the deposition of the plaintiff, Paul Pizzuto.

3.      The document set forth as Exhibit 2 is a true and accurate copy of Deposition Exhibit 55.

4.      The document set forth as Exhibit 3 is a true and accurate copy of Deposition Exhibit 56.

5.      The document set forth as Exhibit 4 is a true and accurate copy the Plaintiff's Answers to the Defendants' Interrogatories.

6.    The document set forth as Exhibit 5 is a true and accurate copy of the Massachusetts Commission Against Discrimination ("MCAD") case of *Harmon v. Malden Hospital*, 19 MDLR 157, (1997).

7.    The document set forth as Exhibit 6 is a true and accurate copy of the MCAD case of *Woodason v. Norton Sch. Comm.,* 25 MDLR 62, 64 (2003)

Sworn to under the pains and penalties of perjury this 5th day of October, 2007.

/s/ C. Max Perlman
C. Max Perlman

CERTIFICATE OF SERVICE

I, C. Max Perlman, attorney for Defendants, do hereby certify that a copy of the foregoing has been duly served upon Plaintiff's Counsel, Richard A. Mulhearn, Esq., at 41 Elm Street, Worcester, MA 01609, via e-mail and first class mail, on this 5th day of October, 2007.

/s/ C. Max Perlman
C. Max Perlman

ORIGINAL

1

Volume 1, Pages 1-248

Exhibits: 42-59

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - -

PAUL PIZZUTO

       Plaintiff

vs.                Docket No. 04-12492 GAO

CROSSKEN EXPRESS, INC., STEVEN

CROSSKEN, JOSEPH HAMILTON, GREG

SWEATT, AND ARTHUR LEVERIS

       Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF PAUL PIZZUTO

Tuesday, June 12, 2007, 10:23 a.m.

Sullivan, Weinstein & McQuay, P.C.

2 Park Plaza, Suite 610

Boston, Massachusetts

- - - - - - - Reporter: Joan M. Cassidy, RPR, CRR - - - - - - -

jcassidy@fabreporters.com    www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404  Fax 617.728.4403

EXHIBIT

1

91

1    right?

2        A.    (Witness nods.)

3        Q.    Okay.  So now that we have that, what did

4    Mr. Crossken have to do with the key stuck in the

5    bulkhead door?

6        A.    Well, just like I explained.  And I know

7    you want a specific period.  For two weeks he acted

8    like an angel, but prior to that he acted like a

9    hell man.  And I'm not the only person that he

10   interrogated or he harassed, because there's a lot

11   of people who have harassment grievances against

12   this individual, and a lot of them weren't done

13   properly through the union.  Okay?  And I know

14   there's a lot of people out there that I can prove

15   that they have actual harassment claims against

16   Mr. Crossken --

17       Q.    Who?

18       A.    -- grievances.

19       Q.    Who are these people?

20       A.    I can't supply names right now, but I will

21   to Richard.

22       Q.    I need to know.

23       A.    Well, they are all in the union files,

24   grievances.

FARMER ARSENAULT BROCK LLC

209

1    Q.   What is the most threatening thing you can

2    recall saying in July 2003?

3    A.   I can't recall.

4    Q.   On July 24, the day before you were

5    terminated from employment, do you recall refusing

6    to engage in a meeting with Mr. Hamilton?

7    A.   Yes.

8    Q.   Can you tell me what happened there,

9    please.

10   A.   It starts with the evening before, on the

11   23rd.

12   Q.   On the 23rd?

13   A.   Yes.

14   Q.   Okay.

15   A.   Let's see.  I believe it was a Thursday,

16   because that was payday, and I was supposed to get

17   my check for the hours that were due for the drug

18   and alcohol test, I believe three days' pay.  And I

19   was supposed to get it in my payroll check through

20   the GO, which came in on Thursdays, they distribute

21   it.

22        Upon receiving all the checks, all the

23   employees, I asked Arthur if there was any checks in

24   there that were mine, in the bag.  Usually, there's

212

1   because I have two warning letters.  And at that

2   point I says, "You know what?  I'm out of here.  You

3   do what you want."  I gave them back the check,

4   their check, and I left.  And then the next day I

5   was fired.

6       Q.    All right.

7       A.    That's when they fabricated me going up the

8   ramp.  That's when they fabricated me, you know,

9   driving into someone, apparently, Arthur Leveris

10  ducking out of the way.  He thought I was going to

11  hit him.  And he was in the building, and everyone

12  else was outside having coffee and doughnuts.

13      Q.    You're saying they fabricated you going up

14  the ramp.  Are you saying you didn't go up the ramp

15  that day?

16      A.    I did, but I didn't go at a high rate of

17  speed.

18      Q.    You said something about coffee and

19  doughnuts.  Who was having coffee and doughnuts?

20      A.    All the employees were congregating over by

21  the overhead door where the ramp is on both sides.

22      Q.    Can you show me where that is on our

23  diagram?

24      A.    Sure (indicating).

FARMER ARSENAULT BROCK LLC

213

1    Q.   I'm going to ask you to draw another

2  diagram just because that one is kind of small.  And

3  this is an important issue, so I want to make sure

4  we have a very clear diagram.  I'm giving you a

5  piece of paper and a black pen, and we're going to

6  have that marked.  So if you could just draw me a

7  larger diagram of the facility.

8    A.   (Witness complies.) Okay.

9    Q.   Thank you for drawing a larger diagram for

10  us.  We are going to mark it as your next exhibit so

11  we have it for the record.

12         (Marked, Exhibit 55, Drawing by

13  witness.)

14    Q.   Describe what you did on the morning of

15  July 25 when you arrived at the station.

16    A.   (Drawing.)

17    Q.   So I'm going to write some reference points

18  as you point them out for me.  So what did you do

19  first?

20    A.   I came in Fallon Road, and I went into the

21  main parking lot here (indicating).  Okay?

22    Q.   Okay.  So you have written "main parking

23  lot"?

24    A.   Right.

FARMER ARSENAULT BROCK LLC

214

1    Q.    That's where you came in.  And the arrows,

2    is that where you drove your car?

3    A.    Yes, this is the pathway.  Everything else

4    is parking on each side.

5    Q.    All right.

6    A.    I went up to the ramp.  I stopped right

7    about here (indicating).

8    Q.    Okay.  So you stopped at the point marked

9    A?

10   A.    Yup.

11   Q.    Is that correct?

12   A.    Yup.

13   Q.    All right.  And you drove your vehicle up

14   the ramp.  There's an arrow in the ramp.  That's how

15   you drove the car, right?

16   A.    Yes.

17   Q.    And you stopped at the point marked A.

18   Okay.

19   A.    Yes.  Now, to the right of the ramp is the

20   break room right here, drivers' break room.

21   Q.    So I'll mark that point.  Point B is the

22   drivers' break room; is that correct?

23   A.    Correct.  Upon entering the ramp, I was

24   about a minute or two from 7 o'clock, I believe that

FARMER ARSENAULT BROCK LLC

215

1   was the start time.  And I left the vehicle, walked

2   over to the drivers' room, punched in right before

3   the drivers' room.  The time clock was right there.

4        Q.   There's a time clock right here

5   (indicating)?

6        A.   Actually, it's in the drivers' room.

7        Q.   It's in the break room marked as B?

8        A.   Yes.

9        Q.   Is where the time clock is?

10       A.   Yes.

11       Q.   All right.

12       A.   After I punched in, I walked back to the

13   vehicle, opened the door, put it in reverse, backed

14   up till I came back in the main parking lot, and

15   made my way out the same way I entered.  I had to go

16   to the auxiliary parking lot because these slots

17   were all taken by management, trucks and employees

18   already in the building.

19       Q.   So you drove back out the same way you came

20   in, Fallon Road, took a right out Fallon Road and

21   then went to the auxiliary parking lot; is that

22   correct?

23       A.   Yes, there's a Ryder Truck Rental there.

24   They leased the space out to them because their

FARMER ARSENAULT BROCK LLC

216

1  parking lot was too small.

2      Q.   When you stopped your car at Point A, was

3  your car inside or outside the facility?

4      A.   I really don't know.  It might have been

5  slightly under, slightly over, but not much if it

6  was.  I know that there was people congregating on

7  either side of the ramp, you know.  I mean, the

8  ramp's only about -- no more than 15 feet wide, so

9  there was people on either side of the ramp.  So I

10  wasn't going at a fast rate of speed because if I

11  was, I wouldn't have been able to park where I did.

12      Q.   What do you mean by that?

13      A.   Well, I mean I would have been obstructed

14  from going in at all.

15      Q.   How long is the ramp?

16      A.   The ramp might be about 20 feet, about 15

17  feet wide.

18      Q.   20 feet long and 15 feet wide; is that

19  right?

20      A.   Yeah, approximately.

21      Q.   (Drawing) Okay.  Had you done this before?

22  Had you driven up the ramp to punch in before?

23      A.   Yes.  It was common practice by numerous

24  employees who were running late for work, in order

FARMER ARSENAULT BROCK LLC

217

1   to punch in on time, to avoid get any warning

2   letters that were commonly distributed for being

3   late --

4        Q.   My only question was, had you done it

5   before?

6        A.   Yes.

7        Q.   And you had seen others doing it before?

8        A.   Yes.

9        Q.   Who had you seen doing it before?

10       A.   I can't give you specific names.  People --

11   Gary Clemmons.

12       Q.   Who else?

13       A.   Bob Lahey.

14       Q.   Anyone else?

15       A.   Wayne Fox.

16       Q.   Anyone else?

17       A.   Richie Stokes.

18       Q.   Richie Stokes?

19       A.   I'm going to stop there because I know

20   there was numerous people.  I just don't know

21   everyone's name.

22       Q.   Yeah, but do you know any other names other

23   than the four you have given me?

24       A.   Specifics, no, but I know it was common

218

1    practice by most of the employees.

2         Q.    By most of the employees?

3         A.    Most of them that were late on any given

4    day.

5         Q.    So how many people would do that on any

6    given day?

7         A.    If I had to guess, half a dozen, if I had

8    to guess.

9         Q.    Half a dozen employees pulled their

10   personal vehicles up the ramp every day?

11        A.    Pretty much.  I mean, they may not have

12   pulled -- three-quarters of the way up, halfway up,

13   almost up all the way.  I mean, it was common

14   practice.

15        Q.    But it was not permitted; isn't that right?

16        A.    It was never enforced.

17        Q.    But it was wrong to do?

18        A.    No one ever told us it was.

19        Q.    But I am asking you, was it wrong to do?

20        A.    No.

21        Q.    It wasn't wrong to do.

22              (Marked, Exhibit 56, First report of

23   injury or illness dated 7/25/03.)

