UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PAUL PIZZUTO, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | DOCKET NO. 04-12492 GAO |
| | ) | |
| AIRBORNE EXPRESS, INC., STEVEN | ) | |
| CROSSKEN, JOSEPH HAMILTON, | ) | |
| GREG SWEATT AND ARTHUR | ) | |
| LEVERIS, | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I. STATEMENT OF THE CASE

This is a case of disability discrimination brought by Plaintiff against his former employer and four supervisory employees, claiming that Defendants discriminated against him based on his mental disability in violation of M.G.L. c. 151B and the Americans with Disabilities Act, 42 U.S.C. § 12010, et seq.[1] In their summary judgment motion, Defendants do not dispute that Plaintiff has established a prima facie case of disability discrimination. Defendants' Memorandum of Law at 10, n.6. Accordingly, Defendants concede for present purposes that Plaintiff can establish that (1) he suffers from a disability or handicap, (2) that he was nevertheless able to perform the essential functions of his job, either with or without reasonable accommodation, and (3) that Defendants took an adverse employment action against him because of, in whole or in part, his protected disability. Instead, Defendants advance to the second stage of the McDonnell-Douglas burden-shifting framework and assert that they have advanced a legitimate, non-discriminatory reason for the employment decision. Defendants further assert that Plaintiff cannot meet his burden at the third stage that the asserted reason was pretextual.

---

[1]   The claims against the individual Defendants for aiding and abetting discrimination are brought solely under Chapter 151B, not the ADA.

In opposition to Defendants' motion, Plaintiff contends that there is a genuine issue for trial concerning whether his termination was because of his mental disability and whether one or all of the stated reasons for termination were pretextual. Plaintiff further contends that a "mixed-motive" analysis is applicable to this case and that Defendants have neither addressed that analysis nor met their burdens of production and persuasion thereunder. Finally, Plaintiff contends that Airborne failed to accommodate his disability and failed to engage in the required interactive process to determine a reasonable accommodation.

## II.     STATEMENT OF FACTS

Plaintiff has provided a detailed statement of facts in chronological order with subject matter headings in Plaintiff's Statement of Material Facts of Record as to Which There Exists a Genuine Issue to be Tried ("Plaintiff's Statement"). Plaintiff respectfully refers the Court to that document for a full recitation of the relevant facts. Plaintiff provides this somewhat more abbreviated summary for the Court's benefit.

Plaintiff was employed as a driver by Airborne Express ("Airborne") for Airborne for more than 13 years before he was terminated on 7/25/03. In 2002, Defendant Crossken ("Crossken") was essentially the "facility manager" at Plaintiff's workplace. On 3/10/03, Defendant Hamilton ("Hamilton) succeeded Crossken in that position. Defendant Leveris ("Leveris"), at times material, was the second in charge. Defendant Sweatt ("Sweatt") was a supervisor. There were approximately 125 drivers at Plaintiff's work facility and 6 or 7 supervisors. The drivers did their own sorting and loading of packages at the facility before going out to deliver them.

### Work Environment at Airborne

Airborne is a union shop. Teamsters Local 25 (the "union") represents the employees. The work environment at Airborne was characterized by a great deal of stress and friction between management and

the employees.  Employees were frequently written up for various infractions, even minor ones such as being a minute late for work.  Some employees, such as Plaintiff, would be subjected to increased scrutiny and singled out for disciplinary actions.  Fellow driver James O'Brien ("O'Brien") testified that the reason for the difference in treatment was  "personality," especially with Defendants Crossken and Leveris.  If anyone questioned their authority, they would not let it go.  Instead, they would "stay on" the driver and try to "push the driver's buttons."  They did that with Plaintiff since he would respond by getting upset.  Plaintiff was like "the kid in first grade" that some kids would pick on, "the more you pushed him, the more you get a reaction."  Management "micromanaged" and "overmanaged" Plaintiff, according to drivers O'Brien and James Sambataro ("Sambataro") and Union Steward Gerry Halloran ("Halloran").  They were "scanning" Plaintiff and watching his paperwork more than other people.  Moreover Crossken and Hamilton would "personally" deal with Plaintiff instead of letting immediate supervisors do so, something not done with other drivers.

The "scanning" was what was called "audit scans" conducted by Airborne management before the drivers left the facility in the morning.  Drivers would initially scan all their out-for-delivery packages with a hand-held computer and load them on their trucks.  Management would then select two or three drivers a day to "audit scan" or rescan packages on their trucks to see if packages had been properly scanned.  Drivers were disciplined if they failed the audit scans, even fired for it.  Audit scans were not random, but instead targeted.  Halloran testified that audit scans were used as a weapon to "leap on an employee."  It was done to "outspoken people."  "It puts a lot of pressure on you." In the last week of Plaintiff's employment, Plaintiff was audit scanned four times.  Moreover, while an audit scan normally involved scanning 10-12 pieces, in Plaintiff's case, they scanned his entire.  One of Plaintiff's two written warning letters at the time of his termination was from an audit scan showing missed scans.

### Plaintiff's Mental Breakdown and FMLA Leave

In 2002, while Crossken was still the facility manager, Plaintiff was the subject of eight separate disciplinary actions, including written warnings, a suspension for insubordination (later reduced to a writing warning via union intervention), and a discharge for falling asleep on company property while on light duty.  Plaintiff's explanation for falling asleep was that it was due to a combination of the medications he was taking for his work injury and sleep apnea.  When Plaintiff reported to work following his suspension, Crossken told him that he was "still fired" until Crossken spoke to his Regional Manager.  Crossken delayed Plaintiff's return to work for an additional day.  Plaintiff subsequently filed a harassment complaint with the union against Crossken.  Plaintiff states that continued to harass him on a daily basis, including issuing disciplinary actions and conducting excessive audit scans.

Plaintiff's work stress took its toll.  On 10/14/02, Plaintiff's doctor took him out of work. Plaintiff states that he was in a "state of mental breakdown."  Plaintiff submitted a written request for FMLA leave to Airborne with medical support from his physician, Dr. John Chang.  The diagnoses were insomnia, sleep apnea, acid reflux, anxiety disorder, inability to cope, stress, tremor, poor concentration and "lack mechanism to cope."  Dr. Chang confirmed that Plaintiff was in a state of mental breakdown in October 2002, suffering severe depression and many associated medically related illnesses.  Dr. Chang noted Plaintiff's history of "months of emotional insults" at work and "unfounded charges" by his manager and that Plaintiff was constantly under the fear of being terminated if he stepped out of line and was in a "state of confusion." Plaintiff submitted his FMLA leave request paperwork, including the medical documentation, directly to Defendant Crossken.  Plaintiff's FMLA was subsequently approved. Plaintiff was on FMLA leave from 10/14/02 to 2/24/03 and received short-term disability benefits through the Union benefit plan during that time.

Plaintiff did not feel "emotionally ready" to return to work when he was released to work as of 2/24/03, that he was still "very ill and depressed" with "some serious emotional issues." Plaintiff states that he was "forced" back to work by the union because the union did not want to continue to pay short-term disability benefits. The union doctor, Dr. Heckler, specifically pressured Plaintiff to agree to a firm return to work date. Plaintiff states that from the time he returned to work on 2/24/03 until he was terminated in July 2003, his emotional state was still vulnerable, making him more susceptible to stress and impairing his ability to cope with stress.

### Plaintiff's First Day Back

When Plaintiff returned to work from his medical leave on 2/24/03, Defendant Crossken was still the plant manager. On that first day, Plaintiff was assigned the "worst" truck in the station. The other drivers were "snickering" over it and Plaintiff suspected that Crossken had intentionally done it. The truck was in disrepair, had no gas and had an unworkable bulkhead door key. In addition, Plaintiff was provided with a scanner with missing keys, preventing him from properly scanning. The truck was "kicking and bucking" when Plaintiff left the station and broke down within two miles. Plaintiff managed to get the truck back to the station and Crossken instructed him to offload all his freight and load it onto another truck. Due to the delays, Plaintiff did not "make service" that day. Crossken had to send another driver out to assist Plaintiff with his deliveries.

When Plaintiff returned to the facility after finishing his route that day, he had a very minor accident in the facility. There were skids or pallets that had been left on the floor near the entrance to the facility that Plaintiff tried to navigate around. In the course of that, Plaintiff scraped a yellow pole resulting in yellow paint on the truck bumper. Crossken's response to this incident was to issue Plaintiff a written warning for a "preventable" accident.