24        Q.    Do you recognize Exhibit 56?

219

1    A.    (Witness reviews document.) Yes.

2    Q.    What is it?

3    A.    This is the individual I saw, upon being

4    discharged from Airborne, at the Holy Family

5    Hospital.

6    Q.    This is a form, isn't that right, and it's

7    filled out by you?

8    A.    Yes.

9    Q.    If you look at the handwriting, all the

10   handwriting on this document is yours; isn't that

11   right?

12   A.    No.

13   Q.    What handwriting is not yours?

14   A.    Just give me a second to review it, please.

15   Q.    I'm just asking you about the handwriting.

16   I'm not asking you about the content.

17   A.    I'm reviewing the handwriting, to be

18   honest.

19   Q.    Let me ask you this:  Look at the second

20   page.  Did you write the portion on the second half

21   of the page, where you describe in detail how the

22   accident or incident occurred?

23   A.    Yes.

24   Q.    Can you look at the back page.  Did you

220

1    also write that part?

2        A.    (Witness reviews document.)

3        Q.    Did you write that?

4        A.    Yeah, under distress.

5        Q.    You wrote this under distress?

6        A.    The psychiatrist part.

7        Q.    Okay.  It says, "I apologized for pulling

8    up to the overhead door and admitted being wrong for

9    pulling up on ramp."  Did I read that correctly?

10       A.    I don't know.  I was in a --

11       Q.    Did I read that correctly?

12       A.    You read it from those words, but --

13       Q.    I read it from what you wrote, correct?

14       A.    Yeah, you read what I have written.

15       Q.    So you admitted being wrong for pulling up

16   on the ramp, right?

17       A.    Well, that's how I wouldn't phrase it

18   after -- after realizing that it was common practice

19   all the time.  I mean, I was in a hurry, and once

20   this all happened, I was in a state of a nervous

21   breakdown.

22       Q.    It sounds like you're changing the subject,

23   Mr. Pizzuto.  All I am asking is, did you admit that

24   you were wrong for pulling up on the ramp?

FARMER ARSENAULT BROCK LLC

221

1    A.   No.

2    Q.   You never did that?

3    A.   No.

4    Q.   So why did you write in this statement that

5    you admitted being wrong for pulling up on the ramp?

6    A.   Because I was in a state of a nervous

7    breakdown.

8    Q.   When you are in a state of nervous

9    breakdown, you say things that are untrue?

10   A.   I don't know.  I don't remember -- I don't

11   recall anything I said.

12   Q.   Okay.  Did anybody ever accuse you of

13   attempting to run over a supervisor?

14   A.   Yes, Joe Hamilton.

15   Q.   When did he say that?

16   A.   Upon entering the ramp, prior to punching

17   in, that day that we just wrote the diagram of the

18   building, of the ramp.

19   Q.   Okay.  When did Mr. Hamilton tell you that

20   you were being accused of trying to run over a

21   supervisor?

22   A.   On July 25.

23   Q.   Did you have a meeting with Mr. Hamilton

24   that day?

230

1  was the manager.

2      Q.    Do you know what Joe Hamilton considered in

3  terminating you?

4      A.    No, I have no idea what his actions or his

5  thoughts were.

6      Q.    You say in your interrogatory answers that

7  Leveris and Sweatt gave false statements concerning

8  the July 25 incident to Airborne to support your

9  termination.  Is that true?

10     A.    That I did not drive up the ramp at a fast

11 raid of speed and approach the ramp where they

12 thought I was going to shoot them, yeah.

13     Q.    Let me pull out the answers to

14 interrogatories.  I want to be specific about this.

15 If you look at Interrogatory No. 5 -- here, this is

16 Interrogatory No. 5.

17     A.    (Witness reviews document.)

18     Q.    You state in the last paragraph in your

19 answer to Interrogatory No. 5, which is on page 7,

20 the last line, "Defendants Leveris and Sweatt gave

21 false statements concerning this incident to

22 Airborne to support plaintiff's termination."  Is

23 that a correct statement?

24     A.    Yes.

245

1    CERTIFICATE OF COURT REPORTER

2         I, Joan M. Cassidy, Registered

3    Professional Reporter and Certified Realtime

4    Reporter, do certify that the deposition of Paul

5    Pizzuto, in the matter of P. Pizzuto v. Crossken

6    Express, Inc., et al., on June 12, 2007, was

7    stenographically recorded by me; that the witness

8    provided satisfactory evidence of identification, as

9    prescribed by Executive Order 455 (03-13) issued by

10   the Governor of the Commonwealth of Massachusetts,

11   before being sworn by me, a Notary Public in and for

12   the Commonwealth of Massachusetts; that the

13   transcript produced by me is a true and accurate

14   record of the proceedings to the best of my ability;

15   that I am neither counsel for, related to, nor

16   employed by any of the parties to the above action;

17   and further that I am not a relative or employee of

18   any attorney or counsel employed by the parties

19   thereto, nor financially or otherwise interested in

20   the outcome of the action.

21

22

23   6/19/07    _____

24              Joan M. Cassidy, RPR, CRR

ORIGINAL

249

Volume 2, Pages 249-415

Exhibits: 64-85

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - -

PAUL PIZZUTO

              Plaintiff

vs.                              Docket No. 04-12492 GAO

CROSSKEN EXPRESS, INC., STEVEN

CROSSKEN, JOSEPH HAMILTON, GREG

SWEATT, AND ARTHUR LEVERIS

              Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - -

CONTINUED DEPOSITION OF PAUL PIZZUTO

Wednesday, June 20, 2007, 10:05 a.m.

Sullivan, Weinstein & McQuay, P.C.

2 Park Plaza, Suite 610

Boston, Massachusetts

- - - - - - -Reporter:  Joan M. Cassidy, RPR, CRR- - - - - - -

jcassidy@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404   Fax 617.728.4403

299

1    A.    Telling me I was paranoid, taking into his

2    own hands that I drove up the ramp, because his two

3    supervisors told him so, and I went to punch in and

4    they feared for their lives because I was going to

5    get out and start shooting all of them with a gun,

6    which I never possessed, never had.

7    Q.    So if I understand correctly -- I'm just

8    trying to figure out what the claim is here for

9    discrimination.  And what you have told me is that

10   Mr. Hamilton committed the following acts that you

11   consider to be discriminatory:  Terminating you,

12   calling you paranoid, and terminating you on the

13   basis of the statements of Mr. Sweatt and Mr.

14   Leveris?

15   A.    Correct.

16   Q.    Is there anything else?

17   A.    Not that I can recall at the moment.

18   Q.    Did Mr. Hamilton, in addition to those

19   things, do anything to retaliate against you?

20   A.    Not that I can recall.

21   Q.    Can you tell me -- strike that.  What

22   events or actions did Mr. Sweatt take that you

23   considered to be discriminatory?

24   A.    Oh, I believe he was the other one, along

300

1    with Arthur Leveris, that said I got out of the car

2    and their opinion was I was going to start shooting

3    people in the building.

4        Q.   So his report to Joe Hamilton is what you

5    are talking about, right?

6        A.   I never saw a report.  There was a verbal

7    exchange.

8        Q.   That's what I mean, his reporting to Joe

9    Hamilton what he had allegedly seen --

10       A.   Led to my termination.

11       Q.   Other than him telling Mr. Hamilton what he

12   told Mr. Hamilton on that day, is there any other

13   action that you contend is discriminatory on the

14   part of Mr. Sweatt?

15       A.   I never had any run-ins with Greg Sweatt.

16       Q.   So the answer is no?

17       A.   No.

18       Q.   Just to clarify the transcript, the answer

19   to that question is no, correct?

20       A.   No.  I think I said that.  No.

21       Q.   I know, but I said "the answer is no?"  And

22   you said "no."  This is muddling up the transcript.

23       A.   The answer is, I never had any run-ins with

24   Greg Sweatt.  Okay?

304

1        Q.   Yeah, I'm just saying if you know,

2    ballpark, as to how many there were.

3        A.   I have no idea.

4        Q.   So you contend the warning letters you

5    received from Mr. Leveris were discriminatory on the

6    basis of your disability; is that correct?

7        A.   I can't recall that stuff.

8        Q.   You can't recall what?

9        A.   I can't recall him giving me a letter, so

10   how can I recall if it was directly involved towards

11   discrimination?

12       Q.   So let me get at it this way, then.  I am

13   just asking, I want you to tell me all of the

14   actions of Mr. Leveris that you say were

15   discriminatory.

16       A.   Specifically?

17       Q.   Yes, sir.

18       A.   When he said I was getting out of the car

19   and I was going to start shooting him.

20       Q.   So the same one that you talked about with

21   Mr. Leveris (sic)?

22       A.   Mr. Sweatt.

23       Q.   I'm sorry, Mr. Sweatt.

24       A.   Correct.

FARMER ARSENAULT BROCK LLC

305

1    Q.   Telling Joe Hamilton about what he said

2    happened when you came into the dock that day?

3    A.   Correct.

4    Q.   Besides that, is there anything else, any

5    other actions that Mr. Leveris took that you

6    consider discriminatory?

7    A.   I can't recall.

8    Q.   Is there anything that would assist you in

9    refreshing your recollection on that topic?

10   A.   I'd have to go through all the warning

11   letters that I received, and there's quite a few of

12   them.

13   Q.   Do you have copies of those?

14   A.   I believe I have them at the house.  I'd

15   have to look through the pile at the house again.

16   Q.   Do you have any recollection, sitting here

17   today, of any warning letters that Mr. Leveris --

18   any specific warning letters that Mr. Leveris gave

19   you that you consider his action to be

20   discriminatory in giving them to you?

21   A.   To the best of my knowledge, the main one

22   was when I went to punch in at the top of the ramp.

23   Q.   On July 25?

24   A.   That's the one I can specifically say that

FARMER ARSENAULT BROCK LLC

307

1    could not tell you.

2                    (Interruption.)

3        Q.    Is it possible in your mind, Mr. Pizzuto,

4    that the actions of the defendants were taken

5    because they simply didn't like you?

6        A.    I can't answer the question.  They have to

7    answer that question.

8        Q.    You were a pretty vocal employee at

9    Airborne, weren't you?

10       A.    I don't know if you would use the word

11   "vocal," but as a Teamster, knowing what my job

12   duties were and responsibilities, if I felt that I

13   was being reprimanded for something, I would point

14   it out to them, sure.

15       Q.    You stood up for yourself?

16       A.    Correctly, yeah.

17       Q.    And you might have rubbed some people the

18   wrong way?