5

**Defendant Hamilton Becomes the Station Manager**

Hamilton succeeded Crossken as facility manager in March 2003.  Hamilton had a meeting with Plaintiff and informed Plaintiff that Crossken had left him information that he was a "troublesome employee."  Plaintiff told Hamilton that he was taking medications for anxiety and depression.  The result of the meeting was that Hamilton agreed to "start over from square one" and to move on from any problems that Plaintiff had with Crossken.

In April 2003, Plaintiff had to be recertified as fit to drive through a D.O.T. physical.  Plaintiff handed Hamilton the D.O.T physical paperwork, Exhibit 14.  Exhibit 14 listed Plaintiff's medical conditions (including sleep apnea, anxiety and depression) and his medications, including paxil.  It states that Plaintiff was out of work from 10/14/02 to 2/24/03 due to an episode of anxiety and depression. Exhibit 14 further states that Plaintiff would be certified as fit to drive for only 3 months (vs. the usual 2 years) until 7/30/03 pending further documentation from his doctor regarding the sleep apnea. Within a few months of his return to  work, Plaintiff began to "notice" that packages were "disappearing" from his truck.  Plaintiff spoke to Hamilton about the missing packages, but Hamilton responded that Plaintiff was imagining it, that he was "paranoid."

**Plaintiff is Sent for a Drug and Alcohol Test**

On 7/16/03, Hamilton and Leveris called Plaintiff into the office.  Hamilton told Plaintiff that he was suffering from paranoia and that he was making threatening gestures and looks to supervisors. Hamilton told Plaintiff he was being sent for a drug and alcohol test, that he was "worried" about him, that he was "acting too suspicious."  Plaintiff told Hamilton that he had "some medical issues, nothing to do with drugs and nothing to do with alcohol" and that his medical problems were known and documented.   However, Hamilton insisted on sending him for the test

Plaintiff was taken to a clinic for the drug and alcohol test by Defendants Hamilton and Leveris. He was also accompanied by a union employee, James O'Brien. Plaintiff does not remember much of what happened or what he may have said at this time since he was "very frustrated and irate" that he was being sent for the test and that he was suffering from bipolar disorder, which may have affected his behavior and his memory.

Hamilton's memoranda regarding the "probable suspicion" drug and alcohol test, Exhibits 15 and 16, recites that Plaintiff's "mood swings" were becoming too common and that his behavior lately with supervisors was "loud and boisterous." Hamilton states that he confirmed with Defendant Leveris that Plaintiff had said that he was "heavily medicated" from his doctor. Supervisors such as Chris Demmons had reported to Hamilton that Plaintiff had been acting "very paranoid and strange" and had even made some threatening remarks like "I will get you guys." Demmons, after noting that Plaintiff had been out on workman's compensation for seven months "due to various physical and mental health issues," Defendants' Exhibit 2 to Hamilton Aff., wrote that Plaintiff "harbors unfounded delusions" that management was conspiring against him and that Plaintiff claims "that some unknown entity is stealing freight from his truck." Demmons related that Plaintiff was unable to scan his freight correctly and that, instead of rescanning it and leaving, he spent an hour counting and recounting it, while blaming management for sabotaging him. Demmons claimed that Plaintiff made threatening remarks and that, although Plaintiff has "rambled" on like this before, "a threat is a threat, innocuous or otherwise." Demmons' opinion was that Plaintiff needed "professional help."

O'Brien accompanied Plaintiff to the drug and alcohol test as the union representative. They drove to the clinic in Leveris's truck with Leveris and Hamilton in the front seat and Plaintiff and O'Brien in the back. While the union contract permitted drug and alcohol testing of employees if there was "probable cause," Plaintiff did not appear to O'Brien to be under the influence of drugs or alcohol.

O'Brien and Halloran stated that this was the first time in 20 years at that facility that someone was pulled out of service for a drug test. There was one for alcohol, but the guy was drunk. O'Brien asked Hamilton and Leveris what was the "probable cause" for the test, but they would not answer him. O'Brien questioned whether Hamilton and Leveris really thought that Plaintiff was on drugs or a danger to himself or others because they let Plaintiff drive and load his truck that morning and work the machinery on the belt until a replacement arrived before sending him for the drug and alcohol test. Moreover, on the day after the test, O'Brien asked Supervisor what the "probable cause" was. The only reason given by Demmons was that, on the day before the test, Plaintiff had rescanned his whole truck and left the building 40 minutes late and did not "make service."

At the clinic, Plaintiff asserted that he did not want Airborne to "touch" his urine sample. He wanted it shipped with UPS or FedEx "because I don't trust these people." Hamilton and Leveris starting laughing when Plaintiff said that. Plaintiff also paid for his own separate drug and alcohol test, which was done immediately and came back negative. However, Plaintiff was told that he would still be taken out of service until the official lab results came in.

O'Brien testified that he never saw Plaintiff act in a threatening manner. Plaintiff "wasn't that type of kid." He was not a "threatening kid." Plaintiff is "as big as a pint of ice cream." Plaintiff, on the other hand, could be "argumentative." O'Brien did, however, hear Plaintiff say to Leveris, while they were waiting to go for the drug test, "Let me tell you. When this is said and done, the police are going to get you." Leveris replied, "Is that a threat?" Plaintiff said, "No, that is not a threat. The police are going to get you." O'Brien did not think that was a threat, nor did he think that Plaintiff's remarks made sense. O'Brien also did not believe that any of the Airborne managers or supervisors were genuinely afraid of Plaintiff. For example, Plaintiff was sitting right behind Leveris when they drove to the clinic. If Leveris

were afraid of Plaintiff, he wouldn't have had Plaintiff sitting right behind him.  Also, they let Plaintiff

work the sort and move his truck around that morning before the drug test.

  O'Brien and Halloran testified that the practice at Airborne when drivers actually threaten

supervisors is that the supervisors file police reports and the drivers are escorted off the property by the

police.

### Hamilton Meets with Plaintiff Concerning the Probable Cause Test Results

On 7/21/03, Hamilton met with Plaintiff regarding the test results.  Present were Hamilton, Leveris,

Plaintiff and Union Steward Gerry Halloran.  Hamilton informed Plaintiff that the test results were

negative and that he would be paid for any lost time in his next paycheck.  Hamilton told Plaintiff that his

"mood swings" were too common and that his "paranoid behavior" was affecting his job.  Hamilton stated

that Plaintiff had made "specific threats" to four supervisors, including to him, and that the next threat or

statement that could be interpreted as a threat would lead to action, including termination.  Plaintiff denied

that he had threatened anyone.  Plaintiff told Hamilton that he was under medical care and that he was

taking prescribed medicines for his condition.  Plaintiff gave Hamilton permission to call his doctor if he

wanted to.

### Plaintiff's Behavior on 7/22/03 and 7/23/03

  Hamilton wrote a memo on 7/22/03 regarding what he referred to as "2 more examples" of

Plaintiff's "paranoia schizophrenia."  Exhibit 18. The memo recites that Plaintiff complained about

discrepancies in his scans and that he felt there was a "conspiracy going on."  Plaintiff even called the

station pretending to be a customer to investigate the alleged discrepancies.  Hamilton wrote a memo on

7/23/03, Exhibit 19, stating that he instructed Supervisor Greg Sweatt to do a "100% scan" of Plaintiff's

truck.  Hamilton states that Plaintiff had been complaining to him on a regular basis that someone was

"messing" with his truck.  Hamilton remarks, "If I audit him each day, I can prove what is on his truck at depart time."

### Events of 7/24/03

Supervisor Mike Trudeau was instructed to do a full truck audit on Plaintiff on 7/24/03.  Defendants' Exhibit 8 to Hamilton Aff.  Supervisor Greg Sweatt had audit scanned Plaintiff's entire truck the day before.  Id.  Trudeau recounted alleged threats made by Plaintiff while Trudeau was performing the audit scan.  Id.