19       A.    Everybody does, don't they?

20       Q.    I don't know.  I'm asking about you.

21       A.    You'd have to ask the opinions of the

22   people I rubbed the wrong way.

23       Q.    That's fair.

24       A.    Okay.

FARMER ARSENAULT BROCK LLC

410

1     CERTIFICATE OF COURT REPORTER

2          I, Joan M. Cassidy, Registered

3     Professional Reporter and Certified Realtime

4     Reporter, do certify that the deposition of Paul

5     Pizzuto, in the matter of P. Pizzuto v. Crossken

6     Express, Inc., et al., on June 20, 2007, was

7     stenographically recorded by me; that the witness

8     provided satisfactory evidence of identification, as

9     prescribed by Executive Order 455 (03-13) issued by

10    the Governor of the Commonwealth of Massachusetts,

11    before being sworn by me, a Notary Public in and for

12    the Commonwealth of Massachusetts; that the

13    transcript produced by me is a true and accurate

14    record of the proceedings to the best of my ability;

15    that I am neither counsel for, related to, nor

16    employed by any of the parties to the above action;

17    and further that I am not a relative or employee of

18    any attorney or counsel employed by the parties

19    thereto, nor financially or otherwise interested in

20    the outcome of the action.

21

22    June 28, 2007   _____

23                    Joan M. Cassidy, RPR, CRR

24







pg 4      FAX 17812143044

**AIRBORNE EXPRESS**

## First Report of Injury or Illness

CLAIM / CONFIRMATION NO.

**Management complete and sign below**

EMPLOYEE NAME: PAUL PIZZUTO          STATION CODE: NSH    WAS EMPLOYEE PERFORMING REGULAR JOB DUTIES AT TIME OF INJU: Yes

WAS EMPLOYEE INJURED WHILE ON THE JOB? Yes

EMPLOYMENT STATUS: [X] FULL TIME  [ ] PART TIME  [ ] ON CALL    JOB END DATE IF ON CALL / /    OCCUPATION / DEPARTMENT: Driver

HIRE DATE: 10|08|89    HIRE DATE IN CURRENT POSITION: 10|08|90    NAME OF GROUP HEALTH CARE PROVIDER (For Oregon State Only): Tufts

APPRO. # OF HRS WORKED PER DAY: 8+    APPRO. # OF DAYS WORKED PER WEEK: 5    WAS EMPLOYEE PAID FOR FULL DAY OF INJURY? [ ] NO  [X] YES

SPECIFY DAYS OF WEEK THAT EMPLOYEE IS SCHEDULED OFF (For Oregon State Only):    DOES EMPLOYEE HAVE VACATION DAYS SCHEDULED, IF SO, WHEN? Yes    WAGE STATUS [X] HOURLY [ ] WEEKL[ ] DAILY [ ] MONTH

O/T HRS WORKED PER WEEK ON AVERAGE: 5 To 8    O/T WAGE PER HOUR: $ 29.74    GROSS AMOUNT OF LAST CHECK:    NUMBER OF HOURS / DAYS WORKED

WERE DRUGS AND ALCOHOL INVOLVED? [X] NO [ ] YES    IF EMPLOYEE DIED, DATE OF DEATH    NUMBER OF DAYS EMPLOYEE IS EXPECTED TO MISS WORK

LAST DATE WORKED: 07|25|03    TIME EMPLOYEE LEFT WORK [ ] AM [ ] PM    FIRST DAY MISSED: 07|26|03    HAS EMPLOYEE RETURNED TO WORK? [ ] YES / / DATE  [X] NO / /    EXPECTED RTN DATE

DOES EMPLOYEE HAVE PREVIOUS CLAIM? [ ] NO [ ] YES If Yes, is Claim [ ] OPEN [ ] CLOSED    DESCRIBE PREVIOUS INJURY: Extreme Axiety and Stress    DATE OF PREVIOUS INJUR 10|14|02

WAS ANY SAFETY EQUIPMENT PROVIDED? [ ] NO [ ] YES If Yes, was it used? [ ] NO [ ] YES    WAS A SAFETY RULE VIOLATED? [ ] NO [ ] YES If Yes, which one?

WAS DISCIPLINE ISSUED? [ ] NO [X] YES If yes, Indicate type: Termination

WAS A MACHINE PART / CONVEYOR / ROLLER INVOLVED? [X] NO [ ] YES If yes, Describe    WAS THE EQUIPMENT DEFECTIVE [ ] NO [ ] YES

NAME OF SUPERVISOR (For additional information if required)    PHONE ( )

STREET ADDRESS    CITY    STATE    ZIP CODE

WAS FIRST AID GIVEN ON SITE? [X] NO [ ] YES    WHAT MEDICAL TREATMENT WAS RECEIVED? DESCRIBE: Yes Axiety and Stress

CLINIC/DOCTOR NAME OF DOCTOR: Holy Family Ronald Teitler MD    SPECIALTY (Family Practice, Chiropractic, etc.)    PHONE

STREET ADDRESS: 70 East Street    CITY: Methuen    STATE: MA    ZIP CODE: 01844    PHONE (978)687-0156

NAME OF HOSPITAL: Holy Family    PHONE ( )

STREET ADDRESS: 70 East Street    CITY: Methuen    STATE: MA    ZIP CODE: 01844

WAS EMPLOYEE HOSPITALIZED? [X] NO [ ] YES IF YES, DATE / /    WAS EMPLOYEE TREATED AS AN OUTPATIENT? [ ] NO [X] YES    RECEIVE EMERGENCY TREATMENT? [ ] NO [X] YES

DID EMPLOYEE RECEIVE AMBULANCE SERVICE? [X] NO [ ] YES

EXHIBIT
Pizzuto
56
kc 6/12/07

SUPERVISOR'S SIGNATURE
X
MANAGER'S SIGNATURE
X

EXHIBIT
3

PROOF #4 (12/23/02)

P 00482

*Page 2*

**AIRBORNE EXPRESS**

**First Report of Injury or Illness**

Employee complete and sign on reverse side

EMPLOYEE NAME
First **Paul**  Middle **Joseph**  Last **Pizzuto**

STATION CODE **NSH**

SOCIAL SECURITY NO. **03258 4883**

DRIVERS LICENSE NUMBER AND STATE

STREET ADDRESS (HOME/MAILING ADDRESS)
**59 Rollins Street**

CITY **Lawrence**   STATE **MA**   ZIP CODE **01841**   COUNTY **Essex**

HOME PHONE **(978) 6859005**   DATE OF BIRTH **01/03/1964**   GENDER ☒ MALE ☐ FEMALE   MARITAL STATUS **Married**

SPOUSE'S NAME **Susan**   NO. OF DEPENDENTS **0**   DATE OF INJURY OR ONSET OF ILLNESS **071 251 2003**

TIME OF ACCIDENT ☐AM ☐PM   DATE REPORTED TO EMPLOYER **1 1**   TIME REPORTED TO EMPLOYER **830** ☒AM ☐PM   TO WHOM DID YOU REPORT THE ACCIDENT? **Joe Hamilton**

YOUR SUPERVISOR'S NAME **Chris Demmons**   SHIFT BEGINNING TIME **700AM**   ENDING TIME **330pm**

STREET ADDRESS WHERE ACCIDENT/INCIDENT OCCURRED? **200 Fallon Road  Airborne Express**

CITY **Stoneham**   STATE **MA**   ZIP CODE   COUNTY

ON EMPLOYER'S PREMISES? ☐ NO ☒ YES

P 00483

DESCRIBE IN DETAIL HOW ACCIDENT/INCIDENT OCCURRED (INCLUDE BODY PART(S) INJURED)

I have been accused of "Just Cause" I was subjected to a suspicion drug and alcohol test which a negative result was found. I feel I was unjustly accused based on the findings. Returned to work on 07/21/03 and was told I would recieve pay for 7/16 thru 7/18 which I was not until I approached mgt on 7/24/03 (payday) I was then told it was a grievance even though test results were negative. I was then given 3 letters on 7/25 which led to termination. Manager Joe Hamilton claims I am giving intimidating look and harassing his (Supvs) also I was told I committed an intimidating gesture with my vehicle when I was running late for work on 7/25 **continued on reverse side** Joe prochaims I peeled out from ramp area under overhead doors (witnesses) waiting to start at 700

put car in reverse and backed up, I apoligize
for pulling up to overhead door and admitted being
wrong for pulling up on Ramp, also I Just ~~was~~
explained to Joe Hamilton that all it was
Trying to do was make work on time and
not be Late. Never did I operate my vehicle
in a erratic WAY or try to cause any harm
To Anyone.

    I have been diagnosed with depression
due to Axiety and stress and have been
under the care of a phyciatirist since 7/25/03.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PAUL PIZZUTO,<br>　　　Plaintiff, | )<br>)<br>) |
| v. | )<br>)　　DOCKET NO.  04-12492 GAO |
| AIRBORNE EXPRESS, INC., STEVEN<br>CROSSKEN, JOSEPH HAMILTON,<br>GREG SWEATT AND ARTHUR<br>LEVERIS,<br>　　　Defendants. | )<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S ANSWERS TO INTERROGATORIES OF DEFENDANTS

### Interrogatory No. 1

Please identify each person whom you believe: (i) has knowledge or information concerning any of the allegations in your Charge; (ii) has knowledge of information concerning any of the allegations in your Complaint or Plaintiff's Rule 26(a) Initial Disclosure; or (iii) whom you consulted (other than your attorney) in preparing your answers to these interrogatories.  Your answer shall include a summary description of the knowledge or information that you believe each such individual has.

**Answer:**  Plaintiff believe that the following persons have knowledge:

**Susan Pizzuto.**  Plaintiff's wife.  Plaintiff's employment at Airborne; Plaintiff's emotional distress.

**James O'Brien,** 22 Coral Hill, Essex, MA 01929.  He is expected to have knowledge concerning undue scrutiny by Plaintiff's supervisors concerning his work performance; ongoing harassment; the practices at the workplace concerning issuance of warnings and discipline; the work environment; the attitude of Plaintiff's supervisors towards him, his own experience with regard to the issuance of warnings and terminations, the circumstances surrounding Plaintiff's terminations from employment; and the circumstances surrounding the drug test of Plaintiff.

**James Sambataro,** 26 Golden Oaks Drive, Salem, NH 03039.  He is expected to have knowledge concerning the events on 7/25/03 that resulted in Plaintiff's termination; the practice of workers to drive up to the building and punch in when running late; the practices at the workplace concerning issuance of warnings and discipline; the work environment; and the attitude of Plaintiff's supervisors towards him:



**William Beekman**, 1 Fernview Ave., North Andover, MA 01845. He is expected to have knowledge concerning the practice of workers to drive up to the building and punch in when running late; the practices at the workplace concerning issuance of warnings and discipline; the work environment; and Plaintiff's conduct at the workplace.