Plaintiff was supposed to get 3 days' pay that he lost due to the drug test on 7/24/03.  Paychecks would come in by plane on Thursday mornings in a red bag from Airborne corporate in Seattle.  However, when Plaintiff asked for his check, he was told it was not there. When Plaintiff spoke to Leveris about it, Leveris told Plaintiff that he would have to file a union grievance for it.  Plaintiff was very perturbed by this and asked Gerry Halloran, the union steward, to address it with Hamilton.  Plaintiff then left for his route.  Halloran testified that it was not necessary for Plaintiff to file a grievance to get the money, as claimed by Leveris.  Later on that day, Hamilton told Halloran that they "found" the check.

While Plaintiff was off on his route, Hamilton and Leveris had a meeting with Halloran and Chief Union Steward Quigley.  The subject of the meeting was "problems" with Plaintiff.  Hamilton and Leveris discussed that Plaintiff had been on FMLA for a mental issue and that they thought that maybe he should see a doctor or take a leave.  Hamilton said that Plaintiff had been threatening people and acting "weird" and paranoid.  Hamilton and Leveris wanted Halloran to meet with Plaintiff and tell him that he was going to be issued warning letters and to talk to him about seeing the union doctor and getting union disability benefits.  Hamilton and Leveris thought that Plaintiff or the company should get "some medical opinions on him."

Hamilton told Halloran that Plaintiff was making threats to supervisors, saying things like "you're going to get yours," "the FBI is going to arrest you," or "your day is coming." Halloran did not think that these remarks were threats of physical violence, but that the remarks were "non-threatening." Hamilton and Leveris did not appear genuinely afraid of Plaintiff. Instead they appeared agitated and embarrassed that someone was questioning their authority. Halloran thought that Plaintiff appeared "very stressed," "angry at the company, paranoid, scared he was going to be fired." Plaintiff had told Halloran that there was a conspiracy against him. When Plaintiff was being audit scanned, Plaintiff would say things to the supervisors like, "You're going to get yours, your name is going to be in the paper, the FBI is watching you." Plaintiff was ranting and talking nonsense. According to Halloran, the threats were not physical threats and the supervisors were not afraid that Plaintiff was going to be physical.

Hamilton wrote that he met with Joe Quigley and Gerry Halloran about Plaintiff's threats and paranoia on 7/24/03. Halloran stated that he felt Plaintiff needed medical help. Hamilton wrote they all came to the conclusion that "something was not right" with Plaintiff. "After an hour of debate," the three decided that Gerry and Joe would take Plaintiff aside when he came off the road and ask him if he needed help. They would offer the union's disability benefits and refer him to the Teamster doctor for help. If Plaintiff did not think he needed help, then Plaintiff would need to meet with Hamilton and Leveris and be issued a written warning that he would be put out of service if he made any more threats or aggressive gestures. Plaintiff was also going to be issued a written warning for failing to scan a shipment. Exhibits 20 and 21.

When Plaintiff returned from his route, he was met by Halloran and Quigley. They handed him the check for the missing pay and said that Hamilton had "found" it. Plaintiff was skeptical about that. They told Plaintiff that, before he could keep the check, he had to meet with Hamilton, who wanted to issue two warnings to him, one for threatening a supervisor and one for a delivery. Plaintiff stated that he

"had all he could take" with the whole situation, "going for the drug test, then supposedly putting in my check, then not putting in my check, then coming back, getting my check, then telling me to go see Joe because I have two warning letters." Plaintiff gave them back the check and left. Halloran stated that they discussed with Plaintiff seeing the union doctor and getting him disability insurance. Plaintiff said that he did not want to see the union doctor because he had his own doctor. Halloran told Plaintiff that maybe he should speak to his doctor if "you're stressed like this." Plaintiff said that he would take care of it himself, that he would talk to his doctor. Plaintiff said that he would be going out on FMLA or worker's compensation. Halloran reported back to Hamilton that Plaintiff was agitated and stressed and that he left the property. He told Hamilton that Plaintiff was not interested in seeing the union doctor, that he had his own. Hamilton's response was that he still needed to see Plaintiff to give him the warning letters, which would be done the next morning.

### Plaintiff is Terminated

On the morning of 7/25/03, Plaintiff was running late for work. As many other employees have done in like circumstances, Plaintiff drove his car up the ramp to the overhead door of the building, got out of his car, walked to the time clock, punched in, walked back to his car, backed down the ramp, parked his car in the auxiliary parking lot and walked back to the building. Plaintiff reported to his workstation and worked for about an hour and a half. Then he was told by a replacement employee that he was not going to do his route, that they wanted to see Plaintiff in the office.

Plaintiff went to the office and had a meeting with Hamilton, Leveris and Halloran. Hamilton told Plaintiff that he was informed that Plaintiff had tried to run over a couple of his supervisors. Hamilton also said that his supervisor thought Plaintiff was going to shoot him. Hamilton told Plaintiff that he had two warning letters to give him and that, if Plaintiff did not want to cooperate, he was going to fire him. Hamilton had the two warning letters on the table and the termination letter in his hand. Hamilton told

Plaintiff that he was going to be discharged "for all the reasons that have led up to this incident" and that "he wasn't going to tolerate it anymore." Leveris signed the termination letter and Hamilton handed it to Plaintiff, along a written warning for threatening comments and intimidating looks and a written warning for missed scans.

Plaintiff states that "after the fact" Hamilton said something like "We can't help you anymore." Plaintiff said, "Joe, you're not a doctor. Okay?" "If you want to terminate me, I'm going to go right to my doctor and I'm going to explain the situation, what's going on here" "I can't handle this anymore, emotionally, physically, I'm done, I'm spent." Plaintiff does not recall being offered medical help by Hamilton or the union. Plaintiff states that he was probably having a "breakdown" right there. Plaintiff does not recall what he said. Everything was "blurry." Hamilton escorted Plaintiff to his car with "two other guys" and would not let even Plaintiff get his personal belongings from his truck. Plaintiff drove himself to the emergency room at Holy Family Hospital. Plaintiff wanted to be "admitted" somewhere.

Halloran testified that Plaintiff's termination on 7/25/03 came as a "surprise." Hamilton and Leveris had told Halloran that Plaintiff was going to get two warning letters and that's what Halloran thought was going to happen. However, because Plaintiff had driven up the ramp that morning, they decided to discharge him, "their mind was made up to discharge." Halloran does not recall any discussion at the termination meeting about Plaintiff trying to hit anyone or that anyone was in any danger by the manner in which Plaintiff drove up the ramp. Halloran testified that if Plaintiff was considered a threat and dangerous, they would have discharged him immediately and called the police. Instead they let Plaintiff load his truck for "45 minutes." Halloran did recall Hamilton saying that Plaintiff drove on the property recklessly and that they were afraid that Plaintiff was going to "do something violent." Halloran recalled that Hamilton said at the termination meeting that Plaintiff should see a doctor. But Plaintiff "was already seeing a doctor, so, you know, nobody can make you change doctors." Halloran thought

that Plaintiff had a "stress, emotional, mental" problem and Halloran asked Hamilton and Leveris to put

Plaintiff "out of service and let the doctors argue about it." Their reaction was that they were terminating

Plaintiff for just cause for driving up on the property. According to Halloran, before Plaintiff was

terminated, Plaintiff told Hamilton that he had his own doctor and that he would be going on FMLA for

stress.

Halloran testified that, instead of termination, the company had the option to put Plaintiff out of

service and have him examined by doctors, "absolutely." However, Hamilton and Leveris would not go

that route because Plaintiff had driven up the ramp. Hamilton, in turn, admitted that he had an option of

placing Plaintiff on involuntary medical leave, but does not recall ever investigating or thinking of that.

Hamilton also acknowledged that generally he had to give a written warning to an employee before

discharging the employee for certain conduct. However, Hamilton believes that he did not have to give

Plaintiff a written warning first because Plaintiff was a "real threat" and he needed Plaintiff "out of here."

Hamilton's version of the termination meeting is set forth in Exhibit 21. Hamilton admits that his

intention initially was to issue Plaintiff the two warning letters. However, based on the incident that

morning, he told Halloran that "depending how the meeting went," he was prepared to put Plaintiff out on

termination. Hamilton stated that Supervisor Greg Sweatt had reported to him that Plaintiff had driven his

car onto the dock in a reckless manner and that "the only thing that went through his [Sweatt's] mind was

to hit the deck." Sweatt said that Plaintiff got out of his car, ran to the clock and punched in. Then

Plaintiff returned to his car and "peeled out in reverse." Hamilton states that he asked Plaintiff if he

thought he needed medical help and that, if so, Hamilton would work with the company and the union to

provide that help. Plaintiff's response was that he "was here to receive discipline, so issue the discipline."