**Dave Vallone**, Airborne Express, 200 Fallon Road, Stoneham, MA 02180. Union steward at Airborne. He is expected to have knowledge concerning workplace standards and practices regarding performance issues, including absenteeism and employee error, and practices at the workplace concerning issuance of warnings and discipline; knowledge regarding disparate treatment by Airborne concerning infractions; knowledge regarding disciplinary actions against Plaintiff and the harassment grievance by Plaintiff.

**Gerry Halloran**, 14 Elgin Boulevard East, Londonderry, NH. He is expected to have knowledge concerning undue scrutiny by Plaintiff's supervisors concerning his work performance; ongoing harassment; the practices at the workplace concerning issuance of warnings and discipline; the work environment; the attitude of Plaintiff's supervisors towards him, his own experience with regard to the issuance of warnings and terminations, the circumstances surrounding Plaintiff's termination from employment; and the circumstances surrounding the drug test of Plaintiff.

**Thomas Mari.** Airborne Express, 200 Fallon Road, Stoneham, MA 02180. Union steward at Airborne. He is expected to have knowledge concerning workplace standards and practices regarding performance issues, including absenteeism and employee error, and practices at the workplace concerning issuance of warnings and discipline. He is also expected to have knowledge regarding disparate treatment by Airborne concerning infractions.

**Michael Ray**, Airborne Express, 200 Fallon Road, Stoneham, MA 02180. He is expected to have knowledge concerning workplace standards and practices regarding performance issues, including absenteeism and employee error, and practices at the workplace concerning issuance of warnings and discipline; knowledge regarding disparate treatment by Airborne concerning infractions; knowledge regarding circumstances of the drug test of Plaintiff in July 2003.

**Lou DiGiampaolo**, Business Agent, Teamsters Local 25, 544 Main Street, Boston, MA 02129. He is expected to have knowledge concerning workplace standards and practices regarding performance issues, including absenteeism and employee error, and practices at the workplace concerning issuance of warnings and discipline; knowledge regarding disparate treatment by Airborne concerning infractions; knowledge concerning disciplinary actions against Plaintiff and the harassment grievance by Plaintiff.

**John V. Chang, M.D.**, Salem Family Practice, 7 Stiles Road, Salem, NH 03079. Plaintiff's former PCP. He is expected to have knowledge concerning Plaintiff's medical conditions, medical treatment and disability.

2

**Gloria I. Kvaternik, M.D.,** 23 Stiles Road, Salem, NH 03079. She is expected to have knowledge concerning Plaintiff's medical conditions, medical treatment and disability.

**Bijan Sadrnoori, M.D.,** 411 Merrimack St., Methuen, MA 01844. He is expected to have knowledge concerning Plaintiff's medical conditions, medical treatment and disability.

**Dr. John Heckler,** Tewksbury Mental Health Associates, 1445 Main Street, Tewksbury, MA 01876. He is expected to have knowledge concerning Plaintiff's medical condition, medical treatment and disability.

**Thomas Sarjeant,** Tewksbury Mental Health, 1445 Main Street, Tewksbury, MA 01876. He is expected to have knowledge concerning Plaintiff's medical condition, medical treatment and disability.

**Greater Lawrence Mental Health Center,** 30 General Street, Lawrence, MA 01841. Plaintiff's medical condition, medical treatment and disability.

**Dr. Claudia Trombly, Happy 'n' Healthy Family Medicine,** 95 Stiles Road, Salem, NH 03079. Plaintiff's medical condition, medical treatment and disability.

**Robert A. Moverman, Ph.D. and Dr. Marc Sadowsky,** New England Neurological Associates, P.C., 220 Sutton St., North Andover, MA 01845. He is expected to have knowledge concerning Plaintiff's medical condition, medical treatment and disability.

**Interrogatory No. 2**

Please identify and describe with particularity the impairments(s) that you contend constituted, or constitutes, your disability or handicap(s) in this case, including, with respect to each such impairment: (i) the medical name for the impairment and the nature of it; (ii) the period for which you have had, or had, the impairment; (iii) the way or ways in which the impairment manifests itself, if it does; and (iv) the ways or ways in which the impairment affects your ability to perform any activity or activities, if at all.

**Answer**: See answer to Interrogatory No. 3.

**Interrogatory No. 3**

With respect to each impairment you identified in Answer No. 2, please state whether you have sought medical or other therapeutic treatment for the impairment, and if so, identify (in accordance with Rule 26.5(C)(8) of the Local Rules): (i) the persons and/or entities from whom you have sought treatment, including the approximate dates on which you have sought it; (ii) the persons on entities who have evaluated, diagnosed, provided you with a prognosis, and/or treated you for the impairment(s) and the

approximate dates on which they have done so; and (iii) any documents concerning the evaluation, diagnosis, prognosis or treatment of your impairment(s).

**Answer to Interrogatories 2 and 3:**

Plaintiff has been diagnosed with anxiety and depression. He was treated for this condition by John V. Chang, M.D., Salem Family Practice, 7 Stiles Road, Salem, NH 03079. Plaintiff has produced medical records in response to document requests and refers Defendants to those records for specific treatment information. According to the records, however, Plaintiff was treated by Dr. Chang from September 2001 to April 2003 for this condition as well as other medical issues. Plaintiff was initially treated with medications. Plaintiff experienced symptoms such as fatigue, dizziness, tremors, ringing in his ears, insomnia and difficulty with coping and concentration. In October 2002, Dr. Chang took Plaintiff out of work on a medical leave of absence.

Plaintiff treated with Thomas Sarjeant, L.C.S.W and Dr. John Heckler of Tewksbury Mental Health Associates from approximately 11/13/02 to 1/13/03 for anxiety and depression. The treatment consisted of counseling.

On 7/25/03, following his termination from employment, Plaintiff went to the emergency department of Holy Family Hospital, 70 East St., Methuen, MA, where he was seen for depression. Plaintiff was referred for treatment to Greater Lawrence Mental Health Center. He was seen there from approximately 7/25/03 to 3/9/04. He had counseling with a therapist, Carol Zeleznik, LMHC.

Plaintiff has been seen by his PCP, Dr. Claudia Trombly of Happy 'n' Healthy Family Medicine for the anxiety and depression and other medical conditions. In approximately May 2005, Dr. Trombly referred Plaintiff to Dr. Robert Moverman of New England Neurological Associates for treatment of the anxiety and depression. Plaintiff has had counseling with Dr. Moverman and has been evaluated by Dr. Marc Sadowsky. Dr. Marc Sadowsky has diagnosed Plaintiff with bipolar disorder. Plaintiff continues to be treated by him. Plaintiff has produced medical records in response to document requests and refers Defendants to those records for specific treatment information.

In approximately November 2002, Plaintiff was diagnosed with sleep apnea by Dr. Bijan Sadrnoori. Plaintiff had experienced symptoms of insomnia, excessive snoring, breathlessness and daytime sleepiness. Plaintiff has produced medical records in response to document requests and refers Defendants to those records for specific treatment information. According to the records, however, Plaintiff was seen by the doctor from approximately 11/26/02 to 6/19/03.

On or about 9/5/03, Plaintiff underwent a tonsillectomy and a uvulopalatopharyngoplasty for treatment of his sleep apnea. The treating physician was Dr. William Postal of Andover Ear, Nose and Throat Center. Plaintiff has had follow up treatment with Dr. Postal, including sleep studies. Plaintiff has produced medical records

in response to document requests and refers Defendants to those records for specific treatment information.

Plaintiff was referred by Dr. Chang to Dr. Gloria I. Kvaternik for evaluation of tremors. Plaintiff was seen by her from approximately 12/12/02 to 2/10/03. Plaintiff has produced medical records in response to document requests and refers Defendants to those records for specific treatment information.

**Interrogatory No. 4**

Please state whether you were able to perform all your work responsibilities while you were employed by Airborne. If your answer is anything but an unqualified "yes," please state when you were not able to perform such responsibilities, describe which responsibilities you were unable to perform, and explain the basis for the inability to perform.

**Answer:** Plaintiff objects to this interrogatory on the grounds that it is overbroad, unduly burdensome and is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and does not reasonably identify the information sought. Notwithstanding these objections, and without waiving them, Plaintiff provides the following information:

Plaintiff worked for Airborne for more than 13 years. There were times during that period when Plaintiff may have been unable to work due to either injuries or illness. This includes the period of disability due to the work-related calf injury in 2002 where Plaintiff was out of work from approximately 4/15/02 until 4/29/02 when he returned to work with restrictions under Airborne's light duty program. On or about 6/7/02, Plaintiff was released to full duty work by his doctor from that work injury.

On or about 10/14/02, Plaintiff's doctor took him out of work because he was on the verge of a nervous breakdown. The diagnoses were depression, anxiety, insomnia, sleep apnea, acid reflux, tremor and poor concentration. Plaintiff was out of work on medical leave from 10/14/02 to 2/24/03 for these conditions.

From the time Plaintiff returned to work on or about 2/24/03 until he was terminated in July 2003, Plaintiff was able to perform his work responsibilities. However, Plaintiff's emotional state was still vulnerable as a result of his psychological condition, making him more susceptible to stress and impairing his ability to cope with stress.

**Interrogatory No. 5**

Please state the basis (in accordance with Rule 26.5(C)(8) of the Local Rules) for your claim that Defendants discriminated against you on the basis of your disability or handicap(s). Your answer should identify, for each alleged act of discrimination, any

Defendant or Defendants to which you ascribe discriminatory intent in connection with the alleged act.

**Answer**: When Plaintiff returned to work on 2/24/03 from his medical leave, his assigned truck had no gas and no bulkhead door key. Plaintiff's departure for his route was thus delayed since he had to gas up. The absence of a bulkhead door key meant that Plaintiff would not be able to properly work out of his truck cab. He would be forced to go to the back door on every delivery. Over the course of 60-70 deliveries, this meant much more effort and time to complete his route. In addition, Plaintiff's scanner keys "R" and "V" were missing which prevented him from properly inputting the scanner. The assigned truck was unsafe and was making a very loud noise after Plaintiff departed the station. The truck then overheated after leaving the station and the truck had to be towed. Plaintiff had to return to the building and had to offload packages and load them onto another truck.

When Plaintiff returned to the facility after finishing his route that day, he wound up scraping a pole with the truck, causing minor damage. Plaintiff believes that the stress of the events on his first day back was a substantial factor in this minor accident. Plaintiff was given a written warning for a "preventable" accident.