Id. First Plaintiff said that he was going to have his doctor write a note saying he was fine to come to

work; then Plaintiff said he "would be going on FMLA for stress." Hamilton told Plaintiff that based on

14

his actions that morning driving his car in the building in a reckless manner, Hamilton was classifying that as "threatening gesture" and terminating him for cause.

Leveris, in turn, states that the first question Hamilton asked Plaintiff was "Can we help you?" Plaintiff replied, "If you have a discipline letter to issue me give it to me now." Hamilton answered, " Paul, can we help you … yes or no?" Plaintiff again answered, "Give me the discipline letters now." Plaintiff also stated he was going out on FMLA for stress and anxiety and that he was filing for both FMLA and Worker's Compensation. Leveris does not remember whether Plaintiff said that before or after being terminated. Leveris wrote that during the meeting, Hamilton brought up the fact that "we were not doctors, but we do believe Paul needs help." Leveris wrote, "I think this is an important statement to add to this letter." Leveris said that it was obvious that "something wasn't right" with Plaintiff.

### Pretext in the Stated Reason for Termination

Plaintiff denies that he drove up the ramp at a high rate of speed or that he peeled out in reverse. Plaintiff states that Leveris "fabricated" needing to "duck out of the way." Plaintiff said that there were employees congregating at the overhead door near the ramp, having coffee and doughnuts and that he never even saw Leveris or Sweatt in that area.

James Sambataro, a fellow driver, was near the time clock at the time of this incident. He testified that he was talking with other drivers and had his back to the ramp, which was about 40 feet away. He heard a car come up and there was a "lot of commotion," "laughing" "boisterous laughing" from other drivers in the area. Sambataro said that the laughter was because Plaintiff had driven his car in. Sambataro thought it was funny too. He did not see Plaintiff actually drive in, but he heard the sound of Plaintiff's foreign car. From the sound of the motor, Plaintiff had not driven in there fast. Sambataro had seen "pissed off" drivers "barrel-assing" in there with their trucks faster than Plaintiff had done that day. Sambataro testified that the incident has been "embellished" and "doesn't buy" Leveris's claim that

Plaintiff tried to run him over. Sambataro stated that Plaintiff wasn't going to run anybody over. He saw Leveris yelling at Plaintiff after he drove in. Leveris did not look frightened, he looked "pissed off" with "flared" nostrils. Leveris "always looked like that" "His nostrils were always flared, he looked like he was mad at the world all the time." Sambataro testified that there was nothing threatening or alarming about Plaintiff at the time of this incident. He recalls that Greg Sweatt was there and believed that Sweatt was with him near the time clock. Sweatt did not look scared or frightened and there was no interaction between Plaintiff and Sweatt at the time. Sambataro states that none of the supervisors either ever looked afraid or ever said that they were afraid of Plaintiff.

O'Brien, Halloran and Sambataro testified that there was a practice for drivers who were late to drive up to the building and punch in before parking their cars. The reason for that was that the company was then disciplining the drivers for being even a minute late. O'Brien drove up like that himself and saw other drivers do it. Depending on how late they were, the drivers would stop outside and run up the ramp or drive up the top of the ramp or right into the building. Sambataro similarly testified regarding the practice of drivers running late and driving up to punch in. "Happens every day." They would drive up the ramp and park near the overhead door and punch in. You weren't supposed to do that, but it was not enforced, no one was written up for it. Supervisors Demmons and Sweatt confirmed the practice of drivers running late punching in like Plaintiff had, though Sweatt contended that the drivers did not pull into the building, but at most parked on the ramp.

Supervisor Demmons testified that he was a witness to Plaintiff's "ramp" incident. Demmons said that when Plaintiff pulled in, he was going a "good ten miles plus" an hour over the usual speed of "under five" miles an hour in that area. Demmons said that Plaintiff got out of his car, punched in, got in his car and drove out. Sweatt testified that Plaintiff pulled into the building "going pretty fast," faster than Sweatt would have driven. Sweatt could not estimate Plaintiff's speed. Plaintiff then jumped out of his

car, punched in, went back to his car and backed out "kind of fast."  Leveris testified that Plaintiff

punched in and "sped off in reverse."  He is not "100%" sure that Plaintiff "peeled out."

### Plaintiff Denies Making Threatening Remarks or Gestures

Plaintiff denies making the threatening remarks and gestures attributed to him by Defendants.  He

denies telling supervisors that he would catch the persons doing things to him, or that somebody was

"fucking around" with him or that he'd "fix him" or "get" him.  Plaintiff doesn't recall telling Demmons

that he was "being followed daily," but Plaintiff believes that he was being followed and was afraid that

someone would steal a package out of his truck.   Plaintiff suspected that someone was stealing his freight

and that the company records supported his suspicions.  Plaintiff denies that he told Hamilton and

Leveris, "you will get yours" or "that I can go to bed at night without worrying."  Plaintiff testified that he

was not a "mean person" and would never say that.  However, Plaintiff states that he had bipolar disorder

and was in such a state of anxiety and depression that "if I did say it, I can't recall it."  Plaintiff denies

making any statements to supervisors that were either threats or that could be interpreted as threats.

### Plaintiff's Bipolar Disorder

Plaintiff's mother and brother had bipolar disorder.  Plaintiff's mother committed suicide in 1987

from the disease and his brother "died" from it.  Plaintiff himself "waited forever" to get treatment and

"fought off taking meds" all his life because he saw what his mother went through.  Plaintiff was not

actually diagnosed with bipolar disorder until late 2005, when his psychiatrist, Dr. Sadowsky, made that

diagnosis and began prescribing him medications for it.  Prior to that, he had been diagnosed with

depression, anxiety, inability to cope, lack of concentration and sleep apnea.  Plaintiff had been prescribed

different antidepressants as well as different drugs for sleep apnea by his primary care physician. Plaintiff,

however, believes that he has had bipolar disorder for 14 years, and has no doubt that he had bipolar

disorder in 2002.

Plaintiff describes his manic and depressive states of his bipolar disorder as follows. In his depressive state, he would "go hide", not wanting to go out of the house or interact with people or his family. In his manic state, he would "speed" in his brain and be agitated, confused and be unable to focus. He would be very "irritable." Plaintiff states that the effects of his bipolar disorder are lack of concentration, inability to cope, anxiety and inability to sleep. He had these symptoms in July 2003. Plaintiff's bipolar disorder sometimes prevented him from remembering things, like what freight he had scanned or remembering to scan his gas card.

Dr. Claudia Trombly, Plaintiff's primary care physician since 6/13/03, testified that Plaintiff had been initially diagnosed with depression and anxiety. It was not until the fall of 2005 that Plaintiff was diagnosed with bipolar disorder and was put on the medications for that condition. Dr. Twombly stated that the symptoms of bipolar disorder include paranoia, mood swings, emotional outbursts, grandiose thoughts, difficulty with concentration and impulsive behavior. In a manic state, the people think they are the center of the universe and everyone is against them or for them, one or the other. People with bipolar disorder may have it as an underlying condition that is aggravated or exacerbated by situations or events, thereby bringing out the symptoms. In Plaintiff's case, his depression reportedly started with problems at work, "unfounded accusations" and so forth. Such things could have aggravated bipolar disorder. Dr. Twombly first suspected that Plaintiff had bipolar disorder in April 2005, when it was reported that Plaintiff was saying that people were trying to kill him and he always had to keep "an extra eye out." At the same time, Plaintiff said that he felt he had "a good handle on things." The doctor said that was the "tip off," that he had that paranoia and yet felt he had a handle on things. That "is pretty classic bipolar." The doctor agrees that Plaintiff had not been diagnosed with bipolar in 2003, but that is a very difficult diagnosis to make. "You can't make it until someone goes manic or "off the deep end."

Plaintiff's psychiatrist, Dr. Marc Sadowsky, testified that Plaintiff was diagnosed by him with bipolar disorder in the fall of 2005, shortly after first seeing him. The reported symptoms that led to that diagnosis were mood swings, irritability, racing thoughts, episodes of euphoria, rapid loud speech and the worsening of Plaintiff's symptoms on anti-depressant medication. Other symptoms of bi-polar disorder are paranoia, impaired judgment and impulsive behavior. The doctor stated that people with bipolar tend to seek treatment when they are depressed, since, when they are manic, they generally "feel really good" and so deny that there is anything wrong with them. He testified that people that develop bipolar disorder have a predisposition to it. Traumatic or stressful events may precipitate it. Plaintiff's work stressors would not have caused his bipolar disorder, but "clearly it exacerbated things for him."