Beginning in early March 2003, Plaintiff began to experience problems with missing freight. This was a very serious issue since drivers were held accountable for any missing freight and Plaintiff could have lost his job over it.

In connection with this issue, on 3/05/03, Plaintiff's truck cab was unlocked at 8:15 a.m. after he went to the drivers' room to download his scanner. After Plaintiff left his truck, Supervisor Chris Demmons opened up Plaintiff's cab door and performed a truck audit without Plaintiff being present. Plaintiff expressed his concern to Mr. Demmons that he could not be held accountable for missing freight if other people were allowed to access his truck without his presence. Plaintiff's request to rescan his freight to ensure everything was there that should be there was denied by Mr. Demmons, who told Plaintiff to just go deliver his freight.

On 3/06/2003, Plaintiff went to download his scanner in the drivers' room and to retrieve his Special Customer paperwork. Plaintiff noticed that someone had taken his scanner from the cradle in the drivers' room. Plaintiff knew that he could not access his Special Customers with another scanner at the point of delivery. When Plaintiff notified his supervisor Mr. Demmons. Plaintiff was told to use another scanner and depart the station. At approximately 10:15 a.m., Plaintiff noticed that a package that he had scanned that morning was not on his truck. Further investigation revealed that this piece showed up as "not delivered."

On 3/07/03, while on his route, Plaintiff noticed that a package was missing that he knew was on the truck previously. Plaintiff reported the incident to the Lawrence Police Department.

6

Plaintiff's supervisors, including Defendant Hamilton, ignored and ridiculed Plaintiff's reports about missing packages and discrepancies, despite the fact that computer records supported Plaintiff's reports.  Defendant Hamilton told Plaintiff that he was suffering from paranoia and was imagining that packages were missing.

On 7/16/03, Plaintiff was sent for a drug and alcohol test.  Plaintiff states that there was no probable suspicion for the drug and alcohol test as required by the union contract.  Hamilton told Plaintiff that he was suffering from paranoia and claimed that Plaintiff was threatening supervisors with gestures and looks. The results of the test were negative.  Hamilton informed Plaintiff that he would be paid the 2-3 days of lost work from the drug test in his next paycheck.

On 7/24/03, Plaintiff received his paycheck and the amount for the lost days from the drug test were not included.  Plaintiff spoke to Defendant Leveris regarding the missing money and was told by him that he would have to file a grievance for it.  Plaintiff then spoke to Gerry Halloran, the union steward, and asked him to remedy this.  Plaintiff then left for his route.  When Plaintiff returned from his route, he was met by Gerry Halloran and Joe Quigley.  They showed him the check for the missing pay, but said that they could not give it to him until he met with Hamilton, who wanted to issue warnings to Plaintiff.  Plaintiff was very upset by this and went home.

On 7/25/03, Plaintiff was terminated from employment about an hour after he had reported to work.  Plaintiff was given a warning for alleged threatening comments and intimidating gestures that had allegedly occurred sometime before, a warning for an OFD failure on 7/24/03 and a termination letter for allegedly driving onto the dock at a high rate of speed and then peeling in reverse earlier that day.  Plaintiff submits that these accusations were untrue.  Plaintiff had not made threatening comments and intimidating gestures, nor had Plaintiff driven onto the dock at a high rate of speed or peeled in reverse.  Plaintiff had simply driven up the ramp, got out of his car, punched in, and backed up and parked his car in the parking lot.  He did this since he was running late and did not want to get disciplined for being late.  Other drivers did the same under similar circumstances.  Defendants mischaracterized Plaintiff's actions that day in order to terminate him.  Defendants Leveris and Sweatt gave false statements concerning this incident to Airborne to support Plaintiff's termination.

**Interrogatory No. 6**

Please state the basis (in accordance with Rule 26.5(C)(8) of the Local Rules) for your claim that Defendants retaliated against you because you opposed unlawful acts or practices by the Defendants.  Your answer should identify, for each alleged act of retaliation, any Defendant or Defendants to which you ascribe discriminatory intent in connection with the alleged act.

**Answer**: Plaintiff alleges the same facts as set forth in answer to Interrogatory No. 5.

**Interrogatory No. 7**

Do you base your claims of discrimination and/or retaliation on acts that occurred prior to February 18, 2003? If so, please describe each act upon which you base the claim(s), identifying:(i) the person(s) who committed the act; (ii) documents concerning the act; (iii) when and where it occurred, and whether there were witnesses to it.

**Answer**: No.

**Interrogatory No. 8**

Please state the basis (in accordance with Rule 26.5(C)(8) of the Local Rules) for your claim that Defendants "terminated and otherwise discriminated against" you because of your assertion of rights under the Massachusetts Workers' Compensation laws. Your answer should identify, for each alleged act of discrimination, any Defendant or Defendants to which you ascribe discriminatory intent in connection with the alleged act.

**Answer**: Plaintiff objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff's claim in that regard was dismissed by the Court.

**Interrogatory No. 9**

Please describe the conduct you refer to in Count VI of your Complaint as "extreme and outrageous." Your answer should identify the individuals(s) who engaged in such alleged conduct, and state when and where it occurred, as well as whether there were witnesses to such conduct.

**Answer**: Plaintiff objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff's claim in that regard was dismissed by the Court.

**Interrogatory No. 10**

Please state the basis (in accordance with Rule 26.5(C)(8) of the Local Rules) for your contention, in Count VII of your Complaint, the Defendants Crossken, Hamilton, Sweatt and Leveris "knowingly induced Airborne to terminate Plaintiff's employment."

**Answer**: Plaintiff objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff's claim in that regard was dismissed by the Court.

**Interrogatory No. 11**

Please state the basis (in accordance with Rule 26.5(C)(8) of the Local Rules) for your contention, in Count VIII of your Complaint, that there was not sufficient cause for Defendants Airborne and Hamilton to require Plaintiff to submit to a drug and alcohol test.

**Answer:** Hamilton's told Plaintiff that he was being sent for the test because Plaintiff was suffering from paranoia and was threatening supervisors with gestures and looks. Plaintiff denies that he was threatening supervisors with gestures and looks. Plaintiff also denies that his complaints regarding missing packages were based on paranoia. In any event, there were no specifically observable reasons for suspecting that Plaintiff was under the influence of either drugs or alcohol.

**Interrogatory No. 12**

Do you contend that you abided by the workplace rule and policies of Airborne at all times? If not, please describe when and in what manner you did not abide by such rules and policies.

**Answer:** Plaintiff objects to this interrogatory on the grounds that it is overbroad, unduly burdensome and is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and does not reasonably identify the information sought. Notwithstanding these objections, and without waiving them, Plaintiff provides the following information:

Plaintiff worked for Airborne for more than 13 years. During that period, Plaintiff tried to abide by workplace policies and rules. There were times when Plaintiff made mistakes or otherwise ran afoul of company policies and rules. However, the work environment at Airborne was such that management would write employees up for relatively minor infractions and impose more severe discipline than the situation called for. Moreover, some employees, such as Plaintiff, would be subjected to increased scrutiny and singled out for disciplinary actions.

**Interrogatory No. 13**

Do you contend that Defendant(s) treated you differently, by terminating your employment for misconduct, from employees who were not disabled or handicapped? If your answer is "yes" please identify the individuals to whom you compare yourself in order to arrive at this conclusion, describe the circumstances in which you contend they were treated differently, and specify what was different about the treatment.

**Answer:** Yes. Plaintiff had simply driven up the ramp, got out of his car, punched in, and backed up and parked his car in the parking lot. He did this since he was running late and did not want to get disciplined for being late. There was a practice at the

workplace for other drivers to do the same for the same reason. Defendants
mischaracterized Plaintiff's actions that day in order to terminate him

**Interrogatory No. 14**

Please state whether you held other employment, or received compensation from
any source other than Airborne, during your employment by Airborne. If you did, please
identify your employer(s) or former employer(s), or the source of any such income, and
state what position and title you held (if any), and for what period of time you were
employed or received such income.

**Answer**: No.

**Interrogatory No. 15**

Please state whether you have made any efforts to obtain employment after
Defendant terminated your employment on or about July 25, 2003. If you did make any
such efforts, please describe them. Your answer should include: (i) identification of any
persons or entities from whom you sought employment; (ii) the nature of the employment
sought; (iii) a statement as to whether you received any offers of employment and, if so,
what salary you were offered; (iv) whether you accepted or rejected any such offers, and
the basis for your acceptance or rejection of the offer.

**Answer**: Plaintiff made efforts to obtain other employment. Plaintiff sent out
numerous resumes in response to job listings at the Valley Works Career Center in
Lawrence. He also looked for job ads and made his own inquiries. Plaintiff also
consulted Andover Personnel, Technology Dr., Andover, MA 01810 for available jobs.
Plaintiff applied to ADP for a transportation and warehousing job without success.
Plaintiff believes that he had interviews with the following companies, though no job
offer was made.

Electrical Wholesale

Altaquip, Ballardvale St., Wilmington, MA

Aldworth Company

Delucca Fence, 5 Old Ferry Road, Methuen, MA 01844

Corporate Express, 655 Andover Street, Lawrence, MA 01841

John Nagle Co., 306 Northern Avenue, Boston, MA

R.T.I., Ward Hill , Bradford, MA

Andover Electric, 206 Andover Street, Andover, MA

**Interrogatory No. 16**

Please state whether you have been employed, performed services for compensation, or received income from any source, subsequent to July 25, 2003. If your answer is in the affirmative, please identify and describe, with respect to each incidence of other employment, provision of services for compensation, or receipt of income:

a)  any person or entity that has employed you or retained your services, in what capacity, and for what period of time;

b)  any source of income you have had;

c)  if any position of employment has ended, the reason for the ending;

d)  the amount of the income, compensation and/or benefits that you have received; and

e)  identify documents within your possession, custody or control concerning such employment, income, compensation or receipt of other benefits.

**Answer**: Plaintiff obtained employment with UTS of Mass., Inc., 5 Richardson Lane, Stoneham, MA in approximately October 2004 and worked there until approximately November 2005, when he ceased work due to his disability. The position was concrete technician and paid $12 per hour. Depending on weather conditions, Plaintiff worked 20-40 hours per week. Plaintiff's 2004 income from that job was $4,218.00 and his 2005 income was $24,896.75.

**Interrogatory No. 17**

Please describe the nature and impact of the emotional distress you claim to have suffered as a result of Defendants' actions. Your answer should identify:

a)  Each physician, physical therapist, psychologist, therapist, counselor or other professional whom you consulted in any way with respect to any of your alleged harm, including the date(s) of all visits and/or treatment and the medication or other treatment prescribed by that person; and

b)  All documents that reference, reflect or concern your damages and/or the treatment you received for them.