Dr. Sadowsky testified that if Plaintiff had emotional outbursts at work, was yelling at supervisors, making threats, claimed he was being persecuted, claimed that there was a conspiracy against him, and had trouble scanning freight and doing simple tasks – that conduct would be consistent with bipolar disorder. The doctor stated that he would not be surprised that Plaintiff had bipolar in 2003.

### Accommodation for Plaintiff's Mental Condition

Plaintiff testified that he had previously asked Airborne for an accommodation for his disability when he went on FMLA in October 2002. However, Plaintiff states that, in July 2003, he wasn't given the opportunity to ask for an accommodation. He was "fired." Plaintiff states that the accommodation he needed was going back on short-term disability. Plaintiff, however, does not know how long he would have needed to be out.

Dr. Sadowsky testified that if Plaintiff had not been fired, but had instead had been put out on involuntary medical leave with the opportunity for treatment, there is clearly a possibility that that would have been helpful to Plaintiff. The treatment would be medications and psychotherapy. Plaintiff has had improvement with the medications prescribed or him by Dr. Sadowsky and Plaintiff's prognosis would be

between guarded and good, depending largely on Plaintiff following through on treatment recommendations.

## III.    ARGUMENT

**A.    There is a Genuine Issue for Trial Concerning Whether Plaintiff was Discriminated Against on the Basis of Disability in Violation of the ADA and Chapter 151B**

In evaluating a disability discrimination claim based on disparate treatment under the ADA and Chapter 151B, the courts use the burden-shifting framework outlined by the Supreme Court in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973) or, where applicable, the alternative "mixed-motive" analysis established by the Supreme Court in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). In this case, Defendants have confined their argument to the McDonnell-Douglas burden-shifting framework, asserting that Plaintiff is unable to establish that the asserted reason for his termination is a pretext. Plaintiff submits that a "mixed-motive" analysis is applicable to the facts of this case, but that, regardless of the standard used, summary judgment should be denied.

### 1.    McDonnell-Douglas **Burden-shifting Framework**

In evaluating a disability discrimination claim based on disparate treatment under the ADA and Chapter 151B, the courts typically use the burden-shifting framework outlined by the Supreme Court in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973). Tobin v. Liberty Mutual Insurance Co., 433 F.3d 100, 104-105 (1st Cir. 2005); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999); Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 116 (2000).

Under this approach, the plaintiff must first establish a prima facie case by establishing that (1) he suffers from a disability or handicap, as defined by the ADA and Chapter 151B, that (2) he was nevertheless able to perform the essential functions of his job, either with or without reasonable accommodation, and that (3) the employer took an adverse employment action against him because of, in whole or in part, his protected disability. See McDonnell-Douglas, 411 U.S. at 802; Tobin, supra. Once

the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its employment decision and to produce credible evidence to show that the reason advanced was the real reason.  McDonnell-Douglas, 411 U.S. at 802.  If the employer meets its burden of production at stage two, the presumption created by the prima facie case drops from the case and the proceedings advance to the third stage. Abramian v. President & Fellows of Harvard College, 432 Mass. at 116-117.

At the third stage, the burden shifts back to the plaintiff, and he must proffer evidence to establish that the employer's non-discriminatory justification is mere pretext, cloaking discriminatory animus. McDonnell-Douglas, 411 U.S. at 804.   The plaintiff may meet his burden of going forward by showing that the employer's articulated reason for the challenged employment action was pretextual.   Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000).  The ultimate burden on the plaintiff is to show that discrimination is the or a motivating factor, a showing which may be inferred from the showing of pretext.  Hoffman v. Applicators Sales And Service, Inc., 439 F.3d 9, 17 (1st Cir. 2006) (citing Reeves). A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 148.

If an employer can produce a nondiscriminatory reason for its decision with an adequate evidentiary backing, then, to prevail in the third stage of the analysis, the plaintiff must persuade the trier of fact by a preponderance of the evidence that discriminatory animus was the "determinative cause" for the employer's decision.  Lipchitz v. Raytheon Co., 434 Mass. 493, 504 (2001).  A fact finder's decision in the third stage may be based, either in whole or in part, on a determination that a legitimate reason for the employer's decision advanced in stage two was actually a pretext. Chief Justice for Admn. & Mgmt. of Trial Ct. v. M.C.A.D, 439 Mass. 729, 735 (2003); Abramian v. President & Fellows of Harvard College,

432 Mass. 107, 117-118. There is no need for the fact finder to explicitly to reject the nondiscriminatory reasons ultimately proffered by the defendant because a violation of G.L. c. 151B may still occur even if those reasons played some part in the defendant's decision. See Lipchitz v. Raytheon Co., supra at 506 (no requirement for G.L. c. 151B plaintiff to "disprove every reason articulated by the defendant or suggested in the evidence"). Because employment decisions are seldom made for a single reason, discriminatory and nondiscriminatory motives may coexist in the mind of a decision maker. Thus, even when nondiscriminatory reasons play some role in a decision, that decision may still be unlawful if discriminatory animus was a "material and important ingredient" in the decision-making calculus. Lipchitz v. Raytheon Co., supra at 506 n. 19; Chief Justice for Admn. & Mgmt. of Trial Ct. v. M.C.A.D., 439 Mass. 729, 735 (2003).

Under Massachusetts law, as under federal law, the employer's provision of a non-discriminatory reason or reasons rebuts the presumption of discrimination created by the prima facie case, and the issue of discriminatory intent then turns upon the evidence. Under federal law, that evidence may include inferences drawn against the employer if his alleged reason or reasons for the adverse action are shown to be pretextual. Joyal v. Hasbro, Inc., 380 F.3d 14, 16-17 (1st Cir. 2004). Massachusetts law is similar, but in one relevant respect perhaps even "friendlier" to plaintiffs. Joyal v. Hasbro, Inc., 380 F.3d at 16-17. Under Lipchitz, a plaintiff may be able--automatically and regardless of circumstances--to avoid a directed verdict and reach a jury if he or she proves that **at least one** of the reasons given by the defendant was pretextual. Joyal, supra.

In order to sustain his burden of persuasion on pretext, Plaintiff needs to demonstrate either that his dismissal was (i) more likely motivated by discrimination than by the explanation proffered by Defendants or (ii) the proffered explanation is unworthy of credence in circumstances where the suspect denial, taken together with other facts, suggests such a motivation. Straughn v. Delta Air Lines, 250 F.3d

23, 35 (1st Cir. 2001). The burden of persuasion on pretext may be met by showing that discriminatory comments were made by the key decisionmaker. Id.

In this case, Defendants do not dispute that Plaintiff has established a prima facie case of disability discrimination. Defendants' Memorandum of Law at 10, n.6. Accordingly, for present purposes, Defendants concede that Plaintiff can establish that (1) he suffers from a disability or handicap, (2) that he was nevertheless able to perform the essential functions of his job, either with or without reasonable accommodation, and (3) that Defendants took an adverse employment action against him because of, in whole or in part, his protected disability. Instead, Defendants advance to the second stage and assert that they have advanced a legitimate, non-discriminatory reason for the employment decision. Defendants further assert that Plaintiff cannot meet his burden at the third stage that the asserted reason was pretextual.

Plaintiff submits that there is a genuine issue for trial concerning whether Defendants' stated reason for terminating him was pretextual. The facts reveal that Defendants were aware that Plaintiff had recently returned to work from a four month leave of absence for mental health issues and that he continued under medical care and was taking medications for that condition. Plaintiff was sent for a drug and alcohol test the week before his termination because he was allegedly acting paranoid and weird and making disturbing remarks. When that test came back negative, from the process of elimination, Plaintiff's mental health was the likely reason for that conduct. Hamilton and Leveris both stated that "something was not right" with Plaintiff. While Defendants assert that they became afraid of Plaintiff and what he might do, their conduct was not consistent with that assertion. Defendants decided to take the unusual step of conducting almost daily audit scans of Plaintiff's entire truck, something that was obviously upsetting to Plaintiff and something that the drivers generally found stressful, since it could lead to discipline or termination. Moreover, when Plaintiff rightfully complained to Leveris about not

receiving his check from the drug test, Leveris told him that he would have to file a grievance to get it, something completely untrue.  Defendants acted in their typical "push back" mode, pushing Plaintiff's buttons.  Defendants' conduct towards Plaintiff did not appear to be motivated by on fear of him.  Fellow drivers Halloran, O'Brien and Sambataro all testified that the supervisors did not appear to be afraid of Plaintiff.  Halloran said that instead they were upset that he was challenging their authority.  Further, Halloran and O'Brien heard some of the alleged threats and thought they were not threatening remarks, but rants and nonsense.