**Answer**: Plaintiff was and continues to be emotionally devastated by the loss of his job and the financial distress that it has placed on him and his spouse. Please see Answer to Interrogatories 2 and 3 and the documents produced in response to Defendants' document requests for the identity of medical providers and treatment for emotional distress as well as the reported symptoms.

**Interrogatory No. 18**

      With respect to any relief you intend to seek at trial, identify:

a) The monetary value of each element of any such relief (including an explanation of the manner in which you calculated the amount of any claim for damages or other monetary relief);

b) All documents that form the basis of, reference, refer, concern or affect the calculations of referenced in sub-section (a); and

c) Any efforts you have made to mitigate your damages.

      **Answer:** Plaintiff claims lost wages, lost employment benefits and damages for emotional distress. The following calculation of monetary damages is based on current information.

      Plaintiff was earning approximately $1,000.00 per week or approximately $52,000.00 per year when employed by Airborne. Plaintiff also had substantial employment benefits, including medical, dental and eye care insurance, disability insurance, union pension benefits and union pension disability benefits. Plaintiff lost this income and these employment benefits as well as any expected increases in his wages if his employment had continued.

      Plaintiff was found disabled by the Social Security Administration as of 11/11/05. The period from Plaintiff's termination of employment to the date of that disability (7/25/03 to 11/10/05) is 120 weeks. Plaintiff seeks gross lost wages of $120,000.00 ($1,000.00 x 120 weeks), excluding any expected increases in his wages. Subtracted from this would be post-employment earnings that he has made.

      Plaintiff's only post-termination employment was at UTS. Plaintiff was employed there from approximately October 2004 to early November 2005. Plaintiff's 2004 income from that job was $4,218.00 and his 2005 income was $24,896.75. Total UTS income was thus $29,114.75. Plaintiff also received an unspecified payment in 2004 of $1,626.40 from Airborne. Total post-termination earning would thus be $30,741.15.

      Plaintiff also received unemployment benefits of $8,417.00 in 2003 and $4,873.00 in 2004, or a total of $13,290.00. Plaintiff submits that these would be considered collateral source payments not deductible from lost wages.

      Net lost wages from 7/25/03 to 11/10/05 would be $89,258.85 ($120,000.00 - $30,741.15) (excluding any expected increases in his wages) if unemployment benefits are not credited and $75,968.85 ($120,000.00 - $30,741.15 - $13,290.00) (excluding any expected increases in his wages) if those benefits were credited.

Plaintiff has incurred additional expense for medical, dental and eye care insurance as a result of his termination. Plaintiff had to pay $1,000.00 initially to obtain extended coverage through the union. Thereafter, Plaintiff has incurred additional expense to obtain coverage through his wife's employer. This additional expense has been approximately $65.00 per week from approximately 1/1/04 to the present and ongoing. To date, the additional expense is approximately $9,555.00 (147 weeks x $65.00). In addition, the wife's insurance plan has much higher co-pays and inferior coverage to the union plan. The amount of the financial impact of this difference is currently undetermined.

Plaintiff has also incurred expenses for medical treatment for emotional distress. That amount is currently undetermined.

Plaintiff's loss of his employment resulted in the capping of his monthly union pension benefit at retirement at $2,490.89. If Plaintiff's employment had continued, his monthly pension benefit would increase by approximately $10.00 per year worked. The amount of this loss is currently undetermined.

Plaintiff's termination from employment also resulted in Plaintiff being unable to obtain union disability pension benefits as a result of his post-termination disability. If Plaintiff had remained employed until 11/10/05, he would have been entitled to union disability pension benefits of 50% of his monthly retirement rate. Plaintiff's monthly union pension benefit at retirement is currently $2,490.89. Based on that figure, the value of the lost union disability pension benefit is $1,245.45 per month. Plaintiff would have been eligible for such benefits beginning 6 months following his being found disabled by the Social Security Administration. He thus would have been eligible for that monthly benefit as of 5/11/06.

Plaintiff seeks damages for emotional distress, the amount of which is for a jury to determine. Plaintiff seeks punitive damages. Plaintiff also will seek an award of attorney's fees, interest and costs upon recovery. Finally, Plaintiff will seek an order of reinstatement to employment with full seniority.

**Interrogatory No. 19**

Please state whether you intend to use an expert witness at trial. With regard to each person whom you may call as such witness, please identify:

a)  The expert's name, address, and telephone number;

b)  The expert's educational background, credentials, occupation and field of expertise

c)  The subject matter on which the expert is expected to testify at trial;

d)  The substance of the facts and opinions to which the expert is expected to testify at trial, including a summary of the grounds for each opinion; and

e)  The documents upon which the expert intends to rely.

**Answer**:  Plaintiff has not determined whether he will call an expert witness to testify at the trial of this matter.  Should Plaintiff decide to do so, he will provide the information concerning any such expert required by the rules.

Signed under the penalties of perjury this $^{31}$ day of October 2006.

PAUL PIZZUTO

AS TO OBJECTIONS:

Richard A. Mulhearn

Dated:  October 31, 2006.

I HEREBY CERTIFY THAT A TRUE COPY OF THE ABOVE DOCUMENT WAS SERVED UPON THE ATTORNEY OF RECORD FOR EACH OTHER PARTY BY MAIL/HAND ON:

DATE  11/2/06  SIG

14

EXHIBIT
5

REVELLA HARMON

v.

MALDEN HOSPITAL

Docket No. 96-BEM-1146

*January 31, 1997*
*Charles E. Walker, Jr., Investigating Commissioner*

## ORDER

This matter came before me on: Respondent's motion for a protective order; and Complainant's August 1996 motion, not yet acted upon, to amend her charge to add a claim against Joseph Gravel MD and to add a claim of discrimination based upon disability.

### 1. Protective Order

After review of the investigative needs of the Commission in this matter, and the legitimate business interests of the Respondent in maintaining confidentiality of the materials, I direct that a protective order issue making such materials confidential as to the general public. The materials include all filings of the Respondent which identify third parties by name. Respondent should note however, that this order is subject to renewal if this matter proceeds to a public hearing. Therefore, during the pendency of this matter before me as investigating commissioner, materials submitted by Respondent in its position statement are subject to this order of confidentiality. Since the materials pertain directly to alleged comparators, it is in the interest of the Commission to allow the Complainant to view such data. Therefore, Complainant may review such materials but may not disclose them to third parties excepting her attorney. Violations of this order may subject the offending party to appropriate sanctions, including dismissal of the claim altogether.

### 2. Motion to Amend

As to paragraphs 1 and 2 of the motion to amend, the individual named by the Complainant in her motion to amend is not alleged to be her employer and so it is only under the provisions of G.L. c.151B, s.4 (4), (4A) and (5) that claims may proceed against individuals. These provisions read in part as follows:

[it is an unlawful practice]:

4(4) For any **person**, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five.

4(4A) For any **person** to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter, or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by

4(5). For any **person, whether an employer or an employee or not**, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so.

(emphasis added)

To the extent that Complainant argues that the amendment is proper since "persons" as opposed to "employers" may be found liable in their individual capacity, Complainant has properly stated a rule of liability drawn from these sections of G.L. c.151B. The application of such rule is, however, not subject to easy articulation. The Supreme Judicial Court has not yet spoken to the issue of personal liability under G.L. c.151B in any manner which clearly delineates the evidentiary standards necessary to demonstrate liability. While the MCAD has in the past spoken to the question in somewhat oblique terms, there is some discussion in Massachusetts decisional law which is helpful.[1]

A claim that an individual is liable under the chapter is a claim which on its face seeks to establish accessory liability. That is, while as here the individual is not alleged to be the "employer" the allegation which is necessary to hold the individual liable is that he/she: retaliated (see sec. 4(4)); coerced, intimidated, threatened or interfered (see sec. 4(4A)); or, aided, abetted, incited, compelled or coerced (sec. 4(5)) in the doing of certain acts specified in those provisions.

Accessory liability, while more familiarly a concept in the criminal law, also has a footing where the alleged wrong is a civil wrong. *Planned Parenthood League of Mass* v. *Blake,* 471 Mass.467, 481 (1994). In *Planned Parenthood,* the SJC was confronted with an issue not too unlike the issue which might be presented at the MCAD in an "aiding and abetting" case. There, acting under the Massachusetts Civil Rights Act (MCRA), G.L. c. 12 §§11H, 11L, a superior court judge issued an injunction which included a clause barring the defendants from "aiding and abetting" directly or indirectly any persons who engaged in any of the acts made unlawful under the injunction. The Court noted that:

> Because intentional conduct is the measure of a violation of the MCRA...proof of a violation of the aiding or abetting prohibition of [the injunction] will require a showing of a defendant's intention to assist intentional conduct violative of [other provisions of the injunction]...

*Planned Parenthood* v. *Blake, supra* at 481.

The Court also noted that aiding and abetting requires proof that the defendant knew of its substantial supporting role in an unlawful enterprise, and that any violator of the prohibition against aiding or abetting in the injunction must share the mental state of the principal violator. See also *Kyte* v. *Philip Morris Inc,* 408 Mass 162, 168-169 (1990), *Deas* v. *Dempsey,* 403 Mass. 468, 471 (1988), *Commonwealth* v. *Sylvester,* 400 Mass 334, 339, n.6 (1987), *Redgrave* v. *Boston Symphony Orchestra, Inc.,* 399 Mass 93, 99 (1987), and *Commonwealth* v. *Richards,* 363 Mass. 299, 307-308 (1973). While these principles have not been discussed within the context of G.L. c.151B, I believe that the concepts are easily transferrable to fact patterns involving employment discrimination claims. The principles appear equitable, have rational public policy underpinnings, and I adopt them.

Thus, in order to prevail on a claim of personal liability under G.L. c.151B, §§4(4),4(4A) or 4(5) a complainant must demonstrate that a wholly individual and distinct wrong was committed by the proposed or named individual respondent(s). This wrong must be separate and distinct from the claim in main. See e.g., *Davis* v. *City of Chelsea*, 3 MDLR 1335, 1377 (1981). Further, the complainant must provide credible evidence that the aider or abetter shared an intent to discriminate not unlike that of the alleged principal offender, and that the aider or abetter knew of his or her supporting role in an enterprise designed to deprive an individual of a right guaranteed him or her under G.L. c.151B. Negligent acts or omissions such as a negligent failure to investigate a claim while possibly rendering the employer liable under various theories, do not in and of themselves operate to render the (e.g.) human resources manager personally liable. There must exist direct evidence of the intent referred to herein, or sufficient circumstantial evidence to permit a reasonable fact finder to conclude that the aider/abettor possessed the requisite intent and knowledge of the unlawful enterprise to render himself or herself liable under an accessory liability theory.