However, regardless of the characterization of Plaintiff's remarks or whether he in fact made them, the evidence shows that Hamilton was only going to issue Plaintiff a written warning.  This turned into a termination based on Plaintiff's driving up the ramp to punch in that morning.  However, the evidence is in conflict regarding that incident. The statements of Leveris and Sweatt that they wanted to "duck for cover" when Plaintiff drove up and were afraid that Plaintiff would "come out shooting" are in stark contrast to Sambataro's testimony that there was nothing threatening about the incident and that in fact there was "boisterous laughter" at the time.  He said that Leveris looked "pissed off" and was yelling at Plaintiff, and that he thought Sweatt was near him by the time clock and there was no interaction between Plaintiff and Sweatt.  Morever, nether Leveris nor Sweatt looked frightened.  Plaintiff also denied that he had driven up at a high rate of speed or that he had peeled out in reverse.  Finally, there is overwhelming evidence that there was a practice at Airborne for drivers running late to drive up and punch in, like Plaintiff had done that day, before parking their cars.

Halloran testified that Hamilton and Leveris had made up their minds to fire Plaintiff based on the ramp incident.  Interestingly, Hamilton claimed that, "depending on how the meeting went," he was prepared to terminate Plaintiff.  However, the evidence concerning what transpired at the termination meeting are in material dispute and are confusing at best.  Plaintiff does not recall being offered medical

help, but stated that he thought he was having a "breakdown" right there and everything was "blurry."
Halloran testified that Hamilton told Plaintiff he should see a doctor, but Plaintiff said that he was already
seeing a doctor and "nobody can make you change doctors."  Leveris, in turn, says that Hamilton asked
Plaintiff, "Can we help you?" and Plaintiff replied,  "If you have a discipline letter to issue me give it to
me now."   However, Hamilton, Leveris and Halloran all agree that Plaintiff stated that he was going to go
out on FMLA for stress.

The above demonstrates that, based on the conflicting versions of the ramp incident, there is a
triable issue concerning whether this incident represented egregious conduct on Plaintiff's part or was
"embellished" due to Defendants' perception that Plaintiff was mentally unstable.  There is also a triable
issue concerning whether the ramp incident was truly the reason for Plaintiff's termination or whether
instead it was how Plaintiff responded to Hamilton's confusing and misunderstood remarks concerning
Plaintiff getting medical help.

### 2.    Mixed-Motive Analysis

An alternative framework involves "mixed-motive" analysis, as established by the Supreme Court
in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989); Tobin v. Liberty Mutual Insurance Co., 433 F.3d
100, 105 (1st Cir. 2005).  Mixed-motive analysis is appropriate where evidence exists that an employer
considered both a proscribed factor (for example, gender) and one or more legitimate factors (for
example, competence) in making an adverse employment decision.  Price Waterhouse, 490 U.S. at 241-
242; Tobin, supra; Fernándes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 580 (1st Cir. 1999).  Where a
mixed motive analysis applies, a plaintiff's burden is tempered so that he need prove only that the
discriminatory action was a motivating factor in an adverse employment decision. The defendant then
may "assert an affirmative defense, bearing the burdens of production and persuasion that it `would have
taken the same action in the absence of the impermissible motivating factor. Patten v. Wal-Mart Stores

East, 300 F.3d 21, 25 (1st Cir. 2002) (disability case); Weston-Smith v. Cooley Dickinson Hosp., 282

F.3d 60, 64 (1st Cir. 2002) (gender case); Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60 (1st Cir.

2000) (age case).  If the employer makes such a showing, the employer may avoid liability for monetary

damages and reinstatement. However, as long as the employee shows that the impermissible factor was a

motive, even if not the determinative motive, the employer will still be subject to declaratory and limited

injunctive relief, as well as attorneys' fees. Weston-Smith, 282 F.3d at 64; Thomas v. Contoocook Valley

Sch. Dist., 150 F.3d 31, 42 n. 6 (1st Cir. 1998) (ADA case).

    The mixed motive analysis applies in cases where both legitimate and illegitimate reasons

motivated the adverse employment decision. Desert Palace, Inc. v. Costa, 539 U.S. 90, 93 (2003).  Prior

to Desert Palace, the law in the First Circuit was that the availability of a mixed motive analysis depended

on the plaintiff's producing "direct evidence" of discrimination. Desert Palace overruled that rule.

Estades-Negroni v. Assocs. Corp., 345 F.3d 25, 30 (1st Cir. 2003); Hillstrom v. Best Western TLC Hotel,

354 F.3d 27, 30-31 (1st Cir. 2003).  In Desert Palace, the Supreme Court held that "direct evidence" is not

required to prove employment discrimination in a mixed-motive case. Accordingly, the court must

consider both "direct evidence," see Vesprini v. Shaw Contract Flooring Servs., 315 F.3d 37, 41 (1st Cir.

2002) (noting that "the term 'direct evidence' normally contemplates only those statements by a

decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment

decision"),  and "circumstantial evidence." Estades-Negroni v. Associates Corp. of North America, 345

F.3d 25, 30 (1st Cir. 2003).

    The Supreme Judicial Court has adopted mixed motive analysis in Chapter 151B discrimination

cases, though it apparently still limits it to situations involving direct evidence.  In Wynn & Wynn, P.C. v.

Massachusetts Comm'n Against Discrimination, 431 Mass. 655, 667 (2000), the court held that, where a

plaintiff presents strong, direct proof that an unlawful consideration was a factor in the employment

decision, a mixed motive analysis applies. Id. at 669-670.  Direct evidence is evidence that, "if believed, results in an inescapable, or at least highly probable, inference that a forbidden bias was present in the workplace." Id. at 667. Typically, direct evidence consists of statements of discriminatory intent attributable to an employer.  Id. at 667-668. Under the mixed-motive framework, the plaintiff must first prove by a preponderance of the evidence that a proscribed factor played a motivating part in the challenged employment decision. Once the plaintiff carries her initial burden, the burden of persuasion shifts to the defendant who "may avoid a finding of liability only by proving that it would have made the same decision" even without the illegitimate motive.  "Of course, once the plaintiff has met her initial burden of persuasion on the presence of an illegitimate motive, the decision whether the employer has met its burden of proving that another legitimate, nondiscriminatory reason actually led it to make the decision, is normally for the jury or other finder of fact to decide."  Id. at 670 ((citing Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 127 (1997) for the proposition that summary judgment is a disfavored remedy in discrimination cases based on disparate treatment)).

In this case, since Defendants do not contest for present purposes that Plaintiff can establish a prima facie case, Defendants effectively concede that they took an adverse employment action against Plaintiff because of, in whole or in part, his protected disability.  Accordingly, a mixed motive analysis is applicable.  Defendants, by their motion, have not met their burdens of production and persuasion that they would have taken the same action in the absence of the impermissible motivating factors.  Even if Defendants had made such a showing, Defendants would only avoid liability for monetary damages and reinstatement.  Defendants are still subject to declaratory and injunctive relief, as well as attorneys' fees, as long as Plaintiff has shown that the impermissible factors were a motive, even if not the determinative motive.  Weston-Smith, 282 F.3d at 64.

However, regardless of this procedural result, a mixed motive analysis is applicable because the evidence shows that Defendants believed that Plaintiff was mentally unstable. They knew that Plaintiff had been out on a leave of absence for mental health issues and that he continued under medical care and was taking medications for that condition. They sent Plaintiff for a drug and alcohol test because he was allegedly acting paranoid and weird and making disturbing remarks. Hamilton and Leveris both stated that "something was not right" with Plaintiff. The reactions of Leveris and Sweatt, and subsequently Hamilton, to the ramp incident, demonstrate that they stigmatized or misunderstood Plaintiff because of his apparent mental health problems and that they operated under "myths, fears, and stereotypes" concerning mental disabilities. There is a triable issue concerning whether Plaintiff's mental health issues were a motivating factor leading to his termination.