In this case, the Complainant states that she was treated more harshly by the individual, but does not provide evidence that the individual was motivated by an intent to retaliate against her, or to aid or abet the primary respondent, the hospital, in promoting a scheme which was premised upon unlawful and prohibited motivations. This being the case, the Complainant cannot at this point in time amend her claim since she cannot articulate a *prima facie* case of individual liability. Complainant has 14 days from the date of receipt of this order to refile her request to amend with a more specific statement of facts which she believes demonstrates that the individual who is proposed to be brought into this matter and who is proposed to be personally and individually liable to her, in fact was motivated by unlawful considerations. I will revisit the issue upon receipt of such information.

As to paragraph 3 of the motion to amend, Complainant seeks to add a count of disability discrimination. Her claim is that she was subject to disability discrimination but she provides no specifics. Since her motion to amend was filed within 6 months of the alleged wrong, I allow it as a technical amendment, with the proviso however that she forthwith submit a more specific statement indicating: the nature of the disability; the nature of the alleged act of discrimination (whether it be failure to accommodate or unlawful termination etc.); the specifics if she did seek accommodation; and, the evidence which she believes demonstrates that the Respondent hospital acted with unlawful consideration of her disability.

I reserve judgment on the motion to amend pending receipt of such further information. Such information should be submitted directly to: George Napolitano, General Counsel, MCAD, Rm 601, 1 Ashburton Place, Boston, MA 02108, within 14 days of receipt of this order. Copies of all such information shall be submitted to opposing counsel as well.

SO ORDERED this 31st day of January, 1997

* * * * * *

---

1. In this regard I would also note that federal law is not useful in this area since Title VII, Title VIII, the ADEA and the ADA contain no analogous provision.

(2) Pay to Complainant, Jill Mercurio, the sum of $100,000.00 in damages for emotional distress with interest thereon at the rate of 12 % per annum from the date the Complaint was filed until such time as payment is made or the matter is reduced to a court order and post-judgment interest begins to accrue. Payment shall be made within 60 days of receipt of this decision.

The Complaint against Robert Atamian is hereby dismissed.

The parties shall notify the Clerk of the Commission as soon as the ordered payments have been made. If any Respondents fail to comply with this Order within the time period allotted, please notify the Clerk of the Commission.

This constitutes the final order of the Hearing Officer. Any party aggrieved by this decision may file a Notice of Appeal with the Full Commission within ten (10) days of receipt of this Order and a Petition for Review with the Full Commission within thirty (30) days of receipt of this Order.

So Ordered this 11th day of February, 2003.

* * * * * *

---

MARY-ANN WOODASON

v.

TOWN OF NORTON SCHOOL COMMITTEE, MAURICE SPLAINE and IRENE STANOVICH

Docket No. 98-BEM-0624

*February 19, 2003*
*Cynthia A. Tucker, Commissioner*
*Walter J. Sullivan Jr., Commissioner*

---

**F**ull Commission Review-Reasonableness of Emotional Distress Damages-Individual Liability—The Full Commission affirmed a Hearing Officer's refusal to find individual liability in a handicap-discrimination case in noting the absence of the requisite intent to discriminate but affirmed an award of $50,000 in emotional-distress damages as reasonable in light of the Town of Norton's own liability.

### DECISION OF THE FULL COMMISSION

**T**his matter came before us following a decision of Hearing Officer Eugenia Guastaferri in favor of the Complainant [24 MDLR 21]. Following an evidentiary hearing, the Hearing Officer concluded that Respondent, Town of Norton School Committee, discriminated against Complainant due to her disability in violation of M.G.L. c. 151B, § 4(16), when she was terminated from her position as a cafeteria assistant at the Nourse Elementary School. The Hearing Officer found in favor of the Complainant as to the employer Respondent, but dismissed the complaint as to the individual Respondents. Both the Complainant and Respondents then filed timely appeals to the Full Commission.

The responsibilities of the Full Commission are outlined by statute, the Commission's Rules of Procedure (804 CMR 1.00 *et seq.*) and relevant case law. It is the duty of the Full Commission to review the record of proceedings before the hearing commissioner or officer. M.G.L. c. 151B, § 5. The Hearing Officer's findings of fact must be supported by substantial evidence, which is defined as "...such evidence as a reasonable mind might accept as adequate to support a finding..." *Katz* v. *MCAD*, 365 Mass. 357, 365 (1974); M.G.L. c. 30A. It is the responsibility of the hearing officer to evaluate the credibility of witnesses and/or to weigh the evidence when deciding disputed questions of fact, and the Full Commission defers to these determinations. See e.g. *School Committee of Chicopee* v. *MCAD*, 361 Mass. 352 (1972); *Bowen* v. *Colonnade Hotel*, 4 MDLR 1007, 1011 (1982). The role of the Full Commission is to determine whether the decision under appeal was rendered in accordance with the law, or whether the decision was arbitrary or capricious, an abuse of discretion, or was otherwise not in accordance with the law. See 804 CMR 1.16(8)(f).

We have carefully reviewed the petition for appeal and the full record in this matter and have weighed all the objections to the decision in accordance with the standard of review articulated



EXHIBIT
6

herein. Respondents assert that the decision of the Hearing Officer finding that Complainant was subjected to unlawful discrimination in employment constitutes an abuse of discretion and is not supported by substantial evidence in the record. In addition, Respondents submit that the remedial orders of the Hearing Officer constitute an abuse of discretion. *See Dartt* v. *Browning-Ferris Industries, Inc.*, 427 Mass. 1 (1998).

As a result of our review, we find no material errors of fact or law and conclude that there is substantial evidence in the record to support the findings of fact made by the Hearing Officer. We, therefore, deny Respondents' appeal.

Complainant has appealed the Decision of the Hearing Officer on the grounds that: a) it was error of law to not find Respondent Maurice Splaine individually liable for his actions[1]; b) the determination that $50,000.00 was a suitable compensatory award of emotional distress constitutes an abuse of discretion; and c) the failure to award statutory interest constituted an abuse of discretion and clear error of law.[2]

We will address the two remaining grounds.

*1. Emotional Distress Award*

In her decision, the Hearing Officer found that:

> "Complainant and her husband testified credibly about the emotional distress and physical maladies Complainant suffered as a result of her termination. Complainant lost a great deal of weight which caused her to suffer hair loss and was very depressed as a result of having lost her job. She stopped socializing and just sat at home. Complainant testified that she became obsessed with the loss of her job and called Gail Scott so many times that Gail asked her to stop calling and she lost a friendship over this. There was also testimony that Complainant was so distraught over having been terminated that she threatened Rivard with the possible loss of her job, if Rivard testified against her. Complainant stated that she had just lost it at that point because she believed a school official had lied in deposition about the events leading up to her termination and this caused her to make such an irrational threat. I am persuaded that Complainant suffered significant emotional distress as a direct result of Respondent's actions and is entitled to an award of $50,000.00."

We have previously held that it is the responsibility of the Hearing Officer to evaluate the credibility of witnesses and/or to weigh the evidence when deciding disputed questions of fact. The Full Commission defers to these determinations. See e.g., *School Committee of Chicopee* v. *MCAD*, 361 Mass. 352 (1972); *Bowen* v. *Colonnade Hotel*, 4 MDLR 1007, 1011 (1982). The role of the Full Commission is to determine whether the decision on appeal was rendered in accordance with the law, or whether

the decision was arbitrary, capricious, or an abuse of discretion. See, 804 CMR 1.16(8)(f). See e.g., *Said* v. *Northeast Security*, 23 MDLR 124 (2001 Order of the Full Commission).

As the Commission previously noted in *Baldelli* v. *Town of Southboro*, 18 MDLR 167, 168 (1996):

> A challenge to the damages awarded as against the weight of the evidence generally is a matter within the judge's discretion. As the judge here recognized, '*a judge has no right to set aside a verdict merely because he himself would have assessed the damages in a different amount.*' [Citing *Bartley* v. *Phillips* 317 Mass. 35, 40 (1944)]. The judge concluded that the jury could have reached, honestly and fairly, the award that they did based on the plaintiff's continuing permanent pain and disability, and the impairment of her earning capacity. For this reason, the judge declined to exercise his discretion and to order a remittitur or a new trial because the award was against the weight of the evidence. We find no abuse of discretion in this ruling. *Maria F. Solimene* v. *B. Grauel & Co., & Another*, 399 Mass. 790, 802 (1987) (as cited in *Said supra*).

In the instant matter, we find that there was substantial evidence in the record to award emotional distress. We further find there is insufficient basis, based on the applicable scope of review, to disturb the award as issued by the Hearing Officer.

*2. Individual Liability*

In her Decision, the Hearing Officer found:

> Complainant named both Splaine and Stanovitch as individuals in her Complaint of discrimination. She seeks to hold Splaine liable as an individual under M.G.L. c. 151B, s. 4(4A) for interfering with her right to work free of unlawful discrimination. Since the individuals named in this complaint are not the employer and thus not covered by M.G.L. c. 151B, s.4 (16), the individuals would have to be found liable under alternative sections of the statute which prohibit individuals from retaliating, aiding and abetting discrimination, or threatening, intimidating, coercing or interfering with an individual's rights. See. *Hudson* v. *Pembroke/ Hanover Elks Lodge, et al.* 24 MDLR 19 (2002) (Full Commission found individual liable for retaliation.) In order to be held liable under these sections an individual Respondent must have undertaken some act wholly individual and distinct from, or in furtherance of, the employer's discriminatory act. *Harmon* v. *Malden Hospital*, 19 MDLR 157 (1997). I conclude that such is not the case in this matter.