### B. There is a Genuine Issue for Trial Concerning Whether Plaintiff was Provided Reasonable Accommodation for His Mental Disability

Under the ADA, employers are required to provide reasonable accommodation to an otherwise qualified employee with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the employer's business. 42 U.S.C. § 12112(b)(5)(A) (2000); Tobin v. Liberty Mutual Insurance Co., 433 F.3d 100, 106-107 (1st Cir. 2005). To survive summary judgment on his reasonable accommodation claim, Plaintiff has to produce enough evidence for a reasonable jury to find that (1) he was disabled within the meaning of the ADA, (2) he was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) Airborne, despite knowing of his disability, did not reasonably accommodate it. Tobin v. Liberty Mutual Insurance Co., 433 F.3d at 107; Estades-Negroni v. Associates Corp. of North America, 377 F.3d 58, 63 (1st Cir. 2004). Whether a requested accommodation is reasonable or whether it imposes an undue hardship are questions typically proved through direct, objective evidence. The McDonnell Douglas model does not apply to ADA discrimination claims based on failure to reasonably accommodate. Reed v. LePage Bakeries, 244 F.3d

254, 259 n.3 (1st Cir. 2001). In order to prove "reasonable accommodation," a plaintiff needs to show not only that the proposed accommodation would enable him to perform the essential functions of his job, but also that, at least on the face of things, it is feasible for the employer under the circumstances. If plaintiff succeeds in carrying this burden, the defendant then has the opportunity to show that the proposed accommodation is not as feasible as it appears but rather that there are further costs to be considered, "certain devils in the details." <u>Reed v. LePage Bakeries</u>, 244 F.3d at 259.

In this case, Plaintiff had previously asked for an accommodation for his disability when he went on FMLA in October 2002. However, Plaintiff states that, in July 2003, he wasn't given the opportunity to ask for an accommodation. He was "fired." Yet, while Plaintiff does not recall asking for a leave of absence, the other persons that were there recall that Plaintiff expressed an intention to go out on FMLA. Plaintiff states that the accommodation he needed was going back on short-term disability, though he does not know how long he would have needed to be out. Dr. Sadowsky testified that if Plaintiff had not been fired, but had instead had been put out on involuntary medical leave with the opportunity for treatment, there is clearly a possibility that that would have been helpful to Plaintiff. Halloran testified that, instead of termination, the company had the option to put Plaintiff out of service and have him examined by doctors, "absolutely." However, Hamilton and Leveris would not go that route because Plaintiff had driven up the ramp. Hamilton, in turn, admitted that he had an option of placing Plaintiff on involuntary medical leave, but does not recall ever investigating or thinking of that. He just wanted Plaintiff "out of here."

Plaintiff has met his burden of demonstrating a proposed accommodation that was facially feasible. Defendants, however, have not engaged in any reasonable accommodation analysis nor have they presented evidence on the feasibility of reasonable accommodation or undue hardship. Defendants instead simply assert that their stated reason for termination was nondiscriminatory. The First Circuit has

29

noted that many cases on reasonable accommodation have "turned on the surprising failure of one party or the other to proffer any significant evidence in favor of their position." Tobin v. Liberty Mutual Insurance Co., 433 F.3d at 107; Reed v. LePage Bakeries, 244 F.3d 254, 260 (1st Cir. 2001). See Ward v. Massachusetts Health Research Institute, Inc., 209 F.3d 29, 36-37 (1st Cir. 2000) (reversing summary judgment in an ADA case where the employer had produced no evidence of undue hardship).

**C.      There is a Genuine Issue for Trial Concerning Whether Airborne Engaged in the Required Interactive Process with Plaintiff**

The ADA's regulations state that "it may be necessary for the covered entity [the employer] to initiate an informal, interactive process with the qualified individual [the employee] with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3) (2005); Tobin v. Liberty Mutual Insurance Co., 433 F.3d at 108-109. Once the employer becomes aware of the disability of an employee, he is expected to engage in a meaningful dialogue with the employee to find the best means of accommodating that disability. Tobin, supra. Massachusetts law imposes a similar requirement to engage in an "interactive process." Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443, 457 (2002), though there is no similar requirement under Massachusetts law for the employer to initiate the interactive process. Mammone v. President and Fellows of Harvard College, 446 Mass. 657, 669 n.25 and 685-686 (2006).

Interactive process is the "first step" in a proper response to a disabled employee's request for reasonable accommodation. It is a means of ensuring that employers take steps to understand and address their employees' disabilities. Tobin v. Liberty Mutual Insurance Co., 433 F.3d at 107. An employee's request for reasonable accommodation requires "a great deal of communication" between the employee and employer and both parties bear responsibility for determining what accommodation is necessary. Criado v. IBM Corp., 145 F.3d 437, 444 (1st Cir. 1998). This is especially true in cases involving an employee suffering from mental illness. Tobin, 433 F.3d at 109; Criado, supra. The Criado court cited Bultemeyer v. Fort Wayne Community Schools, 100 F.3d 1281, 1285 (7th Cir. 1996) for the proposition

that "[i]n a case involving an employee with mental illness, the communication process becomes more difficult," and "[i]t is crucial that the employer [is] aware of the difficulties, and help the other party determine what specific accommodations are necessary";  See also Beck v. University of Wis. Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996); Campbell v. Wal-Mart Stores, Inc., 272 F.Supp.2d 1276, 1289-1290 (N.D.Okla. 2003) (recognizing that mental illness may prevent individual from comprehending need to request accommodation or ability to do so).

The ADA may require the employer to initiate the interactive process, Kvorjak v. State, 259 F.3d 48, 52-53 (1st Cir. 2001); Criado v. IBM Corp., 145 F.3d 437, 444 (1st Cir. 1998); Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 515 (1st Cir. 1996), especially when an employee is suffering from a mental disability.  Tobin, 433 F.3d at 109; Criado, supra.  An employer's failure to engage in an informal interactive process may itself constitute a failure to provide reasonable accommodation that amounts to a violation of the ADA. Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 515 (1st Cir. 1996).

In Taylor v. Phoenixville School District, 184 F.3d 296 (3rd Cir. 1999), the Third Circuit reversed an order granting summary judgment in a case not unlike the present case.  The plaintiff in Taylor was a long-term secretary to a school principal that suffered an onset of bipolar disorder.  She was hospitalized and subsequently treated with medications for her disorder.   Almost immediately upon Taylor's return to work, school officials began documenting errors that Taylor committed. Rather than speak to her informally about problems as they arose, the officials documented every misstep and waited to confront her with the evidence in disciplinary meetings.  Ultimately she was terminated.  184 F.3d at 309.  The court also held that there were genuine factual disputes on whether the school district participated in good faith in the "interactive process" required by the ADA.  "Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." Id. at 306.  The Court further stated that when

31

an employee has evidence that the employer did not act in good faith in the interactive process, it would not readily decide on summary judgment that accommodation was not possible and the employer's bad faith could have no effect. Id. at 318.  See also Criado v. IBM Corp., 145 F.3d 437, 444 (1st Cir. 1998) (When an employer terminated an employee with a mental illness due to an alleged miscommunication over a leave of absence, a jury could find that the employer failed to live up to its responsibility to help find accommodations.).

Plaintiff claims that Airborne failed to engage in an "interactive process" with him to identify appropriate accommodations.  Instead, Plaintiff was initially sent for a drug test and then later called to a disciplinary meeting for the issuance of warnings.  At the eleventh hour, the agenda of the disciplinary meeting was changed to a termination meeting.  This disciplinary and formal setting led to miscommunication and defensiveness of the part of Plaintiff.  The subject of medical help was apparently brought up, yet there was confusion regarding whether it was being proposed that Plaintiff change doctors.  Plaintiff's mention of going out on FMLA request was ignored.  Meanwhile, Hamilton was waving a termination letter in front of Plaintiff.  This situation is far from the informal interactive process required by the ADA and Chapter 151B.