While the cases relied on by the Hearing Officer address individual liability, this Commission has recently addressed this question with different results. In *Bendell* v. *Lemax Inc. et al.*, 22 MDLR 259, 262 (2000), Commissioner Schwarz stated:

> Complainant seeks to hold Respondent Lee liable as an individual under G.L. c. 151B, s.4, par. 4A for interfering with her right to

---

1. Complainant did not appeal the Hearing Officer's dismissal of the complaint filed against Irene Stanovitch.

2. Complainant's objection to the failure of the Hearing Officer to award interest requires no discussion, as the law in Massachusetts has been set forth in *City of Salem* v. *MCAD* , 44 Mass. App. Ct. 627 (1998):

Finally, the city challenges the imposition of interest on the damages award. Interest on MCAD awards does not lie against the Commonwealth *or its instru-*

*mentalities* (as here) in the absence of express statutory authority. See *Boston* v. *Massachusetts Comm'n. Against Discrimination*, 39 Mass. App. Ct. 234, 245-246 (1995), and cases cited. The principle of that decision presents an application of the doctrine of sovereign immunity, as explained in *Onofrio* v. *Department of Mental Health*, 411 Mass. 657, 659 (1992), a doctrine which, despite different historical bases, is normally treated as applying to the Commonwealth and to municipalities without important distinction. See *Morash & Sons, Inc.* v. *Commonwealth*, 363 Mass. 612, 616-618 (1973).

work at Lemax free of unlawful discrimination. Respondent argues that section 4, paragraph 4A is not intended to proscribe "direct" denials of rights. Respondent cites cases construing G.L. c. 12, s.11H and 11I (the Massachusetts Civil Rights Act) in support of its assertion. E.g., *Longval* v. *Commissioner of Correction*, 404 Mass. 325, 333 (1989).

Respondent states that the language of G.L. c. 151B, s. 4, par. 4A is "identical" to G.L. c. 12, s. 11H and 11I, and therefore the word "interfere" should be construed identically. In fact, the word "interfere" appears differently in the two statutes. In G.L. c. 12, s. 11H, "interfere" is modified by "threats, intimidation or coercion," which are the three ways a person is forbidden from interfering with the exercise or enjoyment of a protected right. *In G. L. c. 151B, s. 4, par. 4A, "interfere" stands on its own, unmodified, as an impermissible action, with no requirement of threats, intimidation or coercion.* (emphasis added)

Respondent's argument raises the question of whether the legislature intended individual liability to be imposed in the large number of circumstances implicated by the plain language of G.L. c. 151B, s. 4, par. 4A. But to interpret the statute to exempt from coverage "direct" denials of protected rights would read into the statute words it does not contain. In view of the legislative mandate that the statute be "construed liberally for the accomplishment of the purposes thereof," G.L. c. 151B, s. 9; *Bournewood Hospital* v. *MCAD*, 371 Mass. 303 (1976), such a reading would be unduly restrictive. In line with the broader reading of G.L. c. 151B, trial courts have concluded that the statute applies to "any person who interferes with another's right to work free of unlawful discrimination." *Ruffino* v. *State Street Bank and Trust Co.*, 908 F.Supp. 1019,1048 (D. Mass. 1995); *Morehouse* v. *Berkshire Gas Co.*, 989 F.Supp 54, 60 (D. Mass. 1997), regardless of whether the interference is "direct."

We would modify and amplify the analysis articulated by Commissioner Schwarz, above. In our view his construction of the language "interfere with the rights protected under this statute," because it gives no consideration of the context in which the phrase appears, requires amplification. While we agree that the word "interfere" does not necessarily require coercion, intimidation or threats, the concept of interference with one's rights must be construed with some regard for the context of the statutory language within which it appears. In construing the word "interfere" to give no import to the strong language surrounding it would be misguided. Thus, we conclude that in order for an individual to be held liable for a violation of M.GL. c. 151B he must have, at the very least, "interfered" with another's rights in a manner that was in deliberate disregard of those rights.

Starting from this premise we hold that complaints alleging violations of M.GL. c. 151B, § 4(4A) *may* appropriately name individual employees as respondents in the following circumstances:

1. Where the individuals are alleged perpetrators of unlawful harassment (sexual and otherwise), they may be named as individual respondents, without regard to whether they are supervisors or co-workers. Such individuals may be charged with *"interfering with*

*one's exercise or enjoyment of the right to a non-discriminatory, harassment free, workplace."*

2. Where there is direct evidence of discrimination and the alleged perpetrator of discrimination was in a supervisory position in which he or she had direct control over complainant's employment, the individual may be named as acting in deliberate disregard of complainant's rights.

3. Where there is only circumstantial evidence of discrimination, employees may be named if:

    a. They had the authority or the duty to act on behalf of the employer;

    b. Their action or failure to act implicated rights under the statute; and

    c. There is evidence articulated by the complainant that the action or failure to act was in deliberate disregard of the complainant's rights allowing the inference to be drawn that there was intent to discriminate or interfere with complainant's exercise of rights.

The evidence in this record does not establish the requisite *"intent to discriminate"* required in order to find Maurice Splaine individually liable for unlawful discrimination.[3] Therefore, we affirm the Decision of the Hearing Officer dismissing the complaint against Maurice Splaine.

Having affirmed the decision of the Hearing Commissioner, in favor of the Complainant, we conclude that the Complainant has prevailed in this matter and is therefore entitled to an award of reasonable attorneys' fees and costs.

The determination of what is a reasonable fee is one that the Commission approaches utilizing its discretion and its understanding of the litigation of a claim of discrimination in the administrative forum of the Commission Against Discrimination. In rendering a determination of what is a reasonable fee, the Commission has adopted the lodestar method for fee computation. *Fontaine* v. *EBTEC Corp*, 415 Mass. 309, 613 N.E.2d 881, 891 (1993); *Baker* v. *Winchester School Committee*, 14 MDLR 1079 (1992); *Brown* v. *City of Salem*, 14 MDLR 1365 (1992). This method requires the Commission to undertake a two-step analysis. First, the Commission will calculate the number of hours reasonably expended to litigate the claim and then multiply that number by an hourly rate considered to be reasonable. Second, the Commission will then examine the resulting figure, known as the "lodestar", and adjust it either upward or downward or not at all depending on various factors.

A calculation of the hours reasonably expended involves separating out work done in relation to the individual doing the work (e.g., senior partner, junior associates, and paralegal). Time beyond that consistent with a standard of reasonable efficiency and productivity is eliminated. Hours that appear to be duplicative,

---

3. While there are circumstances where the mere *"failure to act"* may, in and of itself, constitute a sufficient basis to establish an *intent* to interfere, that is not the case here. M.G.L. c. 151B, § 4(16) has been construed to require an employer to engage in some pro-active conduct with a *"qualified handicapped person, capa-* ble of performing the essential functions of the position involved with reasonable accommodation."* However, based on the facts in the instant matter, we agree with the Hearing Officer's finding that Mr. Splaine did not act with deliberate disregard of Ms. Woodason's rights pursuant to M.G.L.c. 151B.

unproductive, excessive, or otherwise unnecessary to prosecution of the claim are subtracted, as are hours insufficiently documented. *Grendel's Den* v. *Larkin*, 749 F.2d 945 (1st Cir. 1984); *Miles* v. *Samson*, 675 F.2d 5 (1st Cir.1982); *Furtado* v. *Bishop*, 635 F.2d 915 (1st Cir. 1980); *Baird* v. *Belloti*, 616 F.Supp. 6 (D.Mass 1984); *Brown* v. *City of Salem*, 14 MDLR 1365 (1992).

The Commission's efforts to determine the number of hours reasonably expended will involve more than simply adding all hours expended by all personnel. The Commission carefully reviews the Complainant's submission and will not simply accept the proffered number of hours as "reasonable". *See e.g.*, *Baird* v. *Belloti*, *supra*.

In the instant matter, counsel for the Complainant has submitted extensive affidavits and attachments thereto detailing the hours expended during the course of this matter before the Commission. We have examined the facts of this case, the affidavits submitted by complainant and the billing specification of time and services. Based upon this and similar matters before the Commission, we conclude that these listed hours are reasonable. Despite Respondent's assertion to the contrary, we see no evidence to warrant a conclusion that these hours were excessive.

Furthermore, we find that the hourly rates requested by Complainant's counsel are reasonable and are within the range of rates common to the marketplace within which Complainant obtained counsel and litigated her claim *See, e.g. Baker* v. *Winchester School Committee*, 14 MDLR 1097 (1992).

Thus, the lodestar figure here of $74,760.80 for attorneys' fees and costs is hereby allowed. We decline to adjust this figure upward since it is in our view a reasonable award under the circumstances presented.

ORDER

For the reasons set forth above, we hereby affirm the findings of fact, conclusions of law and the Order of the Hearing Officer and issue the following ORDER of the Full Commission:

   1. Within sixty (60) days of receipt of this Order, Respondent, Town of Norton School Committee, shall pay to Complainant the amount of $50,000 in damages for emotional distress.

   2. Within sixty (60) days of receipt of this Order, Respondent, Town of Norton School Committee, shall pay to Complainant the amount of $4,595.40 in damages for lost wages in the form of back pay.

   3. Within sixty (60) days of receipt of this Order, Respondent, Town of Norton School Committee, shall pay to Complainant the amount of $28,970.02 in damages for lost pension retirement benefits.

   4. Respondent, Town of Norton School Committee, shall conduct a training session for all of its cafeteria managers and supervisors, and those school officials, including the Superintendent, who make determinations regarding medical leaves of absence, use of sick time, accommodations to disabled employees and termination. This training shall be conducted within 3 months of the issuance of this Order and on an annual basis thereafter if there is over 50% turnover in the above positions resulting in new employees. The training shall be at least one-half day and shall include a review of the employer's obli-

gations under M.G.L. c. 151B, § 4 (16). The trainer shall be an approved trainer from the MCAD trainer referral list and the MCAD shall be provided with advance notice of the training date and the training agenda for approval. The Respondent shall provide the MCAD with notice of compliance with this training session, including the date it was held and the names and titles of those in attendance.

   5. The complaint against Respondents Maurice Splaine and Irene Stanovitch is hereby dismissed.

   6. Within sixty (60) days of receipt of this Order, Respondent, Town of Norton School Committee, shall pay $74,760.80 for attorneys' fees and costs to the Complainant.

This ORDER represents the final action of the Commission for purposes of M.G.L. c.30A. Failure to comply with this Order will result in the Commission's initiation of enforcement proceedings, pursuant to 804 CMR 1.25, which may subject the non-complying party to both civil and criminal penalties as provided in M.G.L. c.151B, s.8.

Any party aggrieved by this final determination may contest the Commission's decision by filing a complaint in superior court seeking judicial review, together with a copy of the transcript of proceedings. Such action must be filed within 30 days of receipt of this decision and must be filed in accordance with M.G.L. c.30A, c.151B, §6, and the 1996 Superior Court Standing Order on Judicial Review of Agency Actions. The filing of a petition pursuant to M.G.L. c.30A does not automatically stay enforcement of this Order. Failure to file a petition in court within 30 days of receipt of this Order will constitute a waiver of the aggrieved party's right to appeal pursuant to M.G.L. c.151B, s.6.

SO ORDERED this 19th day of February, 2003.

* * * * * *