### D.    There is a Genuine Issue for Trial Concerning Whether Plaintiff's Alleged Misconduct was Sufficiently Egregious to Deprive Him of the Protection of the ADA or Chapter 151B

For the purposes of their motion, Defendants concede that Plaintiff is a qualified individual with a disability.  Accordingly, Defendants have waived any argument regarding Plaintiff's qualified status.  However, even had Defendants chosen to do so, there is a genuine issue for trial whether Plaintiff's alleged misconduct was sufficiently egregious to deprive him of the protection of the ADA or Chapter 151B.

The First Circuit has held that the ADA does not require that an employee whose unacceptable behavior threatens the safety of others be retained, even if the behavior stems from a mental disability. Such an employee is not qualified. Calef v. The Gillette Co., 322 F.3d 75, 87 (1st Cir. 2001); Reed v. LePage Bakeries, Inc., 244 F.3d 254, 262 (1st Cir. 2001).[2]  In Calef, the evidence was that the employer consistently disciplined or terminated employees that engaged in similar behavior and that there was not "a whiff of proof" that the fears of relevant personnel about the plaintiff were motivated by sterotypes about the disabled.  322 F.3d at 87 and n.9.

In Mammone v. President and Fellows of Harvard College, 446 Mass. 657 (2006), the Supreme Judicial Court held that a handicapped employee who engages in egregious misconduct, sufficiently inimical to the interests of his employer that it would result in the termination of a nonhandicapped employee, is not a qualified handicapped person within the meaning of G.L. c. 151B, and therefore is not entitled to the protection of that statute.  446 Mass. at 679-680.  In so doing, the Court held that its decision in Garrity v. United Airlines, Inc., 421 Mass. 55 (1995) (alcoholism-related misconduct) is applicable to employment discrimination based on disability-related workplace misconduct regardless of the type of handicap underlying the misconduct.  446 Mass. at 679-680.  The Court, however, expressly stated that it was not implying that disability-related misconduct is entitled to no protection from relevant discrimination statutes.

> To the extent that such misconduct is not egregious and sufficiently inimical to the employer's interest, it is entitled to protection.  The position we adopt would not "permit employers carte blanche to terminate employees with mental disabilities on the basis of any abnormal behavior" and thus "largely nullify the ... protection of the mentally disabled."  Den Hartog v. Wasatch Academy, 129 F.3d 1076, 1087, 1089-1092 (10th Cir.1997).

> 446 Mass. at 673 n.32.

---

[2]  On the other hand, the First Circuit has also held that where misconduct flows directly from a disability, a discharge based on that misconduct may be deemed to be a discharge because of the disability.  Ward v. Massachusetts Health Research Institute, Inc., 209 F.3d 29, 36-37 (1st Cir. 2000) (reversing summary judgment on that issue).

The <u>Mammone</u> court concluded that it is appropriate for a jury to decide the nature and extent of an employee's misconduct, where those issues are in dispute.   446 Mass. at  680.

In <u>Den Hartog v. Wasatch Academy</u>, 129 F.3d 1076, 1081 (10th Cir.1997), the Tenth Circuit held that bipolar disorder was a disability within the meaning of the ADA, pointing out that the EEOC expressly characterized bipolar disorder as a disability under the ADA in its compliance manual, <u>EEOC Enforcement Guidance:  Psychiatric Disabilities and the Americans With Disabilities Act</u>, 2 EEOC Compl. Man. (BNA), filed after Section 902, at 15 ¶  1 (Mar. 25, 1997) ("EEOC Enforcement Guidance") and that, applying the statutory definition and the EEOC Enforcement Guidance, every appellate court which has considered the question has held or assumed that "bipolar disorder" is a mental disability covered under the ADA, at least if it is sufficiently severe. 129 F.3d at 1081.  The Court stated at note 2:

> Bipolar disorder has been defined as: a psychosis involving a mood disorder characterized by swings from mania to depression. Mania is characterized by elevated mood and associated behavioral responses.  Characteristics of mania are hyperactivity, optimism, flamboyance, loud, pressured speech, garrulousness, distractibility, delusions of grandeur, disorganized behavior pattern, and poor judgment.  Depression is characterized by lowered mood state and related behavior.  Characteristics of depression are sadness, hopelessness, feelings of guilt and worthlessness, social withdrawal, psychomotor retardation and vegetative somatic symptoms including anorexia, weight loss, and insomnia.  The disability experienced from bipolar disorder ranges from mild to severe. <u>Taylor v. Principal Financial Group, Inc.</u>, 93 F.3d 155, 160-61 n. 2 (5th Cir.), <u>cert. denied</u>, 519 U.S. 1029 (citing Alan Balsam, M.D. & Albert P. Zabin, <u>Disability Handbook</u> 628-29 (1990)); <u>accord</u> <u>Williamson v. Ward</u>, 110 F.3d 1508, 1515 n. 9 (10th Cir.1997) ("Bipolar disorder is a mood disorder marked by alternating manic and depressive episodes.") (citing 1 J.E. Schmidt, M.D., Attorneys' Dictionary of Medicine B-76 (1996)).

The <u>Den Hartog</u> Court observed that mental illness is manifested by abnormal behavior, and is in fact normally diagnosed on the basis of abnormal behavior.  <u>See</u> <u>Diagnostic and Statistical Manual of Mental Disorders</u> 350 (4th ed.1994) (stating that bipolar disorder may be diagnosed "by the occurrence of one or more Manic Episodes or Mixed Episodes").  "To permit employers carte blanche to terminate employees with mental disabilities on the basis of any abnormal behavior would largely nullify the ADA's protection of the mentally disabled." <u>Den Hartog</u>, 129 F.3d at 1087.  The EEOC echoes this concern in

the introduction to the Enforcement Guidance, stating that the workforce includes many individuals with psychiatric disabilities who face employment discrimination because their disabilities are stigmatized or misunderstood. Congress intended the ADA to combat such employment discrimination as well as the myths, fears, and stereotypes upon which it is based.

As argued in Section IIIA(1), there are conflicting versions of the ramp incident that raise a triable issue concerning whether this incident represented egregious conduct on Plaintiff's part or was "embellished" due to Defendants' perception that Plaintiff was mentally unstable. There are also conflicting versions of the alleged threatening remarks, also raising a triable issue, though the remarks were only going to lead to a written warning.

**E.    There is a Genuine Issue for Trial Whether the Individual Defendants Aided and Abetted Discrimination in Violation Chapter 151B**

Plaintiff contends that there is sufficient evidence that the individual Defendants aided and abetted the discrimination against him. The case against Hamilton is straightforward. He made the decisions alleged to have been discriminatory. Leveris, as second in command, was an active participant in the drug testing of Plaintiff and in Plaintiff's termination meeting. Moreover, Leveris was actively involved in exaggerating and mischaracterizing to Hamilton the ramp incident that resulted in Plaintiff's termination. Hamilton and Leveris were the senior management team that engaged in the discriminatory treatment of Plaintiff. Leveris was actively involved in exaggerating and mischaracterizing to Hamilton the ramp incident that resulted in Plaintiff's termination. While Hamilton claims total responsibility for these actions, there is a triable issue concerning Leveris's role.

Sweatt was also actively involved in exaggerating and mischaracterizing to Hamilton the ramp incident that resulted in Plaintiff's termination. His statements that he felt he should duck for cover and that he feared that Plaintiff would come out shooting – when all Plaintiff did was punch in - demonstrate that he stigmatized or misunderstood Plaintiff because of his apparent mental health problems and

operated under "myths, fears, and stereotypes" concerning mental disabilities.  He, together with Leveris, jointly caused Plaintiff's termination.   Crossken is the more difficult case, though his actions towards Plaintiff exacerbated Plaintiff's mental condition and effectively set the wheels in motion.  His contribution to the claimed discrimination is allegedly providing Plaintiff with the worst truck upon his return from mental disability leave, writing him up for the minor accident and later bad mouthing Plaintiff to his successor, Hamilton.

## IV.    CONCLUSION

WHEREFORE, Plaintiff respectfully requests this Honorable Court to deny Defendants' Motion for Summary Judgment.

Respectfully Submitted,

PAUL PIZZUTO,

By his attorney,


/s/ Richard A. Mulhearn_____
Richard A. Mulhearn
BBO #: 359680
Law Office of Richard A. Mulhearn, P.C.
41 Elm Street
Worcester, MA 01609
Tel:  (508) 753-9999

Dated: November 13, 2007.