UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PAUL PIZZUTO,                          )
     Plaintiff,                       )
                                )
v.                                     )          DOCKET NO.  04-12492 GAO
                                )
AIRBORNE EXPRESS, INC., STEVEN         )
CROSSKEN, JOSEPH HAMILTON,             )
GREG SWEATT AND ARTHUR                 )
LEVERIS,                               )
Defendants.                            )

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS OF RECORD
AS TO WHICH THERE EXISTS A GENUINE ISSUE TO BE TRIED CONCERNING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In opposition to Defendants' motion for summary judgment and pursuant to Local Rule

56.1, Plaintiff submits the following statement of material facts of record as to which there exists

a genuine issue to be tried.

1.     Plaintiff was employed as a driver by Defendant Airborne Express  ("Airborne").

Plaintiff worked for Airborne for more than 13 years. Exhibit 1, Plaintiff's MCAD complaint,

para. 1.

2.     Defendant Steven Crossken ("Crossken") was Airborne's District Field Services

Manager at Plaintiff's workplace from January 14, 2002 to March 10, 2003. Defendant Joseph

Hamilton ("Hamilton) succeeded Crossken in that position.  Exhibit 1, Plaintiff's MCAD

complaint, para. 3; Defendants' Statement of Facts, para. 18-19.

3.     In 2003, there were approximately 125 drivers at Plaintiff's worksite and 6 or 7

supervisors.  Exhibit 8, Plaintiff Dep. at 58-59.  The drivers did their own sorting and loading of

packages before going out to deliver them.  Exhibit 8, Plaintiff Dep. at 58-59 and 74-78.

**Plaintiff's Work Environment at Airborne**

4.      Airborne is a union shop.  The union is Teamsters Local 25 (the "Union").  Exhibit 1,

Plaintiff's MCAD complaint, para. 11.

5.      The work environment at Airborne was such that management would write employees up

for relatively minor infractions and impose more severe discipline than the situation called for.

Some employees, such as Plaintiff, would be subjected to increased scrutiny and singled out for

disciplinary actions.  Defendants' Exhibit 4 to Perlman Aff., Plaintiff's Ans. to Int. 12.

6.      Gerald Halloran, a union steward at Airborne for 20 years, testified that, in 2002-2003,

the work environment there had a lot of stress and friction, "like the kitchen is hot", "you're

always waiting to get it – you're always waiting to get accused of something wrong." Exhibit 2,

Halloran Dep. at 6-7.  Halloran stated that Plaintiff was being "overmanaged" by Airborne

management, that they were "scanning" Plaintiff and watching his paperwork more than other

people.  Exhibit 2, Halloran Dep. at 37.

7.      Halloran explained that the "scanning" was what was called "audit scans" conducted by

Airborne management.  Drivers would scan their out-for-delivery packages with a hand-held

computer before leaving in the morning.  Management would then select two or three drivers a

day before they left the building to "audit scan" or rescan packages on the truck to make sure the

driver had properly scanned all the packages.  Halloran stated that audit scans were not random,

but instead targeted.  Airborne scanned "who they wanted to scan."  In the last week of

Plaintiff's employment, Plaintiff was scanned four times in a week, which is "kind of high."   In

fact, one of Plaintiff's final warning letters was from an audit scan showing missed scans.

Exhibit 2, Halloran Dep. at 7-11; Exhibit 3, Warning Letter dated 7/24/03.

8.      James O'Brien, a fellow driver of Plaintiff, similarly testified that in 2002-2003 Airborne management "tended to get on" Plaintiff more than the other drivers. Plaintiff was "micromanaged."  For example, Station Managers Crossken and Hamilton would "personally" audit scan Plaintiff's truck instead of having the supervisors doing it.  They did not do that to any other driver.  Exhibit 4, O'Brien Dep. at 8-11.  Also, while an audit scan usually involved scanning 10-12 pieces, in Plaintiff's case, they scanned his whole truck.  Exhibit 4, O'Brien Dep. at 14-15.  Airborne was "hot" at the time on issuing warnings to drivers who missed scans. Plaintiff would argue with them regarding the results of the audit scans and would rescan his whole truck after the audit scan.  Management would then be "mad" at Plaintiff for not departing the station quickly enough due to this rescanning.  Exhibit 4, O'Brien Dep. at 15.

9.      O'Brien testified that the work environment at Airborne was such that drivers were not treated the same with respect to discipline, but instead some drivers were treated with more severity than others -  "they do it at their whims."   Exhibit 4, O'Brien Dep. at 11-13.  O'Brien stated that the reason for the difference in treatment was  "personality," especially with Defendants Crossken and Leveris.  If anyone questioned their authority, Crossken and Leveris would not let it go.  Instead, they would "stay on" the driver and try to "push the driver's buttons."  They would definitely do that with Plaintiff since he would respond by getting upset. Plaintiff was like "the kid in first grade" that some kids would pick on, "the more you pushed him, the more you get a reaction."  Exhibit 4, O'Brien Dep. at 13-14.  Defendant Crossken personally "micromanaged" Plaintiff instead of following the usual practice of allowing his immediate supervisor deal with him.  Crossken seemed to "have it out for" Plaintiff and Plaintiff was "paranoid" that they were out to fire him.  Defendant Leveris was "on" Plaintiff constantly. Defendant Hamilton was not as bad as Crossken, but Defendant Leveris was still the "number

two guy" so it was "business as usual" after Hamilton succeeded Crossken.  Exhibit 4, O'Brien

Dep. at 19-20.

10.      James Sambataro, a fellow driver of Plaintiff, similarly testified about the work

environment.  Defendants Crossken, Hamilton and Leveris were " always on" Plaintiff.  There

was 'no respect, no communication," " just feeding the fire back and forth."  Exhibit 5,

Sambataro Dep. at 16.  They would be "on" Plaintiff at least once or twice a week.  Exhibit 5,

Sambataro Dep. at 17-18.  Plaintiff would respond to this "as everyone else did."  There would

be raised voices by both sides. "It was always loud most of the time."  Exhibit 5, Sambataro Dep.

at 19.  There was disparate treatment on discipline depending on the supervisor or the driver

involved.  Id. at 30.  Plaintiff was singled out for discipline.  Id. at 50-51.

**Plaintiff's Mental Breakdown and FMLA Leave**

11.      During the year 2002, Plaintiff was the subject of eight separate disciplinary actions.

Exhibit 6, Plaintiff's Disciplinary Record.  These included written warnings for failure to scan

shipments, tardiness, failing to turn in a gas card, misconduct for alleged "grandstanding" on

4/4/02 when he protested the prior disciplinary actions and for inappropriate conduct on 4/5/02

for making bird sounds and other noises and insubordination. On 9/26/02, Plaintiff received a

suspension for insubordination, which was reduced to a writing warning via union intervention.

Exhibit 1, Plaintiff's MCAD complaint, para. 12 and 21.

12.      On 5/24/02, Crossken discharged Plaintiff from employment for " the cardinal offense of

dishonesty – theft of company time."  The basis for the discharge was that Plaintiff had fallen

asleep on company property during work hours while on light duty form a work injury.  Plaintiff

claims that had fallen asleep due to a combination of the medications he was taking for his work

injury and sleep apnea from which he suffered.  Plaintiff grieved the discharge through the Union

and the discharge was reduced to a two-day suspension on 6/3/02. Exhibit 1, Plaintiff's MCAD complaint, para. 14-17. Plaintiff was told to report to work on the following day, 6/4/02, but when he reported to work Crossken told him that he was "still fired" until Crossken spoke to his Regional Manager. Crossken delayed Plaintiff's return to work for an additional day. Exhibit 1, Plaintiff's MCAD complaint, para. 18-19.

13.    On 7/10/02, Plaintiff filed a harassment complaint with the union against Crossken with regard to his discharge and Crossken's alleged ongoing discrimination and retaliation against him. Exhibit 7, Plaintiff's Harassment Complaint.

14.    Plaintiff states that, during the period from 6/7/02 to 10/14/02, Crossken continued to harass him make his daily workday difficult, including issuing disciplinary actions and conducting excessive audit scans. Exhibit 1, Plaintiff's MCAD complaint, para. 21. Plaintiff characterized his treatment by Airborne management as "abuse" and "constant harassment." Exhibit 8, Plaintiff Dep. at 47-48.

15.    Plaintiff claims that Airborne's treatment of him affected his physical and emotional health. On 10/14/02, Plaintiff's doctor took him out of work. Exhibit 1, Plaintiff's MCAD complaint, para. 23. Plaintiff applied for FMLA leave because he was in a "state of mental breakdown." Exhibit 8, Plaintiff Dep. at 286-287. Plaintiff submitted a written request for FMLA leave to Airborne with medical support from his physician, Dr. John Chang. Exhibit 9, FMLA Application; Exhibit 8, Plaintiff Dep. at 285-286. The diagnoses were insomnia, sleep apnea, acid reflux, anxiety disorder, inability to cope, stress, tremor, poor concentration and "lack mechanism to cope." Id.

16.    Dr. Chang confirmed that Plaintiff was in a state of mental breakdown in October 2002, suffering severe depression and many associated medically related illnesses. Exhibit 10, Dr.

Chang Letter dated 4/24/03. Dr. Chang noted Plaintiff's history of "months of emotional insults" at work and "unfounded charges" by his manager. Plaintiff stated that he was constantly under the fear of being terminated if he stepped out of line and was in a "state of confusion" for several months. Id.

17.    Plaintiff submitted his FMLA leave request paperwork, including the medical documentation, directly to Defendant Crossken on 10/21/02. Exhibit 11, Letter to Crossken Dated 10/21/02. Defendant Leveris confirmed that FMLA paperwork like Exhibit 11 would have crossed Crossken's desk. Exhibit 12, Leveris Dep. at 12-14.

18.    By letter dated 10/28/02, Airborne corporate approved FMLA leave for Plaintiff starting 10/14/02. A copy of that approval was sent to Crossken. Exhibit 13, FMLA Approval.

19.    Plaintiff was out of work on FMLA leave from 10/14/02 to 2/24/03. He received short-term disability benefits through the Union benefit plan during that time. Exhibit 1, Plaintiff's MCAD complaint, para. 24 and 26.

20.    Plaintiff believes that he was not emotionally ready to return to work when he was released to work as of 2/24/03, that he was still "very ill and depressed" with "some serious emotional issues." He states that he was "forced" back to work by the union because the union did not want to continue to pay short-term disability benefits. The union doctor, Dr. Heckler, met with Plaintiff and asked him why he couldn't go back to work. Dr. Heckler "put" it to Plaintiff two or three times, "We need a return date to work." Plaintiff felt like he was "being backed into a corner" and "out of frustration" gave Heckler the 2/24/03 date. Exhibit 8, Plaintiff Dep. at 126-129.

21.    Plaintiff states that from the time he returned to work on 2/24/03 until he was terminated in July 2003, his emotional state was still vulnerable, making him more susceptible to stress and

impairing his ability to cope with stress.  Defendants' Exhibit 4 to Perlman Aff., Plaintiff's Ans. to Int. 4.

**Plaintiff's First Day Back from FMLA Leave**

22.      When Plaintiff returned to work from his medical leave on 2/24/03, Defendant Crossken was still the plant manager.  Exhibit 8, Plaintiff Dep. at 83.  On that first day, Plaintiff was assigned the worst truck in the station.  Exhibit 8, Plaintiff Dep. at 94.  The other drivers were "snickering" because they knew the truck Plaintiff had.  Id.  The truck had no gas and an unworkable bulkhead door key.  Plaintiff had to take the time to gas up.  The defective bulkhead door key meant that Plaintiff would not be able to properly work out of his truck cab.  He would be forced to go to the back door on every delivery.  Over the course of 60-70 deliveries, this meant much more effort and time to complete his route.  In addition, Plaintiff was provided with a scanner with missing keys, preventing him from properly scanning. Defendants' Exhibit 4 to Perlman Aff., Plaintiff's Ans. to Int. 5.  The truck was "kicking and bucking" when Plaintiff left the station and broke down within 2 miles.  Plaintiff managed to get the truck back to the station. Crossken instructed him to offload all his freight and load it onto another truck. Exhibit 8, Plaintiff Dep. at 84.  These problems caused Plaintiff to be unable to "make service" that day. Crossken had to send another driver out to assist Plaintiff with his deliveries.  Id.

23.      When Plaintiff returned to the facility after finishing his route that day, he had a very minor accident in the facility. There were skids or pallets that had been left on the floor near the entrance to the facility that Plaintiff tried to navigate around.  In the course of that, Plaintiff scraped a yellow pole resulting in yellow paint on the truck bumper.  Exhibit 8, Plaintiff Dep. at 85 and 100-103.  Crossken's response to this incident was to issue Plaintiff a written warning for a "preventable" accident.  Exhibit 6, Plaintiff's Disciplinary Record.  Plaintiff believed that the

stressful events on his first day back from medical leave led to this minor accident and that

Crossken should have taken that into account before issuing more discipline.  Exhibit 8, Plaintiff

Dep. at 85 and 99.

**Defendant Hamilton Becomes the Station Manager**

24.     Defendant Hamilton succeeded Crossken as District Field Services Manager in March

2003.  Hamilton had a meeting with Plaintiff.  Hamilton told Plaintiff that Crossken had left him

information that Plaintiff was a "troublesome employee."  Exhibit 1, Plaintiff's MCAD

complaint, para. 28-29.  Plaintiff did his best to explain his side of things to Hamilton. Id.

Plaintiff told Hamilton that he was taking medications for anxiety and depression.  Exhibit 8,

Plaintiff Dep. at 189-190.  Hamilton and Plaintiff mutually agreed to "start over from square

one" and to move on from any problems that Plaintiff had with Crossken.  Exhibit 8, Plaintiff

Dep. at 107-108.

25.     Plaintiff states that Hamilton was also aware of his medical problems because in April

2003, Plaintiff handed Hamilton the D.O.T physical paperwork that listed Plaintiff's medical

conditions and medications.  Exhibit 14, D.O.T Physical Dated 4/30/03; Exhibit 8, Plaintiff Dep.

at 191-192.  Exhibit 14 does in fact list Plaintiff's medical conditions, including sleep apnea,

anxiety and depression.  It states that Plaintiff takes paxil and that Plaintiff was out of work from

10/14/02 to 2/24/03 due to an episode of anxiety and depression.  Exhibit 14 further states that

Plaintiff would be certified as fit to drive for only 3 months (vs. the usual 2 years) until 7/30/03

pending further documentation from his doctor regarding the sleep apnea.  Id. at page 2; Exhibit

8, Plaintiff Dep. at 192-193.

26.     Plaintiff states that things "went well" for several months after Hamilton took over.  Then

Plaintiff began to notice that packages were "disappearing" from his truck.  Plaintiff spoke to

Hamilton about the missing packages, but Hamilton responded that Plaintiff was imagining it, that he was "paranoid". Exhibit 8, Plaintiff Dep. at 115; Exhibit 1, Plaintiff's MCAD complaint, para. 30; Defendants' Exhibit 4 to Perlman Aff., Plaintiff's Ans. to Int. 5.

**Plaintiff is Sent for a Drug and Alcohol Test**

27.    On 7/16/03, Defendants Hamilton and Leveris called Plaintiff into the office.  Hamilton told Plaintiff that he was suffering from paranoia and that he was making threatening gestures and looks to supervisors.  Hamilton told Plaintiff he was being sent for a drug and alcohol test. Exhibit 1, Plaintiff's MCAD complaint, para. 31-32; Plaintiff testified that Hamilton told him that he was "worried" about him, that he was "acting too suspicious."  Exhibit 8, Plaintiff Dep. at 117.  Plaintiff told Hamilton that he had "some medical issues, nothing to do with drugs and nothing to do with alcohol" and that his medical problems were known and documented. However, Hamilton insisted on sending him for the test.  Id.   Plaintiff does not believe that he was acting suspiciously or that there was any valid reason to send him for the test.  Plaintiff felt that the company was looking for an excuse to fire him.  Exhibit 8, Plaintiff Dep. at 176-177.

28.    Plaintiff was taken to a clinic for the drug and alcohol test by Defendants Hamilton and Leveris.  He was also accompanied by a union employee, James O'Brien.  Exhibit 8, Plaintiff Dep. at 170-171.  Plaintiff does not remember much of what happened or what he may have said at this time since he was "very frustrated and irate" that he was being sent for the test and that he was suffering from bipolar disorder, which may have affected his behavior and his memory. Exhibit 8, Plaintiff Dep. at 172-174.   The test came back negative for drugs and alcohol.  Exhibit 1, Plaintiff's MCAD complaint, para. 32.

28.    Hamilton wrote a memorandum, Exhibit 15, and an email, Exhibit 16, regarding the "probable suspicion" drug and alcohol test.  Hamilton stated in Exhibit 15 that Plaintiff's "mood

swings" were becoming too common and that his behavior lately with supervisors was "loud and boisterous." Hamilton states that he confirmed with Defendant Leveris that Plaintiff on more than one occasion had said that he was "heavily medicated" from his doctor. Based on his own observations and those reported to him by Supervisors Chris Demmons and Mike Trudeau, Hamilton decided to take Plaintiff out of service pending the drug and alcohol test. Chris Demmons had reported to Hamilton that Plaintiff had been acting "very paranoid and strange" and had even made some threatening remarks like "I will get you guys." Exhibit 16.

29.    Supervisor Chris Demmons wrote an email regarding his observations of Plaintiff. Defendants' Exhibit 2 to Hamilton Aff. Demmons wrote that he was Plaintiff's supervisor for fourteen months and that during that time Plaintiff had been out on workman's compensation for seven months "due to various physical and mental health issues." Demmons wrote that Plaintiff "harbors unfounded delusions" that management was conspiring against him and that Plaintiff claims "that some unknown entity is stealing freight from his truck." Demmons related that Plaintiff was unable to scan his freight correctly and that, instead of rescanning it and leaving, he spent an hour counting and recounting it, while blaming management for sabotaging him. Plaintiff kept telling Demmons that "He'd fix me … he'd get me." Demmons stated that although Plaintiff has "rambled" on like this before, "a threat is a threat, innocuous or otherwise." Demmons' opinion was that Plaintiff needed "professional help." Id.

30.    Supervisor Mike Trudeau also wrote an email regarding his observations of Plaintiff on 7/14/03. Defendants' Exhibit 1 to Hamilton Aff. Trudeau wrote that Plaintiff became irate over a problem with his package count and claimed that "someone did this to him." Plaintiff used vulgar language and stated that he would "get the guys' that did this to him and that

Trudeau knew who it was.  When Trudeau asked who Plaintiff thought that was, Plaintiff replied,

"The bald guy with glasses." This was a nonsensical response.  Exhibit 25, Hamilton Dep. at 61.

31.    James O'Brien accompanied Plaintiff to the drug and alcohol test as the union

representative.  Exhibit 4, O'Brien Dep. at 28-29.  They drove to the clinic in Leveris's truck

with Leveris and Hamilton in the front seat and Plaintiff and O'Brien in the back.  Id. at 29.

32.    The union contract permitted drug and alcohol testing of employees if there was

"probable cause," for example, if you were slurring your words, unsteady on your feet, falling

asleep – anything typical of someone under the influence of drugs or alcohol.  Exhibit 4, O'Brien

Dep. at 29-31.  O'Brien stated that this was the first time in his 20 years at that facility that

someone was pulled out of service for a drug test.  There was one for alcohol, but the guy was

drunk in the building.  Id. at 33-34.  Union Steward Gerry Halloran agrees that Plaintiff was only

the second probable suspicion drug and alcohol test in more than 20 years.  Exhibit 2, Halloran

Dep. at 13-14.

33.    Plaintiff did not appear to O'Brien to be under the influence of drugs or alcohol.  Plaintiff

just appeared very agitated about that accusation.  Exhibit 4, O'Brien Dep. at 30.  O'Brien asked

Hamilton and Leveris what was the "probable cause" for the test, but they would not answer him.

Id. at 29-31.

34.    O'Brien questioned whether Hamilton and Leveris really thought that Plaintiff was on

drugs or a danger to himself or others because they let Plaintiff drive and load his truck that

morning and work the machinery on the belt until a replacement arrived before sending him for

the drug and alcohol test.  O'Brien stated that if they thought Plaintiff was a danger, they would

not have allowed him to work the sort, but instead would have just had him sit in the breakroom.

Exhibit 4, O'Brien Dep. at 29-30 and 36.

35.    At the clinic, Plaintiff did not want Airborne to touch his urine sample.  He wanted it shipped with UPS or FedEx "because I don't trust these people."  Hamilton and Leveris starting laughing when Plaintiff said that.  Exhibit 4, O'Brien Dep. at 31-32.

36.    At the clinic, Plaintiff paid for his own separate drug and alcohol test.  The test was done immediately and came back negative.  However, Plaintiff was told that he would still be taken out of service until the official lab results came in.  Exhibit 4, O'Brien Dep. at 31-32.

37.    O'Brien never saw Plaintiff act in a threatening manner.  Plaintiff "wasn't that type of kid."  He was not a "threatening kid."  Plaintiff is "as big as a pint of ice cream."  He could be argumentative, however.  If he thought he was right, he would argue his cause.  Exhibit 4, O'Brien Dep. at 34-36.

38.    O'Brien did hear Plaintiff say to Leveris, while they were waiting to go for the drug test, "Let me tell you.  When this is said and done, the police are going to get you."  Leveris replied, "Is that a threat?"  Plaintiff said, "No, that is not a threat.  The police are going to get you." Exhibit 4, O'Brien Dep. at 34-35.  That is all O'Brien ever heard Plaintiff say.  O'Brien did not think that was a threat.  Plaintiff was saying that what they were doing was illegal and that they were going to be arrested for it.  However, O'Brien did not feel it was a police matter.  It was a union matter.  Id.

39.    O'Brien did not believe that any of the Airborne managers or supervisors were afraid of Plaintiff.  For example, Plaintiff was sitting right behind Leveris when they drove to the clinic. If Leveris were afraid of Plaintiff, he wouldn't have had Plaintiff sitting right behind him.  Also, they let Plaintiff work the sort and move his truck around that morning before the drug test. Exhibit 4, O'Brien Dep. at  36.

40.    O'Brien testified that over the years that he has seen what Airborne does when drivers actually threaten a supervisor.  The supervisors file police reports and the drivers are escorted off the property by the police.  Then it was a union issue to get your job back.  Exhibit 4, O'Brien Dep. at  37-38.

41.    On the day after Plaintiff's drug and alcohol test, O'Brien asked supervisor Chris Demmons what the probable cause was for sending Plaintiff for the test.  Demmons stated that Plaintiff was sent for the test because, the day before, Plaintiff had rescanned his whole truck and left the building 40 minutes late and did not "make service."  There was no other reason given. Exhibit 4, O'Brien Dep. at 36-37.

**Hamilton Meets with Plaintiff Concerning the Probable Cause Test Results**

42.    On 7/21/03, Hamilton met with Plaintiff regarding the test results.  Present were Hamilton, Leveris, Plaintiff and Union Steward Gerry Halloran.  Exhibit 17, Hamilton Memo Dated 7/21/03.  Hamilton informed Plaintiff that the test results were negative and that he would be paid for any lost time.  Hamilton told Plaintiff that his "mood swings" were too common and that his "paranoid behavior" was affecting his job.  Id.  Hamilton stated that Plaintiff had made "specific threats" to four supervisors, including to him, and that the next threat or statement that could be interpreted as a threat would lead to action, including termination.  Id.

43.    Plaintiff asked Hamilton what threats did he make and to whom.  Hamilton replied that they were made to Leveris, Chris Demmons, Mike Trudeau and to him, and that the threats were, "He is going to get someone," "Wait til I get him," "Joe, you will get yours."  Plaintiff answered that these were not threats to specific people, just statements he made "that when I find out who is screwing with me, I will handle."  Exhibit 17.

13

44.    Plaintiff told Hamilton at the meeting that he was under medical care and that he was taking prescribed medicines for his condition.  Plaintiff told Hamilton that if he needs to call his doctor, he should do so.  Exhibit 8, Plaintiff Dep. at 186-187.  Plaintiff states that Hamilton was "well aware" that he was having emotional issues and was on prescribed medicines when he came back to work in February 2003.  Id.

**Plaintiff's Behavior on 7/22/03 and 7/23/03**

45.  Hamilton wrote a memo on 7/22/03 regarding what he referred to as "2 more examples" of Plaintiff's "paranoia schizophrenia."  Exhibit 18, Hamilton Memo Dated 7/22/03.  The memo recites that Plaintiff complained about discrepancies in his scans and that he felt there was a "conspiracy going on."  Plaintiff then called the station pretending to be a customer to investigate the alleged discrepancies.

46.    Hamilton Hamilton wrote a memo on 7/23/03 regarding Plaintiff's alleged behavior at a group video presentation.  Hamilton claimed that Plaintiff was staring at him "with a very serious look in his eye."  Exhibit 19, Hamilton Memo Dated 7/23/03.  Hamilton goes on to say that he instructed Supervisor Greg Sweatt to do a "100% scan" of Plaintiff's truck.  Hamilton states that Plaintiff had been complaining to him on a regular basis that someone was "messing" with his truck.  Hamilton remarks, "If I audit him each day, I can prove what is on his truck at depart time."

47.    Union steward Gerry Halloran testified that audit scans were used as a weapon to "leap on an employee."  It was done to "outspoken people."  "It puts a lot of pressure on you."  Employees were discharged for it.  Exhibit 2, Halloran Dep. at 69-70.  Plaintiff told Halloran that he felt the company was "out to get him" with these audit scans.  Plaintiff could not understand why they were coming up.  Exhibit 2, Halloran Dep. at  21-22.

14

**Events of 7/24/03**

48.     Supervisor Mike Trudeau was instructed to do a full truck audit on Plaintiff on 7/24/03. Defendants' Exhibit 8 to Hamilton Aff.  Supervisor Greg Sweatt had audit scanned Plaintiff's entire truck the day before.  Id.  Trudeau recounted alleged threats made by Plaintiff while Trudeau was performing the audit scan.  Id.

49.     Plaintiff was supposed to get 3 days' pay that he lost due to being put out of service for drug test on his next regular payday on Thursday, 7/24/03.  Paychecks would come in by plane on Thursday mornings in a red bag from Airborne corporate in Seattle.  However, on Thursday morning, there was no check for Plaintiff for the lost time.  Plaintiff spoke to Defendant Leveris regarding the missing money and was told by him that he would have to file a union grievance for it.  Exhibit 8, Plaintiff Dep. at 209-211.  Plaintiff was very perturbed by this and asked Gerry Halloran, the union steward, to address it with Hamilton.  Plaintiff then left for his route.  Id. at 210.

50.     Union Steward Gerry Halloran confirms that Plaintiff was not given the check for the lost time when it was supposed to be given and that Plaintiff was upset.  Exhibit 2, Halloran Dep. at 14-16.  Halloran states that it was not necessary for Plaintiff to file a grievance to get the money, as claimed by Leveris.  Id.  Later on that day, Hamilton told Halloran that they "found" the check.  Id. at 16-17.

51.     While Plaintiff was off on his route, Hamilton and Leveris had a meeting with Halloran and Chief Union Steward Quigley.  The subject of the meeting was "problems" with Plaintiff. Hamilton and Leveris discussed that Plaintiff had been on FMLA for a mental issue and that they thought that maybe he should see a doctor or take a leave.  Exhibit 2, Halloran Dep. at 17-19. Hamilton said that Plaintiff had been threatening people and acting "weird" and paranoid.  Id.

15

Hamilton and Leveris wanted Halloran to meet with Plaintiff and tell him that he was going to be issued warning letters and to talk to him about seeing the union doctor and getting union disability benefits. Id. at 21-25. Hamilton and Leveris thought that, based on the way things were going with the scanning and arguments every day, Plaintiff or the company should get "some medical opinions on him." Id. at 24-25.

52.    Hamilton told Halloran that Plaintiff was making threats to supervisors like Chris Demmons, saying "you're going to get yours," "the FBI is going to arrest you," or "your day is coming." There was no threat of physical violence. Exhibit 2, Halloran Dep. at 19-20.

53.    Based on what Hamilton and Leveris were telling him, Halloran stated that Plaintiff's remarks were "non-threatening." If Plaintiff had been "threatening," the managers would have called the police and had him escorted from the property, liked they have done with others in the past. Exhibit 2, Halloran Dep. at 19-20.

54.    Hamilton and Leveris did not appear genuinely afraid of Plaintiff. Instead they appeared agitated and embarrassed that someone was questioning their authority. Exhibit 2, Halloran Dep. at 25.

55.    Halloran thought that Plaintiff appeared "very stressed," "angry at the company, paranoid, scared he was going to be fired." Exhibit 2, Halloran Dep. at 22. Plaintiff told Halloran that there was a conspiracy against him. When Plaintiff was being audit scanned, Plaintiff would say things to the supervisors like, "You're going to get yours, your name is going to be in the paper, the FBI is watching you." Plaintiff was ranting and talking nonsense. The threats were not physical threats and the supervisors were not afraid that Plaintiff was going to be physical. Id. at 30-32.

56.     Hamilton wrote that he met with Chief Steward Joe Quigley and Steward Gerry Halloran on 7/24/03 about Plaintiff's threats.  Halloran stated that he felt Plaintiff needed medical help because he had a similar experience with Plaintiff that morning where Plaintiff was mad about the check.  "After an hour of debate," the three decided that Gerry and Joe would take Plaintiff aside when he came off the road and ask him if he needed help.  They would offer the union's disability benefits and refer him to the Teamster doctor for help.  If Plaintiff did not think he needed help, then Plaintiff would need to meet with Hamilton and Leveris and be issued a written warning that he would be put out of service if he made any more threats or aggressive gestures.  Plaintiff was also going to be issued a written warning for failing to scan a shipment.  Exhibit 20, Hamilton Memo Dated 7/24/03.

57.     Hamilton also wrote that management has had an ongoing issue with Plaintiff's threatening behavior and paranoia and that Plaintiff's behavior had escalated to the point where Hamilton felt that Plaintiff was a safety risk.  Hamilton stated that in a long discussion with union representatives about Plaintiff on 7/23/03, they all came to the conclusion that "something was not right" with Plaintiff.  Exhibit 21, Hamilton Memo Dated 7/25/03.  Earlier that day, Plaintiff had an issue with the "way his paycheck was processed" and "this really fired him up."  On his way out of the building, Plaintiff made threatening remarks to three supervisors.  Hamilton stated that Quigley and Halloran planned to have a private conversation with Plaintiff and offer the union's disability resources to Plaintiff as help.  "Depending on how that conversation went," Hamilton was prepared to issue Plaintiff a written warning stating that Plaintiff would be terminated on the spot for the next threatening remark or gesture.  Id.

58.     When Plaintiff returned from his route, he was met by Gerry Halloran and Joe Quigley.  They handed him the check for the missing pay and said that they "found" it.  They told Plaintiff

17

that, before he could keep the check, he had to meet with Hamilton, who wanted to issue two warnings to him, one for threatening a supervisor and one for a delivery. Exhibit 8, Plaintiff Dep. at 210-212 and 226. Plaintiff stated that he "had all he could take" with the whole situation, "going for the drug test, then supposedly putting in my check, then not putting in my check, then coming back, getting my check, then telling me to go see Joe because I have two warning letters." Plaintiff gave them back the check and left. Exhibit 8, Plaintiff Dep. at 211-212.

59.     Halloran described the encounter as follows. They told Plaintiff they found his check. He was upset that they didn't give it to him that morning. Plaintiff was "pretty stressed out" about it. They told him that Hamilton wanted to see him to issue discipline to him. Plaintiff did not want to see Hamilton. Plaintiff was "kind of stressed" and left the property. Exhibit 2, Halloran Dep. at 21. Plaintiff stated that the company was out to get him and treating him unfairly, " these audit scans." Id. at 22. They discussed with Plaintiff seeing the union doctor and getting him disability insurance. Plaintiff said that he did not want to see the union doctor because he had his own doctor. Halloran told Plaintiff that maybe he should speak to his doctor if "you're stressed like this." Plaintiff said that he would take care of it himself, that he would talk to his doctor. Plaintiff said that he would be going out on FMLA or worker's compensation. Id. at 22-24.

60.     Halloran told Hamilton that Plaintiff was agitated and stressed and that he left the property. Halloran told Hamilton that Plaintiff was not interested in seeing the union doctor, that he had his own. Exhibit 2, Halloran Dep. at 25-26. Hamilton's response was that he still needed to see Plaintiff to give him the warning letters. Id. Halloran told Hamilton that we would take care of it the next morning when Plaintiff punched in. Id. at 21.

18

**Plaintiff is Terminated**

61.     On the morning of 7/25/03, Plaintiff was running late for work.  As many other employees have done, Plaintiff drove his car up the ramp to the overhead door of the building, got out of his car, walked to the time clock, punched in, walked back to his car, backed down the ramp, parked his car in the auxiliary parking lot and walked back to the building.  Exhibit 8, Plaintiff Dep. at 214-216.

62.     It was common practice for employees, including Plaintiff, to pull their cars up and punch in like Plaintiff had done that day when they were running late for work.  A half a dozen people would do that on any given day.  Exhibit 8, Plaintiff Dep. at 216-218.  They did this to punch in on time to avoid getting warning letters that were commonly distributed for being late. Id. at 216-217.  The employees would pull up the ramp "three-quarters of the way up, halfway up, almost all the way."  Id. at 218.

63.     Plaintiff reported to his workstation and worked for about an hour and a half.  Then a casual employee approached Plaintiff and told Plaintiff that he was not going to do his route, that they wanted to see Plaintiff in the office.  Exhibit 8, Plaintiff Dep. at 225.  Plaintiff went to the office and had a meeting with Hamilton, Leveris and Halloran.  Hamilton told Plaintiff that he was informed that Plaintiff had tried to run over a couple of his supervisors.  Hamilton also said that his supervisor thought Plaintiff was going to shoot him.  Id. at 227.  He asked Plaintiff what was going on with him.  Id. at 225-226.  Plaintiff replied that the night before he was supposed to get his check for the missing days for the negative drug test and he was told that he couldn't have the money until Hamilton disciplined him first.  Plaintiff stated that he was very upset with that situation and left the building.  Now he was being called in to be disciplined again.  Id. Hamilton told Plaintiff that he had two warning letters to give him and that, if Plaintiff did not want to

cooperate, he was going to fire him.  Hamilton had the two warning letters on the table and the

termination letter in his hand, right in Plaintiff's "eyesight".  Hamilton told Plaintiff that he was

going to be discharged "for all the reasons that have led up to this incident" and that "he wasn't

going to tolerate it anymore."  Id.  Leveris signed the termination letter and Hamilton handed it

to Plaintiff.  Id. at 229.

64.     The termination letter received by Plaintiff is Exhibit 22.  The written warning for

threatening comments and intimidating looks is Exhibit 23.  The written warning for missed

scans is Exhibit 3.

65.     Plaintiff states that "after the fact" Hamilton said something like "We can't help you

anymore."  Exhibit 8, Plaintiff Dep. at 227-228.  Plaintiff said, "Joe, you're not a doctor. Okay?"

"If you want to terminate me, I'm going to go right to my doctor and I'm going to explain the

situation, what's going on here" "I can't handle this anymore, emotionally, physically, I'm done,

I'm spent."  Id.  Plaintiff does not recall being offered medical help by Hamilton or the union.

Plaintiff states that he was probably having a "breakdown" right there.  Plaintiff does not recall

what he said. Everything was blurry.  Id. at 228-229.

66.     Hamilton escorted Plaintiff to his car with "two other guys" and would not let even

Plaintiff get his personal belongings from his truck.  Exhibit 8, Plaintiff Dep. at 227.  Plaintiff

drove himself to the emergency room at Holy Family Hospital.  Plaintiff wanted to be "admitted"

somewhere.  Id. at 228-229; Exhibit 24, Holy Family Hospital ER Record Dated 7/25/03.

67.     Union Steward Gerry Halloran said that Plaintiff's termination on 7/25/03 came as a

surprise.  Hamilton and Leveris had told Halloran that Plaintiff was going to get two warning

letters and that's what Halloran thought was going to happen.  Exhibit 2, Halloran Dep. at 33-34

and 36-37.  However, because Plaintiff had driven up the ramp that morning, they decided to

20

discharge him, "their mind was made up to discharge." Id. at 33-34. Halloran does not recall any discussion at the termination meeting about Plaintiff trying to hit anyone or that anyone was in any danger by the manner in which Plaintiff drove up the ramp. Id. at 35-36. Halloran testified that if Plaintiff was considered a threat and dangerous, they would have discharged him immediately and called the police. Instead they let Plaintiff load his truck for 45 minutes. Id. at 35-36. Hamilton did tell Halloran that Plaintiff drove on the property recklessly and that they were afraid that Plaintiff was going to "do something violent." Id. at 27.

68.     Halloran recalled that Hamilton said at the termination meeting that Plaintiff should see a doctor. But Plaintiff "was already seeing a doctor, so, you know, nobody can make you change doctors." Exhibit 2, Halloran Dep. at 36. Halloran thought that Plaintiff had a "stress, emotional, mental" problem and Halloran asked Hamilton and Leveris to put Plaintiff "out of service and let the doctors argue about it." Id. at 33-34. Their reaction was that they were terminating Plaintiff for just cause for driving up on the property. Id.

69.     Before Plaintiff was terminated, Plaintiff told Hamilton that he had his own doctor and that he would be going on FMLA for stress. Exhibit 2, Halloran Dep. at 59-60.

70.     Halloran stated that the company had the option to put Plaintiff out of service and have him examined by doctors, "absolutely." Exhibit 2, Halloran Dep. at 33-34. However, Hamilton and Leveris would not go that route because Plaintiff had driven up the ramp. Id.

71.     Hamilton admitted that he had an option of placing Plaintiff on involuntary medical leave, but does not recall ever investigating or thinking of that. Exhibit 25, Hamilton Dep. at 112. Hamilton also acknowledged that generally he had to give a written warning to an employee before discharging the employee for certain conduct. However, Hamilton believes that

he did not have to give Plaintiff a written warning first because Plaintiff was a "real threat" and he needed Plaintiff "out of here." Id. at 115-118.

72.    Halloran stated that Plaintiff looked "disabled" beginning in June 2003. He "started acting funny," "different" than he'd seen him before. He was acting in a "stressed" manner and "raising his voice" when disciplined. Exhibit 2, Halloran Dep. at 44-45.

73.    Hamilton's version of the termination meeting is set forth in Exhibit 21, Hamilton Memo Dated 7/25/03. Hamilton admits that his intention initially was to issue Plaintiff the two warning letters. However, based on the incident that morning, he told Halloran that "depending how the meeting went," he was prepared to put Plaintiff out on termination. Id. Hamilton stated that Supervisor Greg Sweatt had reported to him that Plaintiff had driven his car onto the dock in a reckless manner and that "the only thing that went through his [Sweatt's] mind was to hit the deck." Sweatt said that Plaintiff got out of his car, ran to the clock and punched in. Then Plaintiff returned to his car and "peeled out in reverse." Id. Hamilton states that he asked Plaintiff if he thought he needed medical help and that, if so, Hamilton would work with the company and the union to provide that help. Plaintiff's response was that he "was here to receive discipline, so issue the discipline." Id. First Plaintiff said that he was going to have his doctor write a note saying he was fine to come to work. Then Plaintiff said he "would be going on FMLA for stress." Hamilton told Plaintiff that based on his actions that morning driving his car in the building in a reckless manner, Hamilton was classifying that as "threatening gesture" and terminating him for cause. Id.

74.    Leveris set forth his version of the termination meeting in Defendants' Exhibit 10 to Hamilton Aff., Leveris Memo Dated 7/25/03. Leveris states that the first question Hamilton asked Plaintiff was "Can we help you?" Plaintiff replied, "If you have a discipline letter to issue

me give it to me now." Hamilton answered, " Paul, can we help you … yes or no?" Plaintiff

again answered, "Give me the discipline letters now." Id. Plaintiff "also stated he was going out

on FML [sic] due to stress and anxiety relating to the disciplinary actions he received." Plaintiff

also stated, "he was filing for both FML and Worker's Compensation." Leveris does not

remember whether it was before or after the termination that Plaintiff stated that. Exhibit 12,

Leveris Dep. at 43-44. During the meeting, Hamilton brought up the fact that "we were not

doctors, but we do believe Paul needs help." Leveris wrote, "I think this is an important

statement to add to this letter." Id. Leveris said that it was obvious that "something wasn't

right" with Plaintiff. Exhibit 12, Leveris Dep. at 44-45.

**Pretext in the Stated Reason for Termination**

75.    Plaintiff denied that he drove up the ramp at a high rate of speed. Plaintiff states that

Leveris "fabricated" needing to "duck out of the way." Plaintiff said that there were employees

congregating at the overhead door near the ramp, having coffee and doughnuts. Exhibit 8,

Plaintiff Dep. at 212. Plaintiff never even saw Leveris or Sweatt in that area. Id. at 222-223.

Plaintiff denies that he drove onto the dock at a high rate of speed or that he peeled in reverse.

Defendants' Exhibit 4 to Perlman Aff., Plaintiff's Ans. to Int. 5. Plaintiff just pulled his car up

the ramp and stopped either "slightly under" or "slightly over" the interior of the building.

Exhibit 8, Plaintiff Dep. at 216.

76.    James Sambataro, a fellow driver of Plaintiff, was near the time clock at the time of this

incident. He testified that he was talking with other drivers and had his back to the ramp, which

was about 40 feet away. He heard a car come up and there was a "lot of commotion,"

"laughing" "boisterous laughing" from other drivers in the area. Exhibit 5, Sambataro Dep. at

33-39. Sambataro said that the laughter was because Plaintiff had driven his car in. Sambataro

thought it was funny too.  Id. at 39.  He did not see Plaintiff actually drive in, but he heard the sound of Plaintiff's foreign car.  From the sound of the motor, Plaintiff had not driven in there fast.  Sambataro had seen "pissed off" drivers "barrel-assing" in there with their trucks faster than Plaintiff had done that day.  Id. at 34-35.

77.    Sambataro testified that he later learned that this incident was "embellished" and that Leveris claimed that Plaintiff had tried to run him over, but that Sambataro "doesn't buy that." Id. at 35-36.  Plaintiff wasn't going to run anybody over.  Id. at 34.  Sambataro testified that he saw Leveris yelling at Plaintiff after he drove in.  Id. at 34-36.  Leveris did not look "frightened." He looked "pissed off" with "flared" nostrils.  Leveris "always looked like that" "His nostrils were always flared, he looked like he was mad at the world all the time."  Id. at 37.

78.    There was nothing threatening or alarming about Plaintiff at the time of this incident. Exhibit 5, Sambataro Dep. at 43.  Sambataro also recalls that Greg Sweatt was there.  He thought that Sweatt was with him near the time clock.  Id. at 37-38.  Sweatt did not look scared or frightened and there was no interaction between Plaintiff and Sweatt at the time.  Id.  Sambataro states that none of the supervisors either ever looked afraid or ever said that they were afraid of Plaintiff.  Id. at 38.

79.    James O'Brien, a fellow driver of Plaintiff, testified that there was a practice for drivers who were late to drive up to the building and punch in before parking their cars.  The reason for that was that the company was then disciplining the drivers for being even a minute late.  Exhibit 4, O'Brien Dep. at 38-40.  O'Brien drove up like that himself and saw other drivers do it. Depending on how late they were, the drivers would stop outside and run up the ramp or drive up the top of the ramp ramp or right into the building.  Id. at 39 and 47.

80.    Sambataro similarly testified regarding the practice of drivers running late and driving up to punch in.  "Happens every day."  They would drive up the ramp and park near the overhead door and punch in.  Exhibit 5, Sambataro Dep. at 32-33.  You weren't supposed to do that, but it was not enforced, no one was written up for it.  Id.

81.    Supervisor Chris Demmons testified that he was a witness to Plaintiff's "ramp" incident. Demmons said that when Plaintiff pulled in, he was going a "good ten miles plus" an hour over the usual speed of "under five" miles an hour in that area.  Exhibit 26, Demmons Dep. at 65. Demmons said that Plaintiff got out of his car, punched in, got in his car and drove out.  Id. Demmons agreed that there was a practice for drivers running late to drive up and punch in, but states that the drivers do not drive up the ramp, but park outside and walk in.  Id. at 66-67.

82.    Supervisor Greg Sweatt testified that he was a witness to Plaintiff's "ramp" incident. Sweatt said that Plaintiff pulled into the building "going pretty fast," faster than Sweatt would have driven.  Sweatt could not estimate Plaintiff's speed.  Exhibit 27, Sweatt Dep. at 72-73. Plaintiff then jumped out of his car, punched in, went back to his car and backed out "kind of fast."  Id. at 74.  Sweatt admitted that there was a practice for drivers running late to drive up and punch in, but states that he does remember them driving into the building.  He's seen them park on the ramp and punch in.  Id. at 79-80.

83.    Leveris stated that Plaintiff punched in and "sped off in reverse."  He is not "100%" sure that Plaintiff "peeled out."   Exhibit 12, Leveris Dep. at 26.

**Plaintiff Denies Making Threatening Remarks or Gestures**

84.    Plaintiff denies making the threatening remarks and gestures attributed to him by Defendants.  He denies telling supervisors that he would catch the persons doing things to him, or that somebody was "fucking around" with him or that he'd "fix him" or "get" him.  Exhibit 8,

Plaintiff Dep. at 159-164.  Plaintiff doesn't recall telling Demmons that he was "being followed daily," but Plaintiff believes that he was being followed and was afraid that someone would steal a package out of his truck.  Id.  Plaintiff believed that someone was stealing his freight and that the company records supported his suspicions.  Id. at 165-169.

85.    Plaintiff denies that he told Hamilton and Leveris, "you will get yours" or "that I can go to bed at night without worrying."  Exhibit 8, Plaintiff Dep. at 172-173.  Plaintiff testified that he was not a "mean person" and would never say that.  However, Plaintiff states that he had bipolar disorder and was in such a state of anxiety and depression that "if I did say it, I can't recall it.  Id. Plaintiff admits that if was "speaking a bit loud" when being taken for a drug and alcohol test against his will, it could have been due to his bipolar disorder.  Id. at 174.

86.    Plaintiff denies telling the supervisors things like "wait 'til I get him," "you'll get yours" or "who is screwing with me."  Plaintiff says that was all "fabrication."  Exhibit 8, Plaintiff Dep. at 185-186.  Plaintiff denies staring at Hamilton during the video presentation.  Id. at 203-204. Plaintiff denies telling Trudeau that his kids would have to get used to visiting him in jail or that he (Plaintiff) had seen someone hang themself and was not afraid to die.  Id.  at 206-207. Plaintiff denies making any statements to supervisors that were either threats or that could be interpreted as threats.  Id. at 208.

**Plaintiff's Bipolar Disorder**

87.    Plaintiff's mother and brother had bipolar disorder.  Plaintiff's mother committed suicide in 1987 from the disease and his brother "died" from it.  Exhibit 8, Plaintiff Dep. at 34-35. Plaintiff himself "waited forever" to get treatment and "fought off taking meds" all his life because he saw what his mother went through.  Id. at 40.

88.     Plaintiff was not actually diagnosed with bipolar disorder until late 2005, when his psychiatrist, Dr. Sadowsky, made that diagnosis and began prescribing him medications for it. Exhibit 8, Plaintiff Dep. at 37-41.  Prior to that, he had been diagnosed with depression, anxiety, inability to cope, lack of concentration and sleep apnea.  Plaintiff had been prescribed different antidepressants as well as different drugs for sleep apnea by his primary care physician.  Id. and 279.  Plaintiff, however, believes that he has had bipolar disorder for 14 years, and has no doubt that he had bipolar disorder in 2002.  Id. at 40-42.

89.     Plaintiff describes the manic and depressive states of his bipolar disorder as follows.  In his depressive state, he would "go hide", not wanting to go out of the house or interact with people or his family.  In his manic state, he would "speed" in his brain and be agitated, confused and be unable to focus.  He would be very "irritable."  Exhibit 8, Plaintiff Dep. at 42-45.

90.     Plaintiff states that the effects of his bipolar disorder are lack of concentration, inability to cope, anxiety and inability to sleep.  Exhibit 8, Plaintiff Dep. at 276-277.  Plaintiff had these symptoms in July 2003.  Id. at 293-294.  Plaintiff had an inability to cope in "certain situations" that arose, but he tried to do so as best he could.  Id.  Plaintiff's bipolar disorder sometimes prevented him from remembering what freight he scanned or remembering to scan his gas card before he left the building.  Id. at 278-279.

91.     Plaintiff states that he had asked for an accommodation for his disability when he went on FMLA in October 2002.  However, Plaintiff states that, in July 2003, he wasn't given the opportunity to ask for an accommodation.  He was "fired."  Exhibit 8, Plaintiff Dep. at 294-295. Plaintiff states that the accommodation he needed was going back on short-term disability. Plaintiff does not know how long he would have needed to be out.  Id.

92.    Dr. Claudia Trombly has been Plaintiff's primary care physician since 6/13/03. Exhibit 28, Dr. Trombly Dep. at 6-7.  Plaintiff had been initially diagnosed with depression and anxiety. It was not until the fall of 2005 that Plaintiff was diagnosed with bipolar disorder and was put on the medications for that condition.  Id. at 58-59.

93.    Dr. Twombly stated that the symptoms of bipolar disorder include paranoia, mood swings, emotional outbursts, grandiose thoughts, difficulty with concentration and impulsive behavior.   Exhibit 28, Dr. Trombly Dep. at 65-67.  In a manic state, the people think they are the center of the universe and everyone is against them or for them, one or the other.  Id. at 66. People with bipolar disorder may have it as an underlying condition that is aggravated or exacerbated by situations or events, thereby bringing out the symptoms.  Id. at 68-69.  In Plaintiff's case, his depression reportedly started with problems at work, "unfounded accusations" and so forth.  Such things could have aggravated bipolar disorder.  Id.

94.    Dr. Twombly first suspected that Plaintiff had bipolar disorder in April 2005, when it was reported that Plaintiff was saying that people were trying to kill him and he always had to keep "an extra eye out."  At the same time, Plaintiff said that he felt he had "a good handle on things." The doctor said that was the "tip off," that he had that paranoia and yet felt he had a handle on things.  That "is pretty classic bipolar."  Exhibit 28, Dr. Trombly Dep. at 72-73.  The doctor agrees that Plaintiff had not been diagnosed with bipolar in 2003, but that is a very difficult diagnosis to make.  "You can't make it until someone goes manic or off the deep end.  Id. at 62-63.  Plaintiff's fear of going out, paranoid that he could not leave the house, showed a worsening of his condition.  Id. at 60.

95.    Plaintiff's psychiatrist, Dr. Marc Sadowsky, testified that Plaintiff was diagnosed by him with bipolar disorder in the fall of 2005, shortly after first seeing him.  Exhibit 29, Dr. Sadowsky

Dep. at 61-62.  The reported symptoms that led to that diagnosis were mood swings, irritability, racing thoughts, episodes of euphoria, rapid loud speech and the worsening of Plaintiff's symptoms on anti-depressant medication.  Id. at 62-63.  Other symptoms of bi-polar disorder are paranoia, impaired judgment and impulsive behavior.  Id. at 63-64.  People with bipolar tend to seek treatment when they are depressed, since, when they are manic, they generally "feel really good" and so deny that there is anything wrong with them.  Id. at 69-70.

96.    Dr. Sadowsky testified that if Plaintiff had emotional outbursts at work, was yelling at supervisors, making threats, claimed he was being persecuted, claimed that there was a conspiracy against him, and had trouble scanning freight and doing simple tasks – that conduct would be consistent with bipolar disorder.  Id.  The doctor stated that he would not be surprised that Plaintiff had bipolar in 2003.  Exhibit 29, Dr. Sadowsky Dep. at 72.

97.    People that develop bipolar disorder have a predisposition to it.  Traumatic or stressful events may precipitate it.  Exhibit 29, Dr. Sadowsky Dep. at 76-77.  Plaintiff's work stressors or his treatment at work would not have caused his bipolar disorder, but clearly it exacerbated things for him.  Id. at 78-79.

98.    Dr. Sadowsky testified that if Plaintiff had not been fired, but instead had been put out on involuntary medical leave with the opportunity for treatment, there is clearly a possibility that that would have been helpful to Plaintiff.  Exhibit 29, Dr. Sadowsky Dep. at 74.  The treatment would be medications and psychotherapy.   Plaintiff has had improvement with the medications prescribed or him by Dr. Sadowsky and Plaintiff's prognosis would be between guarded and good, depending largely on Plaintiff following through on treatment recommendations.  Id. at 76.

Respectfully Submitted,


PAUL PIZZUTO,

By his attorney,


/s/ Richard A. Mulhearn_____
Richard A. Mulhearn
BBO #: 359680
Law Office of Richard A. Mulhearn, P.C.
41 Elm Street
Worcester, MA 01609
Tel:  (508) 753-9999

Dated: November 12, 2007.

Commonwealth of Massachusetts
Massachusetts Commission Against Discrimination

RECEIVED
DEC 1 5 2003
COMMISSION AGAINST DISCRIMINATION

DOCKET NUMBER:                          EEOC/HUD NUMBER:
FILING DATE:                            VIOLATION DATE: July 25 2003

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Name of Aggrieved Person or Organization:
Paul Pizzuto
59 Rollins St.
Lawrence, MA 01841
(978) 685-9005

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Named is the employer, labor organization, employment agency, or state/local government
agency who discriminated against me:
Airborne Express
200 Fallon Road
Stoneham, MA 02180
*1- See ... PR. 2676*

Telephone Number:                       No. of Employees:  100+

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Named is the employer, labor organization, employment agency, or state/local government
agency who discriminated against me:
Steven Crossken
c/o Airborne Express
200 Fallon Road
Stoneham, MA 02180

Telephone Number:                       No. of Employees:  n/a

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Named is the employer, labor organization, employment agency, or state/local government
agency who discriminated against me:
Joseph Hamilton
c/o Airborne Express
200 Fallon Road
Stoneham, MA 02180
Telephone Number:                       No. of Employees:  n/a

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Named is the employer, labor organization, employment agency, or state/local government
agency who discriminated against me:
Greg Sweatt
c/o Airborne Express
200 Fallon Road
Stoneham, MA 02180
Telephone Number:                       No. of Employees:  n/a

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Exhibit  1

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Named is the employer, labor organization, employment agency, or state/local government
agency who discriminated against me:
Arthur Leveris
c/o Airborne Express
200 Fallon Road
Stoneham, MA 02180
Telephone Number:                    No. of Employees:  n/a

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Cause of Discrimination based on:

Disability
Perceived disability
Retaliation

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


The particulars are:          SEE ATTACHED SCHEDULE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

( X )     I ALSO WANT THIS CHARGE FILED WITH THE EEOC.


DATE: December 12, 2003

Signature of Complainant


SWORN TO AND SUBSCRIBED BEFORE ME THIS 12th DAY OF DECEMBER 2003.


Richard A. Mulhearn, Notary Public
My Commission Expires: 01/29/10

<u>SCHEDULE TO CHARGE OF DISCRIMINATION OF</u>
<u>PAUL PIZZUTO</u>

1.    I was employed as a trucker by Respondent Airborne Express ("Airborne") beginning on or about March 2, 1990 until my termination from employment on July 25, 2003. I worked for Airborne for more than 13 years.

2.    Respondent Steven Crossken ("Crossken") was at times material Airborne's District Field Services Manager at my facility and a supervisor over me.

3.    Respondent Joseph Hamilton ("Hamilton) was at times material Airborne's District Field Services Manager at my facility and a supervisor over me. Hamilton succeeded Crossken in that position in or about March 2003.

4.    Respondent Greg Sweatt ("Sweatt") was at times material was a supervisor of Airborne at my facility.

5.    Respondent Arthur Leveris ("Leveris") was at times material was a supervisor of Airborne at my facility.

6.    As of 3/13/02, I was an employee in good standing at Airborne with no outstanding warnings or disciplinary actions.

7.    On 3/13/02, I suffered a work-related injury to my right calf. The injury was duly reported to Airborne that day. I did not seek medical attention initially and I continued to work following the injury. However, I continued to have pain from the injury.

8.    On or about 4/16/02, I sought medical attention due to worsening symptoms. I was diagnosed with a medial gastroc tear of the right calf. I was referred to physical therapy and prescribed Vioxx for pain.

9.    I was out of work from approximately April 15, 2002 until April 29, 2002 from this work injury and then returned to work on a light duty basis. I received worker's compensation benefits for this period.

10.    Airborne is self insured for worker compensation purposes. Airborne makes ultimate decisions with regard to the payment of benefits and is financially responsible for the full cost of benefits paid.

11.    Airborne is a union shop. The collective bargaining representative is Teamsters Local 25.

12.     Shortly after my work injury, I began to receive written warnings for various alleged infractions. I received a warning for tardiness on 4/2/03 for tardiness dating back to 1/8/02. On 4/4/02, I received a warning for "careless and neglectful performance of duties" for failing to turn in a gas card. On 4/5/02, I received a warning for job misconduct for alleged "grandstanding" on 4/4/02 when I protested the prior disciplinary actions and for inappropriate conduct on 4/5/02 for making bird and other noises.

13.     I believe that these disciplinary actions were discriminatory and/or retaliatory and were issued because of my work injury. The issuance of these multiple warnings represented disparate treatment on account of my work injury.

13.     On approximately 4/29/02, I returned to work with restrictions under Airborne's light duty program, which it calls the Early Return to Work Program (ERTW Program).

14.     On 5/24/02, I was discharged from employment by Respondent Crossken for what he stated was " the cardinal offense of dishonesty – theft of company time."

15.     The basis for my discharge was that I had fallen asleep on company property during work hours while on light duty. I had fallen asleep due to a combination of the medications I was taking for my work injury and sleep apnea from which I suffer.

16.     I believe that my discharge was discriminatory and/or retaliatory and was done because of my work injury. My discharge represented disparate treatment on account of my work injury.

17.     I grieved the discharge through the union. A grievance meeting was held between the union and Airborne management on 6/3/02. The result of the grievance meeting was that the discharge was reduced to a two-day suspension. I was told to report to work on the following day, 6/4/02.

18.     When I reported to work as instructed on 6/4/02, Respondent Crossken told me that I was still fired until he spoke to his Regional Manager. I was not allowed to work.

19.     Later that day, I was called by the union steward and was told to report to work on 6/5/02.

20.     On or about 6/7/02, I was released by my doctor to full duty. I worked at my regular job from approximately 6/7/02 to 10/14/02.

21.     On 7/10/02, I made a harassment complaint to the union against Crossken with regard to my discharge and his ongoing discrimination and retaliation against me. My harassment complaint detailed his actions in terminating me, refusing to allow me to return to work on 6/5/02 as agreed, interfering with my receipt of proper pay and/or worker's compensation benefits for time lost due to my discharge and telling me on 7/3/02 to remove a shirt that had Airborne's logo because it was not a shirt issued by the company.

21.     During the period from 6/7/02 to 10/14/02, Crossken continued to harass me (as indicated above) and to attempt to make my daily workday difficult. In addition, he resumed issuing me disciplinary actions. On 8/8/02, I received a written warning for insubordination. On 9/26/02, I received two suspension notices for insubordination.

22.     I believe that these disciplinary actions and harassment were discriminatory and/or retaliatory and were issued because of my work injury. The issuance of these disciplinary actions and the ongoing harassment represented disparate treatment on account of my work injury and retaliation based on my protesting and/or opposing this discrimination.

23.     The discrimination and retaliation took a tremendous toll on my physical and emotional health. On 10/14/03, my doctor took me out of work. The diagnoses were insomnia, sleep apnea, acid reflux, tremor, poor concentration and anxiety.

24.     I was out of work from 10/14/02 to 2/24/03 for these conditions.

25.     I filed for worker's compensation benefits for this period of disability. The claim was denied by Airborne. Litigation concerning this claim is still pending before the Department of Industrial Accidents.

26.     I did received short-term disability benefits and FMLA leave for this period of disability.

27.     When I returned to work on approximately 2/24/03, Crossken continued to harass me and to attempt to make my daily workday as difficult as possible. However, I tried to avoid interaction with him as much as possible.

28.     In or about mid-March 2003, Crossken was transferred to a different Airborne facility. Respondent Hamilton replaced Crossken as District Field Services Manager at my facility.

29.     Subsequently, Hamilton had a long discussion with me. Hamilton told me that Crossken had left him information that I was a troublesome employee. I did my best to explain my side of things to Hamilton. I thought that we had a meeting of the minds.

30.     Things went well for several months. Then, packages began to disappear from my truck. I spoke to Hamilton about this. Hamilton told me that I was imagining that packages were missing. However, it was showing on the computer that they were missing.

31.     7/16/03, Respondents Hamilton and Leveris called me into the office. Hamilton told me that I was suffering from paranoia and that I was threatening supervisors with gestures and looks.

32.     Hamilton sent me that day to a lab for drug and alcohol testing. The results were negative. I then went back to work.

33.     From 7/21/03-725/03, I still suspected that packages were being taken from my truck. The computer appeared to support my suspicion. I discussed this with Hamilton.

45.    I am a qualified handicapped person within the meaning of M.G.L. c. 151B.

46.    Rather than accommodate my work related disability, Airborne harassed me and terminated me instead.

47.    I believe that I have been replaced by a non-handicapped person.

48.    I believe that Respondents have discriminated me against because of my disability, record of a disability and/or perceived disability in violation of M.G.L. c. 151B, §4(16).

49.    I believe that Respondents have retaliated against because of opposition to their discriminatory practices of M.G.L. c. 151B, §4(4).

50.    I believe that Respondents Crossken, Hamilton, Sweatt and Leveris also violated M.G.L. c. 151B, §4(4A) (intimidation and interference) and M.G.L. c. 151B, §4(5)(aiding and abetting).

51.    As a result of Respondents' conduct, I have suffered emotional distress and financial losses.

## Page 1

Volume I
Pages 1-82
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Docket No. 04-12492-GAO

PAUL PIZZUTO,
    Plaintiff,
vs.

AIRBORNE EXPRESS, INC., STEVEN
CROSSKEN, JOSEPH HAMILTON,
GREG SWEATT and ARTHUR
LEVERIS,
    Defendants.


    DEPOSITION OF GERALD HALLORAN, called as a
witness by counsel for the Plaintiff, pursuant to
the applicable provisions of the Federal Rules of
Civil Procedure, before Jennifer A. Doherty, CSR
No. 1398F95 and Notary Public in and for the
Commonwealth of Massachusetts, taken at the
offices of Richard A. Mulhearn, 41 Elm Street,
Worcester, Massachusetts on Thursday, June 14,
2007 commencing at 3:06 p.m.


***************************************

    FLYNN REPORTING ASSOCIATES
    Professional Court Reporters
    One Exchange Place
    Worcester, Massachusetts 01608
    (508) 755-1303 * (617) 536-2727
    TOLL FREE: (888) 244-8858
    FAX: (508) 752-4611

## Page 2

1  APPEARANCES:
2    BY: Richard Mulhearn, Esq.
      41 Elm Street
3    Worcester, Massachusetts 01609
      For the Plaintiff.
4
5
6
7  SULLIVAN, WEINSTEIN & McQUAY, P.C.
    BY: C. Max Perlman, Esq.
8    2 Park Plaza
      Boston, Massachusetts 02116
9    617-348-4300
      max@swmlawyers.com
10  For the Defendants.
11
12
13
14
15
16
17
18
19
20
21
22      Exhibit 2
23
24

## Page 3

1
             I N D E X
2  Testimony of:  Direct  Cross  Redirect  Recross
3  GERALD HALLORAN
      by Mr. Mulhearn 4
4    by Mr. Perlman      39
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 4

1
        P R O C E E D I N G S
2        STIPULATIONS
3      It is stipulated by and between counsel
4  for the respective parties that the deposition
5  transcript will be read and signed by the
6  deponent within thirty (30) days of receipt of
7  transcript under the pains and penalties of
8  perjury. The filing and the notarization are
9  hereby waived.
10      GERALD J. HALLORAN, having been
11  satisfactorily identified and duly sworn by the
12  Notary Public was examined and testified as
13  follows:
14      DIRECT EXAMINATION
15  BY MR. MULHEARN:
16    Q.  State your full name for the record,
17  please.
18    A.  Gerald John Halloran.
19    Q.  And spell your last name, please.
20    A.  H-A-L-L-O-R-A-N.
21    Q.  Where do you live?
22    A.  I live at 14 East Eglin Boulevard in
23  Londonderry, New Hampshire.
24    Q.  Do you have any plans on moving from

Page 5

1  there in the next year or so?
2      A.  Not within the next year, no.
3      Q.  Are you currently employed?
4      A.  No.
5      Q.  Who is your last employer?
6      A.  DHL.
7      Q.  How long did you work for DHL?
8      A.  I worked for DHL and their subsidiary,
9  Airborne Express, for 29 years.
10     Q.  What was your position at -- we'll call
11 it Airborne, I'll combine them.
12     A.  Courier.
13     Q.  Is that the same as a driver?
14     A.  Yes.
15     Q.  Did you work at more than one
16 facility?
17     A.  Yes.
18     Q.  Did you also work out of the Stoneham
19 facility?
20     A.  Yes.
21     Q.  Is it Stoneham?
22     A.  Stoneham.  It doesn't really matter.
23     Q.  Can you tell me approximately the year
24 you worked out of Stoneham?

Page 6

1      A.  I would say Stoneham -- I worked there,
2  I would say it was 1999 to 2005.
3      Q.  Directing your attention to the years
4  2002, 2003, you were working there then?
5      A.  Yes.
6      Q.  Who were the station managers during
7  that period of time?
8      A.  Crossken, Joe Hamilton comes to mind --
9  in the five-year period there was eight or nine
10 of them.  Hamilton, I believe, the other one was
11 Crossken.
12     Q.  Did you also hold any union office
13 while you worked at Airborne?
14     A.  Yes, I was the chief steward and --
15 steward for approximately 20 years.  Steward and
16 chief steward, chief steward is a steward but
17 he's a chief steward.
18     Q.  You were a steward but also at times
19 you were the chief steward?
20     A.  Yes.
21     Q.  In the year 2002, 2003, if you
22 remember, were you chief steward or steward?
23     A.  I was acting steward.  The steward was
24 called up by the National Guard, they asked me to

Page 7

1  cover.
2      Q.  Was that David Valone (phonetic)?
3      A.  Yes.
4      Q.  What was your job as acting steward?
5      A.  Present grievances, be witness to
6  disciplinary actions.  That's about it.
7      Q.  Can you describe the work environment
8  there at the Stoneham site in 2002, 2003 as far
9  as management and drivers?
10         MR. PERLMAN:  Objection.
11     A.  Very fast paced, going through a
12 transition with a new merging company, a lot of
13 friction, a lot of stress.
14     Q.  What kind of friction do you
15 remember?
16     A.  Problems over productivity, the
17 scanning procedures, absenteeism.
18     Q.  And when you say "friction," what do
19 you mean?
20     A.  Like the kitchen is hot, you're always
21 waiting to get it -- you're always waiting to get
22 accused of something wrong.
23     Q.  What was it about the scanning
24 procedure that led to that?

Page 8

1      A.  They started to be very strick on their
2  out-of-delivery scans and they you would leave in
3  the morning and you would scan each package which
4  you would scan on the hand-held computer, loading
5  on the truck then -- to me, they did because I
6  wouldn't leave the building until -- but other
7  people would leave.  Then you come in in the
8  afternoon and some people tell you you were off,
9  you didn't scan.
10     Q.  And you acted differently at that
11 time?
12     A.  Myself, personally?
13     Q.  Yes.
14     A.  Yes, I wouldn't leave the building
15 until they tell me I was short.
16     Q.  How would someone know whether you were
17 short or not?
18     A.  They would download that scanner, the
19 supervisor would download his scanner then I
20 would download my scanner, and it would show
21 up -- print a report immediately.
22     Q.  By comparing the two reports, you could
23 tell who was off?
24     A.  Yes.  That could be done immediately.

Page 9

1  I don't know if anybody else did it but I always
2  did it because I didn't want to be on the road
3  all day — if I have a problem discrepancy —
4      Q.  Where the supervisor would have scanned
5  items, was that during some sort of special
6  procedure or was that every day?
7      A.  They did different drivers every day.
8      Q.  Are you referring to an audit scan?
9      A.  Yes.
10     Q.  You're saying when this was an audit
11  scan you would make sure everything was okay
12  before you left?
13     A.  I would.
14     Q.  How often were trucks audit scanned
15  during than time?
16     A.  I would say some of them were scanned,
17  depending who they picked, every day they scanned
18  somebody, they had to, but two or three a day
19  maybe.
20     Q.  Were those audit scans, were they
21  random?
22     A.  I would say they were targeted.
23     Q.  Describe that answer, explain that.
24     A.  Random would be if it was computer

Page 10

1  generated, the computer told you to scan Route
2  42, that would be random, or if you put the truck
3  members in a box, they scan -- they scanned them
4  who they wanted to scan.
5      Q.  Were some people scanned more than
6  others?
7      A.  Yes, certainly.
8      Q.  Was Paul Pizzuto one of those people?
9      A.  The week that I had problems with him
10  he was scanning probably a lot more than usual,
11  four times in a week which is kind of high.
12     Q.  You prefaced that by something like the
13  week that you were having problems with him, what
14  do you mean?
15     A.  The week that he was discharged,
16  according to my notes that I read, the week --
17  the two weeks previous to his discharge, part of
18  the problem was this audit scan, particularly
19  post office.
20     Q.  When you say one of the problems, you
21  mean something he's being given discipline over
22  it?
23     A.  Yes, I believe he got a warning letter
24  for audit scan, I believe it was three or four

Page 11

1  pieces they said he was off.
2      Q.  Do you remember, was it the post
3  office?
4      A.  Yes.
5      Q.  Was there something about the post
6  office that was generally a problem or just for
7  him?
8          MR. PERLMAN:  Objection.
9      A.  It was a problem for everybody.  The
10  problem being it was a lot of volume, a lot of
11  packages, and the decision sometime was made late
12  in the breakdown to take it out.  Another problem
13  I encountered with the post office is it had five
14  or six different bar codes on the box, a lot of
15  DHL's packages as they were merging all different
16  companies together, when you're in a hurry you
17  scan one, then you scan the wrong one, your
18  supervisor would scan the right code, you'd still
19  be in trouble.  Hey, you got to fix this bar
20  code.  No, it scanned the right one.  I'm suppose
21  to take the package like this -- let it -- it was
22  a problem, a very high pressure thing that
23  delivery scan.
24     Q.  Do you remember Mr. Pizzuto getting

Page 12

1  some sort of discipline over that issue during
2  the last week?
3      A.  Yes, I believe the issue – the letter
4  the day he was discharged for it.  They were
5  going to issue it before he was discharged in
6  June, and like I said, as acting steward, I
7  wouldn't have kept the file at that time, so I'm
8  sure there were other letters before that.
9      Q.  Do you recall that last week of Mr.
10  Pizzuto's employment?
11     A.  Yes.
12     Q.  Were you aware that he was sent for a
13  reasonable suspicion drug and alcohol test?
14     A.  I became aware of it after the fact,
15  yes.
16     Q.  How did you become aware of it?
17     A.  Through management, probably a
18  supervisor or everybody knew at the time they
19  took Paul for a drug test, everybody in the
20  building knew.  I become aware of it.  I wasn't
21  present for the drug test.
22     Q.  Was there any reason why you were not
23  present?
24     A.  I believe I was on vacation that week,

## Page 13

1   or I was out that day because I would have
2   definitely been part of it.
3       Q.  Was this reasonable suspicion test, is
4   this something covered by the contract?
5       A.  It is probable suspicion.
6       Q.  All right.
7       A.  Yes, it is covered.
8       Q.  And during the time that you worked at
9   Airborne/DHL how many times has somebody been
10  sent for a probable suspicion drug or alcohol
11  test?
12          MR. PERLMAN:  Objection.
13      A.  I believe he was only second one.  I
14  believe there was only one for alcohol.
15      Q.  Do you remember the circumstance for
16  that one for alcohol?
17      A.  I believe the person was slurring
18  speech and he smelt heavily of alcohol.
19      Q.  Two tests in how many years?
20      A.  Since the government instituted the
21  testing and I really can't give you that, because
22  the testing was mandatory -- the random ones,
23  there is three type of post testing.  When CDL
24  come in existance, maybe 1990.

## Page 14

1       Q.  From 1990 until you stopped working?
2       A.  Yes.
3       Q.  Two tests?
4       A.  Yes, for that, two tests for random.
5       Q.  Specifically, probable suspicion?
6       A.  Right.
7       Q.  What happens if management wants you to
8   take a probable suspicion test, could that be
9   forced on you or is that voluntarily?
10          MR. PERLMAN:  Objection.
11      A.  It is voluntarily, but you can be
12  discharged if you refuse.
13      Q.  Were you consulted at all by Mr.
14  Pizzuto about whether he should --
15      A.  I was not, on that day, no.
16      Q.  Under the contract, if somebody was to
17  be sent for a probable suspicion drug test and
18  were to pass the test, but lost time in the
19  meantime, what was suppose to happen?
20      A.  He would be paid for his time out,
21  any time he lost including overtime.
22      Q.  Was there any timing on when that
23  payment had to be made to him?
24      A.  Yes, usually you get it when you -- end

## Page 15

1   of your next check, depending on how it fell if
2   you lost Thursday and Friday you would get the
3   following Thursday.  If you lost Thursday, Friday
4   and Monday you get it two days the next week, the
5   day you lost within the payroll period.
6       Q.  During that pay period, was payroll on
7   Thursday?
8       A.  Yes.
9       Q.  Do you know how the payroll checks
10  would arrive at the facility?
11      A.  Yes, they come in company bag from our
12  own aircraft, DHL.
13      Q.  From out of state?
14      A.  Yes, Seattle, Washington, I think they
15  were coming out of at that time, if not they were
16  coming out of Florida.
17      Q.  And for a worker under those
18  circumstances that was sent for that drug test
19  and passed it, would they have to file a
20  grievance to get paid?
21      A.  Normally not, no.
22      Q.  Do you remember the situation with Paul
23  Pizzuto about him getting paid for the time lost
24  due to the drug test?

## Page 16

1       A.  Yes.
2       Q.  What do you remember about that?
3       A.  I remember that we were in a meeting
4   previous, just after the test, and Joe Hamilton
5   told him that he would get paid all the lost time
6   and the following Thursday, when it was due --
7   the check was -- didn't -- they didn't give him
8   the check.  They said it didn't come in, so he
9   got upset about that.  Later on that afternoon
10  when I come in, they found the check.  And I
11  believe, at the time, Joe Hamilton said the
12  reason they didn't have the check in the morning
13  is because they addressed the check to him.  He
14  hadn't open the envelope that morning.
15      Q.  Do you know if Mr. Hamilton was aware
16  at all earlier during the day that Mr. Pizzuto
17  was looking for his check?
18      A.  I believe management was.
19      Q.  Did you have any role with regard to
20  getting Mr. Pizzuto his check?
21      A.  No.  I just went in and asked him for
22  it when I came off the road, they found it.
23      Q.  Thereafter, did you have any role with
24  regard to the check?

Page 17

1    A.  We had a meeting that night and check
2  come in. -- we had a meeting with Mr. Hamilton,
3  and I believe Mr. Quiggly was with me, I
4  believe.
5    Q.  Who was Mr. Quiggly?
6    A.  He was the chief steward.
7    Q.  Did he work at that same site?
8    A.  No.  He worked in South Boston.
9    Q.  Was Mr. Quickly brought there
10  especially for this meeting?
11    A.  Yes.
12    Q.  Do you recall what the nature of the
13  meeting was?
14    A.  The nature of the meeting was problems
15  with Paul Pizzuto.
16    Q.  Who was part of the meeting?
17    A.  Mr. Hamilton, supervisor named
18  Leveris.
19    Q.  You and Mr. Quiggly?
20    A.  Correct.
21    Q.  Was Mr. Pizzuto part of the meeting?
22    A.  Yes.
23    Q.  Did you say a meeting at the end of the
24  day?

Page 18

1    A.  Which we were waiting for Mr. Pizzuto
2  to come in.  He was going to be part of the
3  meeting.  This meeting was going to be for him,
4  yes.
5    Q.  Before Mr. Pizzuto had arrived back to
6  the station, before the planned meeting, had you
7  met with Hamilton and Leveris?
8    A.  I met with -- yes, Mr. Hamilton, yes.
9    Q.  Just Hamilton?
10    A.  Mr. Leveris was there, too, I
11  believe.
12    Q.  What was being expressed to you?
13    A.  That they had problems with Paul
14  Pizzuto.  They thought that -- we talked about
15  medical issue because he had been out on family
16  medical leave, we thought -- they thought it was
17  discussed that maybe he should see a doctor or
18  take a leave.
19    Q.  Was it discussed that he had been on
20  FMLA leave for some sort of mental issue?
21    A.  Correct.  Just the meeting that he had
22  been threatening people, acting weird,
23  paranoid.
24    Q.  That was spoken by Mr. Hamilton?

Page 19

1    A.  Yes, correct.
2    Q.  Had you observed any of that same
3  behavior from Mr. Pizzuto?
4    A.  I observed him being very stressed,
5  yes.
6    Q.  Have you ever observed him threatening
7  anyone?
8    A.  I personally not.
9    Q.  Staying on that theme, what did
10  Hamilton tell you about who was being threaten?
11    A.  Supervisors like Chris Stemmons. Paul
12  would say, you're going to get yours, the FBI is
13  going to arrest you, maybe, Your day is coming.
14  Nothing -- I was never -- nothing of, I'm going
15  hurt you, or I'm going to shoot you, or I'm going
16  to stab you.
17    Q.  No threat of physical violence?
18    A.  If it would have been physical, I think
19  the company wouldn't have tolerated it.  I took
20  it, You're going to get yours, you're going to
21  get fired.
22    Q.  When you say you took it that way,
23  based on what they were telling you --
24    A.  Based on what they were telling me,

Page 20

1  right.
2    Q.  What did it appear to be to you?
3    A.  It appeared to be non-threatening
4  because if it was threatening, I believe they
5  would have called the police or they would have
6  terminated him at the time.
7    Q.  Had there been a custom or practice at
8  that workplace if someone was threatening someone
9  that the police would be involved?
10    MR. PERLMAN:  Objection.
11    A.  I would say, yes, if somebody
12  threatened them, they would call the police to
13  escort that person from the property.
14    Q.  Did that happen in this case?
15    A.  No.
16    Q.  Did Mr. Hamilton ask you to do
17  anything?
18    A.  He asked me to have a meeting with Paul
19  because they were going to issue him a warning
20  letter.  The meeting never transpired, though,
21  because Paul was upset.  He wanted to go to his
22  doctor.  He left the property with me and
23  Mr. Quiggly, he left the property.
24    Q.  Had Mr. Hamilton asked you to

Page 21

1  specifically do anything with regard to Pizzuto
2  at that time before --
3      A.  No, other than having a meeting with
4  him to discuss what was going on, to tell him he
5  was going to issued these warning letters, but
6  the meeting never took place on that Thursday.  A
7  meeting took place with Paul and me and Quiggly
8  and Paul, but never me and Mr. Hamilton.
9      Q.  Can you describe the meeting you had
10 with Paul when he came back that time?
11     A.  I told Paul we found his check, he was
12 upset that why didn't they give it to me this
13 morning, he was pretty stressed out about it.
14 You got it.  Joe wants to see you.  He thought
15 that was going to be discipline and he didn't
16 want to see him.  He was kind of stressed, he
17 left the property and I told Mr. Hamilton that we
18 would take care of it the next morning when Paul
19 punched in, to let it go.
20     Q.  Did you tell Paul it was okay to
21 leave?
22     A.  No, I didn't, no.
23     Q.  You said Mr. Quiggly had a meeting with
24 Mr. Pizzuto at the same time?

Page 22

1      A.  He was present with me, yes.
2      Q.  The three of you?
3      A.  Yes.
4      Q.  Was there anything else discussed there
5  with regard to anything?
6      A.  No, other than that just Paul thinking
7  that they were out to get him, they were treating
8  him unfairly, these audit scans, he couldn't
9  understand why they were coming up.
10     Q.  Were those the audit scans you
11 mentioned before, the four times a week ones?
12         MR. PERLMAN:  Objection.
13     A.  Yes.  I did say to Paul, Maybe you
14 should speak to your doctor, if you're stressed
15 like this.  I think he asked me, Maybe I should
16 see a doctor and I said maybe I do, but.
17     Q.  What did Mr. Pizzuto's state of mind
18 appear to be at that time?
19     A.  Very stressed.
20     Q.  Since people used different words for
21 different things, can you expand a little bit on
22 that?
23     A.  Angry at the company, paranoid, scared
24 that he was going to be fired.

Page 23

1      Q.  When you say "paranoid," what do you
2  mean?
3      A.  Paranoid that -- when you get paranoid
4  when you think somebody is going to fire you
5  because of the drug tests and a warning letter
6  and all these meetings in a row, paranoia sets
7  in, what did I do wrong.
8      Q.  You said Paul was acting paranoid, what
9  was he doing to make you think that?
10     A.  Just by not wanting to talk about it,
11 not -- I'll take care of it myself, I'll take to
12 my doctor.  I'll be going out on FMLA, I'll go on
13 workman's comp.
14     Q.  At that meeting he was talking about
15 perhaps going out on FMLA?
16     A.  Correct.
17     Q.  Or workman's comp?
18     A.  Yes.
19     Q.  Who raised the subject of doctors or
20 medical treatment?
21     A.  All four of us talked about it.  Me,
22 Mr. Quickly, Mr. Leveris, Mr. Hamilton talk about
23 it.
24     Q.  And what was said?

Page 24

1      A.  What was said that if we thought -- we
2  had a program that -- if he did go out there,
3  would be some disability, but Paul had already
4  had a previous problem, which I wasn't a part of,
5  so when we discussed it with Paul, he didn't want
6  the union doctor because he had his own doctor,
7  but we were still interested in getting him
8  disability insurance which we can -- 26-week's
9  pay for you if you have a medical problem.
10     Q.  Could you get that if he didn't see the
11 union doctor?
12     A.  Absolutely.
13     Q.  Were you describing that to Paul at the
14 time?
15     A.  Yes.  It wasn't important to him at the
16 time.
17     Q.  Before you met with Paul and getting
18 back to that conversation with Paul and Leveris,
19 they were suggesting that maybe he should go out
20 with this kind of disability?
21     A.  Absolutely.  The way the situation was
22 going with the scanning and arguments every day
23 that he should get some get some medical opinion
24 or he already was, or the company should get some

Page 25

1  medical opinions on him.
2      Q.  Did either Hamilton or Leveris appear
3  genuinely afraid of Mr. Pizzuto?
4          MR. PERLMAN:  Objection.
5      A.  No.
6      Q.  How would you describe how they
7  presented themselves?
8      A.  Agitated, embarrassed.
9      Q.  Embarrassed?
10     A.  Yes, that somebody was questioning
11 their authority.
12     Q.  So you raised this idea of disability
13 with Mr. Pizzuto when he comes back?
14     A.  Yes.
15     Q.  And he was not interested --
16     A.  Yes, he was not.
17     Q.  He wasn't interested in seeing the
18 union doctor but he was thinking about seeing his
19 own?
20     A.  He had been seeing his own, yes, and I
21 believe he said he was going to go out on FML,
22 which I believe, or workers' comp.
23     Q.  After you met to Mr. Pizzuto, did you
24 go back and speak to Mr. Hamilton?

Page 26

1      A.  After Paul left the property, I did,
2  yes.
3      Q.  What was told to Mr. Hamilton?
4      A.  That he was agitated, he was stressed,
5  that we would meet the next morning.
6      Q.  Was there any discussion about Paul not
7  wanting to go on the program?
8      A.  I'm sure I told him that he doesn't --
9  yes.
10     Q.  What do you think he may have said?
11     A.  Joe Hamilton?
12         MR. PERLMAN:  Objection.
13     Q.  Yes.
14     A.  I think I might have said that Paul is
15 not interested in the union program, union
16 benefits, seeing the union doctor; he had his
17 own.
18     Q.  A response from Hamilton to that?
19     A.  I don't recall.  The response was while
20 we still have to see him to give him these
21 warning letters.
22     Q.  The next day he comes and what
23 happens?
24     A.  I was at the airport when they come

Page 27

1  back to the building about 7:15, 7:20, I was told
2  that they wanted to -- Mr. Hamilton wanted to see
3  me in the office with Paul, which we knew.  We
4  were also informed that Paul had driven on
5  company property, up the ramp.
6      Q.  What was being alleged by management at
7  that point?
8          MR. PERLMAN:  Objection.
9      A.  That he drove on their property
10 recklessly and they were afraid that he was going
11 to commit something violent or do something
12 violent.
13     Q.  Who was that that told you that?
14     A.  Joe Hamilton.
15     Q.  Do you know what they were talking
16 about as to him driving up on the property?
17     A.  I did not witness.  They were saying
18 there was a ramp that trucks go in and out of.
19 They said that he drove up in that ramp at a high
20 rate of speed, that he punched in and got back in
21 his car, put his car back in the company assigned
22 parking spot.
23     Q.  That general action by a driver
24 punching in, driving up, going to park their car

Page 28

1  was that something unusual?
2          MR. PERLMAN:  Objection.
3      A.  No, it wasn't.
4      Q.  What was the situation with regard to
5  that?
6          MR. PERLMAN:  Objection.
7      A.  Drivers, when they were running late to
8  punch time -- because the company was getting
9  strict on tardiness.  You could save two or three
10 minutes by doing that.  They would drive up to
11 the ramp, go punch in, and quickly put their cars
12 back in spot, which would make them late
13 anyway.
14     Q.  They would be punched in?
15     A.  Correct.
16     Q.  And had you seen this happen, yes?
17     A.  Yes, I did it myself.
18     Q.  Can you put a frequency on it, I know
19 it's not a science, how many times a week this
20 might happen?
21     A.  I would say say this would happen ten
22 times a week, twice a day.
23     Q.  Was that something that people were
24 disciplined about?

Page 29

1    A.  No, they didn't discipline them.
2    Q.  Were supervisors aware that this was
3  happening?
4         MR. PERLMAN: Objection.
5    A.  I would say, yes, that they were
6  aware.
7    Q.  Have you seen supervisors in the
8  vicinity when this was being done?
9    A.  In order for a driver to do that, he
10  would be late at the meeting, because usually at
11  seven o'clock you had a meeting so you would be
12  missing four minutes by the time it took you to
13  put your car away so they would have to know
14  where you were those four minutes.
15    Q.  I've seen a number of drawings of that
16  particular site, but anyway it looks like there
17  is a ramp leading up to the building where all
18  this activity goes on?
19    A.  Correct.
20    Q.  The ramp is outside the building?
21    A.  Correct.
22    Q.  And then there is an overhead door at
23  the top of the ramp?
24    A.  Correct.

Page 30

1    Q.  Which is open during business hours?
2    A.  One.
3    Q.  Was it the practice when people were
4  running late for them to pull their car up to a
5  particular spot or not?
6    A.  Pull as close to the door as they could
7  get, yes.
8    Q.  On the ramp?
9    A.  No.
10    Q.  You were not a witness to Mr. Pizzuto
11  driving up the ramp that day?
12    A.  No, I was not.
13    Q.  Have you ever seen him do that
14  before?
15    A.  No.
16    Q.  Drive up the ramp?
17    A.  I never saw him.
18    Q.  During the time that you had any
19  interaction with Mr. Pizzuto at the workplace,
20  have you ever overheard him make any threats to
21  supervisors?
22    A.  Not physical threats.
23    Q.  Non-physical threats?
24    A.  I wouldn't call them threats.

Page 31

1    Q.  What kinds of things had you overheard
2  him say to supervisors?
3    A.  You're going to get yours, your name is
4  going to be in the paper, the FBI is watching
5  you, things like that.
6    Q.  And who were he saying these things
7  to?
8    A.  A supervisor, Mr. Trudeau, maybe
9  Mr. Leveris.
10    Q.  Did it appear that either of those two
11  gentlemen Trudeau or Leveris was afraid of
12  Pizzuto as a result?
13         MR. PERLMAN: Objection.
14    A.  No, I don't believe they were afraid
15  that they were going to be physical.
16    Q.  Do you remember any of the
17  circumstances under which he would be saying that
18  to supervisors like Trudeau or Leveris?
19    A.  He would say that while he were outside
20  scanning him or he would say that when they told
21  him that his audit scan was off that night.
22    Q.  Did Mr. Pizzuto say to you, or anything
23  to the effect, he thought that he that he was
24  being conspired against?

Page 32

1    A.  Yes.
2    Q.  Do you know why he was saying that to
3  these supervisors that fit into context, the FBI
4  was watching you, does that make any sense to
5  you?
6         MR. PERLMAN: Objection.
7    A.  No, it made no sense.
8    Q.  Did he appear to be ranting?
9    A.  Yes.
10    Q.  Did he appear to be talking nonsense?
11    A.  Yes.
12    Q.  Did any of the management come to you
13  before that Thursday, the day before he was let
14  go, had they come to you before that day advising
15  you that Pizzuto was threatening people?
16    A.  I don't believe — I believe that most
17  it came to a head the Thursday before he was
18  fighting with the threats. I don't recall before
19  that, no.
20    Q.  Pizzuto worked there a number of years
21  as had you?
22    A.  Correct.
23    Q.  Was this new behavior for Pizzuto,
24  nonsense or rants like that to his supervisors,

Page 33

1    or was this something that happened before?
2    A.  No.
3    Q.  What did you make of it?
4    A.  That he had a problem.
5    Q.  Emotional problem?
6    A.  Stress, emotional, mental.
7    Q.  What did you want to see happen on that
8    last day?
9    A.  I wanted him to -- them to put him out
10   of service and let the doctors argue it.
11   Q.  Had you mentioned that to them?
12   A.  Yes.
13   Q.  What was the reaction?
14   A.  The reaction was that they were
15   terminating him for just cause, for driving up on
16   the property.
17   Q.  As far as you understood it, did the
18   company have that option to put him out of
19   service, have the doctors examined?
20   A.  Absolutely.
21   Q.  When I said, was that mentioned to you
22   to them by them I meant Hamilton and Leveris; is
23   that what you meant?
24   A.  Yes, but they already made the decision

Page 34

1    to terminate.
2    Q.  Did they tell you why they weren't
3    going to go that route?
4    A.  Because of his actions that morning,
5    driving up the ramp.
6    Q.  Had those actions not occurred, had
7    they told you what they were going to do?
8    A.  They were going to issue him two
9    warning letters.
10   Q.  Either way, he was not being taken out
11   of service and sent to a doctor, correct?
12   A.  No.
13   Q.  He was going to get a warning or two
14   warnings?
15   A.  Or go back to work.
16   Q.  Or he was going to get fired?
17        MR. PERLMAN:  Objection.
18        MR. MULHEARN:  That's a confusing
19   question.
20   A.  Up until he punched in, drove on the
21   property Friday, he was going to get a warning,
22   two warnings, because he drove up the ramp, they
23   decided to discharge him, their mind was made up
24   to discharge.

Page 35

1    Q.  They had relayed to you Hamilton and
2    Leveris -- that morning driving up the ramp?
3    A.  They thought he was -- drove, correct.
4    Q.  Was anything more than that being said
5    like look -- like he was trying to hit
6    somebody?
7    A.  No, I don't recall that.
8    Q.  Was it said that anyone was in any
9    particular danger by the way he drove up?
10   A.  No, I don't believe because if they
11   were, they would have called the police.
12   Q.  You mean at the time?
13   A.  Yes.  If somebody -- a car is a weapon,
14   same as a bat or a knife, they would have called
15   the Stoneham police.
16   Q.  How long do you think it was between
17   the time Pizzuto drove up that day and the time
18   he was actually terminated?
19   A.  Within 45 minutes.
20   Q.  Do you know what he was doing in the
21   meantime?
22   A.  He was at his truck, loading it.
23   Q.  If someone was considered to be a
24   threat and dangerous, would that have been

Page 36

1    allowed to take place?
2        MR. PERLMAN:  Objection.
3    A.  No.  They would be been discharged
4    immediately and the police would have been
5    called.
6    Q.  Have you told us -- at the termination
7    meeting, have you told us everything that took
8    place at that meeting?
9    A.  I believe so, yes.
10   Q.  Do you remember any discussion or
11   statement by Hamilton to Pizzuto at that
12   termination meeting as to whether Pizzuto needed
13   medical help?
14   A.  Yes, I believe that was discussed.  Joe
15   Hamilton thought that he needed to see a doctor,
16   and he thought the union -- probably thought he
17   should have seen a doctor but Paul was already
18   seeing a doctor, so, you know, nobody can make
19   you change doctors. I'm sure the company was
20   aware more so than me of what his problems were.
21   They had more access to his personal records than
22   I do.
23   Q.  Was it clear to you before you walked
24   into that termination meeting that Pizzuto was

Page 37

1 going to get terminated?
2    A.  No.
3    Q.   What did you think could happen beyond
4 that?
5    A.  I thought that he was going to get two
6 warning letters, that's what I thought.
7    Q.   The fact that he was terminated came as
8 a surprise to you?
9    A.  Came as a surprise to me.
10    Q.   Based on your observations at that
11 station during the years 2002, 2003, did it
12 appear that Mr. Pizzuto was being picked on by
13 management?
14    A.  I would say he was being overmanaged.
15    Q.   What leads you to say that?
16    A.  I believe they were out scanning him
17 more than other people, watching his paperwork
18 more than other people.
19    Q.   To the extent that was happening, to
20 your observation if Pizzuto was concerned about
21 them looking to fire him, was that an irrational
22 thought on his part?
23        MR. PERLMAN:  Objection.
24    A.  No, not irrational to be scared to lose

Page 38

1 your job.
2    Q.   Especially if you were being scanned
3 and looked at more than others?
4    A.  Right.
5    Q.   So when you say "paranoid," it sounds
6 like there is some basis, however, that he was
7 being targeted, is that so?
8        MR. PERLMAN:  Objection.
9    A.  Yes, when you're getting written up and
10 other people aren't, you get paranoid about why
11 are they singling me out.
12    Q.   I have a different idea of paranoid.
13 Let me share mine.  Paranoid is like your seeing
14 things that are not there, overly concerned about
15 danger because there is no danger to be concerned
16 about.  Take my definition, was Pizzuto
17 paranoid?
18    A.  No.  My definition of paranoid is you
19 come in on Monday, you get a warning letter, you
20 come in on Tuesday, you get a warning letter,
21 Wednesday you're going to get paranoid that you
22 are going to get another one.
23    Q.   There a word called pessimistic.
24    A.  I'm using the word paranoid as scared

Page 39

1 or uncertain.
2    Q.   Or fearful?
3    A.  Yes.
4    Q.   Is fearful a good word?
5    A.  If you get hit with a stick three days
6 in a row, my definition of paranoid is holy shit,
7 I'm paranoid I'm going to get hit with that stick
8 even though I'm don't know that for sure until I
9 get it.
10        MR. MULHEARN:  I have no further
11 questions.
12        CROSS-EXAMINATION
13 BY MR. PERLMAN:
14    Q.   Do you know that Paul Pizzuto was
15 accused of Teamsters of killing his dog.
16    A.  I may have heard some through the
17 grapevine of that.
18    Q.   What did you hear?
19    A.  That his dog got killed.
20    Q.   Did you hear that the Teamsters was
21 behind the killing of his dog?
22    A.  I really didn't hear Teamsters.  I
23 heard Blue, business agent had killed his dog,
24 but yes, those are stories like fishing stories

Page 40

1 get big by the time I hear them.  I just heard
2 that just last week, by the way.
3    Q.   From whom?
4    A.  I heard it from another employee at DHL
5 Mike Rae, R-A-E.
6    Q.   What did Mr. Rae tell you about the
7 untimely demise of Mr. Pizzuto's dog?
8    A.  He was laughing and said Mr. Pizzuto's
9 dog got hit by a car and that he had heard it was
10 Luke.
11    Q.   I'm sorry, Mr. Rae had heard it was Lou
12 Degiapallo (phonetic)?
13    A.  He didn't say Lou Degiapallo, he said
14 Lou.
15    Q.   Did you ever talk to Mr. Pizzuto about
16 how his dog passed?
17    A.  No.
18    Q.   Are you aware that Mr. Pizzuto has
19 insinuated that he was going to file a lawsuit
20 against the union?
21    A.  No.
22    Q.   Mr. Pizzuto, is he a friend of yours?
23    A.  No.
24    Q.   Did you ever see him socially?

Page 57

1  events of the morning of the next day, the day
2  that Paul was terminated, who did you first hear
3  from about Mr. Pizzuto how he came to enter the
4  workplace?
5      A. **It would be either Mr. Leveris or Mr.**
6  **Hamilton.**
7      Q. It wasn't one of the drivers?
8      A. **I'm sure that if they saw me on the way**
9  **to their office, they would say, yes. It was all**
10 **over the building.**
11     Q. You testified before, that with some
12 regularity, drivers will temporarily park their
13 car at or near the facility punch in and go back
14 out, make sure you beat the clock?
15     A. **Yes.**
16     Q. You also testified about there being a
17 ramp and an overhead door?
18     A. **Yes.**
19     Q. And inside is where the clock is?
20     A. **Correct.**
21     Q. Now, drivers would park at the bottom
22 of the ramp to do this punch-in, right?
23     A. **Near the bottom, on the top, before the**
24 **overhead door.**

Page 58

1      Q. Not inside the overhead door?
2      A. **They have thought it -- would believe**
3  **unusual to go inside the overhead door because**
4  **generally there is a lot of work going on in that**
5  **area.**
6      Q. When you talk about -- I want to
7  make -- I understand what you say is routine. It
8  is routine for people to come to the bottom of
9  the ramp or be on the ramp --
10     A. **To go into the building, yes.**
11     Q. That's not a regular thing to happen at
12 all. Okay. Talk about the termination now.
13 Here is what Mr. Hamilton says that's what
14 happened. At 0725 hundred hours myself, Arthur
15 Leveris, Gerry Halloran and Paul Pizzuto had a
16 meeting at the MSH conference room, did that
17 happen?
18     A. **Yes.**
19     Q. I told Paul, this is Hamilton, I told
20 Paul I had real concerns about his behavior and
21 that he was a safety issue at that stage; do you
22 agree that Hamilton told Paul that?
23     A. **Yes.**
24     Q. MR. MULHEARN: What exhibit are

Page 59

1  you looking at?
2      MR. PERLMAN: 32.
3      Q. I ask him if he thought he needed
4  medical help so that I would work with Airborne
5  to provide that help. Did Mr. Hamilton say that
6  to Mr. Pizzuto?
7      A. **I would say he did.**
8      Q. He would not respond to me other than
9  to say that he was here to receive discipline so
10 issue the discipline; is that what Mr. Pizzuto
11 said?
12     A. **I believe that would have been said,**
13 **yes, issue my discipline.**
14     Q. Mr. Hamilton also says that Pizzuto at
15 some point in that meeting asked him, asked
16 Hamilton, if he was telling him to punch out
17 because if he was, he was going to leave and go
18 directly to his doctor; was that said by Mr.
19 Pizzuto?
20     A. **Say that again.**
21     Q. He asked me, Joe Hamilton, he asked me
22 if I was telling him to punch out because he was
23 going to leave and go directly to his doctor; is
24 that accurate?

Page 60

1      A. **Is that also saying I'm going to my**
2  **doctor, I'm going on FMLA? Yes, that would be**
3  **accurate.**
4      Q. Then Mr. Hamilton reports, he said he
5  was going to have his doctor write a note saying
6  he was fine to come to work; is that something
7  Mr. Pizzuto said?
8      A. **Right, that's correct. He does have a**
9  **doctor.**
10     Q. He then said he would be going on FMLA
11 under stress; is that something that Mr. Pizzuto
12 said that day?
13     A. **I would say that he said that before he**
14 **was terminated, yes, he probably did, yes.**
15     Q. Other than what you testified to when
16 Mr. Mulhearn was asking you questions and things
17 we just discussed here, is there anything else
18 that Mr. Hamilton said to Mr. Pizzuto or
19 Mr. Pizzuto said to Mr. Hamilton during the
20 termination meeting that you recall?
21     A. **Not that I recall.**
22     Q. Is there anything you could look at --
23     A. **You got to remember from Thursday**
24 **night, I'm looking at a guy we know we have**

Page 69

1    Q.  You said that he was subject, as far as
2  you know, subject to a number of audit scans the
3  week he was terminated?
4    A.  Yes.
5    Q.  He was complaining about missing
6  freight at that time in that same week?
7    A.  Because his audits scan show, he was --
8  he was saying from what I can think of it, he was
9  going out but didn't have all his freight.
10    Q.  Isn't it possible that Mr. Pizzuto
11  brought these audit scans upon himself by
12  actually --
13    A.  Anything is possible.
14    Q.  Do you think that likely?
15    A.  I think it's possible.  It can happen
16  due to the fact -- basically the operation.
17    Q.  If a driver is complaining about
18  missing packages and saying he thinks the company
19  is stealing packages from his truck, wouldn't
20  that be grounds to conduct an audit scan on a
21  truck?
22        MR. MULHEARN:  Objection.
23    A.  You know, you can also use that
24  auditing as a weapon.  It's not random.  If you

Page 70

1  want to leap on an employee, you can do it.  It
2  was done to me, it is done to outspoken people.
3  I would rather prefer, as a union rep, that the
4  audit scans are done randomly like drug test, and
5  they weren't.  It puts a lot of pressure on you.
6  I feel myself, which I didn't think I deserved.
7  I was never worried about audit scan until
8  somebody was discharged for it.
9    Q.  You don't know one way or the other
10  whether Mr. Pizzuto was discriminated against on
11  the basis of any sort of disability, do you?
12    A.  I can't -- discriminated against?  I
13  know you're trying to ask me if DHL discriminate?
14  I can't answer that question.
15    Q.  That's fair.  You mentioned a few
16  statements that Mr. Pizzuto made that I may
17  characterize as threats.  I think you
18  characterize them as threats as well, but you're
19  going to get yours, your name is going to be in
20  the paper, the FBI is going to get you; are those
21  things you heard Mr. Pizzuto say?
22    A.  Personally, no.  But I was told that he
23  said it and I reason to believe he said it, yes I
24  heard from good sources.

Page 71

1    Q.  What sources told you?
2    A.  Other drivers.
3    Q.  Could you remember any names of any
4  drivers who told you?
5    A.  Not offhand.
6    Q.  Did you hear Paul Pizzuto say anything
7  along these lines, any of this within your
8  earshot?
9    A.  No.
10    Q.  The statements, just to be clear, that
11  you heard about from others having been made
12  we're talking about July 2003?
13    A.  June or July, yes.  Mostly July.
14    Q.  Was Mr. Pizzuto a good driver?
15    A.  I would have to say he would have to be
16  to last as long as he did.
17    Q.  He was good at his job?
18    A.  Yes.  To last as long as he did.  If he
19  wasn't, he would have been gone.
20    Q.  When did you become a union steward?
21    A.  I would have to say in 1982.
22    Q.  How did you happen to become a
23  steward?
24    A.  I was elected, I think.  I ran for

Page 72

1  election.
2    Q.  Was it something you were interested in
3  doing, being leader in the union?
4    A.  Yes.
5    Q.  Who was your contact in the union
6  during period of Pizzuto's employment during the
7  2002, 2003?
8    A.  Who was my contact at the union, Louis
9  Giapallo (phonetic).
10    Q.  What was his position?
11    A.  Vice-president and representative of
12  the Airborne people, Teamster Local 25.
13    Q.  Did you have any sort of reporting
14  requirement to the union?
15    A.  No.  As far as -- yes, I would report
16  to them if they disciplined somebody, suspended
17  them or discharged them
18    Q.  How many hours a week, forgive me for
19  not knowing how this works, was it a large time
20  commitment on your part?
21    A.  Not really, sometimes it could be if
22  you had discharged, two hours a week to ten hours
23  a week.
24    Q.  Did you receive any additional



Name: Paul Pizzuto                          Certified Mail #

By reason of your conduct described below, it is necessary to issue this notice of:

    XXX   **WARNING**        **EFFECTIVE:**
           SUSPENSION      EFFECTIVE:
           DISCHARGE        EFFECTIVE:

           ARTICLE 35, SECTION 3
    XXX   **CARELESS AND NEGLECTFUL PERFORMANCE OF DUTIES**
           INSUBORDINATION
           GROSS NEGLIGENCE
           ATTENDANCE
           FAILURE TO FOLLOW INSTRUCTIONS/DIRECT WORK ORDER
           FAILURE TO MEET JOB REQUIREMENTS
           THEFT AND DISHONESTY

SPECIFICALLY:

On 07/24/03 you had an OFD failure on AWB 73055263422.   This type of performance jeopardizes our current customer base.  This letter is written pursuant to Article 47 of the N.M.F.A. and New England Supplemental Agreement.

Further violations of this kind will result in additional disciplinary action. This is your final warning.

                                        FIELD SERVICES SUPERVISOR

Distribution:
        Employee
        Local 25  (Certified)
        Regional Manager
        District Manager
        Employee File
        Shop Steward

SUPERVISOR SIGNATURE    DATE 7/24/03       UNION REPRESENTATIVE    DATE

EMPLOYEE SIGNATURE    DATE       AIRBORNE REPRESENTATIVE  DATE

Exhibit  3

## Page 1

Volume I
Pages 1-88
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Docket No. 04-12492-GAO

PAUL PIZZUTO,
    Plaintiff,
vs.

AIRBORNE EXPRESS, INC., STEVEN
CROSSKEN, JOSEPH HAMILTON,
GREG SWEATT and ARTHUR
LEVERIS,
    Defendants.

DEPOSITION OF JAMES O'BRIEN, called as a
witness by counsel for the Plaintiff, pursuant to
the applicable provisions of the Federal Rules of
Civil Procedure, before Jennifer A. Doherty, CSR
No. 1398F95 and Notary Public in and for the
Commonwealth of Massachusetts, taken at the
offices of Richard A. Mulhearn, 41 Elm Street,
Worcester, Massachusetts on Thursday, June 14,
2007 commencing at 11:55 a.m.

*****************************************
FLYNN REPORTING ASSOCIATES
Professional Court Reporters
One Exchange Place
Worcester, Massachusetts 01608
(508) 755-1303 * (617) 536-2727
TOLL FREE: (888) 244-8858
FAX: (508) 752-4611

## Page 2

1  APPEARANCES:
2      BY: Richard Mulhearn, Esq.
3      41 Elm Street
       Worcester, Massachusetts 01609
       For the Plaintiff.
4
5
6
7  SULLIVAN, WEINSTEIN & McQUAY, P.C.
   BY: C. Max Perlman, Esq.
8  2 Park Plaza
   Boston, Massachusetts 02116
9  617-348-4300
   max@swmlawyers.com
10 For the Defendants.
11
12
13
14
15
16
17
18
19
20
21
22          Exhibit 4
23
24

## Page 3

1
2              I N D E X
   Testimony of:   Direct Cross Redirect Recross
3  JAMES O'BRIEN
       by Mr. Mulhearn  4
4      by Mr. Perlman    56
5
6
              E X H I B I T S
7  No.      Description         For I.D.
8  63  Diagram                  42
9
10
11
12
13
14
15
16
17
                **EXHIBITS RETAINED BY ATTORNEY MULHEARN**
18
19
20
21
22
23
24

## Page 4

1          P R O C E E D I N G S
2            STIPULATIONS
3      It is stipulated by and between counsel
4  for the respective parties that the deposition
5  transcript will be read and signed by the
6  deponent within thirty (30) days of receipt of
7  transcript under the pains and penalties of
8  perjury.  The filing and the notarization are
9  hereby waived.
10         JAMES O'BRIEN, having been
11 satisfactorily identified and duly sworn by the
12 Notary Public, was examined and testified as
13 follows:
14         DIRECT EXAMINATION
15 BY MR. MULHEARN:
16    Q.  Can you state your full name?
17    A.  James W. O'Brien, Jr.
18    Q.  Your address, sir?
19    A.  I moved this week.  Currently, it's 390
20 Walnut Street, Lynn, Massachusetts 01905.
21 Previous was 22 Coral Hill, Essex, Mass.
22    Q.  By whom are you employed?
23    A.  DHL/Airborne Express.
24    Q.  We understand from previous testimony

Page 5

1  and common knowledge at some point DHL took over
2  Airborne?
3      A.  Correct.
4      Q.  What I'll ask you is questions about
5  Airborne, and by that, it includes DHL, so be
6  it?
7      A.  That's fine.
8      Q.  How long have you worked at Airborne?
9      A.  Going into my 19th year.
10     Q.  Your position?
11     A.  Driver.
12     Q.  The whole time?
13     A.  Correct.
14     Q.  And out of what station do you work?
15     A.  North Shore station.
16     Q.  Is that abbreviations now?
17     A.  NSH.
18     Q.  Previously, did it have other
19  initials?
20     A.  I don't think so.
21     Q.  Is that located in Stoneham?
22     A.  Yes.
23     Q.  Have you always worked out of that
24  location?

Page 6

1      A.  No.  Over the years I worked out of the
2  Boston location, Needham location and previous
3  North Shore station at Concord Street.
4      Q.  Do you remember when you began working
5  out of Stoneham, approximately?
6      A.  Approximately, when it opened, when
7  they moved from the Woburn station.  I'd say
8  about 14 years.
9      Q.  For the last 14 years, it's been out of
10  Stoneham?
11     A.  They moved to Stoneham.  I've been at
12  Stoneham since they have been at Stoneham.
13     Q.  Were you working in Stoneham in the
14  years 2002, 2003?
15     A.  Yes.
16     Q.  Who were the station managers at the
17  time?
18     A.  I want to say -- must have been Steve
19  Crossken.  I think it was Steve Crossken and Joe
20  Hamilton after Steve Crossken.
21     Q.  There was a gentleman named Arthur
22  Leveris that worked there?
23     A.  He was a station manager, he was a
24  cottage manager where he oversaw all the on-line

Page 7

1  supervisors, he'd be next in line to the station
2  manager.
3      Q.  Just to understand the chain of
4  command, there would be on-line supervisors
5  first?
6      A.  Yes.  There is Woburn, Beverly, North
7  Shore and what's the other belt?  There are four
8  belts, each belts has its own supervisor for that
9  particular sort.  He was in charge of the
10  drivers -- there are two belts on each side, the
11  supe in charge of everybody on the right side the
12  other supe is in charge of everybody on the left
13  side and the cottage manager oversees the station
14  manager.
15     Q.  Do you know Paul Pizzuto?
16     A.  Yes.
17     Q.  For how long have you known him?
18     A.  I've known him since his first day at
19  DHL.  I work up at the old North Shore station in
20  North Reading, and that's where Paul started.
21     Q.  Before Airborne, where were you
22  working?
23     A.  Before Airborne, I had my own company.
24  I had a canteen truck.  I was the canteen driver

Page 8

1  for Airborne Express, so when I sold it, that's
2  how I ended up coming --
3      Q.  Is there like coffee and beverages?
4      A.  Yes, I had a coffee truck.
5      Q.  Would you consider yourself to be a
6  friend of Paul Pizzuto's?
7      A.  I'm a friend of all the drivers.  We
8  were never friends as far as on a one-on-one
9  basis.  I never chummed around with him all the
10  time.  Paul doesn't have any kids.  I have three
11  kids.  My lifestyle is curbed.  No golfing all
12  the time and stuff.  He liked to golf, he used to
13  golf.  I used to kid him that they don't like
14  guys with kids that's --
15         MR. MULHEARN:  Off the record.
16         (Discussion off the record.)
17     Q.  Did you have an opportunity during the
18  course of working at the Stoneham facility in
19  2002 to 2003 to observe how Paul was treated by
20  the supervisors of the managers there?
21     A.  They tended to get on Paul more than
22  some of the other drivers.
23     Q.  And what do you mean by that, "get
24  on"?

Page 9

1    A. I would say he was micromanaged. The
2  reason I say that is generally if they had a
3  problem with me or if I misdelivered a package
4  had missed routes, my on-line supervisor would
5  come down and say, Jimmy, you didn't scan all
6  five pieces yesterday. Paul for whatever reason
7  couple times he was having the station manager
8  who never really oversaw the drivers, would come
9  out and personally audit scan Paul's truck.
10    If they let the other manager know
11  how they should be taken care of him, like old
12  ladies in there. The station manager audit
13  scanning Pizzuto's truck. They didn't do it to
14  anybody else. The supervisor did, but not the
15  station manager
16    Q. And which station manager are you
17  thinking of?
18    A. Steve Crossken mainly and Joe
19  Hamilton.
20    Q. And what is an audit scan?
21    A. They have priority and DHL at the time
22  they were real big on scanning every piece of
23  freight on your truck so they would know where it
24  was because we download all our scanners, so they

Page 10

1  know that that piece in on my truck. If somebody
2  called says, I have a Del computer going to 24
3  New Boston Street in Woburn can you tell me what
4  time the delivery is going to be? The driver has
5  that aboard then they call you say they're
6  looking for it, can you get it in a certain
7  amount of time.
8    If you don't scan everything for
9  whatever reason, then they wouldn't know if you
10  didn't have the package or you had the package.
11  A lot of time we had so much freight not so much
12  the hard freight because we write it all down so
13  you know what's in the back of your truck, but
14  your envelopes, we put them in buckets, you put
15  your afternoon bucket on one seat and sometimes
16  you get talking you can't remember if you scanned
17  your bucket or didn't scan your bucket or the
18  driver next to you distracts you and you can't
19  remember where you left off scanning, so they
20  were really hot on it. If you had more than two
21  pieces that weren't scanned, they'd come down and
22  call you on it and stuff and sometimes give
23  warning letters out to certain drivers.
24    Like I said, it was standard

Page 11

1  practice that they would audit scan your truck
2  for security purposes, but they only do ten
3  packages random and make sure you scan them for
4  security purposes.
5    You never saw the station manager
6  scanning other people's truck but Paul's. I
7  don't know if it was because he had a problem
8  with his on-line supe, I don't know the
9  particular reasons, but Paul wasn't on my belt.
10  I was on the Beverly belt, he was over doing
11  Methuen, I think, up in that area, or I might
12  have been doing Lowell. I wasn't right next to
13  him. I don't know all the particulars, but I
14  know they were doing it. Like I said, it's a
15  bunch of old ladies; they can't wait to see
16  somebody get in trouble in there.
17    Q. When you said warning letters went to
18  certain drivers, what did you mean by that?
19    MR. PERLMAN: Objection.
20    A. They didn't treat everybody the same
21  that was a lot of guy's beefs in there that
22  punishment wasn't doled out the same to some
23  people and they do absentism, one guy, Jimmy you
24  got seven, eight days out, we are going to give

Page 12

1  you a suspension letter. You have to fight it.
2  The next guy come in get a suspension letter when
3  they do stuff, they do at their whims. Today
4  we're going to call everybody over their 5-day
5  sick, but the guy next to him might have 44 days
6  sick, they just decide to crack down on the
7  policy in October. I've got 7-days sick, I'm
8  getting the same punishment as guy with 44 days
9  because unionwise, they have to give you a
10  warning letter a suspension they can't just give
11  you -- they have to give you some type of
12  progressive discipline.
13    They wouldn't give the progressive
14  discipline, like I say, to this driver. Then
15  when they decide to do it, you say, Geez, the
16  guys got 44 days out, I got 8 days out, I'm
17  getting the same punishment as him, what's wrong
18  with this? And they did that with a lot of
19  things. It wasn't the same for everybody, not in
20  one particular person a lot of different drivers.
21  it wasn't the same for everybody. They were very
22  poor as far as their discipline in keeping things
23  the same for every single driver. Six days,
24  everyone gets it. Some guys 20, 30 days and

Page 13

1  they'd be called in and some guy would be called
2  in on his fifth day.
3      Q.  Did it appear to you if there was a
4  reason for those kinds of differences between
5  severity of discipline?
6      A.  For Pizzuto or just anybody?
7      Q.  In general.
8      A.  Yes, I think it was personality
9  especially with Arthur Leveris and Steve
10  Crossken.  Anybody that questioned their
11  authority in any way or form whether they were
12  right or wrong, they couldn't let it go.  If the
13  driver's right they couldn't say, Gee, the
14  driver's right.  I'll deal with him down the
15  road.  They could never let it go that you were
16  right.  They would just stay on that driver.
17  Every little thing they would try to push the
18  driver's buttons.
19      Q.  Did you see that happening with regards
20  to Paul?
21      A.  I saw that, yes, definitely with Paul.
22  Paul was the type of driver, he was kind of the
23  kid in first grade that some kids would pick on,
24  the more you pushed him the more you get a

Page 14

1  reaction, he'd get upset, and he reminded of the
2  kid in school that was fun to pick on because you
3  got a response other than someone who let's it
4  roll off their back.
5      Q.  Were there as far as these scans and
6  audit scans and so forth, what was the point to
7  all that?
8      MR. PERLMAN:  Objection.
9      A.  The point of the audit scans, first of
10  all was for customer service.  You mean the
11  management, scanning manager, audit scans were
12  sometime for security.  If they never audit scan
13  your truck -- we have cameras in the building you
14  don't have to worry about someone taking
15  something off your truck, but back then there was
16  no security cameras.  I could have my truck half
17  loaded.  Somebody could walk by my truck after I
18  scanned the piece, take a piece off my truck.
19  I've got 400 pieces, they could send it back down
20  the belt, stuff could be stolen then I'm
21  responsible for it.
22      In the same respect, management
23  would scan to make sure I'm not taking your
24  freight out.  Maybe they sent you up going to

Page 15

1  unload the cans, throw it on my truck, then the
2  next thing I got out the building and drop it off
3  at home so they would just periodically go in and
4  scan a couple of trucks 10, 12 pieces to see if
5  you had anything that didn't belong to you on
6  your truck just to keep everybody on the up and
7  up.
8      Paul's case they were scanning his
9  whole truck the reason being at that time, they
10  were hot on giving letters to drivers who didn't
11  scan every single piece.  Jimmy had three outfit
12  delivery scans yesterday that you didn't scan.  I
13  don't know what they came from.  I could have
14  scan the wrong bar code.  I don't know, you know,
15  but there were really out on that.  Paul started
16  arguing with them about it, Geez then I'm going
17  to scan my whole truck again because I don't
18  trust your scans and it becomes kind of like a
19  little he-said-she-said thing.  They would be
20  scanning, he would be re-scanning them.  He
21  didn't trust them.  They would be mad at him.  He
22  didn't depart the station quick enough because he
23  re-scanned his truck again.
24      Q.  When the supervisor or manager did the

Page 16

1  audit scan in somebody's truck, typically was the
2  driver right there?
3      A.  Yes.
4      Q.  And was it done though sometimes when
5  the driver wasn't there?
6      A.  No.  If it was, it wasn't supposed to
7  be.
8      Q.  We heard from other testimony there was
9  a process there where after the truck is loaded
10  and everything is scanned that the driver would
11  go and place the scanner into some sort of cradle
12  to download it?
13      MR. PERLMAN:  Objection.
14      Q.  Is that the process?
15      A.  Yes, after I scan everything, we don't
16  know because of the wireless router systems, but
17  back then, you had to put in "send," you have to
18  go put your scanner in and it would download.
19  Then afterwards they want you twice a day go to a
20  pay phone and we had a coupler, it would fit over
21  the mouthpiece of a phone.  It would send all the
22  data over the phone.  It became outdated.  Our
23  scanners scan continuously as we are walking they
24  are always sending the information but back then

Page 17

1  they didn't we would have to go back to the
2  office and mull around, wait for the scanner to
3  scan. Half the time the printer would break and
4  we'd end up there for 40 minutes.
5      Q.  Were there any times that you observed
6  either you or the other drivers where the scanner
7  was missing when they went back to retrieve it?
8      A.  Yes, it happens to everybody. You grab
9  the wrong scanner because they are all the same
10  back then especially if your out in front of the
11  belt it would be an inbound scanner, then if
12  somebody be inbounded, all the freight and it
13  would be your personal scanner or you might grab
14  another driver's scanner, they didn't always have
15  numbers on them, then you get out you go to punch
16  in your information, and I got somebody else
17  scanner. Then the girls would get mad, Geez,
18  Jimmy everything you wanted delivered was on the
19  418, looks like they're missing until they find
20  them under the other routes.
21      It still happens today, they won't
22  get the wrong scanner but punch in the wrong
23  route number and their information would go to
24  somebody else's route. It still happens. Nature

Page 18

1  of the business.
2      Q.  Would it cause a headache for the
3  driver if they had the wrong scanner?
4      A.  A bigger headache for the girls in the
5  office, they let you know you took the wrong
6  scanner.
7      Q.  Beyond a headache, would there be any
8  other problem?
9      A.  Yes, I mean, I'm sure they don't know
10  what you have on your truck, they think
11  everything is missing until it's delivered. Back
12  then, if you had hots in there what you did back
13  then is you punch in, if I wanted to say the IRS
14  in North Andover there would be 300 packages, I
15  couldn't scan every piece it would be too time
16  consuming so I punch in a hot code it would be
17  IRS-AND for Andover, I'd scan them all and when I
18  got to Andover, I would press "Special Customer"
19  and it would come up IRS-AND. Then all of sudden
20  the scanner would go 89 pieces, I didn't have to
21  scan them, then I just drop them off and the guy
22  would scan it. Dump the scanner sometimes you
23  have a printout, you punch the scanner if it's
24  not your scanner, the hot code isn't in there.

Page 19

1  So, yes, it could cause problems, yes.
2      Q.  Any of those problems result in
3  discipline for the driver?
4      A.  Not just for having it, but things
5  could come up that cause the problem – you
6  wouldn't get disciplined just for the sake of
7  taking the wrong scanner everytime, but everyone
8  for a while, say, there is a piece they can't
9  find right away then, yes, a circumstance could
10  come out of it that cause discipline but not just
11  by taking the wrong scanner.
12      Q.  Could you observe the kind of
13  relationship that Paul Pizzuto had with Steve
14  Crossken?
15      MR. PERLMAN:  Objection.
16      A.  Steve Crossken, yes, not a very good
17  relationship. Steve Crossken seemed to have it
18  out for Paul, and Paul seemed to be paranoid that
19  he had it out for him. Paul would re-scan
20  everything, They're out to fire me. It wasn't a
21  good relationship. Steve took it upon himself to
22  come out and micromanage. We have station
23  supervisor Corey, only see him come out of his
24  office to talk to the supes but he's never taken

Page 20

1  out on himself since he's taken over the station
2  to be hands on with the driver. He delegate
3  authority to the next in charge and that's how it
4  goes. If you actually get to the point of being
5  fired, of course, you're in his office. As far
6  as out in the work area, the authorities
7  delegated where you're supposed to be, but Steve
8  Crossken actually micromanaged Paul himself.
9      Q.  What about Arthur Leveris?
10      A.  Arthur Leveris was on Paul
11  constantly.
12      Q.  What about Joe Hamilton when he took
13  over?
14      A.  Yes, not as bad of Steve Crosskon. He
15  was on Paul, and I think – well, I can't say for
16  sure, Art Leveris was Steve Crossken number two
17  guy and he was Joe Hamilton's number two guy, so
18  it was business as usual, you could say.
19      Q.  Do you recall at some point in October
20  of '02 through sometime in early 2003 that Paul
21  was out on a leave of absence?
22      A.  Yes.
23      Q.  Did you have any idea what his
24  condition was that caused that?

## Page 25

1  some guys wouldn't trust each other.  I wouldn't
2  leave my scanner on the back of my truck if I had
3  to do scanning because I would be too afraid
4  somebody would scan a package with my scanner and
5  put it in their truck.  Later on manager, Jimmy,
6  where is that Del computer?  You scanned it.  I
7  scanned so many packages in the morning maybe I
8  did, maybe I didn't, I don't know where it is.
9  Always keep my scanner with me so nobody would
10 take it.  With the cameras I don't worry because
11 they're going to go over and see somebody take my
12 scanner.  It's more relaxed now.
13     Q.  When you said before that Paul was
14 paranoid about getting fired for various reasons,
15 what do you mean by paranoid?
16     A.  I don't know all the particulars I was
17 in the Lowell run and he was the Methuen run and
18 our runs kind of overlap on the Methuen/Lowell
19 line.  They would give me a couple of his
20 Methuens every now and then, P1s, early 10:30
21 service that he couldn't make.  I see him every
22 now and then coming back, and I don't know all
23 the particulars, I got my own problems, there was
24 a package missing, and he couldn't find it and

## Page 26

1  they accused him of maybe taking it or not
2  knowing where it was.  He ended up finding it,
3  researching it and calling the customers, huge,
4  huge -- then after it he was, I know they came
5  out on any route and took that package.
6         Stuff happens that another route
7  driver will see it, pick it up thinking it's a
8  shipment going out, grab it by mistake when you
9  just delivered it.  Sometimes it got two labels.
10 There are so many scenarios that could happen,
11 but he seemed to think that somebody did it on
12 purpose.  I don't know what the particulars are
13 on that one particular package, but there was
14 something with the customers and a package was
15 missing off his truck or something.
16     Q.  With regard the processing at the
17 plant, was there some issue with regard to
18 multiple bar code that the drivers had to deal
19 with?
20     A.  We deal with that still today.  The
21 scanners we have now possibly worse than what we
22 have.  Sometimes I get a box and it would be an
23 old UPS sticker on it, they're returns or
24 whatever and they use the boxes more than one

## Page 27

1  time, maybe 2 Airborne stickers because they
2  shipped it with Airborne Express four or five
3  times and they didn't take them all off or cross
4  them out, and in the international paperwork
5  comes with a bar code and there would be an
6  Airborne Express bar code and yes, a lot of times
7  you'd scan the wrong bar code by mistake.
8     Q.  What problem would that cause?
9     A.  The package either looked like I didn't
10 scan it out, and it all depends which one I
11 scanned when I delivered it.  I could scan the
12 right one the wrong one and deliver it and look
13 like it is missing.  Now they think the package
14 is stolen so they call the customer find out who
15 delivered, then they want to know why they didn't
16 get a signature.
17         Or I could scan the wrong one in
18 the morning, then it looks like I don't have on
19 the route for a delivery scan and because I
20 scanned the right one when I delivered it.  Or I
21 could scan the wrong one on both ends, and they
22 don't know if the package is in the building or
23 being delivered or anything.  So I mean that was
24 kind of some of the things that could happen

## Page 28

1     Q.  Would drivers be disciplined for
2  that?
3     A.  Again, depending on who the drivers
4  were.
5     Q.  Were there any particular accounts that
6  were more troublesome?
7     A.  Yes, they have what they call "hot
8  accounts" like IBM was very, I would say,
9  monitored.  Del was another big account that
10 would be monitored AT&T.  IBM houses had to be
11 done by noon businesses by nine o'clock, nine
12 o'clock the AT&T was ten o'clock, they've had
13 different services for big giant corporate
14 accounts.
15     Q.  At some point in time, were you aware
16 that Paul Pizzuto was being called for a drug and
17 alcohol test?
18     A.  I most certainly was because apparently
19 they had asked him to go with driver Mike Rae and
20 he refused Mike Rae and requested that I go with
21 him because he wanted somebody he could trust, he
22 said.  So the supervisor came and got me and he
23 asked me if I would go down and accompany Paul
24 Pizzuto as his union representative to a drug

Page 29

1    test.
2        Q.   Was that in approximately July 2003?
3        A.   Probably around there.
4        Q.   Do you know the supervisor that asked
5    you to get involve?
6        A.   I don't remember. I know I went down
7    with Art Leveris and Joe Hamilton. We drove Art
8    Leveris Toyota truck and me Paul sat in the back
9    seat.
10       Q.   Do you know who was calling for the
11   drug and alcohol test at that time?
12       A.   At the time when we went down, it was
13   one of the supervisor taken for probable cause.
14       Q.   What was the probable cause?
15           MR. PERLMAN: Objection.
16       A.   I asked several times on the way.
17   Neither one would answer me. Can you tell me
18   what the probable cause? I was no longer in the
19   steward capacity when I went with them, but I
20   asked them, Could you tell us what the probable
21   cause is? Is he slurring his words? Is he
22   stumbling around is he falling asleep on the
23   belt? And neither one would give me the answer
24   to the probable cause. I will say this, that

Page 30

1    morning when he worked, we didn't go down for the
2    drug test until a replacement came and they
3    allowed him to work the machinery on the belt and
4    jockey and move his truck in and out of position
5    while loading it until his replacement arrived,
6    and upon his replacement arriving, they then sent
7    him down for the drug test.
8           In my opinion, if I thought you're
9    under drugs and I thought you could endanger
10   yourself or any of the workers around you, I
11   would not allow you to work the sort, or move
12   your truck. You would sit in the breakroom until
13   the sort was over, then you go for the drug test,
14   you wouldn't work the machinery and then go.
15       Q.   Did Paul Pizzuto appear at times to be
16   under the influence of drugs or alcohol?
17       A.   No. He appeared to be very agitated
18   that everyone suggest that.
19       Q.   What was your understanding at the time
20   of how the company could do a probable cause drug
21   test?
22           MR. PERLMAN: Objection.
23       A.   From the union contract, there had to
24   be probable cause, which would be slurring your

Page 31

1    words, unsteadiness, falling asleep, anything
2    typical of somebody being under the influence of
3    alcohol and drugs; it's probable cause. I have
4    to look at you and say, I think he's under the
5    influence of alcohol or drugs.
6        Q.   Who did you ask concerning whether they
7    had probable cause?
8        A.   I asked Joe Hamilton and Art Leveris in
9    Art Leveris' motor vehicle.
10       Q.   Did they respond to you at all?
11       A.   No. No response whatsoever. Nothing.
12   Didn't even answer me.
13       Q.   Did you go down to the clinic?
14       A.   Yes. In Stoneham.
15       Q.   And what occurred when you got there?
16       A.   We got to the clinic, we sat down and
17   Paul went in and signed in, at that time he
18   started making a statement in front of Art
19   Leveris and Joe Hamilton, I want, you know, I
20   don't want DHL to touch my urine sample. I want
21   you to ship it with UPS or FedEx because I don't
22   trust these people. There were other customers,
23   patients sitting in the room, at which time Art
24   Leveris and Joe Hamilton started laughing

Page 32

1    thinking though it was funny that he wanted
2    another carrier, they weren't to touch his
3    sample.
4           He went in and I sat out there
5    with him and all of sudden he come out, Jimmy, do
6    you have any money on you? No, I don't. Could
7    you get me some money? I want to have my sample
8    tested right here before it leaves this place
9    right now in front of me. I said to Joe Hamilton
10   because he was in charge, is it all right if I go
11   down get $60 for Paul. He said, Sure.
12          So I walked next door and took $60
13   from the ATM, I paid for his sample. He came out
14   little while later waving his sample like this,
15   See, I'm not on nothing, and we proceeded back to
16   the station and they were told we'll wait until
17   your sample comes back.
18          What happened to Paul, he was out
19   of service because it had to go to testing
20   laboratory, he must have had a split sample or
21   whatever but they still had to wait until the
22   official result came back from there, a
23   laboratory where they send it.
24       Q.   When you were at the clinic, did you

Page 33

1  observe Paul drinking some excessive amounts of
2  water?
3       A.   No.  Probably had one or two glasses
4  then he went in right away.
5       Q.   Did you observe any other behavior Paul
6  Pizzuto at the time you haven't already
7  described?
8       A.   No.  He was just fuming until he went
9  in and that's when he started with the girl at
10 the desk, he didn't want them to touch his sample
11 and I want FedEx or UPS touch it, that's when
12 they started laughing, then that's when came out
13 asking me for money, he was going to get his own
14 test done on the spot.
15      Q.   Did he consider at the time Paul's
16 fuming to be made something to rational or
17 unusual?
18      A.   No.  We all get discipline to think
19 we're wrong, we're all fuming.  If you don't get
20 mad, you're a liar.  He was upset.
21      Q.   Was there anything particular about the
22 drug and alcohol test?
23      A.   First probable cause that I have been
24 on in my 20 years at the North Station anyway, up

Page 34

1  until that time a lot of random tests but this
2  was the first one that I know that pulled out of
3  service for a drug test.  I think we might have
4  had one for alcohol, but I think the guy was
5  drunk in the building, but we never had anybody
6  that I knew.
7       Q.   Was it generally known among the
8  drivers that Paul had been taken out for these
9  tests?
10      A.   Absolutely.  They have to replace you
11 so the minute, Where is Paul, Paul went down as a
12 new guy on his route.  Two guys next to you and
13 three guys across from you, when they pull you
14 out, like I say I worked with 300 old ladies that
15 have nothing else to do, any excitement they got,
16 you whisper a secret to one driver, before you
17 get home your wife knows about it.
18      Q.   Did you observe Paul Pizzuto make any
19 threats at the time to any supervisor?
20      A.   I never observed Paul Pizzuto in a
21 threatening manner in any way.  He wasn't that
22 type of kid.  He always had to have the last
23 word, if he felt he right he was going to argue
24 his point up and down.  The day we left, we were

Page 35

1  sitting on the stairs waiting for Art Leveris to
2  come out with his car keys, and when he did, he
3  said to Art Leveris, he said, Let me tell you,
4  when this is said and done, the police are going
5  to get you.  Art Leveris said, Is that a threat?
6  He said, No, that is not a threat, the police are
7  going to get you.  That's all I ever heard him
8  say.  He felt it was illegal what they were
9  doing.  It wasn't illegal, but he felt it was and
10 he thought they were going to be arrested for
11 what they were doing.
12      Q.   Did those words appear to be a threat
13 to you?
14      A.   No.  Just appeared to be unfound that's
15 why, would you say the police, the police can't
16 do anything.  It is a union matter.  That's how I
17 felt about it at the time.
18      Q.   At any other time while you observed
19 Paul Pizzuto, did you ever see him threatened in
20 any way any supervisor or manager?
21      A.   Paul wasn't an opposing kid, he wasn't
22 a threatening kid.  Paul is as big as a pint of
23 ice cream.  That wasn't him.  He would argue, he
24 could be argumentative, if he thought he was

Page 36

1  right he would argue his cause.  If he thought
2  the sky was pink from the end of your life no
3  matter how much you showed him or proved to him
4  it wasn't.
5       Q.   Did it appear to you at any time that
6  any of the supervisors or managers at Airborne
7  were afraid of Paul?
8            MR. PERLMAN:  Objection.
9       A.   No, I don't think they were afraid.
10 For number one, when we drove down for the drug
11 test, Art Leveris let him sit right behind him on
12 the rear seat.  If I was afraid of somebody, I
13 certainly wouldn't be driving with him in the
14 rear seat of my car, bop me over the head.
15 Number 2 if I thought he was afraid to hurt
16 somebody or himself, I wouldn't let him continue
17 to move his truck in the building and handle
18 machinery so, no, I don't think anybody was ever
19 afraid of Paul by no means.
20      Q.   Did you follow-up with managers with
21 regards to what the probable cause was for Paul's
22 drug and alcohol test?
23      A.   Yes.  The following day I asked
24 supervisor Chris Steadmans, Can you tell me why

## Page 37

1  he sent Paul down there, Artie and Joe Hamilton
2  wouldn't tell me, and I asked driver Mike Rae
3  stand with me so he could hear the reason, and
4  Chris Steadmans told me, The day before Paul
5  re-scanned his whole truck when everybody left
6  the building and left here 40 minutes late and
7  didn't make service and that's why they took him
8  down for probable cause the following day. I
9  said, That's no reason for probable cause, that's
10 reason for discipline, if anything, but not just
11 because somebody re-scans his whole truck doesn't
12 mean he's on drugs and you do it the day later or
13 you pull him out of service the day before, but
14 that was when Chris Steadmans told me and driver
15 Mike Rae.
16     Q.  Was there any other reason given?
17     A.  No, that's all he told me, nothing
18 else.
19     Q.  Was there a usual procedure that
20 management would follow if somebody, the driver,
21 was acting in a threatening way?
22         MR. PERLMAN:  Objection.
23     A.  Over my years, I've seen some
24 supervisors actually threatened by drivers,

## Page 38

1  either beat them up or whatever, the drivers have
2  either been escorted off the building by the
3  police and the supervisors have gone down and
4  filed police reports on the drivers. That was if
5  you threaten a driver, that's generally what was
6  going to happen, file a police report have you
7  escorted off the property, then it was a union
8  issue to get your job back.
9      Q.  As far as you know, was Paul Pizzuto
10 escorted off the property by the police?
11     A.  No — I don't remember but I couldn't
12 tell you for positive. I don't remember the date
13 that he was actually fired. I don't think I was
14 there that day, so I couldn't tell you if he was
15 escorted off that day. Up until then, no, I'd
16 never seen him, but I wasn't there the day he was
17 actually fired.
18     Q.  You're aware there is some sort of
19 issue involving Paul Pizzuto and driving his car
20 up onto the ramp?
21         MR. PERLMAN:  Objection.
22     A.  Uh-huh.
23     Q.  Was there a practice among the drivers
24 with regard to driving up and punching in?

## Page 39

1      A.  No, not with all the drivers, just with
2  the drivers who were habitually late. Wayne Fox,
3  late all the time, drove up the ramp looks like
4  he was going to a baseball game, he'd show up,
5  punch in, go out and park his car and get dressed
6  the whole ritual. Over the years in the other
7  building we'd park motorcycles in the building,
8  on Saturdays we have supervisors drive their car
9  in and wash them, so, yes, people have driven in
10 not driven right in the whole building, depends
11 on how late you are. Me, myself, if I'm like
12 borderline, I got a minute or two, run up, run in
13 in get out. If I'm a minute, if you're a minute
14 you drive all the way up to the top of the ramp,
15 it depends how late.
16         At the time they were disciplining
17 us for being late, if you were one minute late,
18 and I argued that out with management, Every
19 other company has a grace period. I'm not saying
20 I can be ten minutes late, I understand this is a
21 time-sensitive business, but up to three or four
22 minutes. I could come into the building at 6:45
23 when I'm supposed to be there and have nine guys
24 in front of me waiting to punch in. By the time

## Page 40

1  I get up to the clock it's 6:48 and now I'm being
2  disciplined. If you're 6:46 you were disciplined
3  that is why some of the guys pulled there. A lot
4  of guys — there would be 20 guys mulling around
5  because we'd have guys get there 40 minutes
6  early, hang out right at the ramp. Another group
7  of guys, ten of them will hang out in the break
8  room. The bulletin boards are there where the
9  time clock is and that's where they all hang out.
10 Drinking their coffee, and the late guys, some of
11 the them will pull up, not on a daily basis but
12 once a week, twice a week, someone pulls up and
13 it's generally all the same drivers who got tardy
14 issues.
15     Q.  Have you done that yourself?
16     A.  Yes, not that much though.
17     Q.  Have you seen others do it?
18     A.  Yes.
19     Q.  You said depending on circumstances,
20 drivers would either be on the bottom of the ramp
21 or pull up the ramp?
22     A.  Yes. If I got time, I can walk up.
23 You have to be quick, if a supervisor caught you
24 pulling up, run in and punching out and parking

## Page 45

1  If you don't go in there, you come on the other
2  side of that door is the time clock and company
3  bulletin board.
4      Q.  Approxmately how many feet, if you can
5  estimate?
6      A.  From the ramp?
7      Q.  From the ramp to the time clock?
8      A.  Twenty feet.
9      Q.  Once you go up the ramp and before you
10 get to where the belts are, is there some sort of
11 table that's normally there?
12     A.  Yes, like right around here, there is a
13 table because they do -- the international is
14 processed at nighttime so there is a table there.
15 It's a tight squeeze for these trucks, you have
16 to squeeze through the table, like a metal just a
17 metal table and they process the international
18 and the hazardous materials.
19     Q.  Would you mind drawing on your diagram
20 the approximate location of the table?
21     A.  The table is moved, from time to time,
22 depends on who moves them but anywhere from here
23 or up here. I mean, they're portable, so they
24 get moved around.

## Page 46

1      Q.  Can you put in one of the rectangles
2  you drew A and B?
3      A.  (Complies.)
4      Q.  A and B on the diagram is possible
5  locations of the table?
6      A.  Yes.
7      Q.  When a driver is running late as you
8  described already, would they go up the ramp?
9      A.  Some would, some wouldn't. It depends
10 if there's a truck sitting sometimes, it could be
11 a van sitting there with nobody in it. You could
12 open the door and there could be a truck pulled
13 in that you can't get up so they park at the
14 bottom. If there is nothing in there, you can
15 pull your nose in a little bit run in and back
16 out and get out of there.
17     Q.  Nose into what?
18     A.  Into the building a little bit, when
19 that door opened, anything could be there.
20 Sometimes you go up the ramp and there will be a
21 truck backed in from the airport with freight on
22 it so you couldn't pull in. Sometimes guys will
23 pull up with the trucks, they forget something,
24 leave the van there, they walk in to get their

## Page 47

1  stuff, so it all depends on the availability of
2  pulling up there.
3          The guys will either pull here,
4  drive up or pull up the ramp. Guys park their
5  motorcycles on the side of the ramp. One guy
6  that parks his car at the bottom of the ramp
7  every day and he thinks it's a private parking
8  spot
9      Q.  What is the furthest you've seen any of
10 the drivers pull up?
11     A.  I've seen the driver pull right into
12 the building.
13     Q.  Were they running late?
14         MR. PERLMAN:  Objection.
15     A.  Yes, when they are running late, I've
16 seen them -- a supervisor pull his subaru and
17 wash it.
18     Q.  Normally in this area at the beginning
19 of the shift as you've been describing when
20 people might be pulling into --
21     A.  That doesn't happen every day. It
22 hasn't happened as much now because they're not
23 bothering the guy about being a minute late. The
24 discipline what they focus on goes in spurts. At

## Page 48

1  one point they're focussing on the tardiness
2  became an issue, so the guy were doing it more
3  prevelently than they are now. Now, no one is
4  saying anything they start cracking down on the
5  tardiness the guys will be pulling in the ramp
6  again.
7      Q.  Would there normally be supervisors in
8  that area when people would be doing this pulling
9  into to punch in?
10         MR. PERLMAN:  Objection.
11     A.  Now and then, if they are having a
12 cigarette. A lot of supervisors would come out
13 and stand in the corner, pull in and have a
14 cigarette because they are not suppose to smoke
15 in the building so they smoke as close to in the
16 building they can, so sometimes they will be
17 sitting there having a cigarette.
18     Q.  Is it fair to say that normally the
19 supervisors would not be there at that time?
20     A.  No, because we start -- we have an
21 earlier start, there's stuff going on, even
22 though the majority of us haven't started work so
23 the supervisors have jobs, they're not
24 sitting waiting to go to work like us, they've

## Page 1

Volume I
Pages 1-76
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Docket No. 04-12492-GAO

PAUL PIZZUTO,
    Plaintiff,
vs.

AIRBORNE EXPRESS, INC., STEVEN
CROSSKEN, JOSEPH HAMILTON,
GREG SWEATT and ARTHUR
LEVERIS,
    Defendants.

        DEPOSITION OF JAMES S. SAMBATARO, called as a
witness by counsel for the Plaintiff, pursuant to
the applicable provisions of the Federal Rules of
Civil Procedure, before Jennifer A. Doherty, CSR
No. 1398F95 and Notary Public in and for the
Commonwealth of Massachusetts, taken at the
offices of Richard A. Mulhearn, 41 Elm Street,
Worcester, Massachusetts on Thursday, June 14,
2007 commencing at 10:05 a.m.

*****************************************

        FLYNN REPORTING ASSOCIATES
        Professional Court Reporters
        One Exchange Place
        Worcester, Massachusetts 01608
        (508) 755-1303 * (617) 536-2727
        TOLL FREE: (888) 244-8858
        FAX: (508) 752-4611

## Page 2

```
 1   APPEARANCES:
 2     BY: Richard Mulhearn, Esq.
       41 Elm Street
 3     Worcester, Massachusetts
       For the Plaintiff.
 4
 5
 6
 7     SULLIVAN, WEINSTEIN & McQUAY, P.C.
       BY: C. Max Perlman, Esq.
 8     2 Park Plaza
       Boston, Massachusetts 02116
 9     617-348-4300
       max@swmlawyers.com
10     For the Defendants.
11
12
13
14
15
16
17
18
19
20
21
22           Exhibit  5
23
24
```

## Page 3

```
 1
 2              I N D E X
 2   Testimony of:  Direct Cross Redirect Recross
 3   JAMES S. SAMBATARO
       by Mr. Mulhearn  4      72
 4     by Mr. Perlman   44
 5
 6
              E X H I B I T S
 7   No.    Description        For I.D.
 8   61  Diagram                57
 9   62  Document               64
10
```

```
11
12
13
14
15
16
17
18
19                           **EXHIBITS RETAINED BY ATTORNEY MULHEARN**
20
21
22
23
24
```

## Page 4

```
 1           P R O C E E D I N G S
 2              STIPULATIONS
 3        It is stipulated by and between counsel
 4   for the respective parties that the deposition
 5   transcript will be read and signed by the
 6   deponent within thirty (30) days of receipt of
 7   transcript under the pains and penalties of
 8   perjury.  The filing and the notarization are
 9   hereby waived.
10        JAMES S. SAMBATARO, having been
11   satisfactorily identified and duly sworn by the
12   Notary Public was examined and testified as
13   follows:
14           DIRECT EXAMINATION
15   BY MR. MULHEARN:
16     Q.  Could you state your full name for the
17   record?
18     A.  James S. Sambataro.
19     Q.  Spell your last name.
20     A.  S-A-M-B-A-T-A-R-O.
21     Q.  And where do you live, Mr. Sambataro?
22     A.  The address is 26 Golden Oaks Drive,
23   Salem, New Hampshire.
24     Q.  Do you have any plans on moving in the
```

Exhibit  5

62487350-9efc-4973-a74a-9dc512eb6580

## Page 13

1  It wasn't pleasant or positive, it went downhill
2  from there. And there was a lot of immature
3  incidents where I would feed the fire and I'm not
4  if you want I can go into details, childish
5  things that I wasn't proud of, it was horsing
6  around and only because he never treated me with
7  respect from day one. Supervisors that do treat
8  me with respect, I treat with respect back. They
9  treat me like Artie did that first day, I'm not
10 cooperative. it wasn't a good relationship and
11 that lasted probably a year until Joe Hamilton
12 replaced Steve Crossken.
13        There was an incident where I did
14 something childish and Joe brought to my
15 attention, Look, Jim, I don't have time for this
16 stupid stuff, I have bigger fish to fry. Do me a
17 favor, work it out with Artie. There was no
18 union involved or anything. I did it man to man
19 to Artie. I apologized, he accepted, and we got
20 along fine from then on.
21    Q.  Can you put that in time as to when
22 that might have been?
23    A.  Was it 2002 to about 2003 because it
24 seemed — if I can back up, if I can give you an

## Page 14

1  analogy what I think a manager should be. My
2  wife is a nurse office manager and she's in
3  charge of maybe a dozen nurses. When there is a
4  new policy for nurses, sometimes it ruffles their
5  feathers so she's learned how to treat each one
6  individually; she approaches the same task
7  different to different nurses knowing how they
8  are going to react. That doesn't happen with
9  some of the supervisors at Airborne and DHL. It
10 has gotten better.
11        I'm bringing that up because Artie
12 told me, Jim, I had a lot to learn about being a
13 manager and I understand your frustration at the
14 beginning and he learned a lot. Steve Crossken,
15 I never had respect for him; I don't have any
16 respect for him now. He went out of his way to
17 push a button. I don't know if he's with the
18 company anymore.
19        Let's see, from my time at UPS and
20 Airborne DHL I never had a problem with
21 insubordination until Steve Crossken and I were
22 working as a team at the beginning of 2002. I
23 found out later part of the reason was, I
24 mentioned earlier, there was a theft issue with

## Page 15

1  Dell computers, and they didn't find out until
2  2003.
3        There was a mechanic, he started
4  four, five in the morning, and they caught him
5  stealing the packages; he was the culprit not the
6  drivers, so we never got a, Sorry guys, sorry for
7  all the frustration over the past year. That was
8  kind of the climate in the building, and there
9  was a lot of friction from Steve Crossken and
10 Artie working as a team together.
11    Q.  What was Artie like as a manager?
12    A.  At the beginning he was a pain in the
13 ass, there is no other diplomatic way to put it.
14 He would go out of your way to push your buttons
15 and I saw for a few other drivers. I seen that
16 at UPS there are certain drivers for whatever
17 reason there is always friction and stuff, and I
18 feel as long as you're doing your job, it
19 shouldn't be on your ass, and they were on my ass
20 for stupid things, and it was uncomfortable
21 working there at the time.
22    Q.  Did you observe the way that Paul
23 Pizzuto was treated by either Crossken, Hamilton,
24 or Leveris?

## Page 16

1  A.  Yes. We have lot of time-sensitive
2  probative accounts like Dell, Xerox, IBM that
3  they have to be delivered my 9:30, 10:30 and most
4  of them by twelve. That's our job, you got to
5  service the customer. They were always on Paul.
6  They would say, If you need help, let your
7  supervisor know.
8        So certain drivers, including
9  Paul, let the supervisor know and they would say,
10 We don't have anybody, do the best you can. you
11 do the best you can and we call them failures,
12 when the time commitment isn't met. The next day
13 depending on who the driver is they're in your
14 face, Why did you screw up? How could you have a
15 failure, why didn't you tell us. Well, I told
16 you before I left but you said you had nobody, do
17 the best I can, that's a small example of what
18 went on a daily basis with Paul and other
19 drivers, where there was service issues, leaving
20 the building too late, staying out there too
21 late, you didn't make service. That's pretty
22 much how all this role in why we're here now.
23 There is no respect, no communication, you know,
24 just feeding the fire back and forth. Paul is a

62487350-9efc-4973-a74a-9dc512eb6580

Page 17

1  great guy. Everyone I work with, they will do
2  anything for you, you know, the union, they help
3  their brothers, so to speak, and there is a lot
4  of horseplay a lot of swearing, not as much as
5  before because we have female workers now, it's
6  toned down a bit. There is off-color humor.
7  There's always yelling, just normal. It doesn't
8  mean that people are upset as far as personally,
9  they just want to get the job done and depending
10  on the situation a lot of things shouldn't have
11  been said in the heat of the moment or the
12  argument. Just trying to give you a picture of
13  what the environment was then.
14      Q.  Was Paul Pizzuto treated any
15  differently than other drivers?
16      A.  Only because he was three or four
17  trucks down from me. I heard it at least once or
18  twice a week, they would be on them. That's not
19  to say the other belt, the Beverly side, I just
20  kind of saw -- I didn't want to know much
21  politics. It really wasn't any of my business
22  what went on. The two or three hours -- I want
23  to get my freight, get the job done and get back.
24          While I'm doing that when you hear

Page 18

1  what's going on on either side of you you can't
2  help but notice it. Paul, and Bill Pickman are
3  always on him, Hurry up, get out of here, what
4  are you doing?
5      Q.  Can you put any faces on those people
6  that were saying that?
7      A.  Coincidentally, he's our new manager in
8  the building; he took over Joe Hamilton's
9  position. His name is Corey Billidoux. He's a
10  great guy and at that time he was a manager, our
11  belt manager, and I think he was our manager for
12  a while. He talked to Paul.
13          Then when it gets past that point
14  when there's a problem that's not resolved on the
15  route, that's when they bring it to the office,
16  and I know Paul was called in with a shop steward
17  and I don't know what was said at those times.
18  It was work-related as far as service related.
19      Q.  Did Paul Pizzuto respond any
20  differently to what other managers were doing
21  than other drivers -- strike that.
22          How did Paul Pizzuto respond at
23  the times you observed him being treated that
24  way?

Page 19

1      A.  He responded as everybody else did
2  being questioned by the service. It was always
3  loud most of the time.
4      Q.  Let me ask you a few questions about
5  that. Loud meaning what?
6      A.  Let's see, loud like, I was trying to
7  do the right thing, can't you see I was trying to
8  do the right thing. Why are you on my ass. I'm
9  not paraphrasing Paul. I'm not saying -- it was
10  passionate about his job and they going against
11  it. It was that level.
12      Q.  Just for the record, since they can't
13  get the increase of volume, there would be raised
14  voices?
15      A.  Yes.
16      Q.  Both sides, driver and manager?
17      A.  Pretty much. I never really analyzed
18  but it was loud.
19      Q.  Let me ask you some questions about the
20  scanning process, accountability for freight.
21  Was it important for a driver to properly scan an
22  account for his freight?
23      A.  Yes.
24      Q.  Can you describe why that would be

Page 20

1  important?
2      A.  It's a bar code and it got a laser
3  scanner and it takes the information and before
4  you leave the building, you dump the scanner and
5  it sucks out all the information, so all the
6  clerks have the information so if a customer
7  calls wondering where their IBM product is, they
8  can go into the computer and say, So and so
9  driver left the building at 8:40, it's on route
10  to you. Give the customer an answer, that's a
11  way of knowing how to find that out.
12      Q.  That would come from the driver
13  scanning the pieces on his truck?
14      A.  Yes. When it comes to loading from
15  the plane, there is a team that scans the freight
16  in the building. They have to scan, then they
17  have another scan when the driver scans it to his
18  vehicle, then they have when -- you punch in when
19  you leave the building. They'll have, So and so
20  scanned that package and he left the building at
21  8:40. You should have it by twelve. They know
22  it's on the way.
23      Q.  Once the driver has scanned the freight
24  that's on his truck, he would bring the scanner

62487350-9efc-4973-a74a-9dc512eb6580

Page 29

1  help. That's not the case in Paul. Yes, he's a
2  smart ass, wise ass only when they press the
3  button, that's how he reacts, but as far as him
4  looking like he's stoned or under the influence
5  or drunk, I never saw it in Paul at all.
6        Like I said, there was plenty of
7  support there if there was the case because
8  drivers, they watch out for another and they
9  don't want them going out on the road driving,
10  hurting somebody.
11        There is a support through the
12  union and a few times that -- I've seen that
13  happen a few times, other drivers, you can tell,
14  it's pretty obvious they were messed up.
15    Q.  You never observed that in Paul?
16    A.  No, never.
17    Q.  Were people drivers get written up for
18  being late?
19    A.  Yes.
20    Q.  How late would you have to be before
21  you got written up?
22    A.  It depends. It's different for
23  everybody. It really is. I've got written up
24  for being a minute late in a snowstorm and other

Page 30

1  people don't get written up. They don't really
2  enforce it. I don't know. I heard different
3  things. I don't know if there's a book that says
4  it. You can ask the same question to three
5  different supervisors and they'll give you three
6  different answers. One minute, two mintes, three
7  minutes, it really depends on -- I actually got a
8  warning letter for being five minutes late when
9  the plane was an hour late. They were just
10  trying prove a point. I didn't really care. I
11  forget what the reason was, there was a problem
12  at home, one of my kids, maybe getting a late
13  start, I got there on time but I found out the
14  plane was late. So, What is your point, why
15  can't you just say, Jim, next time we need you.
16  So I don't have an answer for that. It depends
17  on the supervisor the driver, the circumstances.
18  Some drivers live ten minutes away, they're late
19  every day, it's ridiculous. They enforce, they
20  say, Don't smoke in the building. They don't
21  enforce that. Guys smoke in the building. It
22  drives you crazy. To answer your question, I
23  don't really have an answer.
24    Q.  Was there a time clock on the

Page 31

1  premises?
2    A.  Yes.
3    Q.  Where was that?
4    A.  Upon entering the building, the
5  building in Stoneham facing the building, the
6  main entrance isn't kind of in the middle; then
7  to the left of that there's an overhead door
8  where the trucks enter and exit, when you go into
9  the entrance where the trucks enter, you take a
10  right, it maybe a little way, twenty feet, thirty
11  feet, there's a time clock right there.
12    Q.  Is there a ramp at that location?
13    A.  Yes, there is a ramp.
14    Q.  Can you give me an estimate how long
15  the ramp is?
16    A.  I'm really bad with distance and
17  math.
18    Q.  Ball park?
19    A.  Fifty feet, 60 feet.
20    Q.  And approximately how wide is that
21  ramp?
22    A.  Probably about ten feet, twelve feet
23  wide.
24    Q.  Did you say that ramp is used --

Page 32

1    A.  Yes, there another entrance on the
2  other side of the building but I would call it
3  the main entrance for the vehicles.
4    Q.  Was there a practice at this plant with
5  regard if drivers were running late before their
6  shift of how they would clock in?
7        MR. PERLMAN: Objection.
8    A.  Yes, that's another thing that they
9  didn't enforce depending on the supervisor. For
10  the most part, it happens every day. Somebody is
11  running late and they have a minute to spare and
12  there is the parking area might be full, they
13  might have to park a distance away, it might be a
14  two-minute walk. What they do is they drive up
15  to that -- I'm sorry, they drive up to that
16  overhead door where the trucks enter and exit and
17  they park there, run in, punch in, make it on
18  time, then they will park. You're not supposed
19  to do that. It's not enforced like nothing else
20  is enforced unless they want to bust your
21  balls.
22    Q.  And are you aware of anybody who was
23  written up for that?
24    A.  No.

Page 33

1    Q.   Approximately how often was that
2    occurring?
3    A.   Happens every day.  Sometimes it's the
4    same people, like clockwork.  This one guy he
5    lives 50 minutes away and he makes it by one
6    minute.  It's amazing.
7    Q.   Did you say they would drive up to the
8    overhead door area?
9    A.   Yes, then they walk in, punch out, and
10   walk back out, get back in the vehicle, usually
11   leave it running.
12   Q.   To do that, to drive up to the overhead
13   door, would you have to go up the ramp?
14   A.   Yes.
15   Q.   Direct your attention to July 25, 2003
16   were you in that ramp or time clock area on that
17   day in connection with Mr. Pizzuto?
18          MR. PERLMAN:  Objection.
19   A.   I know what incident you're referring
20   to.  I don't know the exact date, but I wasn't
21   near the time clock which is near that ramp.
22   Q.   What did you observe at that time?
23   A.   What I observed was, I was talking to
24   other drivers, my back was towards the ramp and

Page 34

1    what I heard was a car come up, a lot of
2    laughing, Paul came by me -- no, he didn't come
3    by me, I didn't see him punch in.  I saw him pull
4    up and there was a lot of commotion, laughing,
5    and then I went, then I left, it was time to --
6    roll call, so to speak, and what I observed was I
7    think Artie was there yelling at him and he
8    was -- my opinion he was looking at him, are you
9    serious are you crazy.  I found out later that
10   Artie claims that he tried to run him over which
11   my back was towards it but I don't see that
12   happening.  Paul wouldn't run a supervisor over,
13   and it isn't -- I told you it's not uncommon for
14   drivers to do that, I mean Paul was being a smart
15   ass driver, yes, but he wasn't going to run
16   anybody over.
17          We have a night shift that use our
18   trucks, like the day drivers, they usually come
19   back between three and five.  There is a second
20   shift between two and four that use those trucks
21   and when they come back in the between nine and
22   eleven; if those trucks aren't put back, that
23   supervisor gives that driver a key, sometimes
24   it's a pain in the ass, you come to work and your

Page 35

1    truck is not there, so I've seen drivers upset
2    enough that they come in, barrel-assing in, not
3    really thinking, just like pissed off, you really
4    can't drive fast because you can wreck the motor
5    up, but I've seen drivers drive in there faster
6    than what Paul drove in that day, I didn't
7    physically see him.  I'm going by the sound of
8    the motor.
9    Q.   Can you just describe the sound of his
10   motor?
11   A.   To me, it doesn't sound like, sound
12   like somebody drove into the building, I just
13   know it didn't sound like a diesel truck, it
14   sounded like a foreign car, that's what made me
15   turn around.  I usually see two or three or four
16   guys, Hey, it is Pizzuto and I forget if you got
17   out of the car to punch in.  I think he didn't
18   make it that far that day.  The day went on.
19   What I mean is it was 6:45 our time so we were
20   supposed to meet or in a certain area for our
21   morning meeting.
22   Q.   Did you say that you saw some
23   interaction between Pizzuto and Leveris?
24   A.   Yes, there was like I says, other

Page 36

1    instances it was common occurrence they were
2    always head butting.  I really didn't stick
3    around to what was happening.  They were arguing.
4    Then I found out that, you know, that it was
5    embellished that he was trying to -- Paul was
6    trying to run Artie down, I don't buy that.
7    Q.   Did you see, you said that when you
8    heard the engine, you turned around?
9    A.   Yes.
10   Q.   What was Paul doing at that time?
11   A.   I forget if he was in the car or
12   outside the car.
13   Q.   About how far away were you?
14   A.   Forty feet.
15   Q.   Did you have a clear view?
16   A.   Yes.
17   Q.   Did you see Art Leveris at that time?
18   A.   Yes, he was in front of the hood.
19   Actually, there was a big metal table they use
20   for paperwork.  I believe Artie was either on the
21   side of the table or in front of it, he was at
22   the corner of the table.
23   Q.   Do you know what he was doing there?
24   A.   I don't know if he was walking from

Page 37

1  somewhere. I never noticed him there because my
2  back was toward the -- I don't know if he was
3  working on the job and happened to walk by or he
4  was at that table all the time.
5      Q. Did Leveris at that point to you appear
6  to look frightened or scared?
7      A. No. He looked pissed off. He always
8  looked like that. His nostrils were always
9  flared, he looked like he was mad at the world
10 all the time.
11     Q. Do you know someone called Greg
12 Sweatt?
13     A. Yes.
14     Q. Who is he there?
15     A. Another supervisor.
16     Q. Do you recall him being there at that
17 time?
18     A. I do.
19     Q. Do you have any recollection as to
20 where he was?
21     A. I think he was with me at the time
22 clock, he was in that same area, it was so long
23 ago, I know he was there. I forgot exactly where
24 in the crowd I remember seeing his face.

Page 38

1      Q. Was he over by Leveris?
2      A. I'm not sure.
3      Q. Did Greg Sweatt look scared or
4  frightened to you?
5      A. No. He was a good guy, good to me. I
6  never saw him scold other drivers for anything.
7  He always seemed to be level headed. He was more
8  diplomatic to his drivers, and I remember he was
9  in that area, I forget the circumstances.
10     Q. Was there any interaction between Greg
11 Sweatt and Pizzuto at that time?
12     A. No.
13     Q. Did you ever hear any of the
14 supervisors either saying to you or somebody else
15 or to themselves that they were afraid of Paul
16 Pizzuto?
17     A. No.
18     Q. Did they ever look afraid of Paul
19 Pizzuto?
20     A. No.
21     Q. You said when you drove in, there was
22 commotion and laughter?
23     A. Yes.
24     Q. Who was the laughter coming from?

Page 39

1      A. Other fellow drivers I couldn't name,
2  they congregate in different areas. There was
3  people around that metal table I was telling you
4  about; that was where the commotion was coming
5  from.
6      Q. When you say "commotion," what do you
7  mean?
8      A. Boisterous laughter like, Hey, Pizzuto,
9  knuckle head, what are you doing?
10     Q. Did you understand what the laughter
11 was about at the time?
12     A. Yes, I did because Paul drove his car
13 in. That was funny.
14     Q. Did Mr. Leveris look amused?
15     A. Not at all.
16     Q. The way you described this metal
17 table?
18     A. It's taller than this. It's probably
19 waist high on me. I'm six one, and it's about
20 five feet wide. It has wheels.
21     Q. I'm searching for a diagram. Let's see
22 if you can relate to looking at Exhibit 55?
23         MR. PERLMAN: Actually, I had Paul
24 draw refer to the witness to change that at

Page 40

1  all.
2          MR. MULHEARN: He doesn't have to
3  touch it, just to see if he recognizes the area,
4  you're not going to touch this.
5          MR. PERLMAN: We don't want you to
6  write on it. That's all.
7      Q. Take a look at that as Exhibit 55, see
8  if you can recognize the general --
9      A. Yes.
10     Q. -- layout there?
11     A. What does the B stand for?
12     Q. I understand the time clock area.
13 Exhibit 55 generally speaking represents the area
14 we were talking about?
15     A. Yes, it does.
16     Q. On the exhibit where it says "ramp,"
17 does it look where the ramp would be?
18     A. Yes.
19     Q. And the B where the time clock would
20 be?
21     A. Yes.
22     Q. There is no table on this?
23     A. The table is -- the conveyor belt would
24 be here in front -- the conveyor belt was always

62487350-9efc-4973-a74a-9dc512eb6580

Page 41

1  the metal table right there, so Paul came up, I'm
2  guessing, his intention was to pull up there
3  right out and get back in there. I don't think
4  he punched in that day. He drove in. -- there's
5  a conveyor belt right there. You can't make a
6  left because all the freights there, pallets and
7  cans, there is no access in the morning. After
8  everything is gone, you can drive around. All
9  the trucks that is on this conveyor belt, they
10 all use this entrance and exit. What I meant was
11 this area drivers come to work, they go out to
12 this parking lot, pissed off they come around
13 like friggin screwballs, then they punch it in.
14 Those guys that goes unnoticed, so yes, this is
15 accurate description of range, what isn't
16 there is the belt, you can't go as far as here.
17    Q.  You can't go straight?
18    A.  No.
19    Q.  Give us some idea how far the belt
20 would be from the entrance?
21    A.  Eight feet, eight to 12 feet. I'm bad
22 at distance.
23    Q.  It's right there?
24    A.  Yes.

Page 42

1    Q.  From one side of this room to the
2  other?
3    A.  Yes.
4    Q.  Someone had to make a right-hand turn
5  quickly?
6    A.  Yes.
7    Q.  That table is in front of the belt?
8    A.  Yes, pretty much right in front of it.
9  When you come up to the ramp, it is in this
10 area.
11    Q.  Did you see Paul Pizzuto leave in his
12 car?
13    A.  No, I didn't.
14    Q.  When drivers would drive up the ramp
15 and do this time-clock punch-in thing --
16    A.  They usually stop at the bottom here,
17 run in and run out. Paul, for whatever reason,
18 he drove up.
19    Q.  When you say "at the bottom" the bottom
20 of the ramp or where they --
21    A.  No, the bottom of the ramp down here,
22 the parking lot area.
23    Q.  That was the usual procedure?
24    A.  Yes.

Page 43

1    Q.  Did you observe anything threatening or
2  alarming about Paul Pizzuto on that occasion?
3    A.  No.
4    Q.  Did you hear him make any threats or
5  remarks to the supervisors at that time?
6    A.  No, I didn't.
7    Q.  Were there other drivers congregated --
8  you said some people were laughing and so forth,
9  do you remember who those other people might have
10 been?
11    A.  I really don't.
12    Q.  Do you know whether or not they were
13 drivers?
14    A.  Yes, definitely drivers. Like I said,
15 once 6:45 starts, you stop and go to this area
16 here where we usually have a meeting. The
17 supervisor discusses whatever the topics, current
18 events at the time. That's what pretty much
19 everybody did, so I was at the time clock, I
20 turned around, I saw a little commotion and I
21 started my day, went to the meeting.
22    Q.  Did you ever hear Paul Pizzuto make any
23 threats to any supervisor?
24    A.  No.

Page 44

1    Q.  Do you remember that Paul Pizzuto had
2  been on some sort of leave of absence prior to
3  this time?
4    A.  Vaguely remember that. I'm sure he
5  was.
6    Q.  Did you have any idea as to what kind
7  of condition that led to that leave of absence?
8    A.  No.
9    Q.  Did Paul Pizzuto seem any different
10 after he returned from that leave of absence?
11    A.  Not really. He just seemed like Paul,
12 back to work, he was still cracking jokes and
13 being himself.
14        MR. MULHEARN:  I have got no
15 further questions.
16        CROSS-EXAMINATION
17 BY MR. PERLMAN:
18    Q.  Good morning, Mr. Sambataro. My name
19 is Max Perlman. I represent the defendants in
20 this case, DHL, Mr. Hamilton, Mr. Crossken,
21 Mr. Leveris and Mr. Sweatt. Those are my
22 clients. Do you know whether Mr. Pizzuto is
23 disabled?
24    A.  No, I don't know.

Page 49

1    Q.  Do you know whether Mr. Pizzuto was a
2  good driver.  When I say good driver, good at
3  performing the driving for Airborne as opposed to
4  being a good and able --
5    A.  No accidents, if that's what you mean.
6  I would say, yes.
7    Q.  Was Paul Pizzuto good at his job?
8    A.  Yes, he was.
9    Q.  How could you tell he was good at his
10  job?
11    A.  Because he came to work every day.
12    Q.  Did you get to see his performance?
13  Did you get to see his error rate?
14    A.  No.  That's daily -- I have no access
15  to that.
16    Q.  You never saw whether or not he was
17  performing his job to the standards that were
18  acceptable to --
19    A.  As I mentioned earlier about time
20  commitments, I have no idea.
21    Q.  You don't know.  Okay.  Do you know
22  whether Paul Pizzuto was deserving of the
23  discipline that the supervisors gave him while he
24  was employed at Airborne?

Page 50

1    A.  At which point?
2    Q.  2003.  Right now, I'm not talking about
3  the termination.  I'm talking about routine
4  discipline.
5    A.  Like I said earlier, I don't really pay
6  attention to what is going around me.  There was
7  always arguments with Paul and other drivers in
8  my immediate area in the morning and I couldn't
9  give an example.  I know the supervisors -- this
10  is just in general -- the supervisors, they
11  enforce things from my experience, one guy get
12  away with swearing, where somebody else won't get
13  away with swearing.  Some guys get away with
14  smoking on the belts, it depends on the
15  supervisor.
16    Q.  Do you feel that Paul Pizzuto was
17  singled out for discipline?
18    A.  Yes.
19    Q.  Do you know why that was?
20    A.  When you say "discipline," I need to
21  know what the circumstances were.  Was it being
22  late or missing a pickup or missed delivery a
23  package or having the wrong scanner.  I'm not
24  sure exactly which discipline you're referring to

Page 51

1  that he was treated unfairly.
2    Q.  I'm looking for your perspective, you
3  told me that you saw Mr. Pizzuto being singled
4  out for discipline; whatever you mean by that, I
5  want to know, do you know why Mr. Pizzuto was
6  singled out for discipline?
7    A.  Probably when I said earlier, got to
8  get the last word in, rubbed him the wrong way.
9  I was trying to help the guy.  I'm telling you
10  how I know Paul and he can be a smart ass when
11  he's provoked.  I'm the same way when I'm
12  provoked.  I'm threatening.
13    Q.  When you say you're trying to help the
14  guy, I understand that it's admirable to help a
15  friend, are you saying here you're testifying
16  that you're trying to help the guy?
17    A.  He called me a year ago, if I recall a
18  certain instance, and I said I'd help him out.
19    Q.  You would like to testify in a way that
20  would help him, if you can?
21    A.  Right.
22    Q.  Did you in 2003 witness any erratic
23  behavior on the part of Mr. Pizzuto?
24    A.  No.

Page 52

1    Q.  Anything out of the ordinary?
2    A.  No.
3    Q.  Did you know whether he was struggling
4  with any emotional issues at that time?
5    A.  No, I didn't.
6    Q.  Or any mental issues?
7    A.  No.
8    Q.  You don't know whether or not he
9  threatened his supervisors; isn't that right?
10    A.  That's correct.
11    Q.  And you don't know what it was that
12  Mr. Leveris felt when Mr. Pizzuto drove his car
13  into the dock; isn't that right?
14    A.  I don't know what he felt?
15    Q.  Yes.
16    A.  No, I don't.
17    Q.  You don't know what Mr. Sweatt felt
18  when he drove into the dock?
19    A.  No.  I don't know what Paul was
20  feeling, either.
21    Q.  When we spoke back in January you also
22  told me in the conversation, you said Paul
23  Pizzuto is, quote, unquote, a pain in the ass.
24  Do you remember telling me that?

## Pat' Pizzuto Coaching / Disciplinary Action Log

| Date | Description | Discipline Type | Action |
|------|-------------|-----------------|--------|
| 2/25/1991 | Preventable Accident | C | Written Warning 2/26/91 |
| 4/24/1991 | Failure to ensure proper supplies | C | Written Warning 4/25/91 |
| 6/11/1991 | Failure to follow Instructions | C | Written Warning 6/11/91 |
| 7/26/1991 | Preventable Accident | B | Written Warning 7/29/91 |
| 1/15/1993 | Failed to Follow Instructions-misrouted 36 shipments | C | Written Warning 1/15/93 |
| 1/30/1994 | Violating DOT 60 hour Rule | C | Written Warning 2/18/94 |
| 2/25/1994 | Failed to follow instructions | C | Written Warning 2/25/94 |
| 3/17/1994 | Failure to follow uniform guidelines | C | Written Warning 3/22/94 |
| 10/31/1994 | Failure to follow uniform guidelines | C | Written Warning 10/31/94 |
| 10/31/1994 | Failure to Scan Shipments | C | Written Warning 10/31/94 |
| 3/28/1995 | Failure to Scan Shipments | C | Written Warning 10/31/94 |
| 4/19/1995 | Attendance violation | A | Written Warning 3/30/95 |
| 7/21/1995 | Attendance violation | A | Written Warning 4/19/95 |
| 8/28/1995 | Preventable Accident | A | Written Warning 7/25/95 |
| 10/9/1995 | Attendance violation | C | Written Warning 8/3/95 |
| 11/20/1995 | Attendance violation | A | Final Written Warning 10/18/95 |
| 2/14/1996 | Leaving Freight without signature | A | Suspension 12/5/95-reduced to Final warning by union 2/16/96 |
| 5/28/1997 | Leaving Freight in vehicle | C | Coaching notation in file – No formal disciplinary action |
| 10/25/1997 | Preventable Accident | C | Warning Letter 5/29/97 |
| 1/14/1998 | Failed to Protect Start Time | C | Written Warning 10/29/1997 |
| 4/28/1998 | Insubordination-refused reasonable instruction 3 times | C | Written Warning 1/21/98 |
| 5/23/1998 | Violating DOT 60 hour Rule | B | Note to File |
| 3/2/1999 | Preventable Accident | C | Written Warning 6/12/98 |
| 1/17/2000 | Delivery procedures failure | C | Written Warning 3/11/99 |
| 6/15/2001 | Insubordination-unauthorized break and uncooperative | C | Warning Letter 1/19/00 |
| 6/19/2001 | Insubordination-uncooperative, poor attitude and response | B | Letter to file 6/18/01 |
| 6/19/2001 | Failure to scan 15 shipments | C | Letter to file 6/19/01 |
| 6/19/2001 | Insubordination- hid van keys, deliberate delay | C | Written Warning 6/22/01 |
| 6/21/2001 | Failure to Scan 36 Shipments | B | Note to File |
| 7/3/2001 | Failure to scan 12 shipments | C | Written Warning 6/22/01 |
| 7/13/2001 | Failure to scan 6 shipments (week ending 7/13/01) | C | Written Warning 7/6/01 |
| 8/16/2001 | Refusal to surrender Gas Card - refusing a direct order | C | SUSPENSION reduced to Warning 7/19/01 |
| 10/1/2001 | Failure to scan 45 shipments | B | Discharge reduced to 5 day suspension 8/17-22/02 by union |
| 12/31/2001 | Failure to scan 8 shipments | C | Written Warning 10/1/01 |
|  |  | C | Written Warning 1/8/02 |

EXHIBIT
6

| Date | Description | Discipline Type | Action |
|---|---|---|---|
| 3/8/2002 | Failure to scan 7 shipments | C | Written Warning 3/13/02 |
| 4/1/2002 | Violated Attendance Standards-late 8 times in 4 months | A | Written warning 4/2/02 |
| 4/3/2002 | Failure to Surrender Gas Card | C | Written Warning 4/4/02 |
| 4/4-5/02 | Misconduct | D | Written Warning 4/5/02 - further instances could lead to termination |
| 5/23-24/02 | Theft of company time | D | Discharge reduced to 2 day suspension 6/03/02 by union |
| 8/8/2002 | Insubordination-refused to follow direct order | D | Written Warning 8/9/02 - further instances could lead to termination |
| 9/25/2002 | Insubordination - refused to follow direct order | D | Suspension 9/26/02 - reduced to Warning by union |
| 9/29/2002 | Tardiness | A | Written warning 10/17/02 |
| 2/24/2003 | Preventable Accident | C | Written Warning 3/4/03 |
| 6/6/2003 | 5 days of absence | A | Coaching notation in file6/18/03 — No formal disciplinary action |
| 7/24/2003 | Threatening remarks/intimidating gestures | D | Written warning 7/24/03-further instances could lead to termination |
| 7/24/2003 | Failure to scan shipment | C | Written Warning 7/24/03 |
| 7/25/2003 | Threatening and dangerous behavior | D | Discharge 7/25/03 |

Key to Discipline Type

A -- Attendance Policy

B -- Insubordination and Gross Negligence

C -- Careless and Neglectful Performance of Duties

D -- Cardinal Offenses subject to Discharge

EXHIBIT 1
-HARASSMENT COMPLAINT FORM-
(Privileged and Confidential)

Name: _Paul Pizzuto_    Job Title: _Driver_

Station: _NSH_    Supervisor: _Steve Crosskens_

Date(s) of Incident(s): _5/23 5/24 6/3 6/4 7/3_    Case No: _____

Details of Incident(s):

5/23 I reported to work on light duty. I was instructed to clean the station + the truck lineup for the pm drivers. As I was working I felt dizzy, a result of the medication I am currently taking and I sat down to rest on awakening at Approx 2.05 pm I punched out for the day. On 5/24/02 is questioned on my whereabouts and explained what I wrote above, Crossenkens said he was to conduct an investigative meeting and was without. On 5/24 that afternoon Approx 1:45 pm Steve Crosskens termina - for dishonesty and stealing Company time. On 6/3 a Local hearing w d by Steve Crosskens, Robert Mergenhagen (of Airborne), Joe Quigley, e Vallone and business agent Lou DiGrampaolo and the agreement they ched was a 2 day suspension with all wages paid back except-
(over

Signatures (upon receipt of complaint form):

Complainant: _Paul Pizzuto_

Union Rep: _Gene Vallone_    Date Received: _7/10/02_

Company Rep: _____    Date Received: _07/10/02_

Action:   Resolved _____   Dismissed _____   Withdrawn _____   or  Fwd to Step 2 _____

Note: *Resolutions are final and binding.*

ad   Found to Seattle 6.00 to Be Put into Steve Crosskens File

Signatures (at completion of mediation):

Complainant: _Paul Pizzuto_  3/11/03    Date: _____

Respondent: _____    Date: _____

Union Rep: _____    Date: _____

Company Rep: _____    Date: _____

Copy To:    Complainant, Respondent, DFSM, Business Agent, Labor Relations, Regional
Manager, Independent Oversight Panel

Exhibit 7

the 2 day suspension. I reported to work on 6/4/02
nd Steve Crossbens stated I was still terminated.
In 6/5/02 I reported back to work after being notified
y my Union Steward Dave Vallone. On 6/6 and 6/7
) worked E.R.T.W (Light Duty). On 6/7 I reported
to work after being cleared by the doctor, Since the
ncident I have not been paid in full for for agreement
reached along with workmans comp benefits
ue to Steve Crossens failure to notify workmans
mp of hours paid on agreement reached.
   On 7/3 I was told to remove tee-shirt with
irborne Express logo because it was not an
ssued shirt by the company. Your Imediate Attention
to this matter would greatly be appreciated

124

Volume 1, Pages 1-248

Exhibits: 42-59

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - -

PAUL PIZZUTO

             Plaintiff

vs.                    Docket No. 04-12492 GAO

CROSSKEN EXPRESS, INC., STEVEN

CROSSKEN, JOSEPH HAMILTON, GREG

SWEATT, AND ARTHUR LEVERIS

             Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF PAUL PIZZUTO

Tuesday, June 12, 2007, 10:23 a.m.

Sullivan, Weinstein & McQuay, P.C.

2 Park Plaza, Suite 610

Boston, Massachusetts

- - - - - - -Reporter: Joan M. Cassidy, RPR, CRR- - - - - - -

jcassidy@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404   Fax 617.728.4403

Exhibit 8

Exhibit 8

Paul Pizzuto
Volume 1 - June 12, 2007

10 (Pages 34 to 37)

34

1     Q. Okay. I want to talk to you about those,
2  but first I want to also ask, are you currently
3  taking any drugs, illicit drugs, say marijuana,
4  cocaine, any of those things?
5     A. No.
6     Q. Percocet?
7     A. No.
8     Q. OxyContin?
9     A. No.
10    Q. Are you under the influence of any drugs or
11  alcohol right now?
12    A. No, except for the prescription drugs.
13    Q. Aside from the four prescription drugs that
14  you have just identified to me; is that right?
15    A. Right, right.
16    Q. Is there anything about the four
17  prescription drugs that you just mentioned that
18  would affect your ability to testify here today?
19    A. Not affect me individually, but I am
20  diagnosed bipolar, I don't know if you know what
21  bipolar is.
22    Q. I'm vaguely familiar with it. Why don't
23  you give me your understanding of that.
24    A. Well, I'll tell you briefly. I lost my

35

1  mother in 1987. She committed suicide from her
2  disease. I lost my brother at age 43. He died from
3  the disease. And my younger brother hasn't gotten
4  treatment, and I waited forever to get treatment.
5  And it's basically -- everybody is different. You
6  either have a manic stage, which is a very high
7  stage, or you go through a real depressing state,
8  which you have no energy, fatigue, loss of
9  concentration, inability to cope, all of the above.
10    MR. PERLMAN: Can we go off the record
11  just for a second?
12    (Discussion off the record.)
13    Q. I want to talk about -- you said in bipolar
14  there is a manic and a depressive stage --
15    A. Yes.
16    Q. -- or state?
17    A. Yes, everyone has different states.
18    Q. Are you in one or the other right now?
19    A. I am probably a little bit manic, but I'm
20  not manic-manic. I'm definitely above the
21  depressive state right now, but I'm leaning towards
22  the manic stage. I mean, I don't know what type of
23  scale it is. I just know my body. I know when I'm
24  a little hyper and I'm a little bit strong-headed

36

1  that it's a manic state. And when I just can't get
2  out of bed in the morning, that's depression.
3     Q. That's the depressed state. Okay. I'm
4  just trying to figure out if there is anything
5  that's going to affect your ability to do your job
6  today, which is to tell the truth.
7     A. No.
8     Q. There's nothing about your psychological
9  state or the medications you are on that would
10  affect your ability to tell the truth, right?
11    A. Other than my disease. I mean, you'd have
12  to talk to my psychiatrist about my state of mind.
13  I mean, right now I feel like I'm giving my
14  testimony to the best of my knowledge.
15    Q. Right.
16    A. You know, I mean, I'm not a doctor, you're
17  not a doctor. He's the doctor. He can tell you all
18  about the disease.
19    Q. And you know a decent amount about the
20  disease too from all the treatment you have
21  received, right?
22    A. I sure do, from all my past with my family.
23    Q. In your experience does bipolar disorder or
24  any of the medications that you are presently on

37

1  affect one's ability to tell the truth?
2     A. No, I've always been an honest person all
3  my life.
4     Q. Okay. I'm going to count on that today; so
5  I'm going to ask you some questions, and I'm going
6  to need you to be honest.
7     A. That's what I will do.
8     Q. Good. What are you taking lithium for?
9     A. Lithium is one of the drugs I am taking for
10  the bipolar as well as the other two. They are --
11  they basically offset different chemical reactions
12  that I'm going through in my body and in my brain;
13  and right now, currently, the psychiatrist has found
14  those three to be working for me right now.
15    Q. Those three would be the lithium, the
16  Effexor, and the Lamictal?
17    A. Lamictal.
18    Q. So all three of those drugs are for your
19  bipolar disorder?
20    A. Yes.
21    Q. And do you presently have a psychiatrist?
22    A. Yes, I see him once a month.
23    Q. What's the name of that psychiatrist?
24    A. Psychiatrist? Dr. Sadowsky.

38

1    Q. S-a-d --
2    A. Yes, o-w-s-k-y.
3    Q. Okay. And Dr. Sadowsky has prescribed all
4  three of these drugs for bipolar to you?
5    A. Yes, he has.
6    Q. Are all three drugs just for bipolar and
7  nothing else?
8    A. No, nothing else, that's it, yeah.
9    Q. How long have you taken lithium?
10    A. Well, let's see. I want to say, whew,
11  sometime in 2005. I want to say, like, October,
12  November of '05.
13    Q. That's the first time you were prescribed
14  the lithium?
15    A. You know what? We started out with
16  different drugs. Those are the ones I'm currently
17  on. I did go through a few other different drugs
18  because it's a process, in order to find the right
19  drug that's working for each individual, until you
20  find it. Now, that's basically keeping me together,
21  those three.
22    Q. All right.
23    A. But I had to experiment with everything
24  else until I got up to that level.

39

1    Q. So your psychiatrist had you on and off
2  certain drugs for a --
3    A. Oh, yeah, I tried probably about four
4  different drugs.
5    Q. Let's rip through this on the dates. I
6  just want to know, when did you start taking
7  Effexor?
8    A. I will give you a ballpark. I don't know
9  exactly.
10    Q. That's fine.
11    A. But it was pretty much the same time as
12  those other three, the Lamictal.
13    Q. Fall 2005?
14    A. Yes, and the lithium.
15    Q. Same answer for Lamictal, yes?
16    A. Pretty much.
17    Q. Fall 2005?
18    A. Yeah.
19    Q. Now, I think you testified that your mother
20  was bipolar; your brother, who is now deceased, was
21  bipolar?
22    A. Right.
23    Q. Your other brother, I'm sorry, is bipolar
24  or is he not?

40

1    A. He's not diagnosed.
2    Q. He's not diagnosed?
3    A. No. I mean, he has depression, but
4  everybody has depression. I fought off taking meds
5  all my life because I saw what my mother went
6  through, in institutions and everything else. So
7  you can see how I felt about the whole situation.
8  Then I saw my brother go on SSI because he couldn't
9  cope anymore, and he was in a state of confusion all
10  the time.
11    Q. Is this the brother who is now not with us?
12    A. He's deceased, yeah. And I worked for 14
13  years for Airborne with this disease, and I fought
14  it off for 14 years because I didn't want to take
15  these drugs. And then when I needed help, I wasn't
16  given the opportunity to get help.
17    Q. So it sounds to me that -- when were you
18  diagnosed with bipolar disorder?
19    A. That was sometime after -- I want to say it
20  was early 2006.
21    Q. Who diagnosed you?
22    A. Or late 2005. Dr. Sadowsky.
23    Q. I take it that when you were diagnosed
24  doesn't mean that's when you got it, right, or

41

1  that's when it first presented itself?
2    A. Well --
3    Q. You have had bipolar for a long time,
4  right?
5    A. Yeah. I have been diagnosed since he
6  diagnosed me, but I was taking different drugs
7  through my primary care physician, like Paxil, which
8  is another antidepressant, Wellbutrin, which is
9  another antidepressant. I was on all kinds of
10  different drugs for sleep apnea, which I was
11  diagnosed with.
12    Q. I'm just asking about the bipolar. I want
13  to know -- I mean, how long have you had bipolar
14  disorder?
15    A. I've had it diagnosed for that long.
16    Q. Right, but --
17    A. I couldn't tell you. I'm not a doctor.
18    Q. Right, but you told me you worked for 14
19  years with -- for Airborne with that condition, so
20  you've had it since at least the early '90s. Did
21  you have it before then too?
22    A. I don't know, but I had a lot of symptoms
23  leading up to what -- I was believing that it was
24  bipolar, because, again, I told you I lost two

Paul Pizzuto
Volume 1 - June 12, 2007

12 (Pages 42 to 45)

42

1   family members, and I know this disease is a
2   chemical passed on through the genes, so I had a
3   very good idea of what I was fighting, because my
4   previous two people that had passed on were
5   diagnosed with this, so...
6       Q. When did that --
7       A. So I had no doubt at that point.
8       Q. When did that occur to you, that you had no
9   doubt that it was bipolar disorder?
10      A. I want to say maybe 2002.
11      Q. 2002?
12      A. Right around there.
13      Q. I would imagine that bipolar disorder is
14  not an easy condition to live with.
15      A. No.
16      Q. How does it affect your day-to-day
17  activities or your life?
18      A. Well, when you are in a manic state, you
19  speed all the time upstairs in your brain; or you
20  are in bed and you can't get out of bed. But I got
21  up to go to work every day, I can tell you that.
22      Q. Uh-huh. So you're either in a manic or
23  depressive state?
24      A. Yes.

43

1       Q. Characterize for me what it's like for you
2   to be in a depressive state.
3       A. Not wanting to go out of the house, not
4   wanting to socialize, not wanting to see people, not
5   wanting to be around my family.
6       Q. Not wanting to interact with people at all?
7       A. None whatsoever, no.
8       Q. And describe for me what it's like for you
9   to be in a manic state of mind.
10      A. To do things that I didn't think I could
11  achieve in the daytime, just to keep my mind busy,
12  constantly trying to do things, just to take time,
13  make the time go by constantly.
14      Q. Do you feel agitated?
15      A. A lot of times.
16      Q. Angry?
17      A. I wouldn't say angry. I would say
18  agitated, confused, inability to focus.
19      Q. Aggressive?
20      A. I wouldn't say aggressive, unless there was
21  something that irritated me that was brought on to
22  me.
23      Q. Were you --
24      A. I didn't initially -- I didn't go out

44

1   and -- try to go out and, you know, look for
2   trouble; but, I mean, if there was something
3   chemically I reacted to, then, I mean, I'd give my
4   opinion about it. You know?
5       Q. That you might not have done if you were in
6   a depressive state?
7       A. Depressive state, I'd go hide, I'd
8   take off and go hide somewhere.
9       Q. Let me ask you this, the two incidents, the
10  Andover incident and the Lawrence incident, where
11  you were charged with various crimes --
12      A. Yeah.
13      Q. -- can you characterize whether you were,
14  in your opinion, in a manic state or depressive
15  state at that time?
16      A. Oh, definitely manic, without a doubt.
17      Q. In those two --
18      A. Yeah, even the OUI is, you know, without a
19  doubt.
20      Q. Being honest, when you are in a manic
21  stage, are you more or less prone to anger?
22      A. It depends how you define anger.
23      Q. Do you know what the word "anger" means?
24      A. Yeah, but anger brought on by individuals

45

1   or anger brought on through myself?
2       Q. Either one. Let's go with each. Anger
3   brought on by yourself?
4       A. I'll say a little bit of each.
5       Q. So you are more prone to anger if you are
6   in a manic state?
7       A. I'm more prone to being irritable. I
8   wouldn't say angry. I'd be very irritable, not
9   angry.
10      Q. Well, how would the irritableness -- how
11  would you show irritableness if you were in a manic
12  state?
13      A. Well, the irritableness would not let me do
14  my job properly. All right? As far as, like I
15  explained to you, inability to cope, focusing on my
16  daily routines, very daily routines, small chores,
17  little things. That's the disease.
18      Q. Is there a cure for it?
19      A. No cure. I'm going to live with this for
20  the rest of my life.
21      Q. How do you expect it will impact you for
22  the rest of your life?
23      A. I couldn't answer that, but I can tell you
24  now that I am feeling somewhat better, but there's

46

1    no cure, because I could feel good today, and
2    tomorrow it could be all done, all done.
3        Q. Does it  affect your ability to, say, hold
4    a job?
5        A. I held a job for 18 years, 19 years, before
6    I didn't work.
7        Q. All right, but -- I understand your answer,
8    but I want you to answer my question.  It calls for
9    a yes or no answer.  Did bipolar disorder affect
10   your ability to hold down a job?
11       A. No.
12       Q. Now, you said that the irritableness that
13   you experience affects you in a way that you are not
14   able to do your job properly.  Could you please
15   expand on that, explain what you mean by that.
16       A. Well, you've got to understand, in the
17   business I was in, seconds meant everything to
18   management; not minutes, not hours, seconds.  And if
19   someone was pursuing you and checking on you every
20   day and on your back -- "you didn't do this right,"
21   "you didn't do that right" -- it sort of makes you
22   irritable as an individual.  You want to be treated
23   like a human being.  You don't want to be treated
24   like, you know, a lower individual than the person

47

1    talking to you.  I want to be respected.  That's
2    all.  That's all I've ever wanted.
3        Q. And what happened when you weren't
4    respected?
5        A. When I wasn't respected, I was abused by
6    management.
7        Q. How did you react?
8        A. I reacted the best I could.  Obviously, I
9    never reacted assaulting anyone.
10       Q. You never hit anyone, right?
11       A. Never.
12       Q. You said you were abused by management.
13   Can you explain what you mean by that, please.
14       A. They check-rode me on several occasions.
15   Check-riding is something where the supervisors make
16   sure you're doing your job.  Several warning letters
17   in one day, I can recall once when I got five
18   warning letters before I even got to my first stop.
19       Q. Anything else?
20       A. Punching into work one second late, going
21   over 60 hours, ten minutes late and getting warning
22   letters, wearing a different T-shirt so I can load
23   my vehicle in 90-degree heat in the building, and I
24   got another warning letter.

48

1        Q. So if I am correct, when you say you were
2    abused by management, you mean conduct that's
3    associated with either check-rides that you think
4    were unwarranted or disciplinary warnings that you
5    feel were unwarranted?
6        A. Right.  I can only sum it up to one word --
7        Q. Anything else?
8        A. I had two occasions which I never got the
9    opportunity that I deserved through a harassment
10   grievance that I put through the union, and never
11   once was it discussed the way it should have been.
12       Q. You said there's one word.  What's the
13   word?
14       A. Harassment, constant harassment.
15       Q. Why do you think you were harassed?
16       A. 'Cause I stand up for what I believe in.  I
17   do my job day in, day out.  I help my peers whenever
18   possible, and I wasn't treated fair by management
19   because for some reason they couldn't accept the
20   fact that I was having emotional problems, and they
21   thought I was out to get them.
22       Q. How do you know that?
23       A. I don't have it written down, but it's
24   obviously in a lot of the paperwork that Richard has

49

1    as far as warning letters.  I have 53 warning
2    letters over 14 years.
3        Q. How many of them were warranted?
4        A. Maybe ten, maybe, and I battled this
5    disease for 14 years.  I didn't miss sick days and
6    go over my sick days.  If I had five --
7        Q. How does that relate to your warning
8    letters?
9        A. Because I'm -- you know, my chemical
10   imbalance.  I mean, I'm bipolar.  You know?
11       Q. So that your chemical imbalance was
12   resulting in these warning letters?
13       A. Well, it had an effect on it.  I wouldn't
14   say it was directly resulting in them, but --
15       Q. What was the effect that it had?
16       A. The warning letters?
17       Q. Uh-huh.
18       A. It led to suspensions, they led to
19   terminations.
20       Q. I understand.  What I am asking you is, how
21   did the bipolar disorder result in or affect the
22   warning letters?
23       A. Well, again --
24       Q. You say some of them were legitimate?

Paul Pizzuto
Volume 1 - June 12, 2007

16 (Pages 58 to 61)

| | 58 |
|---|---|
| 1 | A. When I started? I would say between a.m. |
| 2 | and p.m. shifts, there had to be maybe 75 in that |
| 3 | building. |
| 4 | Q. How many were drivers? |
| 5 | A. There was about 75 drivers. |
| 6 | Q. 75 drivers? |
| 7 | A. Yeah. No one ever did a sort. We did our |
| 8 | own sort and load, basically. |
| 9 | Q. How about supervisors? |
| 10 | A. There was always usually one supervisor to |
| 11 | a belt over there. That was over there -- well, |
| 12 | there were two belts, but there was two sides on one |
| 13 | and one on the other, on the back wall, so three |
| 14 | supervisors; and the manager would come in after |
| 15 | that. |
| 16 | Q. So when you began, approximately -- when |
| 17 | you began in 1990, the approximate figures were |
| 18 | there was in that station, NSH station, one manager, |
| 19 | three supervisors, and 75 drivers? |
| 20 | A. Yeah. It's not exact, but that's a |
| 21 | ballpark figure. |
| 22 | Q. Ballpark. How about when you were |
| 23 | terminated in July 2003; can you give me the same |
| 24 | numbers? |

| | 59 |
|---|---|
| 1 | A. In that building? |
| 2 | Q. Yes, sir. |
| 3 | A. Boy, there had to be maybe 125 drivers, and |
| 4 | there was probably about, I want to say six or seven |
| 5 | supervisors. |
| 6 | Q. And then a manager? |
| 7 | A. And then a manager. |
| 8 | Q. I take it in the course of your employment |
| 9 | with the company, you came in contact with quite a |
| 10 | few drivers? |
| 11 | A. Drivers, yes. |
| 12 | Q. Yes. Can you approximate how many drivers |
| 13 | that you worked with over the years? |
| 14 | A. That I worked with as a whole? |
| 15 | Q. That you worked with at the NSH station, |
| 16 | that you have come into contact with. |
| 17 | A. How would you define "contact"? |
| 18 | Q. Being at the NSH facility at the same time. |
| 19 | A. Like going in and loading my truck? |
| 20 | Q. Yes, sure. |
| 21 | A. Yeah, so it would be the equivalent of |
| 22 | adding up the 75 and 120. What's that, 200? |
| 23 | Q. So would you say you came into contact with |
| 24 | no fewer than 200 drivers over the course of -- |

| | 60 |
|---|---|
| 1 | A. I can't tell you specifically on that. |
| 2 | Q. I am not asking for specifics. I'm just |
| 3 | asking generally. You worked there for a good |
| 4 | number of years, so you'd have some idea of how many |
| 5 | people you came into contact with. |
| 6 | A. There was a day shift and a night shift. |
| 7 | The day shift was the majority of the employees. |
| 8 | The night shift was much thinned out. It was |
| 9 | thinned out a lot because the pickups were a lot |
| 10 | less, obviously. |
| 11 | Q. Right. So you think 200 drivers is a safe |
| 12 | estimate for the number of drivers you came into |
| 13 | contact with when you were working for Airborne? |
| 14 | A. Yeah, I would say so. |
| 15 | Q. Okay. How about, how many plant managers |
| 16 | did NSH have during the time you worked there? |
| 17 | A. You might have to give me a lot of time on |
| 18 | this one. I have to count them all. |
| 19 | Q. Let's work backwards. Joe Hamilton was the |
| 20 | manager when you were terminated, right? |
| 21 | A. Yeah. |
| 22 | Q. And before that? |
| 23 | A. Crossken. |
| 24 | Q. Before that? |

| | 61 |
|---|---|
| 1 | A. Tom Hearns, Mark Page, Scott Rutledge. How |
| 2 | many is that? |
| 3 | Q. That's five. |
| 4 | A. Those are most of the managers there in the |
| 5 | 14 years. |
| 6 | Q. Do you remember who the manager was when |
| 7 | you started? |
| 8 | A. Scott Rutledge -- actually, Bob Cox. |
| 9 | Q. So you worked under approximately six plant |
| 10 | managers while you were with the company? |
| 11 | A. Yeah, if not more. |
| 12 | Q. And you were disciplined on numerous |
| 13 | occasions when you were working for the company; is |
| 14 | that right? |
| 15 | A. Yes. |
| 16 | Q. I'm going to show you what's been marked as |
| 17 | Exhibit 2. Have you ever seen that document before, |
| 18 | sir? |
| 19 | A. (Witness reviews document.) I have. |
| 20 | Q. And what is that document? |
| 21 | A. These are all my warning letters that I |
| 22 | received, I believe from, it looks like '91 to 2003. |
| 23 | Q. It's a summary of those warnings; isn't |
| 24 | that right? |

Paul Pizzuto
Volume 1 - June 12, 2007

20 (Pages 74 to 77)

---

74

1    Q. If you look at the bottom of Exhibit 43, it
2 says, "July 21, 2001."
3    A. 43 or 44?
4    Q. 43.
5    A. Okay.
6    Q. Do you see that?
7    A. All right. Then I guess those are them,
8 okay.
9    Q. These are the policies?
10    A. I have no objection to that.
11    Q. Okay. I'll take those back. Thank you.
12        You received a copy of the employee
13 handbook at some point during the course of your
14 employment, right?
15    A. I can't recall.
16    Q. It was available to you at the very least?
17    A. I'm sure it was available. I don't know if
18 I ever received it.
19    Q. What were your responsibilities as a
20 driver?
21    A. Responsible for loading and unloading my
22 vehicle -- first of all, loading; unloading at the
23 top of the belt in the morning, onto the belt, as
24 far as starting the day off. All the employees were

---

75

1 on each side of the belt, and they had to pick off
2 all their freight for a specific route. And
3 everyone had to pick their own freight for their own
4 routes.
5    Q. How did you do that?
6    A. The belt was from one end of the building
7 to the other end, and they had cans that were
8 unloaded at the top of the belt. And all the
9 employees were lined up all the way down the belt;
10 and basically, an unloader would load the packages
11 onto the belt, and then there would be a couple
12 other individuals scanning packages for the station
13 to make sure everything made it to the end of the
14 belt for security reasons. Once it got past them,
15 all the employees were responsible for taking the
16 packages off the belt as they went down.
17    Q. How did you know what packages were
18 supposed to go into your truck as opposed to other
19 people's?
20    A. Because of all the streets in my area.
21    Q. Oh, so as the belt went by, you would read
22 the package --
23    A. Yeah.
24    Q. -- to see whether or not it was on your

---

76

1 route?
2    A. Right. And if it was mine, I'd throw it on
3 the back of the truck; and when I had time, I'd jump
4 up and sort it all.
5    Q. My apologies. I don't know much about the
6 mechanics of this --
7    A. No, that's cool, that's all right.
8    Q. -- and I'm just going to ask you a few
9 things. So that's how you loaded your truck. You
10 would stand at the belt. You would have the truck
11 parked right behind you?
12    A. Yeah.
13    Q. Packages would come, you would see what
14 packages were going where. The ones that were
15 destined for your delivery route, you would put in
16 your truck?
17    A. Right, exactly.
18    Q. So that's loading. What did you mean by
19 unloading your truck?
20    A. Well, once you got back to the station, any
21 of the pickups you had done in between your
22 deliveries, you would have to come back to the
23 building and unload them back onto the belt in order
24 for the night people to reverse the belt and put

---

77

1 them back in the cans so they can go in the truck
2 and back to the airport.
3    Q. So you would have certain destination
4 points on your route where you would have to pick up
5 packages?
6    A. Yeah. We had --
7    Q. And your clients might give you packages to
8 send out?
9    A. Right. We had our scanners and radios at
10 the time for pickups and all that; and as we got
11 them -- we'd pick them up, you know, the most
12 convenient way possible.
13    Q. So did you have any other responsibilities
14 as a driver? I mean other than loading and
15 unloading and selecting freight for your truck.
16    A. No, basically, loading, if an individual
17 was working up on the top of the belt unloading next
18 to you, it was your responsibility to at least pull
19 his freight while he was unloading. So you would
20 take his freight, put it on the side next to the
21 floor. Or if the other guy on the other side of you
22 was in the unload too, which happened quite a bit,
23 you would have to pull three trucks. And obviously
24 if you are pulling three trucks, you are not going

---

**78**

1  to get very much in your vehicle.  So once those
2  guys get back to the trucks, you needed to load your
3  truck up and get out of the station as fast as
4  possible.
5  Q.  Uh-huh, I see.  So it sounds to me like a
6  certain amount of teamwork is required?
7  A.  Absolutely, absolutely.  It's all helping
8  your peers, which I practiced quite a bit.
9  Q.  And who did you consider the members of
10  your team?  The drivers were all kind of a team; is
11  that right?
12  A.  Yeah, but I mean, you never worked next to
13  anyone for any length of time because you always had
14  to bid changes.  You never knew who was going to be
15  aside of you for any length of time.  So you
16  basically treated everyone the same.  You know?  You
17  just tried to help each other so it went as smoothly
18  as possible.
19  Q.  Now, I take it among your other
20  responsibilities as driver was actually delivering
21  packages?
22  A.  That was the idea in the morning, yeah.
23  Q.  And driving the truck?
24  A.  Driving the truck.

**79**

1  Q.  And interfacing with -- or I shouldn't say
2  interfacing -- interacting with people in the
3  public?
4  A.  Oh, yeah, I had no problem interacting with
5  all my customers.  I loved them all.  I loved my
6  job.  It was the internal pressures I was faced with
7  every morning, trying to deal with management that
8  came down on me for whatever reasons they wanted to.
9  You know?  I, to this day, still don't know why I
10  was treated that unfairly, but -- I really can't
11  answer for them.  That's something they are going to
12  have to answer to.
13  Q.  I am going to describe certain abilities,
14  and I'm going to ask you whether they are necessary
15  for performing the essential functions of the job of
16  driver.  You have identified basically what you did
17  as a driver.  I'm going to identify certain
18  abilities, and I want you to tell me whether it's
19  necessary or not.  Okay?
20  A.  Okay.
21  Q.  Do you understand the task?
22  A.  Pretty much, yeah.
23  Q.  Is there anything that's unclear about what
24  I'm asking you to do?

**80**

1  A.  No, not until you do it.
2  Q.  No, I just want to -- I'm going to give
3  you -- I'm going to state an ability, and I want you
4  to tell me whether or not it's necessary for you to
5  perform the functions of the job of driver.
6  A.  Okay, all right, yeah, no problem at all.
7  Q.  The ability to drive safely?
8  A.  Yes.
9  Q.  The ability to stay alert?
10  A.  Yes.
11  Q.  The ability to get along well with others?
12  A.  Yeah.
13  Q.  You might want to answer yes just so we
14  have a clean transcript.
15  A.  Yes.
16  Q.  Understand instructions?
17  A.  Yes.
18  Q.  Carry out instructions?
19  A.  Yes.
20  Q.  Remember instructions?
21  A.  Yes.
22  Q.  Relate to other people?
23  A.  Yes.
24  Q.  Communicate and interact with other people?

**81**

1  A.  Yes.
2  Q.  Work as part of a team?
3  A.  Yes.
4  Q.  Collaborate with other employees?
5  A.  Yes.
6  Q.  Respond appropriately to supervision?
7  A.  Yes.
8  Q.  Have regular contact with other people?
9  A.  Yes.
10  Q.  Perform repetitive tasks?
11  A.  Yes.
12  Q.  Perform varied tasks?
13  A.  Yes.
14  Q.  That's a yes?
15  A.  Cross-training, yes.  Cross-training is
16  what we do.  Say like I just mentioned, if we had to
17  pull freight for another guy, I had to know his
18  route as well as the guy next to me on both sides.
19  That's basically cross-training.
20  Q.  I see.  Plan and perform tasks in an
21  organized manner?
22  A.  Yes.
23  Q.  Remain focused on tasks?
24  A.  Yes.

Paul Pizzuto
Volume 1 - June 12, 2007

22 (Pages 82 to 85)

82

1  Q. Manage your time effectively?
2  A. Yes.
3  Q. Make independent judgments?
4  A. Yes.
5  Q. Supervise or manage others?
6  A. No.
7  Q. Perform under stress?
8  A. Yes.
9  Q. Be adaptive and flexible?
10  A. Yes.
11  Q. Take initiative?
12  A. No.
13  Q. Refrain from making threats?
14  A. Yes.
15  Q. Refrain from threatening behavior?
16  A. Yes.
17  Q. Are there any other functions or abilities
18  than the ones I have just mentioned that you would
19  need to be able to perform the essential functions
20  of the job of driver?
21  A. No. I mean, that's pretty much it in a
22  nutshell.
23  Q. That kind of covers it?
24  A. Yeah.

83

1  Q. Okay. You mentioned earlier that you went
2  on a leave beginning in the fall of 2002, returning
3  February 2003?
4  A. Yes.
5  Q. Do you remember the exact date you
6  returned?
7  A. February 21, 2003.
8  Q. February 21?
9  A. 24, I'm sorry.
10  Q. 24. Okay, that's what I thought. And when
11  you returned, Steve Crossken was the plant manager
12  at NSH; isn't that right?
13  A. Yes.
14  Q. But only for a short time, right?
15  A. He left approximately two weeks after I
16  was -- returned to work.
17  Q. And in that two weeks Mr. Crossken didn't
18  do anything to discriminate against you, did he?
19  A. It's well documented with the Teamsters.
20  It's well documented in my DOT.
21  Q. I am just asking about -- whatever the
22  grand history of this thing is, I'm just asking, for
23  the two-week period, approximate two-week period
24  from when you returned to work in February '03 to

84

1  when he left NSH, did he do anything -- and I'm
2  going to ask you for specifics -- did he do anything
3  to discriminate against you?
4  A. Yes.
5  Q. What did he do?
6  A. My first day back I went to my regular
7  workplace area, and I did my precheck on my vehicle.
8  The key to my bulkhead door was stuck in the
9  bulkhead door, and it wouldn't open. I had no gas
10  in my vehicle. My vehicle was running so poorly it
11  broke down no more than two miles before I departed
12  the station -- after I departed the station. I had
13  to turn around after driving with my flashers on as
14  safely as possible, because the vehicle was no good.
15  It was kicking and bucking, and I couldn't even make
16  it onto the highway. But I was already on the
17  highway, so I reversed my direction.
18      I came back into the station. Steve
19  Crosscken instructed me to off-load all my freight,
20  take another vehicle, and I basically could not make
21  service that day because of those incidents, which
22  affected me in a way that he had to send out another
23  driver to take freight off of my vehicle. Luckily,
24  I made it through the day.

85

1      When I returned to the vehicle -- when I
2  returned to the station, I tried to pull my vehicle
3  in the station. There was stuff all over the --
4  there were skids all over the entrance door. I was
5  involved in a minor accident in the building.
6      Mr. Crossken should have realized that I
7  was already out on short-term disability for severe
8  stress and depression and anxiety. I was issued a
9  warning letter. I believe I was issued another
10  warning letter for preventable accidents on 2/24.
11  That was it.
12      Then basically I thought I was all
13  right, I guess, considering the day I had, and I
14  came in the next day and worked; and I had to bite
15  my tongue for the rest of the time until he
16  departed. But I truly believe that either him or he
17  instructed one of his management team to do those
18  actual things that I just -- that he had just
19  written down. Can I prove it? No. Do I think he
20  was harassing me? Yeah. In my words, definitely.
21  Q. And why do you think he was harassing you?
22  A. Steve Crossken tried to fire me on two
23  different occasions. I was injured in 2002, April
24  2002. I was on short-term -- I was on disability

94

1    through these one by one like you told me.  No gas
2    in the vehicle.  What proof do you have that he had
3    something to do with that?
4        A.  Well, his supervisors answer to him, number
5    one.  And the supervisors are well aware what trucks
6    are in working condition and what trucks aren't in
7    good working condition.  It just so happened that I
8    had the worst vehicle in the station in my slot
9    number on the lineup.
10       Q.  How is that selected?  Who selects what
11   vehicle employees get, the drivers get?
12       A.  Usually, they have someone on the night
13   shift do the lineup after they are all done at
14   night.  Now, who did it that night or what trucks
15   were missing, because a lot of trucks aren't in or
16   whatever -- my truck, when I came in, was in the
17   slot that I usually work from; and I was kind of
18   getting a little bit of snickering from everyone
19   because they knew what vehicle I had.  So, I mean, I
20   could tell I was in for a rough day right off the
21   bat.  As soon as I got in the truck, the key wasn't
22   there.  That meant I had to work out of the back of
23   the door every single stop to make my day miserable.
24   Then the truck broke down.  I mean, I told you

95

1    everything about that.
2        Q.  But you don't have any proof that
3    Mr. Crossken was involved in selecting that truck
4    for you; is that right?
5        A.  No, but I have proof he tried to fire me
6    twice prior.
7        Q.  Okay, fine.  Now, you said that there were
8    skids by the entrance door.  Do you have any proof
9    that Mr. Crossken was somehow involved in putting
10   skids by the entrance door?
11       A.  I can't prove it, that's just my opinion.
12       Q.  And the minor accident that occurred, can
13   you explain to me in your own terms what happened
14   that caused that minor accident?
15       A.  Well, I could draw it out.
16       Q.  Yeah, sure.
17       A.  I mean, I don't know how to -- that would
18   be a lot easier for me.
19           MR. PERLMAN:  Let the record reflect
20   that I am handing the witness a piece of paper and
21   pen.
22       A.  (Drawing.)
23           MR. PERLMAN:  Off the record.
24           (Brief recess.)

96

1            MR. PERLMAN:  Let's mark this.
2            (Marked, Exhibit 45, Witness's diagram.)
3            MR. PERLMAN:  All right, back on the
4    record.  We took a brief recess during which
5    Mr. Pizzuto drew a diagram.  I'm going to ask you
6    some questions about Exhibit 45.  We have marked it
7    as Exhibit 45.
8        Q.  So I think the question was, I wanted you
9    to describe to me how the, quote-unquote, minor
10   accident occurred on February 24, 2003; and I'd like
11   for you to -- if you need to use this diagram to
12   explain it, please do, but I'd like to hear your
13   explanation of how it occurred.
14       A.  The way the building was set up, if you
15   approach from the main parking lot, you pass this --
16   the customer service area.
17       Q.  Is this the main parking lot right here
18   (indicating)?
19       A.  Yes.
20       Q.  Okay.  So I'm going to mark the area with
21   an A, the area that's the main parking lot.
22       A.  After you went through the main parking
23   lot, about three quarters of the way down you would
24   see a ramp or dock for all the vehicles to enter or

97

1    exit.
2        Q.  How many lanes was that ramp?
3        A.  Just one.  It was very narrow.  It was
4    maybe one and a half widths of a normal truck.
5        Q.  Was there an in ramp and an out ramp or
6    just one ramp?
7        A.  The other ramp was at the opposite end of
8    the building.
9        Q.  And that was for cars to go out?
10       A.  Yeah, that was specifically for trucks to
11   go out, yeah.  And when they were doing a lineup,
12   this was all open.  This was all the dock space
13   (indicating).
14       Q.  So I am going to mark as B what you have
15   identified as the dock space.
16       A.  Yeah.
17       Q.  Okay.
18       A.  This was closest to the ramp that I
19   approached and went up.  Once I took a right up the
20   ramp --
21       Q.  We are going to mark as C the ramp.  This
22   is the ramp here (indicating)?
23       A.  Yes.
24       Q.  So I'm putting a C where the ramp is.

Paul Pizzuto
Volume 1 - June 12, 2007

26 (Pages 98 to 101)

98

1    A. I approached the top of the ramp, and the
2    afternoon workers were doing their loading into the
3    cans in order for the trailers to get loaded; and
4    there was numerous skids at the top, maybe a little
5    further in the ramp, not exactly the top, but a few
6    feet in. And they were stacking all these because
7    as trucks came into the dock area, they'd pull them
8    off the jacks, and then they'd pull them over here.
9        Q. The skids are the same thing as pallets?
10       A. Pallets. That's what I meant. So as I
11   approached up to the top --
12       Q. Are these squares here pallets?
13       A. Yes.
14       Q. So I'm going to put D's on each of these
15   pallets.
16       A. Now, I don't know if there was three, four,
17   two.
18       Q. Okay.
19       A. I couldn't tell you. I don't remember.
20       Q. How many do you think there were,
21   approximately?
22       A. There was a good -- I want to say at least
23   three from the diagram I drew. All right? There
24   was at least three. And there was a yellow pole

99

1    next to the ramp on the right-hand side going up on
2    the side --
3        Q. So I'm going to put a little marker here,
4    an E, and that will be the yellow pole.
5        A. Now, what I tried to do is I tried to go
6    inside the pallets as close as possible and avoid
7    them, and evidently I caught the yellow pole on the
8    side. I didn't catch it much. I basically scraped
9    the paint off of the pole onto the side of the
10   vehicle. And I immediately reported it as I hit it,
11   and I was given a preventable accident warning
12   letter.
13       Q. Do you think it was inappropriate for you
14   to get a warning for that accident?
15       A. Well, no, I didn't want any special
16   treatment. You know? But considering the day I had
17   and everything, I mean, there's other -- there's
18   ways of handling it; and I don't think they handled
19   the situation the way they could have, especially
20   knowing that was my first day back from all my
21   problems that were going on and everything.
22       Q. But it was an accident, right?
23       A. It was an accident. Was it preventable? I
24   think it was preventable if all those skids weren't

100

1    in the way, yeah.
2        Q. But you could have gotten out of the truck
3    and moved the skids, right?
4        A. Could I have? Yeah. To be honest with
5    you, I could have, but I had vehicles behind me and
6    everything. You know, they are all waiting to get
7    in. Yeah, I could have, but I thought I could make
8    it through.
9        Q. Between the skids and the pole?
10       A. Between the skids and the pole.
11       Q. And it didn't happen that way, you scraped
12   the pole, correct?
13       A. Yeah, I scraped the pole. I got yellow
14   paint on the vehicle. There was no dents, there
15   was -- there was not even a dent in the vehicle. It
16   was basically just a yellow pole on my bumper. It
17   wasn't even on the side of the truck. It was the
18   black bumper on the front side, and it just caught a
19   little bit of the yellow paint.
20       Q. Right.
21       A. And I reported it and --
22       Q. Do you know if any -- you said there were
23   trucks behind you. Do you know if any of the trucks
24   behind you had the same problem as you?

101

1        A. No, no, but I don't know if there's been
2    any -- I know there's been accidents in the past,
3    but I don't know specifically who it was or where it
4    was or --
5        Q. I'm just saying that specific day, because
6    according to your testimony, there were pallets on
7    the ground, and you had a hard time getting between
8    them and the yellow pole. I'm wondering if you know
9    if any of the trucks that followed you had the same
10   problem.
11       A. No, I don't. I wasn't paying attention to
12   them. By the time I hit that, I just had to get
13   around and then park my vehicle. I wasn't watching
14   anything else. I was kind of aggravated about the
15   whole situation, as you would be, I would guess, I
16   would hope so.
17       Q. And of course, I mean, you are not
18   contesting that Airborne or Airborne management put
19   those pallets in the way to somehow harass you?
20       A. No, absolutely not, but it was -- I tell
21   you what, it must have been a full moon because
22   everything I went through during the course of that
23   day, I'm not going to say it was a coincidence, it
24   wasn't a coincidence, it happened for a reason. Was

Paul Pizzuto
Volume 1 - June 12, 2007

102

1 Steve at fault? He was the guy in charge of
2 everyone. He was the guy that had to answer to
3 everyone. He instructed his supervisors. So if he
4 didn't leave -- if the supervisors didn't leave that
5 area clear, which they should have all the time --
6 and they're always floating around in there -- then
7 I wouldn't have gotten into that accident in the
8 first place.
9    Q. But my question is a little different. You
10 don't think those were put there deliberately to
11 somehow mess with you, right?
12    A. No, no, I'm not going to start assuming
13 things. If I were to give you my opinion, it's
14 such -- you know, it's such -- the way I would
15 explain it, I could not say he did it or she did it.
16 I'm just telling you what the condition of the
17 building was at the time and the type of day I had
18 prior.
19    Q. In fact, you don't know who put the skids
20 in the --
21    A. I have a good idea what happened. The
22 straight job comes up, and usually they back up on
23 the ramp. They unload everything right here
24 (indicating). And then when the guys get a chance,

103

1 they put it on the belt, and they run it up the top
2 of the belt so they can load the cans and send them
3 off. You know?
4    Q. So those skids ended up there as part of
5 the normal course of business?
6    A. Yeah, but normal course of business, when
7 the individuals unload that truck, it's their
8 responsibility to get rid of the freight. Now, if
9 you were going in your driveway, double driveway --
10 all right? -- and you saw stuff all over the place,
11 and your kids put all that stuff in the driveway,
12 and you came home and you saw all that stuff in the
13 driveway, what would you say to your kids? "Why is
14 the driveway blocked?"
15    Q. My question to you -- I think we are on the
16 same page here, I really do.
17    A. Yeah, I think so.
18    Q. But I am just trying to figure out from
19 you, are you contesting that somebody at Airborne
20 deliberately put the pallets in your way to mess
21 with you?
22    A. I'm going to say no, I'm going to say no.
23    Q. That's all I wanted to know.
24    A. I just want to get my point out. That's

104

1 all.
2    Q. Now, Crossken left the facility in March
3 2003; is that right?
4    A. Yes.
5    Q. And after that you had no dealings with
6 him; is that right?
7    A. Do you have the exact date that Steve
8 Crossken left?
9    Q. I'm not sure I have it right in front of
10 me, but after he left the facility, you didn't have
11 any dealings with him?
12    A. No, not at all.
13    Q. And you no longer worked with him at that
14 point?
15    A. No, Joe Hamilton was the interim.
16    Q. Interim?
17    A. Interim. He came in after Crossken.
18    Q. All right. So he came in after Crossken,
19 Joe Hamilton. He's a defendant in the case, as is
20 Steve Crossken?
21    A. Yeah.
22    Q. When did you first meet Joe Hamilton?
23    A. I worked for Hamilton probably in, I want
24 to say in about '96.

105

1    Q. How did your paths cross at that time?
2    A. Joe was a supervisor at the North Shore
3 station on Concord Street at the time.
4    Q. Did you work directly with Joe?
5    A. At times. I was on the night shift, the
6 day shift, depending on, like I said, who had
7 seniority, who had days, and who didn't have enough
8 seniority worked nights. So sometimes I got
9 fortunate and I was able to get a day shift. Most
10 of the times I was on nights.
11    Q. What did you think of Joe when he was your
12 supervisor in the '90s?
13    A. I got along with Joe for the most part. I
14 didn't have any major problems with Joe.
15    Q. You thought he was a good guy?
16    A. At first, yeah.
17    Q. Okay.
18    A. At first.
19    Q. Did things change in your relationship with
20 Mr. Hamilton in the time that he was your
21 supervisor? I'm not talking about when he became
22 plant manager. I'm talking about the time when he
23 was your supervisor. Did you get along?
24    A. Joe really wasn't a major problem. I got

Paul Pizzuto
Volume 1 - June 12, 2007

28 (Pages 106 to 109)

---

106

1    along with Joe for the most part, I will say that.
2        Q. When did you stop working together at --
3    let me strike that.  There was a time at which you
4    didn't work together after that initial period?
5        A. Yeah, one specific incident.  I went out in
6    the afternoon, and I had an agreement with Joe that
7    I needed to come in early and leave an hour early on
8    the night shift.  He said, "Okay, as long as your
9    route's done."
10       So basically, I didn't take my lunch or
11   anything.  I ran around like crazy, got back to the
12   station and off-loaded my truck, did my thing, left.
13   A few days later he gave me a warning letter for
14   failure to -- (Witness reviews document.) Excuse me.
15   I will just read it because I know it's in here
16   somewhere.
17       MR. PERLMAN: Let the record reflect
18   that the witness is looking at Exhibit No. 2.
19       A. "Failure to protect start time."
20       Q. What date is that?
21       A. That's on 1/14/98.
22       Q. That's Joe Hamilton that wrote that?
23       A. Yes.
24       Q. Other than that, did you have any problems

---

107

1    with Joe Hamilton?
2        A. Other than that, no; but, I mean, I lost a
3    little trust in him after that incident.
4        Q. And how long after that incident did you
5    work with Joe?
6        A. Not too long, because Joe was going from
7    station to station; so he really wasn't in one spot.
8    He would go from North Shore to Needham to Boston.
9    He was jumping around quite a bit, so I didn't have
10   a lot of contact with him.
11       Q. But he became the manager of the plant in
12   which you were working in March 2003?
13       A. Yes.
14       Q. What did you think of him at that time?
15       A. Well, the first day Joe took over, me and
16   him had a great conversation, we talked.
17       Q. What did you guys say to each other at that
18   time?
19       A. He approached me.  He asked me to go into
20   the office.  I told him, "Joe, you know me, I know
21   you.  I don't have any problems with you.  I don't
22   want any future problems.  What's done is done, I
23   can't do anything about it, with Crossken, and I
24   just want to move on."  And he said, "That's fine."

---

108

1    He says -- I said, "I'm going to work and give it my
2    best shot, Joe, and try to put it past me." And
3    that was basically how we met again in that first
4    day.
5        Q. Didn't Joe tell you that as far as he was
6    concerned, he was going to wipe the slate clean for
7    you?
8        A. Not to wipe the slate -- as far as a new
9    start, me and him?
10       Q. Yes, that you were going to start over from
11   square one.
12       A. Oh, yeah, yeah.
13       Q. And you were going to get a full chance to
14   do your job?
15       A. Right, and we both agreed.  I mean, it was
16   both of us, it was a mutual type agreement.
17       Q. And at that time did you think Hamilton was
18   a pretty good guy?
19       A. Yeah, I mean, I don't know if he was a good
20   guy, but I respected him because he was a manager.
21   You know?
22       Q. Now, things went pretty well for a while
23   after Mr. Hamilton took over; isn't that right?
24       A. Yeah, I don't know how long, but Joe came

---

109

1    February; is that what we said, or March?
2        Q. March.
3        A. March.  I want to say -- I would probably
4    say about six weeks, five or six weeks.
5        Q. Things went well for five or six weeks?
6        A. Yeah, it was approximately that.
7        Q. Then what happened after that?
8        A. Then what happened was I was having freight
9    disappear from my truck.  First when I was scanning
10   my freight out for delivery -- these special
11   accounts that we deliver, there're numerous
12   packages; and in the process we try to put them
13   aside on the truck or put them in a spot where
14   they're not going to get in the way of all the other
15   stuff going in, put them on the floor.  And we had
16   to scan them as we were going.
17       And I happened to have the post office
18   in Lawrence.  So upon scanning all my other freight,
19   I always waited to scan the bulk packages for the
20   most part last, because I had every one that I had
21   to be accountable for.  And I was having some
22   problems with my count, and I was getting warning
23   letters for out-for-delivery failures, because when
24   a package came down the belt, if I didn't scan that

Paul Pizzuto
Volume 1 - June 12, 2007

30 (Pages 114 to 117)

114

1    Q.  Okay.  And that issue got resolved by
2  exactly how you said it.  You might have gotten held
3  up, but through your calls to Bill McClellan and
4  Chris Demmons and through the fax that you received,
5  you were able to clear that issue up; is that right?
6    A.  Yeah, but that was just one issue of
7  missing freight.
8    Q.  Okay.  Are there any other warnings on the
9  list about missing freight after Mr. Hamilton came
10  in?
11    A.  No, because when I got in the building --
12  I'm going to say no, and I want to elaborate on it,
13  because this was going on for a couple weeks.  And
14  every time I would notice a piece missing, and it
15  wasn't scanned properly after I scanned it -- no, it
16  wasn't scanned out for delivery -- all right? -- I
17  was getting -- I was talking to Joe regarding this;
18  and he says, "Well, it's showing up on the sheet as
19  delivered but not out for delivery."  I said, "What
20  the heck's is going on here, Joe?  If I don't scan
21  it out for delivery, I don't know what's on my
22  truck.  Someone could put it on my truck when I go
23  download my scanner, and then all of a sudden it
24  pops up on my truck when I go to do the post office

115

1  batch.  So it's going to show up not out for
2  delivery."
3    Do you know what his reply was to me?
4  "You're paranoid."  That's how he answered me.
5  "You're paranoid."  Knowing that I came back from
6  short-term disability from the union and the
7  company, my supervisor is telling me I'm paranoid.
8  And he knows that I have mental problems and medical
9  conditions.
10    Q.  Were you ever diagnosed with paranoia?
11    A.  Not paranoia, no.  I came off short-term
12  disability through the union and through the
13  company, and it's all documented what my problems
14  were.
15    Q.  Right.  Do you think you were being
16  paranoid about your shipments?
17    A.  No, because I've got a good head on my
18  shoulders.  I know what I had on my truck, what I
19  didn't have.
20    Q.  You think somebody was trying to mess with
21  you?
22    A.  Do I think?  Yeah.  Can I prove it?  No.
23    Q.  Why do you think somebody was trying to
24  mess with you with this whole missing freight or

116

1  mistaken scanning issue?
2    A.  I think it was a push to get me out the
3  door.
4    Q.  Push by whom?
5    A.  Well, whoever you want to call it, Airborne
6  management.
7    Q.  Who in management was trying to push you
8  out the door?
9    A.  Well, I can't say specifically; but if you
10  look at the reasons for my warning letters and you
11  look at the grievances that I filed with the union
12  that never got settled the way they should have,
13  someone in that list of people --
14    Q.  But Joe Hamilton was your supervisor,
15  right?
16    A.  Yeah.
17    Q.  And he was making all the decisions about
18  your employment and your supervision at that point,
19  right?
20    A.  Yes.
21    Q.  Do you think Joe Hamilton was out to get
22  you?
23    A.  Well, let me back this up.  When --
24    Q.  Well, no, I want to know, do you think Joe

117

1  Hamilton was out to get you?
2    A.  Yes, absolutely.
3    Q.  Why do you think that?
4    A.  I want to go back two weeks prior to the
5  24th when that happened.  Joe Hamilton says he was
6  worried about me, he wanted me to go for a drug and
7  alcohol test at 61 Main Street.  And I said, "Joe, I
8  have some medical issues, nothing to do with drugs
9  and nothing to do with alcohol."  I said, "It's all
10  documented, my past medical experiences.  You people
11  have all the information regarding everything."  He
12  says, "Well, you are acting too suspicious, you need
13  to go and do a drug and alcohol test."
14    And the reason why Joe did that was
15  because there was two ways you could take a drug and
16  alcohol test.  One was random.  All right?  One
17  stated that -- through the union and through the
18  company, they made an agreement, so many people had
19  to get a random drug test every two, three months.
20  They decided the date.  And the other one was for
21  suspicious behavior.  So Joe took it upon himself to
22  give me a suspicious behavior drug and alcohol test.
23  All right?
24    Q.  Were you exhibiting suspicious behavior at

126

1  April 8, 2003?
2      A. Because I was seeing my primary care
3  physician, and I wanted these records along with my
4  primary care physician to state that I had been
5  going through this problem for whatever time, and I
6  wanted to make sure that I had documentation backing
7  it up.
8      Q. What were you trying to back up?
9      A. That I was very ill and depressed and, you
10  know, I was having some serious emotional issues.
11      Q. Was that because you had planned on going
12  out on another leave?
13      A. Not so much a leave, but I wanted to see
14  what this individual was writing about me, because
15  he was tied to the Teamsters.
16      Q. Why did you want to see what this
17  individual was writing about you?
18      A. Because the Teamsters forced me back to
19  work. I had a meeting with Dr. Heckler, I had a
20  meeting with Larry Libby, the drug and alcohol
21  counselor, and I had a meeting with another
22  individual that was supposed to be from Lahey
23  Clinic, but I can't recall his name. So we all met.
24          (Interruption.)

127

1      A. I will go back to that. So we all met, Dr.
2  Heckler, Larry Libby, and this other individual from
3  Lahey Clinic.
4      Q. When was this?
5      A. This was prior to me coming back in
6  February.
7      Q. So you're saying the Teamsters forced you
8  to g back to work. Are you saying that you weren't
9  ready to go back to work at that time?
10      A. Well, let me elaborate on it.
11      Q. I will let you elaborate, but I need you to
12  answer my question.
13      A. Okay.
14      Q. Are you saying you were not ready to return
15  to work at the time you returned?
16      A. Yes.
17      Q. Now, go ahead. If you want to elaborate on
18  the meeting, I welcome you to do that.
19      A. I spoke to Dr. Heckler, who was the head
20  doctor for the Teamsters. I spoke with Larry Libby,
21  and I spoke with that individual from -- I believe
22  it was the Lahey Clinic. So in the process of
23  discussing my personal issues and my problems and
24  what I had gone through in the last few months being

128

1  on disability, Dr. Heckler asked me my history of my
2  family, asked me the history I've had up to date.
3  And he asked me why I couldn't go back to work. And
4  I felt like I was being backed into a corner. And
5  it was put to me two or three times by Dr. Heckler
6  that "We need a return date to work." And I -- just
7  out of frustration, I says, "Listen, you people want
8  me to go back to work? I'll go back to work. But
9  if I can't do the job, I want to at least -- you
10  know, I want you to hear me out again. I want to at
11  least be able to be out of work and be able to
12  support my family."
13      Q. So in April you were trying to plan for
14  that, if that was the case?
15      A. Well, if I had to go out again -- which I
16  didn't want to, but they gave me no choice. They
17  backed me into the corner, and they said, "Give me a
18  date." I said, "Pick a date." "February 24 okay?"
19  I said, "Yeah, okay, go ahead. That's fine."
20      Q. Did they tell you why they were forcing you
21  to return to work?
22      A. Yeah. Tom Sarjeant did about a week prior
23  to that.
24      Q. What did he say?

129

1      A. "They don't want you on short-term
2  disability anymore."
3      Q. Who is "they"?
4      A. Whoever his boss is.
5      Q. The Teamsters?
6      A. Yeah.
7      Q. The Teamsters didn't want you on short-term
8  disability?
9      A. No, they can't keep paying for my
10  short-term disability.
11      Q. So you went back to work, and in April you
12  started gathering some medical information. So you
13  went to the Tewksbury Mental Health Associates
14  office; is that right?
15      A. Yes.
16      Q. And just to finish out this document, you
17  said -- this is what the notes say. It says, "I was
18  out of the office, and he upset the women
19  administrative assistants with his aggressive
20  behavior. I told him this was unacceptable. This
21  incident was reported to Dr. John Heckler."
22          Do you remember any incident -- the
23  incident that's described in this document, sir?
24      A. Yes.

Paul Pizzuto
Volume 1 - June 12, 2007

158

1  with Mr. Brown, Ben Brown, on July 14, 2003?
2      A. Yes, Ben was doing the check-in that
3  evening.
4      Q. Is there anything about this recap of that
5  conversation that is in any way inaccurate?
6      A. Yes.
7      Q. What's inaccurate about it?
8      A. Well, "He stated that he needed it because
9  someone was out to get him."
10     Q. You didn't say that?
11     A. No.
12     Q. Did you say anything to that effect?
13     A. Nope. I asked him for the printouts.
14     Q. Did you say anything that could be
15 interpreted as that, that you needed the document
16 because somebody was out to get you?
17     A. No.
18     Q. Is there anything else about this document
19 that's inaccurate?
20     A. No.
21         MR. PERLMAN: Exhibit 53.
22         (Marked, Exhibit 53, Memo from B.
23 McLellan to J. Hamilton dated 7/16/03.)
24     Q. I have put in front of you Exhibit 53. I'd

159

1  like you to again read that document, and then I'm
2  going to ask you some questions about it.
3      A. (Witness reviews document.) Okay.
4      Q. Do you remember having a conversation with
5  Bill McClellan on Monday, July 14, 2003?
6      A. Yes.
7      Q. Did you tell Mr. McClellan that someone was
8  fucking around with you?
9      A. I didn't use that phrase, but --
10     Q. What did you say?
11     A. I asked Bill, when I was at the post
12 office, first of all, to print out that stuff
13 because my scanner was missing that morning, and I
14 wasn't able to deliver the post office. So I told
15 him, "Bill" -- I phoned NSH and Bill answered the
16 phone. I asked him would he please fax all my post
17 office under P34, which he did, but the count was
18 wrong when it was faxed over to me, and there was a
19 discrepancy in the P34, which was the post office,
20 and a P which he told me that that's where I had my
21 freight under. But the count wasn't correct.
22     Q. What I asked is, did you tell him anything
23 to the effect that somebody was fucking around with
24 you?

160

1      A. No.
2      Q. Did you tell him you were going to find out
3  who was, for lack of a better term, fucking around
4  with you?
5      A. No.
6      Q. Did you ever say to him anything to the
7  effect of "Tell the boys 'nice try' at 5 New England
8  Business Center"?
9      A. No.
10     Q. Did you discuss anything with Mr. McClellan
11 on that day about 5 New England Business Center?
12     A. I can't recall, to be honest with you. I
13 want to say yes or no, but I can't recall
14 specifically. I don't know why I would say that
15 stop specifically, but I can't recall.
16     Q. Was that on your route?
17     A. Yes, it's one of my deliveries and pickups.
18     Q. Did something happen on Monday, July 14, at
19 5 New England Business Center?
20     A. I don't know if it was at that stop, but I
21 was missing freight leaving the building, once I
22 realized it was at the post office.
23     Q. Did you insist to Mr. McClellan that
24 someone was trying to frame you or set you up?

161

1      A. No.
2      Q. Did you tell Mr. McClellan that you were
3  going to catch the person who was doing this?
4      A. No.
5      Q. So Mr. McClellan is wrong about that?
6      A. I can't speak for him.
7      Q. You can't speak for him, but if he's saying
8  that you said that you are going to catch the person
9  who is doing this, then he'd be wrong?
10     A. I never said it, so I can't speak for him.
11     Q. You are denying that you ever said anything
12 to that effect?
13     A. I didn't say it.
14     Q. Other than the passages that we have just
15 discussed, is there anything else about this
16 document that inaccurately portrays what happened on
17 July 14?
18     A. Well, the way it started out, like I said
19 earlier, as far as the post office freight, the
20 reason why I was in the conversation with Bill in
21 the first place was because my scanner was taken
22 from the cradle upon my departure, which created all
23 this problem in the first place. And it created the
24 bad count that I had at the post office, which

Paul Pizzuto
Volume 1 - June 12, 2007

42 (Pages 162 to 165)

162

1  created more problems, because I ended up waiting 45
2  minutes for Bill to fax this over.
3      So was I mad? Yeah. Was I swearing at
4  him? No. But was I having a bad day? Yeah. What
5  I said, I can't recall everything specifically, but
6  this is pretty accurate without (sic) those
7  exceptions.
8      Q. So can you, in your best recollection --
9  I'm not interested in a characterization. I want to
10 know what it is you remember saying to Mr. McClellan
11 that day.
12     A. First of all, I first made contact with him
13 on the phone in the post office; and I asked Bill --
14 since I didn't have my regular scanner, I was unable
15 to punch in the P34 on my scanner and get the
16 download of all the airbills with the freight I had
17 scanned in the morning because it was a different
18 scanner altogether; and the only way to correct that
19 problem was if he were to go in the main system and
20 see what all my freight was under P34, he would be
21 able to tell the pieces and then fax it over to me
22 at the post office.
23     Upon doing that, I realized that once I
24 got that sheet or two sheets from him, it wasn't an

163

1  accurate count that was in my truck. And I said to
2  the receiver, the guy working the dock, that I was
3  unable to give him his freight because the count
4  wasn't proper. And that's their policy; if the
5  count isn't right, you need to bring the freight
6  back. There was no way of scanning any freight
7  because it wasn't in the computer in the first place
8  as far as P34, my special customer, with my scanner
9  already lost. So I bought back all the freight --
10     Q. I'm just asking you what it is you said to
11 Mr. McClellan on that date.
12     A. Basically, he faxed over the sheets and
13 that was it.
14     Q. Did you complain to him that you felt like
15 you were being set up?
16     A. No.
17     Q. Did you ever tell Christopher Demmons that
18 you'd fix him or you'd get him?
19     A. No.
20     Q. Did you ever tell Mr. Demmons that you were
21 being followed daily?
22     A. I can't recollect it, but I was being
23 followed.
24     Q. Who was following you?

164

1      A. There was an instance where I was watching
2  my vehicle every single stop out of frustration and
3  being afraid that a package was going to be stolen
4  out of my vehicle. Every single stop I made, I was
5  peeking out of the windows to see who was firing
6  away packages out of my truck.
7      Q. The question was -- this goes best if you
8  listen carefully to the question and you answer just
9  the question I asked.
10     A. I don't know who was following me.
11     Q. Do you have any suspicions as to who was
12 following you?
13     A. No.
14     Q. Did you suspect that the Teamsters were
15 following you?
16     A. I'm not suspecting anything. I don't know,
17 I don't have any proof.
18     Q. Did you ever tell Mr. Demmons that
19 management is conspiring against you?
20     A. No.
21     Q. Did you ever tell Mr. Demmons that someone
22 was stealing freight from your truck?
23     A. Yes.
24     Q. Can you tell me when you told Mr. Demmons

165

1  that?
2      A. When Mr. Demmons was at my truck and I
3  downloaded my scanner, and I approached him after he
4  was in there scanning all my freight, and I replied
5  to him, "Chris, why is my bulkhead door open?"
6  "Well," he says, "I was doing" -- I think he said he
7  was doing an out-for-delivery scan on all the
8  freight to see if everything I put in the truck was
9  right. I said, "Well, how can I be held accountable
10 for freight in my vehicle if you or anyone else
11 takes it upon themselves to go in the vehicle and
12 scan everything? If there's another individual
13 person in my truck and I don't know about it and
14 there's freight missing, how can I be held
15 accountable for it?"
16     Q. Okay. But again, the question was, the
17 question was, did you ever tell him that somebody
18 was stealing freight from your vehicle?
19     A. I had my suspicions. I don't know if I
20 told him directly, but I had my suspicions.
21     Q. What were those suspicions based upon?
22     A. Cartage reports at the end of the day.
23 They were showing pieces that were out for delivery
24 scan and weren't being delivered and vice versa.

166

1    There were pieces that I did scan, and they were
2    missing at the end of the day.
3        Q.  Did you ever get disciplined for missing
4    freight other than that one incident on July 24,
5    2004 --
6        A.  Absolutely.
7        Q.  -- 2003?
8        A.  Absolutely.
9        Q.  You did?
10       A.  Yes.
11       Q.  When?
12       A.  Missing freight?
13       Q.  Yes.
14       A.  I'd have to go back into all the warning
15   letters but --
16       Q.  I'm talking just about 2003 after
17   Mr. Hamilton took over.
18       A.  Well, you didn't --
19       Q.  *How many times were you disciplined or
20   given a warning for anything having to do with
21   missing freight or failure to scan?
22       A.  I spoke to Joe Hamilton about it.  He told
23   me I was paranoid.
24       Q.  Right.  So the answer to the question is

167

1    what?  I'm asking you --
2        A.  Chris Demmons, not directly.  Joe Hamilton,
3    yes.
4            MR. PERLMAN:  Can you read back my
5    question, Joan.
6            *(Question read.)
7        Q.  I want that question but I want you to tell
8    me, between the time that Mr. Hamilton took over as
9    plant manager and the time you were terminated, how
10   many times?
11       A.  I can't recall.
12       Q.  Well, can you look at the disciplinary
13   summary and tell me?
14       A.  Sure.  (Witness reviews document.) It looks
15   like there's one here, "failure to scan shipment."
16       Q.  Just one.  Were you having problems with
17   more than just one package?
18       A.  Yes.  I have manifest records to back it
19   up.  I don't know if they're in the room today.
20       Q.  Manifest records to back it up?
21       A.  Yes, I've got manifest records to back up
22   everything.
23       Q.  Is that something that you produced in the
24   course of discovery?

168

1        A.  I produced them upon printing out
2    my download of my scanner.
3        Q.  I am asking, did you produce those
4    documents to DHL, to Airborne Express, in the course
5    of this litigation?
6        A.  I produced them to my lawyer.
7        Q.  And is it your understanding that your
8    lawyer produced those to us?
9        A.  That's my understanding, yes.
10       Q.  Are there titles to those documents?  What
11   are they called?
12       A.  The end-of-the-day cartage, and what it is
13   is a printout of every stop you did, every piece you
14   delivered, every piece you picked up, total pieces.
15   And that's how they determine if everything on your
16   truck was delivered or anything that you forgot to
17   scan out for delivery was delivered and you didn't
18   scan it out for delivery.
19       Q.  And what do those records show, in your
20   mind?
21       A.  The records show specific incidents where
22   packages were not scanned out for delivery, ended up
23   on my vehicle, and then delivered and vice versa.
24   There were packages that were scanned out for

169

1    delivery and not delivered.
2        Q.  How many times?
3        A.  They were missing.
4        Q.  How many times?
5        A.  I want to say it was three or four.
6        Q.  In the whole month of July?
7        A.  There was a week or two where it happened
8    quite often.
9        Q.  "Quite often" meaning how often?
10       A.  Pretty much two or three times a week.
11       Q.  How many total packages during July 2003
12   are we talking about?
13       A.  Specifically the ones I traced, I think
14   there's three.
15       Q.  Three packages.  And you received a warning
16   letter regarding only one package, right?
17       A.  For the out-for-delivery, yeah.
18       Q.  And if Airborne were going to claim that
19   there were packages missing, they would have
20   disciplined you for that, wouldn't they?
21       A.  Well, if they gave me 53 warning letters, I
22   would hope they would add the 54th onto there.  Yes,
23   they would have given me one.
24       Q.  Right.  But they didn't?

Paul Pizzuto
Volume 1 - June 12, 2007

44 (Pages 170 to 173)

170

1    A. They didn't, no, they were nice to me that
2  time.
3    Q. Okay. Do you have an idea why they were
4  nice to you?
5    A. I don't know. I can't speak for them.
6    Q. There was a time at which you were sent for
7  drug and alcohol testing, right?
8    A. Yes.
9    Q. Do you remember the day that that happened?
10   A. Yeah, specifically.
11   Q. Do you remember going to the clinic?
12   A. Yes, I do.
13   Q. Who went to the clinic with you?
14   A. A union employee.
15   Q. I'm sorry?
16   A. A union employee, Jimmy O'Brien, Arthur
17 Leveris, and Joe Hamilton.
18   Q. Where is the clinic?
19   A. It's located at 61 Main in Stoneham.
20   Q. How far did you have to travel from the NSH
21 facility to get to that place?
22   A. Ten to fifteen minutes.
23   Q. Who did you travel with?
24   A. All in one vehicle.

171

1    Q. All four of you?
2    A. Yeah.
3    Q. Did you have any discussions while you were
4  traveling to the clinic with the gentlemen in the
5  car?
6    A. No.
7    Q. You sat in silence?
8    A. You know, small talk. I don't know what it
9  was, though, I couldn't tell you.
10   Q. What happened when you arrived at the
11 clinic?
12   A. We entered and Joe went to the window and
13 said, "We have to give him a drug and alcohol test."
14   Q. Did you drink a number of cups of water
15 while you were at that facility?
16   A. I was thirsty, maybe a few little cups.
17   Q. Did you drink 25 cups of water?
18   A. I don't know if I counted 25 like that. I
19 would say three or four cups, maybe.
20   Q. Just three or four cups?
21   A. Yes.
22   Q. Did you let out a number of belches while
23 you were in the waiting room?
24   A. No.

172

1    Q. You didn't do that?
2    A. No.
3    Q. Did you, while you were at the clinic, tell
4  Mr. Hamilton and Mr. Leveris that, quote, you will
5  get yours?
6    A. No.
7    Q. Did you tell Mr. Hamilton and/or
8  Mr. Leveris that you can go to bed at night without
9  worrying?
10   A. No, I can't recall.
11   Q. I'm sorry, you didn't tell them that, or
12 you can't recall whether or not you told them that?
13   A. I can't recall. I can't recall much of
14 that situation because I was very frustrated and
15 irate that they were taking me down for the drug
16 test, number one, and it was not a random, it was a
17 suspicious behavior. So I pretty much kept my mouth
18 shut, and I was very perturbed underneath.
19   Q. So it's possible, though, because your
20 recollection is failing, it's possible you told
21 them, "I can go to bed at night without worrying"?
22   A. I'm not going to say possible, because I'm
23 not a mean person, I would never say that.
24   Q. You would never say that?

173

1    A. No.
2    Q. Because you are not a mean person?
3    A. No.
4    Q. But you don't recall whether or not you
5  did?
6    A. No, I don't.
7    Q. You are just basing your response on the
8  fact that you consider yourself a nice person,
9  right?
10   A. No, on top of it, I have a bipolar
11 disorder, which at the time I was probably in such
12 anxiety and depression at the time or, you know,
13 inability to cope and manage everything, if I did
14 say it, I can't recall it.
15   Q. And I realize that that may have been
16 caused by the state of mind you were in at that
17 point.
18   A. Right.
19   Q. I mean, it might have been caused by the
20 bipolar, but the bipolar disorder causes you to act
21 in ways that probably aren't the best way to act,
22 right? Isn't that true?
23   A. From a personal standpoint? No.
24   Q. What do you mean, "from a personal

174
1  standpoint"?
2      A. The disease is very difficult for people to
3  understand, number one --
4      Q. I'm trying to understand it.
5      A. -- because it's internal, it's not
6  external. If I walk around with a broken arm or a
7  broken leg, you can tell that person is having
8  difficulty; but when I have all these things going
9  through me and a chemical imbalance, and then I have
10  people taking me down for a drug test and an alcohol
11  test, which -- against my will, number one, it was
12  against my will. I was told I had to or else I
13  would be fired. I'd be mad --
14      Q. Mr. Hamilton told you that?
15      A. Yeah. I'd be mad in any situation, never
16  mind being faced with the bipolar on top of that and
17  forcing myself into that state of mind -- not
18  forcing myself, but the disease forcing myself one
19  level above everything. So if I was speaking a
20  little bit loud or I was trying to get to the point,
21  yeah, it could have been my bipolar, sure.
22      Q. Okay. Well, I'm just asking you about what
23  you said. I am not making any judgments about why
24  you said it. I just need to know --

175
1      A. No, I know it's not personal on your level.
2  I'm just trying to protect myself.
3      Q. More than protect yourself, what I want you
4  to do is answer the questions truthfully; and if you
5  said something, I mean, you will have the
6  opportunity to explain why you said it, but I want
7  to ask you whether or not you said something, and if
8  you said it or if you don't remember whether you
9  said it, I need you to be honest with me about that.
10  That's how this works.
11      A. All right. Well, I've tried to tell you,
12  you know, numerous times that I can't recollect it,
13  and you go on to another question just trying to
14  beat around the question and trying to get me to say
15  something else.
16      Q. No, I am not trying to confuse you. All I
17  am trying to do is get a clear answer, because as we
18  found out, sometimes the questions being asked are
19  not exactly being answered. So what I am trying to
20  do is get the questions I am asking answered.
21      A. Okay. I'm trying to answer them the best I
22  can, so we are all on the same page.
23      Q. What I am asking you is, did you say --
24  regardless of the reason you said it, did you say to

176
1  Mr. Hamilton or Mr. Leveris that you can go to bed
2  at night without worrying?
3      A. No.
4      Q. Did you say to Mr. Hamilton or Mr. Leveris,
5  that, quote, you will get yours?
6      A. No.
7      Q. Did you tell Mr. Trudeau, Mike Trudeau,
8  that you think somebody is out to get you and they
9  will pay for it tomorrow?
10      A. No.
11      Q. Do you claim that the drug test that you
12  were given was improper?
13      A. Yes.
14      Q. Why?
15      A. It wasn't random. It was based on
16  suspicious behavior. I was not suspicious from the
17  time I punched in till the time they pulled me out
18  of my work area. All the individuals that I worked
19  around know and will testify that I wasn't acting
20  abnormal other than myself and my daily problems
21  maybe emotionally. So they had no proof that I was
22  acting in a suspicious behavior, but they were out
23  to get me, and they wanted me to get that drug test
24  in so maybe Paul Pizzuto will come up positive from

177
1  one of those two and then they'd have an excuse to
2  fire me.
3      Q. You said there were witnesses to your
4  behavior that day. Can you tell me who they are?
5      A. Jim O'Brien, Bill Beekman, B-e-e-k-m-a-n,
6  Jim Sambataro.
7      Q. Anyone else?
8      A. You know, those were the people that worked
9  next to me that whole morning. If I was acting in a
10  strange behavior, I think that they would have
11  notified the right individuals about it.
12      Q. Oh, you think they would have told
13  management that you were --
14      A. Sure, absolutely.
15      Q. -- acting inappropriately?
16      A. Sure.
17      Q. Have you talked to Mr. O'Brien since you
18  brought this case?
19      A. Yes, I have.
20      Q. Have you talked to him in the last month?
21      A. Yes, I have.
22      Q. What did you discuss with Mr. O'Brien?
23      A. How he was doing, how his family was doing,
24  how work was going.

Paul Pizzuto
Volume 1 - June 12, 2007

47 (Pages 182 to 185)

182

1    Q. -- on July 21; isn't that right?
2    A. Yes.
3    Q. And you had a meeting that morning when you
4  came back, isn't that right?
5    A. Yes.
6    Q. Do you remember who was present at that
7  meeting?
8    A. When I came back from the drug test?
9  Sorry, is that what you are saying?
10    Q. When you returned from the leave that
11  occurred as a result of the drug tests, you had a
12  meeting that morning -- isn't that right? -- where
13  they told you that the drug test had come back
14  negative.
15    A. I believe that was done on the phone.
16    Q. Okay.
17    A. I believe that was done on the phone. I
18  wasn't at work because I wasn't allowed to work
19  until the test was processed.
20    Q. Right. But then you came back to work?
21    A. Oh, okay. I know what you are saying. All
22  right.
23    Q. And you had a meeting? Didn't you have a
24  meeting that morning?

183

1    A. Me and Joe talked.
2    Q. You met with Joe. Was there anybody else
3  at the meeting?
4    A. I can't recall specifics.
5    Q. Was Mr. Howard at the meeting?
6    A. Somebody must have been there because I
7  would not have spoken to Joe without a union rep.
8    Q. Do you remember whether Mr. Leveris was
9  there or not?
10    A. I can't.
11    Q. Do you remember what was discussed in that
12  meeting?
13    A. Yeah. Joe says, "You're going to go back
14  to work." He says -- he also did say if I get out
15  of place -- I don't know his exact words, but if I
16  get out of place or "you do something again," he
17  says, "you're fired, that's it." Those were Joe's
18  words.
19    Q. Did he tell you that he had heard you had
20  been engaging in threatening behavior?
21    A. From his point of view.
22    Q. I'm just asking you if he told you that.
23  I'm not asking you to subscribe to it.
24    A. I don't know what his words were.

184

1    Q. Do you remember at all what he said to you
2  about that?
3    A. No. I basically remember him telling me I
4  can go back to work, and upon going back to work, I
5  was going to receive my check at the end of the week
6  for the days missed because it came back negative.
7    Q. I'm going to give you Exhibit 17. It's a
8  little bit longer, so I'm going to give you a little
9  bit of time to look at it. I want you to read it,
10  and I'm going to ask you some questions about it.
11    MR. MULHEARN: Can we take a quick
12  bathroom break, then?
13    MR. PERLMAN: Go ahead.
14    (Recess.)
15  BY MR. PERLMAN:
16    Q. Have you read that?
17    A. Yes. Go ahead.
18    Q. Exhibit 17, Mr. Pizzuto, I put in front of
19  you. Do you remember having a meeting with
20  Mr. Hamilton on the morning of July 21, 2003?
21    A. Yes.
22    Q. And does this document accurately recount
23  what happened in that meeting?
24    A. Yeah, for most of my -- for most of my

185

1  recollection, yeah.
2    Q. Is there anything in Exhibit 17 that is
3  inaccurate about what happened in that meeting --
4    A. Yeah, just --
5    Q. -- on July 21, 2003?
6    A. Just all the statements, "he said," "she
7  said," and all that in there.
8    Q. Can you tell me specifically? I want you
9  to do this very carefully. I want you to tell me
10  what parts of this memo are incorrect factually.
11    A. All right. He did say, "I told him his
12  behavior the past three months has become an issue."
13  He never said anything about mood swings, and he
14  never said -- he did say, "You are suffering from
15  paranoid behavior," I know that.
16    Q. Did he tell you --
17    A. He never told me he was not a doctor. He
18  did tell me I made specific threats to four of his
19  supervisors, and he did tell me, "I explained to him
20  the next threat," that he was going to take
21  disciplinary action and fire me.
22    Q. Did you ask him specifically who did you
23  threaten?
24    A. Yes, yes. And he did give me those

**186**

1  people's names; but again, what they were saying,
2  "Wait till I get him," "You'll get yours," "Who is
3  screwing with me," that's all fabrication.
4      Q. So you're saying that Mr. Hamilton told you
5  that this is what these gentlemen said, right?
6      A. Well, that's what he heard from them, so he
7  passed it on to me.
8      Q. Right, okay. The next paragraph. You said
9  since February you had four instances where freight
10  had been ofd-scanned and then not delivered at the
11  end of the day.
12      A. That's correct. And that next sentence is
13  correct. He never instructed the supervisors if he
14  had any issues that he would handle it, because if
15  that was the case, he would have given me the
16  warning letters; they wouldn't have been given to me
17  by supervisors.
18      Q. What warning letters?
19      A. Whatever ones I got since Joe took over.
20      Q. Okay. Looking at the last part of that
21  document, did you tell him that you -- did you
22  discuss your prescribed medication?
23      A. I'm sorry. Where is that? Oh, at the very
24  bottom?

**187**

1      Q. Very bottom.
2      A. I think I had said to them, to Joe, that I
3  was under medical care and was taking prescribed
4  medicines for my condition, and if he needs to call
5  my doctor, that he should do so. I'm almost sure
6  that's what I said.
7      Q. Why did you tell him that?
8      A. Because he was well aware that I was having
9  emotional issues, and he knew I was on prescribed
10  medicines because I came back to work in February of
11  '03.
12      Q. Why was that relevant?
13      A. Because he was calling me paranoid.
14      Q. Any other reason?
15      A. He was saying I was being a threat to him
16  and his supervisors.
17      Q. Any other reason you brought that up?
18      A. Well, I mean, those are the main reasons.
19      Q. Were you trying to explain your behavior to
20  Mr. Hamilton?
21      A. I was trying to be nice to him as much as
22  possible as far as explaining my condition, but he
23  wasn't very responsive in trying to hear what I had
24  to say. He was too built up on the issue of

**188**

1  disciplining me, which led up to my termination.
2      Q. Did you tell him you'd be filing a
3  harassment case against him?
4      A. I can't recall it, but I may have. I can't
5  recall it. Because if I did, it would be -- it
6  would already be -- it would already have been filed
7  through the steward and the union, but I don't know
8  if there's a copy of that out there if I did.
9      Q. Did you advise Mr. Hamilton that he
10  couldn't take away your freedom of speech?
11      A. No.
12      Q. You didn't say anything about freedom of
13  speech at that meeting?
14      A. No, it was more about my health condition
15  than anything else.
16      Q. The meeting was about your health
17  condition?
18      A. Well, when he went into the paranoid stuff,
19  about that, then he went into me threatening people
20  and everything else, basically that's when he
21  decided -- and that's the same date. That was the
22  same date that he took me for the drug and alcohol
23  test, correct?
24      Q. No.

**189**

1      A. No? The drug and alcohol test, what day
2  was that?
3      Q. This is the day you came back from your
4  leave from the drug and alcohol test.
5      A. Okay, yeah, okay. So apparently I came
6  back negative, and he still had issues with me and
7  he didn't take my health under consideration. He
8  just wanted to find things he could blame me for, in
9  addition and up to termination.
10      Q. When he made a comment about your paranoid
11  something, did you think that was a direct reference
12  to your disabilities?
13      A. I can't speak for him. All I can tell you
14  is he was well aware I was out on a short-term
15  disability from both the union and the company.
16      Q. How was he aware of that?
17      A. Because it was well documented I was on
18  FMLA and through Seattle, and he had constant
19  contact with Seattle.
20      Q. But you returned before he started at the
21  plant, right?
22      A. Yeah. He has access to that material.
23      Q. He has access to it, but do you know
24  whether or not he ever looked at it?

Paul Pizzuto
Volume 1 - June 12, 2007

49 (Pages 190 to 193)

190

1   A. He knew I was having problems.
2   Q. How did he know you were having problems?
3   A. We just talked about them.
4   Q. But how did he know you were having
5   problems?
6   A. Because we had a talk right on his first
7   day back in work.
8   Q. When we talked about that conversation,
9   Mr. Pizzuto, you never said anything about
10  disability. You talked about discipline.
11  A. We talked about me taking medications for
12  anxiety --
13  Q. You told him about that?
14  A. -- and medications for depression.
15  Q. So you told him about that at that meeting?
16  A. Well, just not to get away from names, I
17  was given two warning letters by Mr. Crossken back
18  to back in the same day, and one of them was an
19  issue that I had all my personal belongings in there
20  with all my medicines.
21  Q. Let's try to focus here.
22  A. Let me just finish, please.
23  Q. I asked --
24  A. Can I just finish, please?

191

1   Q. Let's have the question read back. I am
2   not interested in going back to ancient history.
3   I'm interested in knowing how it is that you
4   informed Mr. Hamilton that you had what you have
5   characterized as problems.
6   A. Okay.
7   Q. How did Mr. Hamilton know that?
8   A. April, when they sent me down to 61 Main
9   Street to get a health physical, a physical for the
10  DOT, my DOT physical -- do you have a copy of that?
11  On the bottom of that it states every single ailment
12  and every problem I was having, so he knew.
13  Q. Did you hand a copy of that to
14  Mr. Hamilton?
15  A. Yes, I did.
16  Q. When did you do that?
17  A. I told him the day I left 61 Main Street.
18  Q. You came in that day and handed it to
19  Mr. Hamilton?
20  A. I went in for my DOT physical after work --
21  while on duty. I took the physical. I brought him
22  the manila envelope back, and I handed it to him. I
23  have a copy of it.
24  Q. Where were you standing? Where was

192

1   Mr. Hamilton standing when you handed it to him?
2   A. He was right in the office.
3   Q. Was anybody else present at that time?
4   A. Not that I can recall. So he was well
5   aware of my problems, just to get back to that
6   question.
7   Q. Just from looking at the sheet that you
8   submitted to the DOT?
9   A. Oh, yeah.
10       THE WITNESS: You are well aware of that
11  sheet, correct?
12       MR. MULHEARN: You can't be asking me
13  questions.
14  A. Yes, yes.
15  Q. That's what you are relying upon. Is there
16  anything else you are relying upon for Mr. Hamilton
17  knowing about your, quote-unquote, problems at that
18  time?
19  A. No, I'm not relying. That's definite.
20  Q. That was it?
21  A. Yeah. I was given -- excuse me, not to
22  just -- I was given a two-month DOT card because of
23  the conditions I was suffering, including sleep
24  apnea, including being on Provigil, which is a

193

1   medicine that keeps you awake, because I was having
2   a problem with sleeping. And it included anxiety,
3   depression, inability to cope, all the prescriptions
4   that I had listed. Plus incidents with Steve
5   Crossken that were going on there. I was having
6   problems at work.
7   Q. At some point during July 2003, did you
8   call Airborne pretending to be a customer?
9   A. Yes.
10  Q. Can you please describe that event to me.
11  A. The package that was missing, not
12  delivered, after I departed and punched out to go
13  home, because of previous problems I had with not
14  finding freight that was out for delivery or not
15  delivered, there was this one specific piece that
16  didn't show up delivered -- okay? -- and I had taken
17  it out for delivery. So I made a photocopy of that,
18  or I wrote down the address of it, and I called
19  customer service, which was the North Shore station.
20  And I asked the girl working at the North Shore
21  station, I says, "Can you please give me a point of
22  delivery," which is a POD, "on the package." And
23  they couldn't find one, which I knew I had the
24  package, but somehow it disappeared out of the

Paul Pizzuto
Volume 1 - June 12, 2007

52 (Pages 202 to 205)

202

1    delivered, but it wasn't, the count was short.
2        Q. Mr. Pizzuto, this analysis, the delivery
3    analysis, set forth as Exhibit 54 is for July 24,
4    2003. Are you confused?
5        A. No, I'm not confused at all. This is the
6    second -- that's the second incident from the post
7    office. There wasn't only one incident. On the
8    14th, the 30 pieces from the post office, which it
9    states in Exhibit 15, I took back because the count
10   was wrong, and apparently --
11       Q. So what happened on the 24th?
12       A. I don't know exactly what happened. I
13   mean, you are putting the exhibit in front of me, so
14   you basically have to tell me what's wrong with
15   it --
16       Q. I am just asking you --
17       A. -- so I can correct it.
18       Q. I asked you if there was anything about
19   this exhibit that supports your claim, and you said
20   there was, and I'm trying to figure out what it is.
21       A. I don't have the customer sheet as far as
22   special customer, so I can't tell you. It's a
23   separate sheet from the manifest. If I was able
24   to get the special customer manifest -- it's in

203

1    addition to this -- then I would be able to see all
2    the airbills on there.
3        Q. Do you have that, sir? Do you have a copy
4    of it?
5        A. I don't know. I mean, I have some
6    paperwork, my lawyer has some paperwork. I would
7    have to go through the paperwork if you need it.
8        Q. Do you remember being shown a video, a
9    chairman's message video, regarding the Airborne/DHL
10   merger?
11       A. Yes.
12       Q. Did you watch the video?
13       A. Yes.
14       Q. How long did it last?
15       A. It was lengthy.
16       Q. Lengthy?
17       A. Ten, fifteen minutes.
18       Q. Do you remember what was said in that
19   video?
20       A. Everything that was going to be taken over,
21   how DHL was going to transform Airborne into the new
22   company, and what was expected from the employees
23   and everything else.
24       Q. All right. Did you watch the video?

204

1        A. I watched it with everyone else, yeah.
2    There was about 40 of us, 50 of us.
3        Q. Did you stare at Mr. Hamilton during that
4    video?
5        A. I was looking at the TV. He might have
6    been at the side of the TV, I don't know.
7        Q. But you don't recall having stared at him
8    during the video?
9        A. No.
10       Q. Did you squirt water into your mouth from a
11   long distance to draw attention to yourself?
12       A. No.
13       Q. Did you look at Mr. Hamilton as if you
14   wanted to fight him?
15       A. No.
16       Q. Did you ever confront Mr. Hamilton as if
17   you were going to fight him?
18       A. No.
19       Q. Did you ever want to?
20       A. No.
21       Q. Did it ever cross your mind?
22       A. No.
23       Q. On the day before you were terminated, July
24   24, '03, do you remember Mike Trudeau doing a full

205

1    truckload audit on your truck?
2        A. Yes.
3        Q. On that day did you tell Mr. Trudeau that
4    "you guys are all going down big-time"?
5        A. No.
6        Q. Anything to that effect?
7        A. No.
8        Q. Did you tell Mr. Trudeau you -- they had
9    video on all of you?
10       A. No.
11       Q. Anything to that effect?
12       A. No.
13       Q. Did you tell him the Feds are on it now?
14       A. No.
15       Q. Or anything to that effect?
16       A. No.
17       Q. Did you tell him this will be bigger than
18   Cashman?
19       A. No.
20       Q. Did you tell him anything to that effect?
21       A. No.
22       Q. Did you ask him, "Do you have a family,
23   Mike? Well, your kids will have to get used to
24   visiting you in jail"?

Paul Pizzuto
Volume 1 - June 12, 2007

53 (Pages 206 to 209)

206

1    A. No.
2    Q. Did you say anything to that effect?
3    A. No.
4    Q. Did you say that "I am going for $30
5 million"?
6    A. No, I wish I was, though.
7    Q. Did you say anything to that effect?
8    A. No.
9    Q. Did you ever say, "Have you ever seen
10 someone die, Mike"?
11   A. No.
12   Q. Did you say anything to that effect?
13   A. No.
14   Q. Did you tell Mr. Trudeau that you had seen
15 someone die?
16   A. No.
17   Q. Did you tell him that you saw someone put a
18 rope around their neck and jump off a chair?
19   A. No.
20   Q. Anything to that effect?
21   A. No.
22   Q. Did you tell Mr. Trudeau that you're not
23 afraid of anything or anyone?
24   A. No.

207

1    Q. Did you tell him anything to that effect?
2    A. No.
3    Q. Did you tell Mr. Trudeau that they can
4 shoot you now with one bullet?
5    A. No.
6    Q. Did you say anything to that effect?
7    A. No.
8    Q. Did you tell Mr. Trudeau that you're not
9 afraid to die?
10   A. No.
11   Q. Did you tell him anything to that effect?
12   A. No.
13   Q. Now, regarding those statements I've just
14 asked you about, did you ever make any of those
15 statements to anyone, any supervisor of yours at
16 Airborne?
17   A. No.
18   Q. Do you remember talking to Timothy Carter
19 on the day before you were terminated?
20   A. No.
21   Q. Do you remember driving up to the exit door
22 and seeing Greg Sweatt and Timothy Carter standing
23 near the exit door?
24   A. No.

208

1    Q. At any point in -- on or about July 24,
2 2003, did you tell Mr. Carter or say within
3 Mr. Carter's presence, "You guys are going to get
4 it"?
5    A. No.
6    Q. "Someone is going to get you guys"; did you
7 say that?
8    A. No.
9    Q. Did you say anything to that effect?
10   A. No.
11   Q. Do you remember Greg Sweatt ever asking you
12 who was going to get it?
13   A. No.
14   Q. Did you make any threats to Airborne
15 employees or supervisors in the month of July 2003?
16   A. No.
17   Q. Did you say anything to any Airborne
18 employee or supervisor that could be interpreted as
19 a threat?
20   A. No.
21   Q. Did you say anything to any Airborne
22 employee or supervisor that could be interpreted as
23 a threat whether or not you meant it to be a threat?
24   A. No.

209

1    Q. What is the most threatening thing you can
2 recall saying in July 2003?
3    A. I can't recall.
4    Q. On July 24, the day before you were
5 terminated from employment, do you recall refusing
6 to engage in a meeting with Mr. Hamilton?
7    A. Yes.
8    Q. Can you tell me what happened there,
9 please.
10   A. It starts with the evening before, on the
11 23rd.
12   Q. On the 23rd?
13   A. Yes.
14   Q. Okay.
15   A. Let's see. I believe it was a Thursday,
16 because that was payday, and I was supposed to get
17 my check for the hours that were due for the drug
18 and alcohol test, I believe three days' pay. And I
19 was supposed to get it in my payroll check through
20 the GO, which came in on Thursdays, they distribute
21 it.
22      Upon receiving all the checks, all the
23 employees, I asked Arthur if there was any checks in
24 there that were mine, in the bag. Usually, there's

Paul Pizzuto
Volume 1 - June 12, 2007

54 (Pages 210 to 213)

210

1  a red bag that comes on the belt. And I said,
2  "Well, I didn't get my check for the three days that
3  I missed for the drug and alcohol test"; and Arthur
4  replied, "Oh, that's an issue with the union, you
5  have to grieve it."
6      So I was a little bit perturbed about
7  it, so I went over to my steward at the time, Jerry
8  Halloran; and I asked Jerry, I said, "Jerry, they
9  didn't pay me for the days they owe me, I was out
10  three days. I'm going to lose three days' pay until
11  they have enough time to get me another check." And
12  then when they cut me a check, they take out 28
13  percent of it, because that's how they take it out
14  of corporate. It's like 40 percent of it, 35
15  percent of it. I said, "I don't want it out of
16  that, I want it out of my own check, out of my
17  regular check, out of the paycheck." And then I
18  said, "You'd better go talk to Joe, better find out
19  what's going on with the check."
20      I went on the road, did my route, came
21  back, and it was about 5:30. Jerry Halloran and Joe
22  Quigley were standing towards the side of the clock,
23  the time clock; and I pulled in and they greeted me,
24  I greeted them. And they said, "We have your check,

211

1  we found it." I said, "Wow, where did that suddenly
2  appear?" He says, "Oh, we don't know, they found
3  it, whatever." It came from Seattle so it had to
4  come in the red bag, there's no way they could have
5  got the check locally. It had to come in through
6  the plane. So that only enforced my thoughts about
7  what was going on that morning and they never gave
8  me the check properly.
9      And then Jerry handed me the check along
10  with Joe, and they said, "Here's the check, but we
11  have a problem. Joe needs you in the office because
12  he wants to give you some disciplinary letters, one
13  being out for delivery, which he wants to give you,
14  and one being for threatening" -- I don't know what
15  the other one was. I think it was an employee,
16  whatever -- not an employee, a supervisor. There
17  was something in there. There was two letters,
18  though, total.
19      And at that point I had all I could take
20  as far as the whole situation that transpired
21  between going for the drug test, finding it
22  negative, then supposedly putting in my check, then
23  not putting in my check, then coming back, getting
24  my check, then telling me I need to go see Joe

212

1  because I have two warning letters. And at that
2  point I says, "You know what? I'm out of here. You
3  do what you want." I gave them back the check,
4  their check, and I left. And then the next day I
5  was fired.
6      Q. All right.
7      A. That's when they fabricated me going up the
8  ramp. That's when they fabricated me, you know,
9  driving into someone, apparently, Arthur Leveris
10  ducking out of the way. He thought I was going to
11  hit him. And he was in the building, and everyone
12  else was outside having coffee and doughnuts.
13      Q. You're saying they fabricated you going up
14  the ramp. Are you saying you didn't go up the ramp
15  that day?
16      A. I did, but I didn't go at a high rate of
17  speed.
18      Q. You said something about coffee and
19  doughnuts. Who was having coffee and doughnuts?
20      A. All the employees were congregating over by
21  the overhead door where the ramp is on both sides.
22      Q. Can you show me where that is on our
23  diagram?
24      A. Sure (indicating).

213

1      Q. I'm going to ask you to draw another
2  diagram just because that one is kind of small. And
3  this is an important issue, so I want to make sure
4  we have a very clear diagram. I'm giving you a
5  piece of paper and a black pen, and we're going to
6  have that marked. So if you could just draw me a
7  larger diagram of the facility.
8      A. (Witness complies.) Okay.
9      Q. Thank you for drawing a larger diagram for
10  us. We are going to mark it as your next exhibit so
11  we have it for the record.
12      (Marked, Exhibit 55, Drawing by
13  witness.)
14      Q. Describe what you did on the morning of
15  July 25 when you arrived at the station.
16      A. (Drawing.)
17      Q. So I'm going to write some reference points
18  as you point them out for me. So what did you do
19  first?
20      A. I came in Fallon Road, and I went into the
21  main parking lot here (indicating). Okay?
22      Q. Okay. So you have written "main parking
23  lot"?
24      A. Right.

Paul Pizzuto
Volume 1 - June 12, 2007

55 (Pages 214 to 217)

214

1    Q.  That's where you came in.  And the arrows,
2  is that where you drove your car?
3    A.  Yes, this is the pathway.  Everything else
4  is parking on each side.
5    Q.  All right.
6    A.  I went up to the ramp.  I stopped right
7  about here (indicating).
8    Q.  Okay.  So you stopped at the point marked
9  A?
10    A.  Yup.
11    Q.  Is that correct?
12    A.  Yup.
13    Q.  All right.  And you drove your vehicle up
14  the ramp.  There's an arrow in the ramp.  That's how
15  you drove the car, right?
16    A.  Yes.
17    Q.  And you stopped at the point marked A.
18  Okay.
19    A.  Yes.  Now, to the right of the ramp is the
20  break room right here, drivers' break room.
21    Q.  So I'll mark that point.  Point B is the
22  drivers' break room; is that correct?
23    A.  Correct.  Upon entering the ramp, I was
24  about a minute or two from 7 o'clock, I believe that

215

1  was the start time.  And I left the vehicle, walked
2  over to the drivers' room, punched in right before
3  the drivers' room.  The time clock was right there.
4    Q.  There's a time clock right here
5  (indicating)?
6    A.  Actually, it's in the drivers' room.
7    Q.  It's in the break room marked as B?
8    A.  Yes.
9    Q.  Is where the time clock is?
10    A.  Yes.
11    Q.  All right.
12    A.  After I punched in, I walked back to the
13  vehicle, opened the door, put it in reverse, backed
14  up till I came back in the main parking lot, and
15  made my way out the same way I entered.  I had to go
16  to the auxiliary parking lot because these slots
17  were all taken by management, trucks and employees
18  already in the building.
19    Q.  So you drove back out the same way you came
20  in, Fallon Road, took a right out Fallon Road and
21  then went to the auxiliary parking lot; is that
22  correct?
23    A.  Yes, there's a Ryder Truck Rental there.
24  They leased the space out to them because their

216

1  parking lot was too small.
2    Q.  When you stopped your car at Point A, was
3  your car inside or outside the facility?
4    A.  I really don't know.  It might have been
5  slightly under, slightly over, but not much if it
6  was.  I know that there was people congregating on
7  either side of the ramp, you know.  I mean, the
8  ramp's only about -- no more than 15 feet wide, so
9  there was people on either side of the ramp.  So I
10  wasn't going at a fast rate of speed because if I
11  was, I wouldn't have been able to park where I did.
12    Q.  What do you mean by that?
13    A.  Well, I mean I would have been obstructed
14  from going in at all.
15    Q.  How long is the ramp?
16    A.  The ramp might be about 20 feet, about 15
17  feet wide.
18    Q.  20 feet long and 15 feet wide; is that
19  right?
20    A.  Yeah, approximately.
21    Q.  (Drawing) Okay.  Had you done this before?
22  Had you driven up the ramp to punch in before?
23    A.  Yes.  It was common practice by numerous
24  employees who were running late for work, in order

217

1  to punch in on time, to avoid get any warning
2  letters that were commonly distributed for being
3  late --
4    Q.  My only question was, had you done it
5  before?
6    A.  Yes.
7    Q.  And you had seen others doing it before?
8    A.  Yes.
9    Q.  Who had you seen doing it before?
10    A.  I can't give you specific names.  People --
11  Gary Clemmons.
12    Q.  Who else?
13    A.  Bob Lahey.
14    Q.  Anyone else?
15    A.  Wayne Fox.
16    Q.  Anyone else?
17    A.  Richie Stokes.
18    Q.  Richie Stokes?
19    A.  I'm going to stop there because I know
20  there was numerous people.  I just don't know
21  everyone's name.
22    Q.  Yeah, but do you know any other names other
23  than the four you have given me?
24    A.  Specifics, no, but I know it was common

Paul Pizzuto
Volume 1 - June 12, 2007

56 (Pages 218 to 221)

218

1 practice by most of the employees.
2    Q. By most of the employees?
3    A. Most of them that were late on any given
4 day.
5    Q. So how many people would do that on any
6 given day?
7    A. If I had to guess, half a dozen, if I had
8 to guess.
9    Q. Half a dozen employees pulled their
10 personal vehicles up the ramp every day?
11    A. Pretty much. I mean, they may not have
12 pulled -- three-quarters of the way up, halfway up,
13 almost up all the way. I mean, it was common
14 practice.
15    Q. But it was not permitted; isn't that right?
16    A. It was never enforced.
17    Q. But it was wrong to do?
18    A. No one ever told us it was.
19    Q. But I am asking you, was it wrong to do?
20    A. No.
21    Q. It wasn't wrong to do.
22        (Marked, Exhibit 56, First report of
23 injury or illness dated 7/25/03.)
24    Q. Do you recognize Exhibit 56?

219

1    A. (Witness reviews document.) Yes.
2    Q. What is it?
3    A. This is the individual I saw, upon being
4 discharged from Airborne, at the Holy Family
5 Hospital.
6    Q. This is a form, isn't that right, and it's
7 filled out by you?
8    A. Yes.
9    Q. If you look at the handwriting, all the
10 handwriting on this document is yours; isn't that
11 right?
12    A. No.
13    Q. What handwriting is not yours?
14    A. Just give me a second to review it, please.
15    Q. I'm just asking you about the handwriting.
16 I'm not asking you about the content.
17    A. I'm reviewing the handwriting, to be
18 honest.
19    Q. Let me ask you this: Look at the second
20 page. Did you write the portion on the second half
21 of the page, where you describe in detail how the
22 accident or incident occurred?
23    A. Yes.
24    Q. Can you look at the back page. Did you

220

1 also write that part?
2    A. (Witness reviews document.)
3    Q. Did you write that?
4    A. Yeah, under distress.
5    Q. You wrote this under distress?
6    A. The psychiatrist part.
7    Q. Okay. It says, "I apologized for pulling
8 up to the overhead door and admitted being wrong for
9 pulling up on ramp." Did I read that correctly?
10    A. I don't know. I was in a --
11    Q. Did I read that correctly?
12    A. You read it from those words, but --
13    Q. I read it from what you wrote, correct?
14    A. Yeah, you read what I have written.
15    Q. So you admitted being wrong for pulling up
16 on the ramp, right?
17    A. Well, that's how I wouldn't phrase it
18 after -- after realizing that it was common practice
19 all the time. I mean, I was in a hurry, and once
20 this all happened, I was in a state of a nervous
21 breakdown.
22    Q. It sounds like you're changing the subject,
23 Mr. Pizzuto. All I am asking is, did you admit that
24 you were wrong for pulling up on the ramp?

221

1    A. No.
2    Q. You never did that?
3    A. No.
4    Q. So why did you write in this statement that
5 you admitted being wrong for pulling up on the ramp?
6    A. Because I was in a state of a nervous
7 breakdown.
8    Q. When you are in a state of nervous
9 breakdown, you say things that are untrue?
10    A. I don't know. I don't remember -- I don't
11 recall anything I said.
12    Q. Okay. Did anybody ever accuse you of
13 attempting to run over a supervisor?
14    A. Yes, Joe Hamilton.
15    Q. When did he say that?
16    A. Upon entering the ramp, prior to punching
17 in, that day that we just wrote the diagram of the
18 building, of the ramp.
19    Q. Okay. When did Mr. Hamilton tell you that
20 you were being accused of trying to run over a
21 supervisor?
22    A. On July 25.
23    Q. Did you have a meeting with Mr. Hamilton
24 that day?

Paul Pizzuto
Volume 1 - June 12, 2007

57 (Pages 222 to 225)

222

1    A. Yes.
2    Q. Did he actually say to you that you tried
3 to run over a supervisor?
4    A. Yes.
5    Q. What did he say exactly?
6    A. He said that he was informed by Arthur
7 Leveris, who stated that I came up the ramp at a
8 high rate of speed and Arthur had to duck for cover,
9 thinking that I was going to hit him.
10    Q. When you pulled up the ramp, did you see
11 Mr. Leveris?
12    A. I never saw him.
13    Q. Did you see Mr. Sweatt?
14    A. I never saw him.
15    Q. Who did you see?
16    A. The guys having coffee and doughnuts.
17    Q. Who were they?
18    A. I don't know their names.
19    Q. Do you know anybody? Can you recall
20 anybody who was present who witnessed that?
21    A. No, no.
22    (Marked, Exhibit 57, Memo from G. Sweatt
23 to J. Hamilton dated 7/25/03.)
24    Q. Exhibit 57. Why don't you read that brief

223

1 document.
2    A. (Witness reviews document.) Okay.
3    Q. Do you own or did you own in 2003 a red
4 Volkswagen?
5    A. Yes.
6    Q. What kind of Volkswagen?
7    A. Jetta.
8    Q. Is there anything inaccurate about the
9 statement on Exhibit 57?
10    A. Other than -- everything but the red
11 Volkswagen.
12    Q. Everything's inaccurate except the red
13 Volkswagen?
14    A. That's correct.
15    Q. So you deny that Mr. Sweatt was even on the
16 dock?
17    A. Yes.
18    Q. You don't think he was there?
19    A. I don't know where he was.
20    Q. But you claim that he was not there at the
21 time.
22    A. He wasn't in my vision. I don't know where
23 he was.
24    Q. Were you having a nervous breakdown at the

224

1 time?
2    A. No, I was trying to make the time clock so
3 I could punch in on time so I wouldn't get a warning
4 letter for being late.
5    (Marked, Exhibit 58, Memo from A.
6 Leveris to J. Hamilton dated 7/25/03.)
7    Q. Exhibit 58. Mr. Pizzuto, I'd like you to
8 read this brief document.
9    A. (Witness reviews document.) Okay.
10    Q. Is there anything inaccurate about the
11 statement on Exhibit 58?
12    A. Everything other than I pulled up onto the
13 dock and punched in, and that's it.
14    Q. You don't know what Arthur Leveris told Joe
15 Hamilton about this incident, do you?
16    A. Only from what -- the statements I'm
17 reading here.
18    Q. And you don't know what Greg Sweatt told
19 Joe Hamilton, do you?
20    A. No, I don't.
21    Q. What happened next?
22    A. From that point I was -- I reported to my
23 workstation. I worked for approximately an hour and
24 a half. A casual approached my truck that they had

225

1 called in to do my route.
2    Q. I'm sorry?
3    A. Another employee, a casual, approached my
4 vehicle and told me I wasn't doing the route. And I
5 responded by saying, "What's up? How come?" He
6 said, "Oh, they want to see you in the office."
7 Another employee had to tell me that, by the way.
8 And also --
9    Q. Who was the employee?
10    A. I don't know. He was a casual. I have no
11 idea. They come and they go every day. They're
12 doing different routes and everything else. It
13 could have been a new hire. Anyways, I went into
14 the office, and Joe was in there, Arthur was in
15 there, myself, and --
16    Q. Joe who?
17    A. -- Jerry. Joe Hamilton, Arthur Leveris,
18 myself, and I believe it was Jerry Halloran. I'm
19 almost sure it was Jerry Halloran, those four.
20 Maybe Arthur wasn't in there. I'm not a hundred
21 percent sure on Arthur, but I know Joe Hamilton was
22 there, I was there, and Jerry was there.
23    Q. What happened at that meeting?
24    A. Once we sat down, Joe said he was informed

Paul Pizzuto
Volume 1 - June 12, 2007

58 (Pages 226 to 229)

226

1  that I tried to run over a couple of his supervisors
2  and he wanted to know what was going on with me; and
3  I explained to him, "Joe, the night before I was
4  supposed to be getting my pay for missing three days
5  on the negative tests; and when I come in, I'm told
6  that I can't have the money until you discipline me
7  first. And I was very upset with that situation, so
8  I left the building. When I come in this morning, I
9  punched in, I worked, and all of a sudden, someone's
10 doing my route, and you're calling me in to
11 discipline me again for whatever reasons."
12        And Joe said he had two warning letters,
13 he would like to give them to me. If I didn't want
14 to cooperate, he was going to fire me. And at that
15 time he still had another letter in his hand, and he
16 had the other two out on the table. And he had
17 already made the termination letter right out. I
18 saw it. It was right in my eyesight. And he said
19 to me, "You're going to be discharged for all the
20 reasons that have led up to this incident" and he
21 wasn't going to tolerate it anymore.
22        Q. What was he talking about, threatening
23 behavior?
24        A. Yeah, all that threatening behavior and

227

1  paranoia he said I had. And he escorted me to the
2  car along with two other guys, wouldn't allow me to
3  get my personal belongings in the truck, even though
4  I worked an hour and a half under my own power and
5  ability and didn't threaten anyone in any way for
6  that whole hour and a half. But his supervisor
7  thought I was going to shoot him coming up the ramp,
8  which made no sense to me. And I was escorted out
9  to the car, and I left quietly.
10        And then I went down 93, and I was
11 starting to experience a nervous breakdown. I drove
12 to Holy Family Hospital in Methuen, waited there for
13 a couple hours in the emergency room. And then they
14 sent me over to Greater Lawrence Mental Health,
15 where I was -- sat down in front of a counselor, and
16 they asked me what the heck was going on and
17 everything.
18        Q. Do you own a gun?
19        A. No, I have no weapons, sir.
20        Q. Did you tell Mr. -- strike that. Did
21 Mr. Hamilton ask you if you needed medical help?
22        A. After the fact he mentioned something, "We
23 can't help you anymore." And I said, "Joe, you're
24 not a doctor. Okay?" I says, "If you want to

228

1  terminate me, I'm going to go right to my doctor and
2  I'm going to explain the situation, what's going on
3  here. I can't handle this anymore, emotionally,
4  physically, I'm done, I'm spent." And I drove
5  myself to Holy Family.
6        Q. Did Joe Hamilton ask you if you needed
7  medical help?
8        A. No.
9        Q. Did he offer medical help?
10       A. Well, the way I was going to look at it --
11       Q. No. Did he offer medical help?
12       A. No, no.
13       Q. Did anybody from the union offer medical
14 help for you?
15       A. No.
16       Q. Did you refuse medical help?
17       A. No.
18       Q. Did you ask for medical help?
19       A. No.
20       Q. What were you going to have your doctor do?
21       A. Admit me somewhere.
22       Q. And were you going to go out on a leave?
23       A. I don't know. I was already terminated by
24 then.

229

1        Q. Did you say anything to Mr. Hamilton to the
2  effect that you would be going out from your job on
3  FMLA under stress?
4        A. I can't recall what I said. I was in such
5  an emotional state, I was probably having a
6  breakdown right there at the table with all three of
7  them -- all two of them.
8        Q. So that gets a little blurry for you?
9        A. It gets a lot blurrier as I left the
10 parking lot too.
11       Q. So you went down to Holy Family, and you
12 sat in the emergency room?
13       A. Yeah, I sat in the emergency room.
14       Q. Can you tell me what Exhibit 33 is?
15       A. (Witness reviews document.) Yeah, this is
16 the termination letter from Joe.
17       Q. Termination notice from Joe Hamilton?
18       A. Arthur Leveris, actually.
19       Q. Is it from Arthur?
20       A. Yeah, but Joe gave it to me. Arthur signed
21 it and Joe gave it to me.
22       Q. Do you know who made the decision to
23 terminate you?
24       A. Ultimately, I think it was Joe's because he

Paul Pizzuto
Volume 2 - June 20, 2007

8 (Pages 274 to 277)

274

1  for an individual, you need to experiment with
2  different medicines.
3      Q.  Is there any therapy aspect of the
4  treatment?
5      A.  No.
6      Q.  It's all medication?
7      A.  Right.  This is a lifetime thing, plus I do
8  talk to him regarding my condition on a daily basis,
9  how I am doing and everything.
10     Q.  Is that therapy or not?
11     A.  Yes.
12     Q.  So you have therapeutic sessions with Dr.
13 Sadowsky?
14     A.  Yes.
15     Q.  And how often are your therapeutic
16 sessions?
17     A.  Approximately once every month.
18     Q.  Have you had a monthly visit with Dr.
19 Sadowsky every month since your diagnosis of
20 bipolar?
21     A.  Yes.
22     Q.  Have you skipped any sessions with Dr.
23 Sadowsky?
24     A.  Just one.

275

1      Q.  When was that?
2      A.  This month.
3      Q.  Why did you skip the one this month?
4      A.  I just was forgetful, and I did not
5  remember the time of my visit.  I called the office,
6  and they rescheduled it for next month.
7      Q.  Next month you are going to go see Dr.
8  Sadowsky?
9      A.  Yes.
10     Q.  Can you please list for me all the
11 medications you have taken for your bipolar
12 disorder.
13     A.  Paxil.  I wasn't diagnosed with bipolar at
14 that time, but I was under Paxil with Dr. Chang.
15 Wellbutrin, Lamictal, lithium, those others I just
16 gave you a few questions ago.
17     Q.  The ones that we discussed at the very
18 beginning of the day?
19     A.  Yes, Lamictal, lithium, and Effexor.
20     Q.  Have these medications been effective in
21 controlling your bipolar disorder?
22     A.  At times.
23     Q.  And at times not?
24     A.  No, because in the manic state, the

276

1  manic-depressive state -- that's what the disease
2  does; it puts you in a high manic state or a low
3  depression state.
4      Q.  Is there anything -- forgive me for not
5  knowing this, but is there anything that causes one
6  to go from one state to the other?
7      A.  I don't know.  The disease is not --
8  there's no cure for the disease.  I'll be living
9  with this disease till the day I die.
10     Q.  Are you in a manic or depressive state or
11 in between at this point?
12     A.  I'm in between somewhere, yeah.
13     Q.  Closer to manic or closer to depressive
14 right now?
15     A.  I'm more on the high -- as far as
16 energy-wise, that's how I can tell I'm on a manic
17 state, so I'm leaning towards middle to
18 three-quarters right now.
19     Q.  Which way?
20     A.  To the high manic side.
21     Q.  To the manic?
22     A.  Yeah.
23     Q.  How does your bipolar disorder affect you?
24     A.  Lack of concentration, inability to cope,

277

1  forgetfulness.  Those are the main ones.
2      Q.  Anything else?
3      A.  Anxiety.
4      Q.  Anything else?
5      A.  Those are the main ones.  I really can't
6  recall any other ones at this time.
7      Q.  And when I ask you, how does the bipolar
8  affect you, I'm asking not just right now, but how
9  has the bipolar affected you for all time.  And what
10 I've heard so far is lack of concentration,
11 inability to cope, forgetfulness, anxiety.  Are
12 there any other ways in which your bipolar disorder
13 has affected you?
14     A.  Not being able to get sleep at night.
15     Q.  Anything else?
16     A.  No, I can't recall anything else at this
17 time.
18     Q.  Did your bipolar disorder prevent you from
19 doing any part of your job responsibilities when you
20 were employed by Airborne Express?
21     A.  Yes.
22     Q.  And what job responsibilities did your
23 bipolar disorder prevent you from doing while
24 employed at Airborne Express?

278

1    A. Sometimes correcting -- sometimes
2  remembering what freight I scanned or didn't scan.
3    Q. Anything else?
4    A. Gas cards leaving the building.
5    Q. Sorry. Gas cards leaving the building?
6    A. It's my job, yeah. I'm supposed to scan
7  the gas card before I leave. I forget. It's lack
8  of concentration, basically; and I forget, you know,
9  with the anxiety and inability to cope, and
10  depending on what I can physically do and what I
11  can't physically do, depending on my state of mind
12  with the bipolar, either being in a manic or
13  depressive state. It really isn't anything
14  specific; you know, it depends on a daily basis.
15    Q. Daily basis.
16    A. Yeah.
17    Q. I'm just trying to get a list of everything
18  that you were prevented from doing at work because
19  of your bipolar disorder. Do I have everything?
20    A. Basically, I went in and did my job every
21  day, I can tell you.
22    Q. Okay, but I just want to know -- you've
23  identified just a couple things. Your bipolar
24  disorder might have affected your ability to

279

1  remember freight and your ability to submit the gas
2  card?
3    A. Right.
4    Q. Is there anything else your bipolar
5  disorder prevented you from doing at work or
6  hindered you from doing at work?
7    A. No.
8    Q. Did you ever tell any of the defendants in
9  this case about your bipolar disorder?
10    A. I wasn't diagnosed at the time, but I was
11  being treated for depression, anxiety, and inability
12  to cope, lack of concentration. I was diagnosed
13  with sleep apnea. That affected my sleep. I was on
14  meds for that also.
15    Q. And what were the meds that you were on for
16  that?
17    A. Primidone. P-r-i-m-i-d-o-n-e, I believe it
18  is.
19    Q. I want to talk about that, because in your
20  interrogatory answers that you submitted under oath
21  in this case, you talked about -- you identified
22  certain disabilities -- anxiety and depression,
23  sleep apnea, insomnia, excessive snoring,
24  breathlessness, daytime sleepiness, tremors. Is it

280

1  true that those are all essentially symptoms of
2  bipolar disorder?
3    A. That's a doctor that can answer those. I
4  can't answer that.
5    Q. Right, but I'm asking you. You know what
6  your disabilities are, and you said you had two,
7  bipolar and this eye disease you have.
8    A. Right.
9    Q. And I'm saying --
10    A. If you want to consider sleep apnea, you
11  can put that down also.
12    Q. Okay. So sleep apnea might be a separate
13  one. So we have bipolar, we have the eye disease,
14  and we have the sleep apnea, right?
15    A. Yes.
16    Q. Okay. But anxiety and depression are
17  symptoms of the bipolar, so you are including those
18  when you are talking about bipolar, right?
19      MR. MULHEARN: Objection, I mean, to the
20  form of the question. You are asking a medical
21  opinion of a lay person.
22      MR. PERLMAN: Not really.
23      MR. MULHEARN: His belief or
24  understanding --

281

1      MR. PERLMAN: He's claiming certain
2  disabilities, and I am trying to figure out what the
3  disabilities are.
4    Q. You have named all your disabilities,
5  correct?
6    A. I don't diagnose my disabilities. The
7  doctors diagnose them. If you want a professional
8  opinion, you should ask a doctor.
9    Q. Yeah, I understand why you might say that
10  after hearing what your lawyer just said, but isn't
11  your claim in this case that you are disabled?
12      MR. MULHEARN: There's no need for that
13  comment. I think that's a valid objection. You are
14  asking for a medical opinion. It's obvious to
15  anybody.
16    Q. Can you answer the question?
17    A. I can't answer the question. My doctor can
18  answer. When you get him in here for a deposition,
19  he can thoroughly answer your questions.
20    Q. Are you disabled, sir?
21    A. In what terms?
22    Q. I don't know, in any terms.
23      MR. MULHEARN: Objection.
24    A. I'm collecting SSI.

Paul Pizzuto
Volume 2 - June 20, 2007

10 (Pages 282 to 285)

---

282

1    MR. MULHEARN: Asked and answered. You
2 asked him whether he had disabilities or not. He
3 named three. Why are you asking him again?
4    MR. PERLMAN: Now he's saying he has no
5 idea whether he has disabilities and that's for a
6 doctor to determine.
7    Q. So your testimony is you have no idea
8 whether you have disabilities?
9    A. I am currently collecting money on
10 disability from the government. Okay? That's all I
11 can tell you.
12    Q. Okay. That's all you can tell me?
13    A. (Witness nods.)
14    Q. Okay.
15    A. That has been diagnosed, yes.
16    Q. Who diagnosed your eye disease?
17    A. Give me a second to think of the name.
18 It's very difficult. (Pause.) I can't recall the
19 name, but it's the eye doctor in Andover, Mass.
20    Q. Who diagnosed your sleep apnea?
21    A. Dr. Sadrnoori, I believe it is. There's
22 some medical reports on that somewhere.
23    Q. Is it an Indian name?
24    A. I couldn't tell you.

---

283

1    Q. When did you first get diagnosed with sleep
2 apnea?
3    A. It's in my medical records. I don't know.
4    Q. Did you seek treatment for your sleep
5 apnea?
6    A. Yes.
7    Q. What was the treatment?
8    A. CPAP machine, CPAP. It's a machine I use
9 at night for breathing in order to allow the oxygen
10 to go through my airway, and I can breathe properly
11 at night. It's forced air. And I also had surgery,
12 a tonsillectomy, which was part of that. I also had
13 surgery for my throat. There was some type of scar
14 tissue in my airway, and I had to have all that
15 removed.
16    Q. That all happened after you were terminated
17 from Airborne Express?
18    A. No.
19    Q. The surgery happened after you were
20 terminated; isn't that correct?
21    A. I can't recall.
22    Q. How did your sleep apnea affect you?
23    A. Waking up constantly at night, being very
24 tired during the daytime because I wasn't sleeping

---

284

1 at night, which also affected my performance out
2 there as far as delivering freight on time.
3    Q. That's my next question. Did your sleep
4 apnea prevent you from doing any part of your job
5 responsibilities at Airborne?
6    A. I did it to the best of my capabilities
7 with my diagnosis.
8    Q. I understand, but what I am asking you is
9 whether or not your sleep apnea prevented you from
10 effectively performing any of your job duties.
11    A. No.
12    Q. Did you ever tell any of the defendants
13 about your sleep apnea?
14    A. Yes. It was on my DOT report.
15    Q. Is there any other way in which you told
16 the defendants about your sleep apnea?
17    A. That's the only one I think we have
18 paperwork on here today.
19    Q. Did you tell them verbally?
20    A. I can't recall.
21    Q. Did you ever tell any of the defendants --
22 strike that. Did you inform any of the defendants
23 about your bipolar disorder? I think I might have
24 asked you this before, but --

---

285

1    A. I can't recall.
2    Q. Did you ever tell any of the defendants
3 about the eye disease?
4    A. I can't recall that either.
5    MR. PERLMAN: I'm going to put the
6 exhibit sticker over a question about pregnancy. I
7 am assuming that's not an issue here.
8    THE WITNESS: I'd be a rich man if that
9 was the case.
10    MR. PERLMAN: That would be a different
11 case.
12    (Marked, Exhibit 68, Form for Airborne
13 re family medical leave.)
14    Q. I want you to look at what we have marked
15 as Exhibit 68. Can you tell me what this document
16 is, sir?
17    A. (Witness reviews document.) This is
18 Airborne's family medical leave paperwork that I
19 filled out in order to qualify for family leave.
20    Q. Did you fill this form out?
21    A. No.
22    Q. Do you know who did?
23    A. This was done by Dr. Chang.
24    Q. Did you sign this document?

---

Paul Pizzuto
Volume 2 - June 20, 2007

11 (Pages 286 to 289)

286

1    A. Yes.
2    Q. Did you look it over before you signed it?
3    A. Yes.
4    Q. I want you to look at the second and third
5  pages. Is that your signature on both of those two
6  pages?
7    A. Yes.
8    Q. And I just want to understand, this
9  handwriting is not yours in the -- if you look at
10  the first page, Section 2, 3, and 4?
11    A. That's the doctor's portion to fill out,
12  it's not mine.
13    Q. Right. But I am just asking you, is this
14  your handwriting?
15    A. No.
16    Q. Do you think it's Dr. Chang's handwriting?
17    A. I know it's his handwriting.
18    Q. If you look at the second page, "purpose of
19  leave," it says -- before we do, the date on this is
20  10/11/02; isn't that right?
21    A. Correct.
22    Q. Why was it that you were asking for a leave
23  of absence in October 2002?
24    A. Because I was in a state of mental

287

1  breakdown.
2    Q. And if you look at the second page and you
3  look in the "purpose of leave" section, you checked
4  the box "because of the employee's" -- the purpose
5  of the leave was "because of the employee's serious
6  health condition which makes the employee unable to
7  perform the functions of the employee's job"; is
8  that correct?
9    A. That's Dr. Chang's opinion.
10    Q. Is that your opinion as well?
11    A. Absolutely.
12    Q. What functions of your job were you unable
13  to perform because of your, quote-unquote, serious
14  health condition?
15    A. It wasn't even functioning in my job. I
16  couldn't get out of bed.
17    Q. Is that all?
18    A. Well, in order to get to work, yeah. I
19  couldn't do any -- I couldn't do any functions at
20  all at home. I was in a state of mental breakdown,
21  and I was trying to get through day to day with all
22  of these symptoms.
23    Q. Did those symptoms subside at some point?
24    A. Never.

288

1        (Marked, Exhibit 69, Request to extend
2  weekly disability benefits.)
3    Q. This is 69. Mr. Pizzuto, do you recognize
4  this document?
5    A. (Witness reviews document.) I do.
6    Q. What is it?
7    A. It's a document from the Teamsters or the
8  medical clinic that the Teamsters sent me to in
9  order to collect short-term disability.
10    Q. And this document speaks of an examination
11  on 12/17/02; is that correct?
12    A. What page are you looking at?
13    Q. This is the first page. If you look at
14  "date of current examination." It's about halfway
15  down.
16    A. Yes.
17    Q. Were you examined by a Dr. Sarjeant on or
18  about 12/17/02?
19    A. I saw him for a few sessions.
20    Q. It says, "Additional remarks: His ability
21  to drive is impaired due to his emotional problems."
22  Is that a correct statement?
23    A. Yes.
24    Q. Did you tell Dr. Sarjeant that you couldn't

289

1  drive because of your emotional problems?
2    A. Absolutely.
3        (Marked, Exhibit 70, Letter report from
4  Tom Sarjeant dated 4/25/03.)
5    Q. I have put in front of you Exhibit 70. Do
6  you know what this document is, sir?
7    A. (Witness reviews document.) This is Tom
8  Sarjeant's diagnosis.
9    Q. Have you seen this before?
10    A. No.
11    Q. This isn't in your files?
12    A. No.
13    Q. I want you to look at the section that says
14  "Medical History." It says, "Paul reports a long
15  history of problems with 'sleeping' and has been
16  diagnosed with sleep apnea. He notes that after he
17  does not sleep all night, he's completely fatigued
18  during the day, which he believes puts him at risk
19  as a driver." First of all, did I read that
20  correctly?
21    A. No.
22    Q. What did I miss?
23    A. "Puts him at risk as a driver." I do
24  recall telling him --

Paul Pizzuto
Volume 2 - June 20, 2007

12 (Pages 290 to 293)

290

1  Q. No, I'm just asking, did I read it
2  correctly?
3  A. Yes, that's what it says here.
4  Q. My next question is, did you tell the
5  doctor that you believed that your sleep apnea put
6  you at risk as a driver?
7  A. I didn't tell him it put me at risk, no.
8  Q. Did you tell him anything along those
9  lines?
10  A. No.
11  Q. Did you tell him that your sleep apnea
12  affected your work performance in any way?
13  A. As far as making service, yeah.
14  Q. What did you tell the doctor about that?
15  A. I told him I was sleeping at lunchtime,
16  setting my alarm on my cell phone in order to wake
17  up from the period of 30 minutes I was trying to
18  take a nap during lunch every day.
19  Q. I just want to talk to you briefly about
20  your family history of mental illness. And I
21  understand that your mom was bipolar?
22  A. Yes.
23  Q. And your brother who is no longer with us
24  was bipolar?

291

1  A. Yes.
2  Q. And you have another brother who has not
3  been diagnosed, but he may be bipolar; is that
4  right?
5  A. I don't know. He has to see a doctor, and
6  this is a doctor's opinion.
7  Q. Do you know of any other members of your
8  family who have suffered from mental illness?
9  A. Immediate?
10  Q. Sure, let's start with immediate.
11  A. Not immediate.
12  Q. How about your father?
13  A. No.
14  Q. Is your father still with us?
15  A. Yes.
16  Q. He does not suffer from any mental illness?
17  A. No.
18  Q. How about any aunts and uncles?
19  A. Yes.
20  Q. Can you tell me your aunt or uncle's
21  relation to you and whether or not they suffer from
22  any mental illness?
23  A. My mother's sister died of -- she was being
24  treated for bipolar also. She passed away.

292

1  Q. Anybody else?
2  A. I don't know if they were evaluated and
3  diagnosed. I don't have any professional opinion on
4  that, I couldn't tell you.
5  Q. Have you ever been treated for any sort of
6  delusional behavior?
7  A. No.
8  Q. Any schizophrenia?
9  A. No.
10  Q. Paranoia?
11  A. No.
12  Q. You have identified some disabilities that
13  you contend you have. How, if at all, were your
14  disabilities affecting you in July of 2003?
15  (Interruption.)
16  MR. PERLMAN: Excuse me.
17  A. Well, my disability itself, are you saying?
18  Q. Yes, sir.
19  A. Well, other than what I was diagnosed from
20  Dr. Chang, it clearly states I was under treatment
21  for apnea, anxiety, inability to cope, lack of
22  sleep, lack of concentration. It clearly states
23  that in all Dr. Chang's reports.
24  Q. I'm just asking you for your lay

293

1  perspective. How is it affecting you, just your
2  behavior and your activities?
3  A. Unless you really go through it and know
4  what the disease does to you, I can't explain it.
5  Q. Okay. Was it making you act any
6  differently than you ordinarily act?
7  A. This type of disease, like I told you
8  before, you're either in a manic state or a
9  depressive state; so if you want to know how I
10  acted, at times I couldn't get out of bed.
11  Q. I'm talking about July 2003.
12  A. You are asking about my disability,
13  correct?
14  Q. Yes. I'm asking how it affected you in
15  July 2003.
16  A. Lack of concentration, inability to cope,
17  anxiety, inability to sleep.
18  Q. When you say "inability to cope," what does
19  that mean?
20  A. Inability to cope with certain situations
21  that might arise.
22  Q. Can you be any more specific?
23  A. Not really.
24  Q. Did any situations arise that you were

Paul Pizzuto
Volume 2 - June 20, 2007

13 (Pages 294 to 297)

294

1  unable to cope with in July 2003?
2      A. All I can tell you is I tried to the best
3  of my ability with my condition.
4      Q. I'm asking you if any situations arose --
5      A. I can't recall.
6      Q. Did you ever ask Airborne or anybody at
7  Airborne for an accommodation for your disability?
8      A. When I went on family medical leave.
9      Q. And that was in October 2002?
10      A. Correct.
11      Q. And after that did you ever ask Airborne or
12  anybody at Airborne for an accommodation for your
13  disability?
14      A. I wasn't given the opportunity. I was
15  fired.
16      Q. But did you ever ask?
17      A. No.
18      Q. Is there any accommodation that Airborne
19  could have given you that would have enabled you to
20  do your job?
21      A. Yes. I could have went back on short-term
22  disability.
23      Q. How long would you have needed to go on
24  short-term disability?

295

1      A. I have no idea. That's a doctor's opinion.
2      Q. And would you have had to have gone on
3  short-term disability just that once, or could it
4  have been multiple times?
5      A. Again, that's a doctor's opinion.
6      Q. How would it have helped you to go on
7  short-term disability?
8      A. Number one, I wouldn't have got fired from
9  Airborne Express by Joe Hamilton when he knew in
10  fact that I had problems emotionally.
11      Q. Is there any other way that it would have
12  helped you to go on short-term disability in July
13  2003?
14      A. That's a doctor's opinion. I can't answer
15  that.
16      Q. In your complaint you state the reason that
17  you were terminated was that you invoked your rights
18  under the workers' comp law. Is that true?
19      A. Can you repeat the question.
20      Q. Sure. In your complaint you state the
21  reason you were terminated from Airborne was that
22  you invoked your rights under the workers' comp law.
23  Is that true?
24      A. I was terminated. Then I applied for

296

1  workmen's comp and Airborne denied it, yeah, yeah,
2  Airborne denied it.
3      Q. Right, but were you terminated because you
4  invoked your rights under the workers' comp law?
5      A. Well, they denied me to go on workmen's
6  comp, so I would say so. I filled out a report the
7  next day after I was fired, and they denied it,
8  which I have a copy of.
9      Q. But you had gone on workers' comp before
10  that, right?
11      A. Briefly, for periods of time when I was
12  injured, like every other driver that gets injured.
13  I believe if you get my reports from Airborne on
14  workmen's comp, you can review them, and I don't
15  believe I was out more than eight to ten weeks at a
16  time.
17      Q. I'm handing you Exhibit 47, which is the
18  complaint filed in this case; and I want you to look
19  at Paragraph 89. It says, "Airborne terminated and
20  otherwise discriminated against plaintiff because of
21  his assertion of rights under Massachusetts workers'
22  comp laws." Is that a true statement?
23      A. Can I just review it? (Witness reviews
24  document.) Correct, yes.

297

1      Q. Would you tell me what actions -- I'm just
2  looking for actions here -- that Joe Hamilton took
3  to discriminate against you.
4      A. He denied me my rights on an unlawful
5  termination --
6      Q. Anything else?
7      A. -- through a disability.
8      Q. Anything else?
9      A. That was the main one.
10      Q. Were there any other acts that Mr. Hamilton
11  took to discriminate against you?
12      A. Well, they are all in the warning letters
13  that he filled out over the years.
14      Q. Over the years?
15      A. Oh, yeah.
16      Q. Mr. Hamilton?
17      A. Mr. Hamilton has warning letters in my
18  personnel file at Airborne.
19      Q. Your testimony is that all of those warning
20  letters constitute disability discrimination?
21      A. No, not at all.
22      Q. Okay, I'm just asking you, what acts did
23  Mr. Hamilton do to discriminate against you? And
24  you've identified termination. Anything else that

Employee Name (Last, First, M.I.) PLEASE PRINT: _Pizzuto Paul_

Employee No.: _272 371_

Social Security No.: _0 3 2 1 5 8 1 4 8_

Employee Address: _59 Rollins St._  City: _Lawrence_  State: _ma_  Zip: _01841_

Patient's Name (if different from employee):

1. The information below describes what is meant by a "serious health condition" under the Family Medical Leave Act. Does the patient's condition[1] qualify under any of these categories described? If so, please check the applicable category.

1. ☐   2. ☒   3. ☐   4. ☐   5. ☐   6. ☐   None ☐

A "Serious Health Condition" means an illness, injury, impairment or physical or mental condition that involves one of the following:

1. HOSPITAL CARE    Inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity[2] or subsequent treatment in connection with or consequent to such inpatient care.

2. ABSENCE PLUS TREATMENT
(a) A period of incapacity[2] of more than three consecutive calendar days (including any subsequent treatment or period of incapacity[2] relating to the same condition), that involves:

(1) Treatment[3] two or more times by a health care provider, by a nurse or physicians's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

(2) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment[4] under the supervision of the health care provider.

3. PREGNANCY  Any period of incapacity[2] due to pregnancy, or for prenatal care.

4. CHRONIC CONDITIONS REQUIRING TREATMENTS
A chronic condition which:

(1) Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;
(2) Continues over an extended period of time (including recurring episodes of a single underlying condition)[2]; and
(3) May cause episodic rather than continuing period of incapacity[2] (e.g. asthma, diabetes, epilepsy, etc.).

5. PERMANENT/LONG-TERM CONDITIONS REQUIRING SUPERVISION
A period of incapacity[2] which is permanent or long term due to a condition for which treatment may not be effective. The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider. Examples include Alzheimer's, a severe stroke, or terminal states of a disease.

6. MULTIPLE TREATMENTS (Non-chronic Conditions)
Any period of absence to receive multiple treatments (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for restorative surgery after an accident or other injury, or for a condition that would likely result in a period of incapacity[2] of more than three consecutive calendar days in the absence of medical intervention or treatment such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), kidney disease (dialysis).

2. Describe the medical facts which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories: _Insomnia, Sleep apnea, Acid reflux, Anxiety disorder inability to cope, stress, tremor, poor concentration, lack medication to cope_

3. a. State the approximate date the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present incapacity[2] if different): _start to met of work 10/14/02 → approximately 4-6 week out_

b. Will it be necessary for the employee to take work only intermittently or to work on a less than full schedule as a result of the condition (including for treatment described in item 4 below)? _Out completely See Above_

c. If the condition is a chronic condition (condition #4) or pregnancy, state whether the patient is presently incapacitated and the likely duration and frequency of episodes of incapacity:

4. a. If additional treatments will be required for the condition, provide an estimate of the probable number of such treatments: _Will see specialist for sleep apnea_

If the patient will be absent from work or other daily activities because of treatment on an intermittent or part-time basis, also provide an estimate of the probable number and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery if any:

Salem Family Practice
7 Stiles Rd. Salem NH 03079

EXHIBIT
9

a regimen of continuing treatment by the patient is required under your supervision, provide a general description of such regimen (e.g., prescription drugs, physical therapy requiring special equipment).

5. a. If a medical leave is required for the employee's absence from work because of the employee's own condition (including absences due to pregnancy or a chronic condition), is the employee unable to perform work of any kind? *No work*

b. If able to perform some work, is the employee unable to perform any one or more of the essential functions of the employee's job (the employee or the employer should supply you with information about the essential job functions)?_____ If yes, please list the essential functions the employee is unable to perform:

*no work    see Abrn*

c. If neither a. nor b. applies, is it necessary for the employee to be absent from work for treatment? *yes*

6. a. If leave is required to care for a family member of the employee with a serious health condition, does the patient require assistance for basic medical or personal needs or safety, or for transportation?

*No work    See Abrn*

b. If no, would the employee's presence to provide psychological comfort be beneficial to the patient or assist in the patient's recovery?

c. If the patient will need care only intermittently or on a part-time basis, please indicate the probable duration of this need:

*Salem Family Practice*
*Salem NH 03079*
*7 Stiles Rd*

| X *[signature]* | *10/11/02* | Type of Practice |
|---|---|---|
| Signature of Health Care Provider | Date | *Fam. Practm* |

| Address *7 Stiles Rd  Salem  N.H.* | City, State, Zip | Phone ( *603* ) *858-4602* |

To be completed by the employee needing family leave to care for a family member

State the care you will provide and an estimate of the period during which care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:

X *[signature]*      *12/11/02*
Employee's Signature      Date

---

[1] Here and elsewhere on this form, the information sought relates only to the condition for which the employee is taking the FMLA leave.

[2] "Incapacity" for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment thereof, or recovery therefrom.

[3] Treatment includes examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examination, eye examination, or dental examination.

[4] A regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition. A regimen of treatment does not include the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider.

**Employee Information**

Family Medical Leave Re

| Employee Name (Last, First, M.I.) PLEASE PRINT | Employee No. | Social Security No. |
|---|---|---|
| IZZUTO, PAul . J | 272371 | 0 3 2 - 5 8 - 4 8 |

| Employee Address | | City | State | Zip |
|---|---|---|---|---|
| 59 Rollins ST. Lawrence | | | MA | 01841 |

Name of Person who completed form (if not the Employee)

## Purpose of Leave

Type of leave requested:  *Check all that apply*

☐ Paid vacation  ☐ Paid sick time  ☑ Unpaid family medical leave  ☐ Other type ___

Purpose of leave:  *Check all that apply*

☐ For the birth of a child or to care for the newly-born child

☐ To care for an immediate family member (spouse, child, or employee's parent) with a serious health condition

☑ Because of the employee's serious health condition which makes the employee unable to perform the functions of the employee's job

☐ Recreation or pleasure

☐ Other reason: ___

If the leave involves the serious health condition of the employee or the immediate family member, does the employee request intermittent leave or a reduced work schedule?

☐ No    ☑ Yes - If yes, explain why intermittent leave or a reduced work schedule is necessary, and the schedule for treatment:

| Anticipated Starting Date | Anticipated Ending Date | Todays Date | Was the employer notified about the leave at an earlier date? |
|---|---|---|---|
| 10, 14, 02 | / / | 10 / 11 / 02 | ☑ No    ☐ Yes, give date of earlier notification  / / |

Has 30 days advance notice been given?

☐ Yes    ☑ No - Give Explanation for delay in providing notice to employer:

Intention to return to work at Airborne (check one box)

☐ I will NOT be returning to work at Airborne.

☑ I may be unable to return to work at Airborne at the end of my leave, but I desire to return to work at a later date if possible.

☐ I intend to return to work at Airborne when my leave ends.

I certify that the above information is true and correct to the best of my knowledge. I understand that any intentional misrepresentation concerning the above facts can result in the termination of employment.

I have read and understand the Family Medical Leave Policy Outline (see reverse) and I agree to its terms and conditions

X ___  Date 10 | 11 | 02

Signature of Person who completed this form

*Salem Family Practice*
*7 Stiles Road*
*Salem, NH 03079*
*603-898-4000*

EXHIBIT
Pizzuto
49
JEC  6/12/07

To Whom It may Concern:

Mr. Paul Pizzuto is a patient well known to me. According to the history obtained from Mr. Pizzuto, he experienced months of emotional insults as a result of an injury he had at work. In spite of his injury he continued to work as long as he was able to the best of his ability. He is constantly under the fear of being terminated if he steps off line. However due to the advice of the specialist he took time out of work to recieve treatment and needed rest to recover from his injury. Unfortunately his manager made some unfounded charges against Paul and made the situation worse by placing Paul in a state of confusion for several months. His job status unstabled. During this period he suffered severe depression and developed many associated medically related illnesses.

I saw Paul on 10/11/02 in a state of mental breakdown along with many other medical problems. Fortunately we were able help him through this with the help of several specialists and extensive diagnostic studies.

Please consider these facts and I can attest that Mr Pizzuto to be a hard working, honest individual

4/24/03

Exhibit 10

P 00169

To : STeve Crosskens                    10/21/02
FR : PAUl PizzuTo
RE : Workmans Comp ; FMLA

**EXHIBIT**
Hamilton
36
6-5-07

Please see enclosed copies for necessary Leave and workmans Comp info I also would like the form for Airbornes weekly reimbursement for workmans Comp. in order that I may process for benefits thru Airborne.

Thank You

PAul PizzuTo

Send form to

PAul PizzuTo
59 Rollins ST
Lawrence Ma 01841

Exhibit 1J

MEMORY TRANSMISSION REPORT

```
                                    TIME       : OCT-21-2002  01:05PM
                                    TEL NUMBER : +1-781-279-4619
                                    NAME       : AIRBORNE EXPRESS
```

| | | |
|---|---|---|
| FILE NUMBER | : | 106 |
| DATE | : | OCT-21 01:04PM |
| TO | : | 12062818967 |
| DOCUMENT PAGES | : | 003 |
| START TIME | : | OCT-21 01:04PM |
| END TIME | : | OCT-21 01:05PM |
| SENT PAGES | : | 003 |
| STATUS | : | OK |

FILE NUMBER    : 106         *** SUCCESSFUL TX NOTICE ***

**AIRBORNE EXPRESS**

3101 Western Avenue Seattle, WA 98111-0662

October 11, 2002

Paul J. Pizzuto
59 Rollins St.
Lawrence MA  01841

Dear Mr. Pizzuto:

*Please fax for information additional information*

In order to properly assess your Family Medical Leave (FML)
request, Page two (2) of the Certificate of Health Care
Provider form needs to be completed.

Page one (1) requires that your attending health care
Provider complete the following:

Section 3.c:  This section was left blank.

I have enclosed page (two) 2 of the Health Care Provider
form. I have also enclosed the Family Medical Leave Act
Policy Outline for you to read and sign and return along
with the completed Medical Certification.

If you expect to be absent from work, arrangements should be
made for Airborne Express Management to receive this
documentation.

If you have any questions regarding this request, please
feel free to contact me at (800)426-4343 ext. 2289.

Sincerely,

M. Jill Parker
Labor Relations            FAX # (206) 281-896?

Enclosures:    FMLA POLICY Outline
               Certificate of Health Care Provider form
               (original)
               Certificate of Health Care Provider form
               (Page 2)

Cc:  Steven Crosskan



**AIRBORNE EXPRESS**

3101 Western Avenue Seattle, WA 98111-0662

October 11, 2002

*Please fat information additional*

Paul J. Pizzuto
59 Rollins St.
Lawrence MA  01841

Dear Mr. Pizzuto:

In order to properly assess your Family Medical Leave (FML) request, page two (2) of the Certificate of Health Care Provider Form needs to be completed.

Page one (1) requires that your attending health care provider complete the following:

Section 3.c₁     This section was left blank.

I have enclosed page (two) 2 of the Health Care Provider form. I have also enclosed the Family Medical Leave Act Policy Outline for you to read and sign and return along with the completed Medical Certification.

If you expect to be absent from work, arrangements should be made for Airborne Express Management to receive this documentation.

If you have any questions regarding this request, please feel free to contact me at (800)426-4343 ext. 2289.

Sincerely,

M. Jill Parker
Labor Relations

*FAx # (206) 281-8967*

Enclosures:     FMLA Policy Outline
                Certificate of Health Care Provider form (original)
                Certificate of Health Care Provider form (page 2)

Cc:  Steven Crossken

-FAMILY MEDICAL LEAVE POLICY OUTLINE-
SEPTEMBER, 2002

The Family Medical Leave Act (FMLA) requires covered employers to provide up to twelve weeks of unpaid, job protected leave to "eligible" employees for certain family and medical reasons. Employees are eligible if they have worked for Airborne Express for at least one (1) year, and for 1,250 hours over the previous twelve (12) months, and if there are at least fifty (50) employees within seventy-five (75) miles.

**REASONS FOR TAKING LEAVE:**  Unpaid leave must be granted for any of the following reasons:

- to care for the employee's child after birth, or placement for adoption or foster care;
- to care for the employee's spouse, son or daughter, or parent, who has a serious health condition; or
- for a serious health condition that makes the employee unable to perform the employee's job.

At the employee's or employer's option, certain kinds of paid leave may be substituted for unpaid leave.

**ADVANCE NOTICE AND MEDICAL CERTIFICATION:**  The employee may be required to provide advance leave notice and medical certification. Take of leave may be denied if requirements are not met.

- The employee ordinarily must provide thirty (30) days advance notice when the leave is "foreseeable."
- An employer may require medical certification to support a request for leave because of a serious health condition, and may require second or third opinions (at the employer's expense) and a fitness for duty report to return to work.

**JOB BENEFITS AND PROTECTION:**

- For the duration of the FML, the employer must maintain the employee's health coverage under any "group health plan."
- Upon return from FML, employees must be restored to their original or equivalent positions with equivalent pay, benefits and other employment terms.
- The use of the FML cannot result in the loss of any employment benefits that accrued prior to the start of an employee's leave.

AIRBORNE'S POLICY

Under our policy, leaves of absence that qualify for family medical leave under state or federal law run at the same time as other types of leave, such as workers compensation leave, leave for a non-industrial injury or illness (including paid leave such as sick leave), leave for drug rehabilitation, leave as a reasonable accommodation for a qualified individual with a disability, including pregnancy and post-delivery recovery, and paid vacation used for a family-leave qualifying reason.

Leave that qualifies as family medical leave will be counted against the employee's annual **12-week** family leave entitlement.

A *FML* may be requested by completing a FML Certification of Health Care Provider form and submitting it to Labor Relations. Airborne requires thirty (30) calendar days notice before the leave may commence unless the reason for the leave is not foreseeable. The Certification of Health Care Provider must be returned within fifteen (15) calendar days, or we may delay the commencement of your leave until the certification is submitted. If you fail to return the medical certification within fifteen (15) calendar days, all absences occurring during this period may be counted under the attendance policy.

Airborne uses the "rolling year" method for FML eligibility calculations. A rolling 12-month period is measured backward in time from the date an employee uses any FMLA leave.

When on FML, employees may elect or Airborne will require the use of accrued benefits based on the following leaves:

1. **birth/adoption/foster child:** may elect to use vacation and sick leave hours; will be required to use personal days.
2. **family illness of parent or spouse:** will be required to use sick leave, vacation and/or personal days.
3. **serious health condition of self/child:** will be required to use sick leave, vacation, and personal days.

The length of any approved unpaid FML shall be reduced by the number of paid days elected or required. Additional conditions and/or limitations may also apply based on the terms of your collective bargaining agreement. For additional information contact Labor Relations.

---

### ACKNOWLEDGEMENT STATEMENT

I acknowledge receipt of the Family Medical Leave Act (FMLA) Policy Outline and Airborne's Policy on Family Medical Leave.

I acknowledge that I have read and understand the Family Medical Leave Act(FMLA) Policy Outline and Airborne's Policy on Family Medical Leave.

If I have any further questions regarding my FML I am to contact the Labor Relations department in the G.O.

X _____        Date: _____
   Employee's Signature

TO BE SUBMITTED ALONG WITH THE
CERTIFICATE OF HEALTH
CARE PROVIDER FORM

## Employee Information

**Family Medical Leave Rec**

Employee Name (Last, First, M.I.)   PLEASE PRINT
PIZZULO, PAUl . J

Employee No.
272371

Social Security No.
0 3 2 - 5 8 - 4 2 8

Employee Address
59 Rollins ST. Lawrence

City

State
Mᴀ

Zip
01841

Name of Person who completed form (if not the Employee)

## Purpose of Leave

Type of leave requested:   *Check all that apply*

☐ Paid vacation          ☐ Paid sick time          ☑ Unpaid family medical leave          ☐ Other type _____

Purpose of leave:   *Check all that apply*

☐ For the birth of a child or to care for the newly-born child

☐ To care for an immediate family member (spouse, child, or employee's parent) with a serious health condition

☑ Because of the employee's serious health condition which makes the employee unable to perform the functions of the employee's job

☐ Recreation or pleasure

☐ Other reason: _____

If the leave involves the serious health condition of the employee or the immediate family member, does the employee request intermittent leave or a reduced work schedule?

☐ No     ☑ Yes - If yes, explain why intermittent leave or a reduced work schedule is necessary, and the schedule for treatment:

Anticipated Starting Date
10, 14 , 0 2

Anticipated Ending Date
/ , /

Today's Date
10, 11 , 02

Was the employer notified about the leave at an earlier date?
☑ No     ☐ Yes, give date of earlier notification     / , /

Has 30 days advance notice been given?
☐ Yes     ☑ No - Give Explanation for delay in providing notice to employer:

Intention to return to work at Airborne (check one box)

☐ I will NOT be returning to work at Airborne.

☑ I may be unable to return to work at Airborne at the end of my leave, but I desire to return to work at a later date if possible.

☐ I intend to return to work at Airborne when my leave ends.

I certify that the above information is true and correct to the best of my knowledge. I understand that any intentional misrepresentation concerning the above facts can result in the termination of employment.

I have read and understand the Family Medical Leave Policy Outline (see reverse) and I agree to its terms and conditions.

X _____          10 11 02

Signature of Person who completed this form          Date

OCT-11-2002  13:37        ABX                    978 664 3897   P.02/02

Employee's Name (Last, First, M.I.)        PLEASE PRINT
PIZZATO  Paul                 572 371      0 3-2,-5 8,-4 8 8 3

Employee Address                           City         State   Zip
59  Rollins ST.  Lawrence                  ma           01841

Patient's Name (if different from employee)

1. The information below describes what is meant by a "serious health condition" under the Family Medical Leave Act. Does the patient's condition quality under any of these categories described? If so, please check the applicable category.

    1.☐  2.☒  3.☐  4.☐  5.☐  6.☐   None ☐

A "Serious Health Condition" means an illness, injury, impairment or physical or mental condition that involves one of the following:

1. HOSPITAL CARE   Inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity² or subsequent treatment in connection with or consequent to such inpatient care.

2. ABSENCE PLUS TREATMENT
    (a) A period of incapacity² of more than three consecutive calendar days (including any subsequent treatment or period of incapacity² relating to the same condition), that involves:

        (1) Treatment² two or more times by a health care provider, by a nurse or physicians's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

        (2) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment⁴ under the supervision of the health care provider.
3. PREGNANCY  Any period of incapacity² due to pregnancy, or for prenatal care.
4. CHRONIC CONDITIONS REQUIRING TREATMENTS
    A chronic condition which:
        (1) Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;
        (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
        (3) May cause episodic rather than continuing period of incapacity² (e.g. asthma, diabetes, epilepsy, etc.).

5. PERMANENT/LONG-TERM CONDITIONS REQUIRING SUPERVISION
    A period of incapacity² which is permanent or long term due to a condition for which treatment may not be effective. The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider. Examples include Alzheimer's, a severe stroke, or terminal stages of a disease.

6. MULTIPLE TREATMENTS (Non-chronic Conditions)
    Any period of absence to receive multiple treatments (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by a health care provider, either for restorative surgery after an accident or other injury, or for a condition that would likely result in a period of incapacity² of more than three consecutive calendar days in the absence of medical intervention or treatment such as cancer (chemotherapy, radiation, etc., severe arthritis (physical therapy), kidney disease (dialysis).

2. Describe the medical facts which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories:  Insomnia, Sleep apnea, Acid reflux, Anxiety disorder is difib to cope. stress tremor, poor uncontrolled  lack medication to cope

3. a. State the approximate date the condition commenced, and the probable duration of the patient's present incapacity² if different:  start to out of work 10/14/02 → approximately 4-6 work out

b. Will it be necessary for the employee to take work only intermittently or to work on a less than full schedule as a result of the condition (including for treatment described in item x below)?  out completely   see Above

c. If the condition is a chronic condition (condition ℓℓ) or pregnancy, state whether the patient is presently incapacitated and the likely duration and frequency of episodes of incapacity:

4. a. If additional treatments will be required for the condition, provide an estimate of the probable number of such treatments:  will see Specialist for sleep apnea

If the patient will be absent from work or other daily activities because of treatment on an intermittent or part-time basis, also provide an estimate of the probable number and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery if any:

Salem Family Practice
7 Stiles Rd. Salem, NH 09079

OCT 11 '02 13:32             978 664 3897        TOTAL P.02
                                                 PAGE.02

_[form header partially illegible]_

_If a regimen of continuing treatment by the patient is required under your supervision, provide a general description of such regimen (e.g. prescription drugs, physical therapy requiring special equipment):_

_[handwritten, illegible]_

**5. a.** If a medical leave is required for the employee's absence from work because of the employee's own condition (including absences due to pregnancy or a chronic condition), is the employee unable to perform work of any kind?

_No work_

**b.** If able to perform some work, is the employee unable to perform any one or more of the essential functions of the employee's job (the employee or the employer should supply you with information about the essential job functions)?_____ If yes, please list the essential functions the employee is unable to perform:

_No work    See Abov_

**c.** If neither a. nor b. applies, is it necessary for the employee to be absent from work for treatment? _yes_

**6. a.** If leave is required to care for a family member of the employee with a serious health condition, does the patient require assistance for basic medical or personal needs or safety, or for transportation?

_No work    See Abov_

**b.** If no, would the employee's presence to provide psychological comfort be beneficial to the patient or assist in the patient's recovery?

**c.** If the patient will need care only intermittently or on a part-time basis, please indicate the probable duration of this need:

_Salem Family Practice_
_7 Stiles road Salem NH 03079_

| | | |
|---|---|---|
| x _[signature]_ | _10/11/02_ | Type of Practice |
| Signature of Health Care Provider | Date | _Fam. Practice_ |
| Address _7 Stiles Rd   Salem   NH._ | City, State, Zip | Phone ( 603 ) 858-____ |

### To be completed by the employee needing family leave to care for a family member

State the care you will provide and an estimate of the period during which care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:

x _[signature]_          _10/11/02_
Employee's Signature          Date

---

[1] Here and elsewhere on this form, the information sought relates only to the condition for which the employee is taking the FMLA leave.

[2] "Incapacity" for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment thereof, or recovery therefrom.

[3] Treatment includes examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examination, eye examination, or dental examination.

[4] A regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition. A regimen of treatment does not include the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider.

Page 3

| 1 | I N D E X |
| 2 | |
| 3 | Deposition of:          Pages |
| 4 | |
| | Arthur J. Leveris |
| 5 | |
| | By Mr. Mulhearn                4 |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| | E X H I B I T S |
| 10 | |
| 11 | No. Description          Page |
| 12 | |
| | 40  Arthur J. Leveris, Jr. Resume     4 |
| 13 | |
| | 41  Hand-Drawn Rough-Sketch Diagram    26 |
| 14 | |
| 15 | |
| 16 | ** EXHIBITS RETAINED BY COUNSEL ** |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Pages:  1 - 50
Exhibits:  40 - 41

UNITED STATES DISTRICT COURT
DISTRICT OF MAASSACHUSETTS
C.A. NO. 04-12492GAO

PAUL PIZZUTO,                )
        Plaintiff,        )
                         )
                         )
    v.                   )
                         )
                         )
AIRBORNE EXPRESS, INC.,      )
et al.,                  )
        Defendants.       )

    DEPOSITION OF ARTHUR J. LEVERIS, called as
a Witness by Counsel for the Plaintiff, pursuant to
the applicable provisions of the Massachusetts Rules
of Civil Procedure, before Ann M. Lavoie, Court
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, taken at Law Office
of Richard A. Mulhearn, 41 Elm Street, Worcester,
Massachusetts 01609, on Tuesday, June 5, 2007,
commencing at 1:35 p.m.

************************

FLYNN REPORTING ASSOCIATES
Professional Court Reporters
One Exchange Place
Worcester, Massachusetts 01608
(508) 755-1303 * (617) 536-2727
TOLL FREE: (888) 244-8858
FAX: (508) 752-4611
************************

Page 2

1    A P P E A R A N C E S
2
3
LAW OFFICES OF RICHARD A. MULHEARN
4  By:  Richard A. Mulhearn, Esq
        41 Elm Street
5      Worcester, Massachusetts 01609
        508-753-9999
6
7      Appearing for the Plaintiff
8
9
SULLIVAN WEINSTEIN & MCQUAY, P.C.
10  By:  C. Max Perlman, Esq.
        Two Park Plaza
11      Boston, Massachusetts 02116
        617-348-4300
12
13      Appearing for the Defendants
14
15
16
17
18
19
20
21      Exhibit 12
22
23
24

Page 4

1      S T I P U L A T I O N S
2
3          It is stipulated by and between
4  counsel for the respective parties that the
5  deposition transcript will be read and signed by the
6  deponent within thirty (30) days of receipt of the
7  transcript under the pains and penalties of perjury.
8  The filing and notary is hereby waived.
9          It is further agreed that any
10  objection, except as to the form of the question,
11  and motions to strike are reserved until the time of
12  trial.
13          (Exhibit No. 40, Arthur J.
14  Leveris, Resume, marked for identification.)
15
16          Arthur J. Leveris, having been
17  satisfactorily identified and duly sworn by the
18  Notary Public, was examined and testified as
19  follows:
20
21  EXAMINATION
22  BY MR. MULHEARN:
23      Q.  State your full name for the record,
24  please?

Page 9

1 manager, the station manager.

2 So when I first arrived it would have been

3 Mike Trudeau and then Steve Crosscken and then, while

4 I was the station manager, I reported directly to

5 Joe Hamilton.

6 Q. Previous to you Trudeau had been the

7 station manager?

8 A. Correct.

9 Q. Did you jump over him in the chain?

10 A. Yes.

11 Q. Afterwards he now reported to you?

12 A. Correct.

13 Q. In the course of those two years, 2002,

14 2003 -- those are the years I'll be asking you about

15 here -- were you familiar with Paul Pizzuto?

16 A. Yes. Absolutely.

17 I don't know -- I know he was out on

18 worker's comp when I first got there, I believe, so

19 I'm not sure when I met him.

20 But, yes, I know exactly who Paul Pizzuto

21 is.

22 Q. Did you come to Stoneham in the middle of

23 the year, middle, end?

24 A. Well, I was station manager at the World

Page 10

1 Trade Center facility during 911.

2 I left there after about a month going back

3 into the city, went to New Jersey for about six or

4 seven months after that.

5 So 2002 -- probably around June or July of

6 2002 I was in the north shore facility.

7 Q. As of mid-year 2002?

8 A. Yeah.

9 Q. He was off on some sort of comp injury for

10 a calf injury; is that so?

11 A. No. I don't recall that.

12 Q. When you came into the facility he was out

13 on comp; is that right?

14 A. I think so. I'm not 100 percent sure.

15 Q. Is it fair to say that --

16 A. Do we know what dates he was out?

17 Q. Let's jump into Exhibit 2.

18 MR. PERLMAN: The original for

19 Exhibit 1 seems to be missing.

20 Q. (By Mr. Mulhearn) I've shown you Exhibit 2.

21 What it is is a Disciplinary Action Log that's been

22 identified previously. This has to do with Paul

23 Pizzuto.

24 Have you seen something like this before,

Page 11

1 this kind of a log?

2 A. Yes.

3 Q. Does looking at it give you some idea as to

4 your first interaction with Mr. Pizzuto?

5 A. The only thing that stands out is --

6 Looking at this do I know when my first interaction

7 with Mr. Pizzuto is?

8 Q. Yes.

9 A. No.

10 Q. Do you know if you were there at Stoneham

11 when he was discharged, in 2002, for sleeping on the

12 premises?

13 MR. PERLMAN: Objection. You can

14 answer.

15 A. I don't think so. I'm not sure if I was.

16 Q. Do you remember learning that at some point

17 that he had been discharged by Crossken for sleeping

18 while on light duty, while on the premises, that was

19 grieved and was reduced to a suspension?

20 MR. PERLMAN: Objection. You can

21 answer.

22 A. Yes.

23 Q. That may have been before you arrived?

24 A. Correct. I'm not 100 percent sure.

Page 12

1 Q. If you look at this exhibit, there's some

2 other disciplines being given in August and

3 September 2002.

4 Did you play any part in any of those

5 disciplines, as far as you remember?

6 A. I would have to say, yes.

7 Q. At some point, approximately October 2002,

8 is it fair to say that he went off on a worker's

9 compensation leave or at least a medical leave?

10 MR. PERLMAN: Objection.

11 A. You know, there's a bunch of -- there's 130

12 employees there. Each employee has things that --

13 their family medical leave.

14 It's hard to recall exactly if -- I can't

15 answer 100 percent sure that I recall he was out on

16 medical leave.

17 Q. Let me show you -- can you get Exhibit No.

18 36 out in front of you?

19 Have you looked at it already, generally?

20 A. It's right here. I've just looked at it.

21 Q. Is it fair to say that by October 21, 2002

22 you were directly reporting to Steve Crossken?

23 A. No. I didn't report -- Joe Hamilton

24 promoted me, so it wasn't until after Steve left

794efc95-b3ba-4f67-8a44-dcdd99bee647

Page 13

1  that I was station manager.
2      Q.  The documentation that's provided as part
3  of Exhibit 36, this FMLA information, was that
4  something that you ever saw?
5      A.  Yes.
6      Q.  When did you see that, approximately?
7      A.  I see FMLA forms every single day as a
8  manager.
9      Do I specifically recall this one?
10     No.
11     Q.  Part of the process at least was that the
12  FMLA paperwork would go through the manager;
13  correct?
14     A.  At one point -- at some point we didn't
15  have anything to do with it.  It went directly to
16  the general office.
17     We can't approve or deny FMLA.  It's a
18  federal act.  We have nothing to do with it.
19     Were we aware of folks on FMLA?
20     Sure.
21     Q.  This kind of paperwork might be something
22  that would cross your desk as a manager?
23     MR. PERLMAN:  Objection.
24     A.  No.  It would have crossed -- it wouldn't

Page 14

1  have crossed my desk.  It would have crossed Steve's
2  desk, if it crossed at all.
3      Q.  Does this refresh your recollection at all
4  about Pizzuto going off on a family medical leave in
5  October of 2002?
6      A.  It's right in front of me but not really.
7      Q.  Would it refresh your recollection at all
8  if I was to suggest to you he was off on a family
9  leave from October 2002 until the end of February
10  2003?
11     Does that sound familiar?
12     MR. PERLMAN:  Objection.  Isn't
13  this a matter of record.  I don't know if Art's
14  testimony on this is -- you can do what you want.
15  I'm not sure he's going to help on this.
16     MR. MULHEARN:  It may not be an
17  earth shattering revelation.
18     MR. PERLMAN:  It doesn't sound
19  like he has any prior knowledge on the topic.
20     A.  I don't.
21     Q.  Do you recall that Mr. Pizzuto was
22  terminated in July of 2003?
23     A.  Yes.
24     Q.  Having to do with threats and his conduct

Page 15

1  and so forth?
2      A.  Yes.
3      Q.  Do you remember being aware at any time
4  before he was let go, in July of 2003, that he had
5  been off on a leave for some mental condition, like
6  stress or something like that, earlier that year?
7      MR. PERLMAN:  Objection.  You can
8  answer, if you can.
9      A.  Do I recall him being out?
10     Can you repeat that?
11     Q.  At any time before he was fired, in July
12  2003, were you aware from any source that he had
13  been out previously, like earlier that year, on a
14  mental health stress leave?
15     MR. PERLMAN:  Objection.
16     A.  When an employee returns to work, you
17  notice -- it's a new employee that you haven't met
18  before, so you knew they were out for a reason.
19     Do I know specifically why he was out?
20     No.
21     Q.  Did you have any idea that he had been
22  treating for mental health issues?
23     A.  No.  Other than the statements he would
24  say, i.e., I'm on my medication, just make remarks

Page 16

1  like, I'm nuts.  I'm taking my meds like I'm
2  supposed to.  That's the only thing that I knew from
3  his own mouth.
4      Q.  He said those things to you?
5      A.  He was saying them out loud.  Sure.
6      Q.  Do you remember the circumstances of that
7  interaction for him to say that?
8      A.  No.
9      Q.  What was your opinion of him during that
10  time?
11     MR. PERLMAN:  Objection.
12     A.  My opinion?
13     Does my opinion matter?
14     Q.  It does here.
15     MR. PERLMAN:  That's debatable.  I
16  object because the question is not clear.
17     A.  My opinion is he was -- he would make odd
18  remarks.  He would say, You guys are going to get
19  yours.  You're going to get it.
20     So my opinion is he had some stress issues
21  in his life.
22     Q.  Would you agree that he appeared not to be
23  right mentally?
24     MR. PERLMAN:  Objection.

794efc95-b3ba-4f67-8a44-dcdd99bee647

Page 25

1  dock.
2       They would drive up in the parking lot and
3  punch in because there's no parking spaces available
4  and then go find a parking space down the street.
5       Q. This ramp; I haven't seen it. I don't
6  know.
7       How long is it approximately?
8       A. 30 yards, 25 yards.
9       Q. There's a parking area at the bottom where
10 people --
11      A. There's a parking lot there. This entire
12 area out here, down to here, is all parking.
13      There's a street right up here where people
14 park on the side of the street.
15      Q. Your experience is that employees, if they
16 were going to punch in like that, would park their
17 car down by the lot area and then walk up the ramp
18 and punch in?
19      A. They'd park near the parking lot, and then
20 they'd walk up, punch in, get in their car and find
21 a spot.
22      Q. They wouldn't drive their car up the ramp?
23      A. No.
24      Q. In this particular case, what did Mr.

Page 26

1  Pizzuto do after he drove up the ramp?
2       A. What did he do?
3       Q. What did he do?
4       A. He drove up onto the dock. That's where
5  things -- you know, my first thought was to get out
6  of there for my own safety to be honest with you.
7       I know he punched in. Then he sped off in
8  reverse.
9       Q. Did he peel out in reverse or just back up
10 quickly?
11      A. I want to say he peeled out, but that's
12 not -- I mean, I'm pretty sure he did. I'm not 100
13 percent.
14      Q. Did you stay in that location from the time
15 that he pulled in or pulled up, got out of the car,
16 punched in, came back?
17      Did you stay in the same place?
18      A. Probably not. I was always moving around.
19      Q. Was there anyone else there with you?
20      A. I believe Greg Sweatt was right there. Tim
21 Carter was there.
22      I'm not sure if Mike Trudeau was.
23           (Exhibit No. 41, Hand-Drawn
24 Rough-Sketch Diagram, marked for identification.)

Page 27

1       Q. (By Mr. Mulhearn) I've just marked as
2  Exhibit 41, a rough sketch that you've done.
3       You say these other supervisors, Carter,
4  Trudeau, and Sweatt, were in the vicinity when this
5  happened?
6       A. Correct.
7       Q. Did any of them have the same reaction that
8  you did?
9       A. Absolutely.
10      Q. Collectively, all of you?
11           MR. PERLMAN: Objection.
12      A. Collectively?
13      I don't know about collectively.
14      There were -- as a manager, they sent
15 emails in of what they witnessed that day.
16      Q. Was anyone as close to Pizzuto's car as you
17 were?
18      A. I don't know. I don't know.
19      Q. The next question is: How close do you
20 think was the closest he ever came to you?
21      A. When he drove up onto the dock?
22      Q. Yes.
23      A. Probably 10, 15 feet.
24      Q. Did you actually physically react -- I

Page 28

1  assume you didn't dive for cover, but did you walk
2  or move away from the area?
3       A. I was in a position where there were
4  trailers there. So my thought was, What vehicle can
5  I jump in and get the heck out of there, because I
6  was in a bad location to try to get out of there.
7       I didn't know if I needed to -- I didn't
8  know what to do.
9       Q. You were looking for an escape route,
10 basically?
11      A. Absolutely.
12      Q. Did you see any of the other supervisors
13 act likewise?
14      A. Don't recall.
15      Q. You wrote up a statement about this event;
16 correct?
17      A. Yeah. It was common practice if there was
18 any type of thing out of the ordinary that we would
19 write statements.
20           MR. PERLMAN: He'll show you what
21 to look at.
22      Q. (By Mr. Mulhearn) Can you tell us what
23 No. 4 is, what this document is?
24           MR. PERLMAN: Again, just for the

794efc95-b3ba-4f67-8a44-dcdd99bee647

Page 41

1  ridiculous statements to you?
2      A. Absolutely.
3      Q. Mixed in there you got things like, Have
4  you seen someone die?
5      Is that fair to say that there's a mix of
6  things that are being uttered?
7          MR. PERLMAN: Objection.
8      A. Sure.
9      Q. Some more alarming than others; would you
10 agree?
11     A. I would say they're all pretty alarming.
12     Q. The idea of the "feds are on it now."
13     A. Uh-huh.
14     Q. Does that seem ridiculous babbling?
15         MR. PERLMAN: Objection.
16     A. No.
17     When I say, no, "Feds are on it now," I
18 mean this history that, you know, the feds are in
19 the union environment isn't -- is commonly used.
20     I think that President Cashman was involved
21 in a federal trial and ended up doing a couple of
22 years for racketeering.
23     The comments don't alarm me. I think that
24 -- when I say, The comments don't alarm me, they are

Page 42

1  alarming but "the Feds are on it now," no, that
2  doesn't seem out of the ordinary.
3      Q. We got video?
4      A. That's just -- that's crazy.
5      Q. Can you look at Exhibit 31, please?
6      A. Okay.
7      Q. Is this an email that you directed to Joe
8  Hamilton?
9      A. Yes.
10     Q. Is it accurate as to what it describes?
11     A. Yes.
12     Q. Is it fair to say that the game plan, if
13 you will, for Mr. Pizzuto at this time, which time
14 being July 24, day before he was let go, and July
15 25, the day he was, was basically to get him to sort
16 of self-refer or go through and get some sort of
17 professional help for his obvious problems in lieu
18 of being let go?
19         MR. PERLMAN: Objection.
20     Q. (By Mr. Mulhearn) Is that fair to say?
21     A. Yeah, I think that's what Joe was pushing
22 for.
23     Ultimately, we were responsible for the
24 safety of our entire workforce. Something just

Page 43

1  wasn't right.
2      I don't know -- there wasn't a game plan,
3  per se.
4      Q. We use that expression. A decision?
5      A. We were involved with labor. We were
6  involved with the Local 25 chief stewart. We were
7  trying to get him some help.
8      Q. Was it Pizzuto's response to that
9  suggestion of him getting help, his response to
10 that, something that led him to be let go?
11         MR. PERLMAN: Objection.
12     A. No.
13     Q. In your email, fourth paragraph down, it
14 says that Paul has stated he was going on FML due to
15 stress and anxiety related to the disciplinary
16 actions he received.
17     Do you see that?
18     A. Paul also stated he was going on FML due to
19 stress and anxiety related to disciplinary actions
20 he received.
21     Okay.
22     Q. Is that what he said; that he was going on
23 FML?
24     A. I think -- was it after we issued him the

Page 44

1  termination letter, which would mean he could file
2  for it? But he was terminated.
3      Q. According to the way it's written here by
4  you, this is after, I guess, the termination letter.
5      A. Well, I mean, I said, Paul also stated, so
6  I don't know exactly when he said that.
7      Was it before or after? I would think
8  after, but I'm not 100 percent sure.
9      Q. Do you want to take a little time to answer
10 that?
11     A. Well, my recollection is that during this
12 whole time he was uneasy. He was not cooperating.
13 He was on the telephone stating he was going to win
14 the big dance.
15     So when exactly did he say he was going on
16 FML? It was probably during the course of when we
17 were issuing the termination.
18     I mean, I can't tell you 100 percent what
19 he said.
20     Q. FML; is that Family Medical Leave?
21     A. Yes, sir.
22     Q. It was clear to all of you at the time that
23 you felt that Paul needed help.
24         MR. PERLMAN: Objection.

794efc95-b3ba-4f67-8a44-dcdd99bee647

Page 45

1    A. It was obvious that something wasn't right.
2    Q. Actually, I was quoting the letter.
3        At the bottom of the page you said, We do
4    believe Paul needs help. And you thought that was
5    an important statement to add.
6    A. During the meeting -- I think what I meant
7    here was we're not doctors. That's important, I
8    think, because we're not doctors. Okay.
9        But when someone is acting differently, not
10   normal, then, yes. I think we were trying to be
11   helpful, to help out Mr. Pizzuto by offering him
12   help.
13   Q. Help was not firing him. The help was
14   actually letting --
15   A. The help was working with Local 25, the
16   chief stewart, to get him something.
17   Q. Do you know whether there was an
18   alternative?
19       Let's say the options that were looked at
20   at the time, at the end, were either termination for
21   what's gone down or, short of that, him seeking some
22   sort of leave and going off on disability and
23   getting some medical attention, say those were the
24   two things on the table, do you know if there could

Page 46

1    have been a third thing on the table, as far as the
2    company putting him out on involuntary medical
3    leave?
4        MR. PERLMAN: Objection.
5    A. Do I know if there was?
6    Q. At the time.
7    A. No. No.
8        I mean, his actions, specifically driving
9    up onto the dock in a reckless manner, was a result
10   of him being terminated.
11       I mean, you know, it wasn't just the
12   management that was afraid of him. The other
13   employees were afraid, his peers were afraid of him.
14       So we have a duty to make sure that the
15   building is safe and secure for the workforce.
16   Q. Do you know which employees -- I've seen
17   the managers' information.
18       Can you remember any employees that
19   expressed concern about their safety because of him?
20   A. Specifically, no, I don't.
21       Their testimony wouldn't be the same. They
22   have a contract that, We will not tell on our
23   brothers or sisters.
24       That's the environment we're dealing with.

Page 47

1    Q. That may be true. They may not want to
2    tell the truth, for example. Who knows?
3        But do you remember any people that
4    expressed to you a concern about their safety
5    because of him?
6    A. Any drivers?
7    Q. Yes.
8    A. Specific names?
9        MR. PERLMAN: Can I meet with the
10   witness just for a second?
11       MR. MULHEARN: Sure.
12       (Brief recess was taken.)
13   Q. (By Mr. Mulhearn) Can you remember the
14   names of any employees, other than supervisors, that
15   complained about their fear of safety due to
16   Pizzuto?
17   A. There were numerous. What period of time
18   is a different story.
19       I know Jim Assetta.
20   Q. He was someone that --
21   A. He was on the same belt relatively -- a few
22   vehicles down from Mr. Pizzuto.
23   Q. Was he a driver?
24   A. Yes.

Page 48

1    Q. Did he complain to you about fear of
2    safety?
3    A. Yes.
4    Q. Was it right around this time that we're
5    discussing; July of 2003?
6    A. I'm not sure exactly. It was his
7    actions -- Mr. Pizzuto's actions in the building.
8    That's the reason these employees were afraid.
9    Q. Any specific action that you can relate to
10   Mr. Assetta?
11   A. Not specific. No.
12       I don't know if it was the shirt incident
13   or -- where he didn't have his shirt on, perhaps.
14       It could have been the time where he
15   wouldn't leave the building until we scanned all the
16   pieces of freight in his truck.
17   Q. Any other names of people that shared
18   concerns about their safety?
19   A. I think Gerry Halloran, the stewart.
20   Q. Did he express to you that he was concerned
21   about his own personal safety?
22   A. I don't know in that particular way.
23       But I think it was discussed that something
24   wasn't right.

794efc95-b3ba-4f67-8a44-dcdd99bee647



EXHIBIT
Hamilton
38
6-5-07

**3101 Western Avenue, Seattle, WA  98111-0662 www.airborne.com**

TO:  Paul Pizzuto - 272371
FR:  M. Jill Parker, Labor Relations          **DATE:** October 28, 2002
RE:  **FAMILY MEDICAL LEAVE CONFIRMATION NOTICE**

You notified us of your need to take family/medical leave due to:

☐     the birth of a child, or the placement of a child for adoption or foster
      care; or
☒     a serious health condition that you need care for; or
☐     a serious health condition affecting your ☐spouse, ☐child, ☐parent

This leave will be counted against both your annual Federal FMLA leave
entitlement and your state leave law.  Except as explained below, you have a
right under the FMLA for up to 12 weeks of unpaid leave continuation of your
health benefits under the same conditions as if you continued to work, and
you must be reinstated to the same or an equivalent job with the same pay,
benefits, and terms and conditions of employment on your return from leave.
If you do not return to work following FMLA leave for a reason other than:
(1) the continuation, recurrence, or onset of a serious health condition
which would entitle you to FMLA leave; or (2) other circumstances beyond your
control, you may be required to reimburse us for our share of health
insurance premiums paid on your behalf during your FMLA leave. This letter is
to inform you that:

1. — **LEAVE DESIGNATION:**
      You are ☒ **ELIGIBLE**  ☐ **NOT eligible** for leave under the FMLA.

2.    **STARTING DATE**: October 14, 2002 (4-6 weeks, inclusive)

      Thirty (30) days advance notice [☐was] [☒was not] given.
      If thirty (30) days was not given, then your leave [☐ will]   [☒ will
      not] be postponed.

3.    **SUBSTITUTION OF PAID LEAVE**: You may elect to substitute accrued paid
      leave for unpaid FMLA leave.  If you have any accrued paid leave
      available, then we will require you to substitute paid leave for unpaid
      FMLA leave.  This paid leave will count against your annual FMLA
      entitlement.
      ☒ Paid vacation leave: per Airborne's Policy
      ☒ Paid sick leave: per Airborne's Policy
      ☒ Other paid leave: Personal and floaters per Airborne's Policy

4.    **INTERMITTENT LEAVE/REDUCED WORK SCHEDULE**
      Intermittent [☐is] [☒is not] approved. Intermittent leave is only
      authorized when it is deemed to be medically necessary [note:
      intermittent leave may not be used for birth of a child]. Based on the
      medical certification supplied by the attending doctor, your leave is
      limited for the medical condition set forth therein.  Please note. all

Exhibit 13

attempt to schedule their leave so as not to disrupt the employer's operations. Also, employee must discuss with their immediate supervisor the anticipated leave schedule and notify them within 2 day of any change in said schedule. Failure to comply with this notice requirement may subject the employee to the attendance policy as set forth in the collective bargaining agreement.

5.  **MEDICAL CERTIFICATION/RECERTIFICATION**
    You [☐ will] [☐ will not] be required to or [☒have already] furnish(ed) a medical certification of a serious health condition. If required, you must furnish certification within 15 calendar days after you are notified of this requirement, or we may delay the commencement of your leave until the certification is submitted. If you fail to return the medical certification within 15 days, all absences occurring during this period may be counted under the attendance policy. You may also be required to furnish re-certification relating to a serious health condition, if you are on intermittent FMLA. With this in mind, remember that compliance with all work rules for notifying your supervisor of absences must be followed. Failure to do so may be just cause for disciplinary action as set forth in your contract. You are further required to discuss with your immediate supervisor the anticipated leave schedule and notify them within 2 days of any change in said schedule. Failure to comply with this notice requirement may subject you to the attendance policy as set forth in the collective bargaining agreement. Re-certification will be required if:
    a)  there is a request for extension of leave;
    b)  circumstances described by the original certification have changed significantly (e.g. the duration of the illness, the nature of the illness, complications, etc.); or
    c)  we receive information that casts doubt upon the continuing validity of the certification.

6.  **EMPLOYEE RESPONSIBILITIES WHILE ON LEAVE**   You may be required to furnish us with periodic reports of your status and intent to return to work every thirty (30) days while on FMLA leave. (Note: See above for medical re-certification).

7.  **FITNESS FOR DUTY**: You [☒will] [☐ will not] be required to present a fitness-for-duty certificate prior to being restored to employment. If such certification is required but not received, your return to work may be delayed until the certification is provided.

Cc:  S. Crossken

EXHIBIT Hamilton 4 6-5-07

## 1. DRIVER'S INFORMATION
Driver completes this section.

| Driver's Name (Last, First, Middle) | Social Security No. | Birthdate M/D/Y | Age | Sex | | Date of Exam |
|---|---|---|---|---|---|---|
| Pizzuto Paul Joseph | 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 | 01 03 64 | 39 | ☑ M ☐ F | ☐ New Certification ☑ Recertification ☐ Follow Up | 4-30-03 |

| Address | City, State, Zip Code | Work Tel / Home Tel | Driver License No. | License Class | State of Issue |
|---|---|---|---|---|---|
| 59 Rollins Street | Lawrence, MA 01841 | Work Tel: (800) 2076295 Home Tel: (978) 6859005 | S229 17374 | ☐ A ☐ C ☑ B ☐ D ☐ Other | MA |

## 2. HEALTH HISTORY
Driver completes this section, but medical examiner is encouraged to discuss with driver.

| Yes | No | |
|---|---|---|
| ☑ | ☐ | Any illness or injury in last 5 years? |
| ☐ | ☑ | Head/Brain injuries, disorders or illnesses |
| ☐ | ☑ | Seizures, epilepsy ☐ medication |
| ☐ | ☑ | Eye disorders or impaired vision (except corrective lenses) |
| ☐ | ☑ | Ear disorders, loss of hearing or balance |
| ☐ | ☑ | Heart disease or heart attack; other cardiovascular condition ☐ medication |
| ☐ | ☑ | Heart surgery (valve replacement/bypass, angioplasty, pacemaker) |
| ☐ | ☑ | High blood pressure ☐ medication |
| ☐ | ☑ | Muscular disease |
| ☐ | ☑ | Shortness of breath |
| ☐ | ☑ | Lung disease, emphysema, asthma, chronic bronchitis |
| ☐ | ☑ | Kidney disease, dialysis |
| ☐ | ☑ | Liver disease |
| ☑ | ☐ | Digestive problems – acid reflux |
| ☐ | ☑ | Diabetes or elevated blood sugar controlled by: ☐ diet ☐ pills ☐ insulin |
| ☑ | ☐ | Nervous or psychiatric disorders, e.g., severe depression ☐ medication Paxil |
| ☐ | ☑ | Loss of, or altered consciousness |
| ☐ | ☑ | Fainting, dizziness |
| ☑ | ☐ | Sleep disorders, pauses in breathing while asleep, daytime sleepiness, loud snoring |
| ☐ | ☑ | Stroke or paralysis |
| ☐ | ☑ | Missing or impaired hand, arm, foot, leg, finger |
| ☐ | ☑ | Spinal injury or disease |
| ☐ | ☑ | Chronic low back pain |
| ☐ | ☑ | Regular, frequent alcohol use |
| ☐ | ☑ | Narcotic or habit forming drug use |

For any YES answer, indicate onset date, diagnosis, treating physician's name and address, and any current limitation. List all medications (including over-the-counter medications) used regularly or recently.

Sleep Apnea, Acid Reflex, Tremors (situational) (Meds) Paxil, Prilosec, Provigil, Primidone,
Dr C Hang, Salem NH Family Doctor P.C Physician (603) 898 4080
Dr Sastroori 411 Merrimac St Methuen MA 01844 Apnea (978) 688 4665
Dr Kvatnick Salem N,H Tremors 1(603) 898 5829

I certify that the above information is complete and true. I understand that inaccurate, false or missing information may invalidate the examination and my Medical Examiner's Certificate.

[signature] Driver's Signature 4-30-03 Date

**Medical Examiner's Comments on Health History** (The medical examiner must review and discuss with the driver any "yes" answers and potential hazards of medications, including over-the-counter medications, while driving.)

sleep apnea diagnosed 1/2003. Is using C-PAP machine & on Provigil. Still has some daytime drowsiness. Sometimes takes nap in middle of day after lunch, which helps.

(R) calf tear 4/2003. Full duty 6/7/2003. Had problems with supervisor upon returning which led to episode of anxiety/depression. Out of work 10/11/2002 to 2/24/2003. Back to full duty without problems

meds: Paxil
Prilosec
Provigil
Primidone prn anxiety-related (tremor) [illegible]

[illegible]

EXHIBIT 14

necessary steps to correct the condition as soon as possible particularly if the condition, if neglected, could result in more serious illness that might affect driving.

Check YES if there are any abnormalities. Check NO if the body system is normal. Discuss any YES answers in detail in the space below, and indicate whether it would affect the driver's ability to operate a commercial motor vehicle safely. Enter applicable item number before each comment. If organic disease is present, note that it has been compensated for.

*See Instructions to the Medical Examiner for guidance.*

| BODY SYSTEM | CHECK FOR: | YES* | NO |
|---|---|---|---|
| 1. General Appearance | Marked overweight, tremor, signs of alcoholism, problem drinking, or drug abuse. | | ✓ |
| 2. Eyes | Pupillary equality, reaction to light, accommodation, ocular motility, ocular muscle imbalance, extraocular movement, nystagmus, exophthalmos, strabismus uncorrected by corrective lenses, retinopathy, cataracts, aphakia, glaucoma, macular degeneration. | | ✓ |
| 3. Ears | Middle ear disease, occlusion of external canal, perforated eardrums. | | ✓ |
| 4. Mouth and Throat | Irremediable deformities likely to interfere with breathing or swallowing. | | ✓ |
| 5. Heart | Murmurs, extra sounds, enlarged heart, pacemaker. | | ✓ |
| 6. Lungs and chest, not including breast examination. | Abnormal chest wall expansion, abnormal respiratory rate, abnormal breath sounds including wheezes or alveolar rales, impaired respiratory function, dyspnea, cyanosis. Abnormal findings on physical exam may require further testing such as pulmonary tests and/or xray of chest. | | ✓ |

| BODY SYSTEM | CHECK FOR: | YES* | NO |
|---|---|---|---|
| 7. Abdomen and Viscera | Enlarged liver, enlarged spleen, masses, bruits, hernia, significant abdominal wall muscle weakness. | | ✓ |
| 8. Vascular System | Abnormal pulse and amplitude, carotid or arterial bruits, varicose veins. | | ✓ |
| 9. Genito-urinary System | Hernias. | | ✓ |
| 10. Extremities - Limb Impaired. Driver may be subject to SPE certificate if otherwise qualified. | Loss or impairment of leg, foot, toe, arm, hand, finger. Perceptible limp, deformities, atrophy, weakness, paralysis, clubbing, edema, hypotonia. Insufficient grasp and prehension in upper limb to maintain steering wheel grip. Insufficient mobility and strength in lower limb to operate pedals properly. | | ✓ |
| 11. Spine, other musculoskeletal | Previous surgery, deformities, limitation of motion, tenderness. | | ✓ |
| 12. Neurological | Impaired equilibrium, coordination or speech pattern; paresthesia, asymmetric deep tendon reflexes, sensory or positional abnormalities, abnormal patellar and Babinski's reflexes, ataxia. | | ✓ |

*COMMENTS:                      *mild hypertension*

**Note certification status here. See Instructions to the Medical Examiner for guidance.**

☐ Meets standards in 49 CFR 391.41; qualifies for 2 year certificate

☐ Does not meet standards

☑ Meets standards, but periodic evaluation required

Due to _____ hypertension _____

☑ 3 months   ☐ 1 year _____ driver qualified only for:

☐ 6 months   ☐ Other _____ need clearance from

_____ pt of docs then will give

_____ a yr cert

☐ Temporarily disqualified due to (condition or medication): _____

Return to medical examiner's office for follow up on _____

If meets standards, complete a Medical Examiner's Certificate according to 49 CFR 391.43(h). (Driver must carry certificate when operating a commercial motor vehicle.)

☐ Wearing corrective lenses

☐ Wearing hearing aid

☐ Accompanied by a _____

☐ Accompanied by a _____ waiver/exemption

☐ Skill Performance Evaluation (SPE) Certificate

☐ Driving within an exempt intracity zone

☐ Qualified by operation of 49 CFR 391.64

Medical Examiner's Signature _____ David M. Enston, M.D.

Medical Examiner's Name (print) _____ David M. Enston, M.D.

Address _____ Occupational Health Center of Stoneham

61 Main Street, Stoneham, MA 02180    61 Main Street

Stoneham, MA 02180

Telephone Number    (781) 438-9600    (781) 438-9600

_____ 7/3/03

EXHIBIT
Ham, Hu
7
(6-5-07

## Paul Pizzutto probable Suspicion Test, 07/16/2003

On Wednesday, July 16, 2003 at 07:00 am. Airborne FSS Chris Demmons approached me regarding the behavior of Paul Pizzutto. He told me that he had an issue with Paul the prior day about scanning his freight OFD and why he could not properly scan his DDU freight. Chris stated that during the conversation, Paul kept blaming management for his errors. He also made the statement that management was trying to sabotage the system on his scanning, and at the same time, Paul was telling Chris "he'd fix me".... "He'd get em". Chris felt that Paul was very unstable and that I needed to act.

At this point, I thought back to a similar encounter I had had with Paul the prior two days. The first being on Monday when I went out on the dock and saw Paul unloading all his DDU freight. I asked him why this was not delivered and he told me it was refused. I then asked why, and he said you tell me. He then brushed me off and told me that he will get the bastard. At this point, I backed off like I have been doing with him and let him check in with Mike Trudeau.

The following day, Tuesday July 15, 2003, Mike Trudeau said he had a situation with Paul at check-in that Monday. Mike said that Paul was very upset about his DDU stop having missing shipments and he said "Someone was doing this to him and he knew who it was". Mike asked him who was it and Paul responded, " The bald guy with glasses". Mike said Paul was very irate yelling and swearing and threatening he will take care of it.

The same day at 16:30 pm, I was arriving back at the station from a sales call. I saw Paul getting in his car so I approached him and asked how he was doing. As he was driving away with his window down, he told me, "I have nothing to say to you" and then sped off. This was very odd behavior from him with me. Since the day I came to NSH, I have made an extreme effort to reach out to him and let him know I will work with him.

After Chris had come to me and asked that I do something about Paul's threats and behavior, I confirmed with Arthur Leveris what I was observing. I confirmed that Paul's mood swings were becoming too common and that his behavior lately with supervisors was loud and boisterous. I also confirmed with Artie that Paul on more then one occasion has said that he is heavily medicated from his doctor. Based on my observations, I decided that I wanted to take Paul out of service pending a drug & alcohol test.

At about 0815am I brought Paul in the office and read the Airborne card that was given to us in MTP class and that we would be taking him for a drug test. He became very mad and wanted to know what I was observing. I told him based on the comments he was making to Chris Demmons that morning, and the loud

Exhibit 15

sporadic behavior myself and other supervisors had been witnessing the past 2 days.

At first Paul did not want to go but based on conversations with Jim O'Brien, Mike Ray, and Dave Vallon via phone, Paul decided to go.

While I was waiting out front for Artie to get his car keys, Paul started staring at me and made a threat that I will get mine. When I asked him if he was threatening me, he said the cops would handle me.

When we got to the Occupational Health Office, Paul was acting very strange. He was very loud in front of the entire office and patients. At one point, he walked over to the water cooler and drank about 20-25 cups of water one after another in a span of about 3 minutes. This made both Artie and I very uncomfortable. Between a few gulps, he let out a few very loud belches in the presence of other patients. This behavior also confirmed my previous observations that he was very laud and unstable.



**From:** JOE.HAMILTON@AIRBORNE
**To:** JOE.HAMILTON
**Sent:** Wednesday, 16 July 2003 2:08pm PT
**Subject:** Paul Pizzutto

On Monday, 7/14/03 at or around 16:30 pm, I went out on the dock and observed Paul Pizzutto unloading approximately 30 post office DDU shipments from his truck. I asked him what these were and he look at me with a stare and said refused post office shipments... I asked why they were refused and he said because the count was wrong. I asked why was the count off and he just looked at me and brushed me off... I backed off knowing Mike Trudeau would check him in...

The next day, 07/15/03 at 16:40, I was arriving back from a day of sales calls... I saw Paul getting in his car and went to approach to see how he was doing.... As he drove by, he spoke out of the window saying to me that he had nothing to say to me and sped away.. From my experience with Paul, he has never done this to me.. He has always approached me and let me know what was bothering him...

I walked in the station on Wednesday 07/16/03 at 07:00... I was approached by FSS Chris Demmons and asked to do something about Paul Pizzutto. Chris said he had some major issues with Paul the day before over his departing the building and scanning his freight... He said Paul had been acting very paranoid and strange and had even made some threatening remarks about "I will get you guys"

Based on these actions witnessed by Chris and the actions That myself, Mike Trudeau witnessed the previous 2 days, I decided that it was in all parties best interest to have Paul Drug Tested...

At 0830 am, Myself and Arthur Leveris escorted Paul Pizzutto and Jim Obrien to Occupation Health for the test. Paul was very upset and made repeated remarks to the both of us that we would get ours... At the drug test site, we observed him drink approximately 20-25 cups of water within a 3 minute span. It made us both uncomfortable.

After the test, I drove Paul back and told him that we would call him when the results came in.

Joe Hamilton
DFSM - NSH

Exhibit 16

EXHIBIT
Hamilton
17
6-5-07

From: JOE.HAMILTON
To:   JOE.HAMILTON
Sent: Monday, 21 July 2003 8:07am PT
Subject: Paul Pizzutto

07/21/2003  (Monday AM)

I had a meeting with Paul Pizzutto this am regarding his probable cause test results and to put on record my observations of his behavior and to let him know that I would not tolerate any more threats at the work place.

Present at the meeting were
Paul Pizzutto
Gerry Halloran

Arthur Leveris
Joe Hamilton

I started the meeting letting Paul know that his test results came back negative and that we would pay him for lost time plus any differential owed to him. At this point he started making demands about wanting all email and documents from the test. I told him all I get is a social security number and a positive or negative result. All other info is covered under his privacy policy that he signed at the doctors office. I then told him that I wanted to say what I needed to say and he needed to listen.

I told him that his behavior over the past 3 months has become an issue at the station and I need it to be addressed. I explained to him that his mood swings were too common and that his paranoid behavior was effecting his job. I told him I am not a doctor but based on last week and the fact that he made specific threats to 4 supervisors including myself caused me great concern and I needed it to stop. I explained to him the next threat or statement that can be interpreted as a threat, I will take action including termination.

Paul then asked specifically who did he threaten... He wanted names... I told him Myself, Artie Leveris, Chris Demmons and Mike Trudeau. He said what was the threat.. I told him the statement of "he is going to get someone"... "Wait till I get him".. When he told me "Joe, you will get yours" He then said those are not threats to specific people. They are just statements I made that when I find out who is screwing with me, I will handle.

He then said that since February, he has had 4 instances where freight has been ofd scanned by him and then ND at the end of the day, Only to be delivered by another driver. I then pointed out to him that during any of those 4 instances, did I or any supervisor discipline him for missing freight? He answered no. I then said that most of these errors are his and that he has missed ofd scan on freight and that we have caught this during audit scans. Further more, I told him that since my first days here, I have instructed my supervisors that if they have any issues with Paul Pizzutto, that I would handle him. I instructed them to give Paul some room and let him work out his stress issues.

I then told him that I could no longer do that because his issues were becoming threatening and causing stress among my supervisors. I told him I have a responsibility to the entire station and that he needed to work under the guidelines of the station. I instructed him that if he had any issues with missing freight, he needed to let Gerry Halloran know. if he had any issues with me or any supervisors, He needed to write it up and give to Gerry.

Other topics that came up during the conversation were:

His prescribed medication and that I should call Seattle or his doctor and ask them if he is all right.
His advising me that he will be filing a harassment case against me.
His advising me that I could not take away his freedom of speech.

Exhibit 17

Joe Hamilton
DFSM - NSH

EXHIBIT
Hamilton
18
6-5-07

**From:** JOE.HAMILTON
**To:** JOE.HAMILTON
**Sent:** Tuesday, 22 July 2003 2:57pm PT
**Subject:** Paul Pizzuto 7/22/03

Paul came off the road today and had some very strange issues with his manifest. Ref awb 4013241916.... AWB shows an LD scan at 0905 and an ofd scan at 1650... Initial appearances seem to suggest he used 2 scanners... One in the am to ofd his freight and a different one to delv with.... Downloading both at 1650..

He also had an ND shipment on his manifest awb 25211519163... When researched, it was obvious that the awb was a duplicate awb in the system... One ob from station BOI not alerted and the 2nd OB from PNO going to Methuen MA. Paul felt that a conspiracy was going on and wanted to know why there was an ND... When I tried to explain to him that it was 2 shipments under the same number, he would not listen and walked away...

At 1740, Paul called customer the 1800 customer service number claiming to be a customer Gneiss and wanted to know where his shipment was... He gave the above AWB number. 1800 Airborne put him through to NSH for resolution. When Paul realized he was talking to Katie Suprenet, he identified himself and wanted info on the awb. I was standing next to Katie and asked if I could speak to Paul. I told Paul we had better things to do with our time and he should call Seattle if he had an issue.

2 more examples of Pauls Paranoia schizophrenia....


Joe Hamilton
DFSM - NSH

Exhibit 18



**From:** JOE.HAMILTON
**To:** JOE.HAMILTON
**Sent:** Wednesday, 23 July 2003 5:55am PT
**Subject:** Paul Pizzuto, 7/23/03...07:02 am

I had all the am drivers in the lobby this am to view the Chairman's message on the merger (Video)..... I was positioned to the right of the TV leaning against the table. Paul Pizzuto was sitting to the left of the TV about 15 ft away. During the video, I glanced over at Paul only to notice him stairing at me with a very serious look in his eye. I turned away so as to not add any more tension to the situation. On two other instances during the 7 minute video, I looked over at Paul sensing he was still starring at me. My looks confirmed this, but I turned away both times.

At 0830, I instructed Greg Sweatt to audit scan Paul Pizzuto's truck. I told him I needed a 100% scan so I can confirm all freight is OFD scanned. Paul has been complaining to me on a regular basis that someone is messing with his truck. If I audit him each day, I can prove what is on his truck at depart time.


Joe Hamilton
DFSM - NSH


Exhibit 19

EXHIBIT
Hamilton
25
6-5-07

From: JOE.HAMILTON
To: JOE.HAMILTON
Sent: Thursday, 24 July 2003 2:34pm PT
Subject: Paul Pizzuto, Thursday 7/24/03

I met with BOS Chief Stewart Joe Quigley, and NSH Stewart Gerry Halloran today to discuss my concerns about Paul Pizzuto. I explained to them that Paul had made threats to two of my supervisors this am. These threats were made after the discussion I had with him on Monday warning him that any threats will be dealt with in a serious manner.

Gerry went on to tell myself and Quigley that he felt Paul needed medical help because he had a similar experience this am. Paul was mad over the way his paycheck was processed.

After an hour of debate, the 3 of us decided that Gerry and Joe Q would take Paul aside when he came off the road and ask him if he needed help. They were going to offer the unions disability benefits and refer him to the Teamster doctor for help. It was also determined that if he did not think he needed the help, then he would need to meet with Myself and Artie to be issued a Written Warning stating he will be put out of service for Just Cause if he made any more threats or aggressive gestures. He was also going to receive a written warning for failure to ofd a shipment in the am.

When Paul came off the road, Joe Q and Gerry met with him briefly, the only topic that came up was about his check and he blew up and started yelling at them... I did not witness this... Mike Trudeau was in the area... Paul did not allow Them to speak to them and left. Gerry told Paul that I wanted to see him but he just walked out.

Gerry and I agreed that we would pull him off the sort in the am and issue the warnings and pursue the dicipline.


Joe Hamilton
DFSM - NSH

Exhibit 20

D 00



**From:** JOE.HAMILTON@AIRBORNE
**To:** JOE.HAMILTON
**Cc:** ARTHUR.LEVERIS, DAVID.FAIRWEATHER, RICK.RIOJA, ROBERT.MERGENHAGEN
**Sent:** Friday, 25 July 2003 6:38am PT
**Subject:** Paul Pizzuto 7/25/03

I terminated Paul Pizzuto this am under article 47, Just Cause.

The NSH supervisor team has had an ongoing issue with Paul's threatening behavior and paranoia for some time now. Over the past few weeks, his behavior has escalated to a point where I feel he is a safety risk for the station personal and himself.

After a long discussion on Thursday with Joe Quigley, Chief Stewart Local 25, and Gerry Halloran, NSH Stewart Local 25, we all came to the same conclusion that something was not right with Paul. Earlier in the am, Paul had an issue with the way his paycheck was processed and this really fired him up. On his way out of the building, he made threatening remarks to three supervisors, Greg Sweatt, Tim Carter & Mike Trudeau. Because of the remarks, I decided that Paul needed to be issued written discipline under the just cause language.

Thursday afternoon, I had Both Joe Quigley and Gerry Halloran wait at the NSH station for Paul to arrive. The plan was for them to have a private conversation with Paul and offer the union's disability resources as help. Depending how that conversation went, I was prepared to issue Paul a written letter putting him on notice that the next threatening remark or gesture, he will be terminated on the spot.

When Paul arrived off the road, the only conversation he wanted to have with Joe and Gerry was regarding his check. Gerry presented him with a separate check and explained to him that it came in this am addressed to Joe Hamilton. This infuriated Paul more. He started yelling at both Gerry and Joe and stormed out. Gerry told Paul he that I wanted to see him but Paul ignored Gerry and went home. (I did not witness any of these conversations, Mike Trudeau was close by)

After Paul left the building, I told Joe and Gerry that when Paul reported to work on Friday, I would issue the letter.

On Friday 07/25/03 at 0710, I arrived at the station. FSS Greg Sweatt reported to me that Paul Pizzuto had driven his car onto the dock in a reckless manner this am. Greg said the only thing that went through his mind was to hit the deck. He said when Paul got out of the car, he ran to the clock and punched in. The he returned to his car and pealed out in reverse.

I then approached Athur Leveris and he confirmed Greg story. Artur said he had the same failing when he saw Paul's car come into the building.

At 0720, Gerry Halloran arrived back to NSH from the aircraft. I told Gerry that we were bring Paul in the office concerning the Warning Letter but that we also had an incident this am that I was real concerned about. I told him that depending on how the meeting went, I was prepared to put Paul out on termination.

At 0725, myself, Arthur Leveris, Gerry Halloran and Paul Pizzuto had a meeting in the NSH Conference room. I told Paul that I had real concerns about his behavior and that a safety issue at NSH. I asked him if he thought he needed any medical help, and if so, that I would work with Airborne and Local 25 to help provide that help. He would not respond to me other then to say that he was in here to receive disciple, so issue the discipline. I then said I was prepared to issue him 2 warning letters yesterday afternoon but he decided to leave the building before I could. The first letter was for Careless performance of duties, specifically not ofd scanning his freight, and the second was a written warning putting him on notice that based on the threats made to three supervisors on Thursday am, any future threat or gesture, he would be terminated.

He asked me if I was telling him to punch out because he was going to leave and go directly to his doctor.

Exhibit 21

He said he was going to have his doctor write a note saying he was fine to come to work. He then said he would be going on FMLA under stress.

I told him that based on his actions this am with his personal car, driving it in the building in a reckless manner, that I was classifying that as a threatening gesture and termination him for just cause. I issued him the warning for Thursdays actions and a termination for the actions in the am.

I had him turn in his badge and scanner and escorted him off the property.

Joe Hamilton
DFSM - NSH

EXHIBIT
Hamilton
33
6-5-07

Name: Paul Pizzuto                    Certified Mail #

By reason of your conduct described below, it is necessary to issue this notice of:

|  | WARNING | EFFECTIVE: |
|--|---------|-----------|
|  | SUSPENSION | EFFECTIVE: |
| XXX | **DISCHARGE** | **EFFECTIVE:** |

ARTICLE 35, SECTION 3
CARELESS AND NEGLECTFUL PERFORMANCE OF DUTIES
INSUBORDINATION
GROSS NEGLIGENCE
ATTENDANCE
FAILURE TO FOLLOW INSTRUCTIONS/DIRECT WORK ORDER
FAILURE TO MEET JOB REQUIREMENTS
THEFT AND DISHONESTY
XXX    JUST CAUSE

SPECIFICALLY:

This letter is being issued pursuant to article 47 of the National Master Freight Agreement and the New England Supplemental Agreement. Based on your action on the morning of 07/25/03 of driving your car on to the dock and peeling in reverse, Management viewed this as intimidating and threatening behavior.

_____ 7/25/03
FIELD SERVICES SUPERVISOR

Employee
Local 25 (Certified) 7002 0860 0007 7367 0623
Regional Manager
District Manager
Employee File
Shop Steward

_____  7/25/03      Jerry Halloum a witness
SUPERVISOR SIGNATURE    DATE      UNION REPRESENTATIVE    DATE

Refused to Sign  7/25      _____  7-25-03
EMPLOYEE SIGNATURE    DATE      AIRBORNE REPRESENTATIVE  DATE

Exhibit 22

D 0050

EXHIBIT
Hamilton
28
6-5-07

Name: Paul Pizzuto                    Certified Mail #

By reason of your conduct described below, it is necessary to issue this notice of:

**XXX**  **WARNING**          **EFFECTIVE:**
       SUSPENSION           EFFECTIVE:
       DISCHARGE            EFFECTIVE:

       ARTICLE 35, SECTION 3
       CARELESS AND NEGLECTFUL PERFORMANCE OF DUTIES
       INSUBORDINATION
       GROSS NEGLIGENCE
       ATTENDANCE
       FAILURE TO FOLLOW INSTRUCTIONS/DIRECT WORK ORDER
       FAILURE TO MEET JOB REQUIREMENTS
       THEFT AND DISHONESTY
**XXX**  JUST CAUSE

SPECIFICALLY:

This letter is being issued pursuant to article 47 of the National Master Freight Agreement and the New England Supplemental Agreement. If you make any type of threatening comment or intimidating gestures, you will be taken out of service immediately. Verbal Harassment and intimidating looks will not be tolerated in the workplace. Future violations of this kind will result in your termination with Airborne Express.

                                    7/27/03
                        FIELD SERVICES SUPERVISOR

Employee
Local 25  (Certified)    7002 0860 0007 7367 0623
Regional Manager
District Manager
Employee File
Shop Steward

_____    7/24/03    _Jerry Halloran as witnes_
SUPERVISOR SIGNATURE       DATE       UNION REPRESENTATIVE    DATE

_Refused to Sign_          7/25       _____  2-25-03
EMPLOYEE SIGNATURE         DATE       AIRBORNE REPRESENTATIVE DATE

Exhibit 23

**Holy Family Hospital & Medical Center**
Methuen, Massachusetts

Holy Family Hospital
70 East Street, Methuen

| Patient Information | Treating Provider | Discharge Summary |
|---|---|---|
| PIZZUTO, PAUL<br>59 ROLLINS ST<br><br>Phone: (978)685-9005<br>ID: | RONALD TEITLER MD<br>70 East Street, Methuen<br><br>Phone: 978-687-0156 ext 211 | Date: 7/25/03  Time: 10:04:23 AM<br><br>**Chart Copy** |

| 1) Your Current Diagnosis | 2) Your Prescription |
|---|---|
| DEPRESSION #Document: 103 | |

| 3) You should follow up with<br>Follow Up Physician | Follow Up Information |
|---|---|
| GREATER LAWRENCE MENTAL<br>HEALTH, PSYCHIATRY<br>30 GENERAL ST<br>LAWRENCE, MASS,01843<br>Phone: 978 683 3128 | On 07/25/2003 this patient was treated in the Emergency Department of Holy Family Hospital at 70 East Street, Methuen for DEPRESSION. The patient was asked to follow up Today. |

I understand that the emergency care which I received is not intended to be complete and definitive medical care and treatment. I acknowledge that I have been instructed to contact the above physician immediately for continued and complete medical diagnosis, care and treatment. EKG's, X-rays, and lab studies will be reviewed by appropriate specialists and I will be notified of significant discrepancies. I also understand that my signature authorizes this Medical Center to release all or any part of my medical record (including, if applicable, information pertaining to AIDS and/or HIV testing, mental health records, and drug and/or alcohol treatment) to the referred physician listed above.

*I have read and understand the above, received a copy of applicable instruction sheets, and will arrange for follow up care.*

Exhibit 24

**MED 00115**

| Signature | Patient/Parent/Guardian | Date/Time | Signature | Patient/Parent/Guardian | Date/Time |
|---|---|---|---|---|---|

CONFIDENTIAL INFORMATION: The information contained in this fax is confidential. If you have received this fax in error, please notify the sender at once and destroy this document.

Powered by ScriptRx, Inc.                                                                           http://www.ScriptRx.com

Exhibit 24

**Caritas Holy Family Hospital**
**And Medical Center**

70 East Street, Methuen, Massachusetts 01844-4597 (978) 687-0151

ADMISSION RECORD

| PATIENT NAME/ADDRESS | ACCOUNT NUMBER | ADMISSION DATE/TIME | UNIT NO./MED. R |
|---|---|---|---|
| PIZZUTO, PAUL J<br>59 ROLLINS ST | H00047694690 | 07/25/03           0924 | HF0063956:<br>UNIT NO./MED. |
| | ADM. TYPE | ROOM / BED | LOCATION | SERVICE | ADM PTY. | ADM S |
| LAWRENCE, MA 01841 | REG ER | | ED.HF | UR | | EMR |
| PHONE  (978)685-9005 | DATE OF BIRTH | AGE | SEX | MAR. STAT. | LANGUAGE | RACE | TYP |
| SOC. SEC. NUMBER:    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 | 01/03/1964 | 39 | M | M | ENGLISH | WH | |
| | MAIDEN/OTHER NAME | | | | | SECOND LOCA |

| EMPLOYER/OCCUPATION | PLACE OF BIRTH |
|---|---|
| UNEMPLOYED | LAWRENCE, MA |
| | RELIGION | AFFILIATION |
| | CATHOLIC | NO AFFILIATION |
| PHONE: | PERSON TO NOTIFY / ADDRESS | RELATION |
| OCCUPATION: NONE | PIZZUTO, SUSAN | WI |
| | 59 ROLLINS ST | |
| GUARANTOR/ADDRESS              REL'N | LAWRENCE, MA 01841 | |
| PIZZUTO, PAUL J                SP | HOME PHONE  (978)685-9005 | OTHER PHONE |
| 59 ROLLINS ST | NEXT OF KIN | RELATION |
| LAWRENCE, MA 01841 | PIZZUTO, SUSAN | WI |
| PHONE  (978)685-9005 | 59 ROLLINS ST | |
| GUAR. EMP: UNEMPLOYED | LAWRENCE, MA 01841 | |
| GUAR. SSN: 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 | HOME PHONE  (978)685-9005 | OTHER PHONE |

**PRIMARY INSURANCE**

| INS CO | SUBSCRIBER | POLICY NO. | GROUP NO. |
|---|---|---|---|
| Tufts Total Health | PIZZUTO, PAUL J | 03258488301 | |
| P.O. Box 9171 | Watertown | MA | 02471 | PRI INS PHONE NO |

**INSURANCE 2**

| INS CO | SUBSCRIBER | POLICY NO. | GROUP NO. |
|---|---|---|---|
| | | | 2ND INS PHONE NO |

**INSURANCE 3**

| INS CO | SUBSCRIBER | POLICY NO. | GROUP NO. |
|---|---|---|---|
| | | | 3RD INS PHONE NO |

| PRIMARY CARE PHYS | PRIMARY PHYS PHONE | ADVANCE DIRECTIVE INFORMATION |
|---|---|---|
| Trombly, Claudia G MD | (603)898-4000 | DOES PATIENT HAVE AN ADVANCE DIRECTIVE? |
| ADMITTING PHYS | ADM PHYS PHONE | NO, DOES NOT WANT INFO |
| | | IF YES, WHO IS YOUR HEALTHCARE PROXY? |
| ATTENDING PHYS | ATT PHYS PHONE | |
| ARRIVAL MODE | BROUGHT IN BY | |
| WI | | |

| REASON FOR VISIT | | INFECTION CONTROL |
|---|---|---|
| FEELING DEPRESSED ANGRY | | |
| COMMENT | | DELIVERY |
| SIGNED VERIFIED NO CARDS | | |

LAST VISIT AT HOLY FAMILY HOSPITAL AND MEDICAL CENTER

08/19/03    REF

USER
HFHDAL02

DISCHARGE DATE/TIME

| DX CODE | PRINCIPAL AND SECONDARY DIAGNOSIS |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| PROC. CODE | PROCEDURES |
|---|---|
| | |
| | |
| | |
| | |
| | MED 00110 |
| | |

MD SIGNATURE

Medical Record    15128 Emergency Registration    FORM 16-50

© 1996 - 2002 T-System, Inc. Circle or check affirmatives, backslash (\) negatives.

HO......HF
07/......03

PIZZUTO, PAUL J
M    39    01/03/1964    HF0063956
Trombly, Claudia G MD

**52**    Holy Family Hospital and Medical Center
**EMERGENCY PHYSICIAN RECORD**
Psych Disorder, Suicide Attempt, Overdose (5)

TIME SEEN: _0950_ ROOM: _5_ __ *EMS Arrival*
HISTORIAN: (patient) __family __paramedics __translator
__nursing home notes_____
__HX / __ EXAM LIMITED BY: _____

**HPI    chief complaint(s):**

| | |
|---|---|
| Suicidal Thoughts  Depression | Suicide Attempt |
| Agitated    Hallucinating | Self-Injury |
| Anxiety | Intentional Drug Overdose |
| Onset- 1/2/4/5 | Accidental Drug Ingestion |
| Worsened since- today | |

**severity-**
mild   moderate   severe

When? _____

**context:** _____
✓situational problems_____
    *related to:* spouse / parent / son / daughter / significant other
        work / lost job / school / legal problems
fired 2 mos _____
_____
_____
_____

**current / associated complaints:**
(depressed) angry / frustrated / agitated / hostile / paranoid
_____
__confused / hallucinating_____
__suicidal thoughts / specific plan / gesture or attempt_____
__ingestion (see list below)_____
    *suicide attempt    wanted to "escape"    accidental    will not answer*
__incised / abraded wrist ( R / L )_____

**"RESCUE FACTOR"** (if suicide attempt)-
How did ingestion / other acts come to attention?
_____

Arrived by: ✓private car   __ambulance (who called?)
        __police        *patient    spouse* _____
__Recently seen / treated by doctor_____

**ROS**
**CVS / PULMONARY**
__cough
__trouble breathing
__chest pain_____

**CONST**
__fever
__chills_____
_____
_____
_____

**NEURO / EYES**
__headache
__visual disturbance_____

**GI / GU**
__abdominal pain_____
__nausea
__vomiting
__diarrhea
__problems urinating

**SKIN / LYMPH / M/S**
__skin rash / swelling_____
__joint pain_____
✓all systems neg. except

**PAST HX**    __negative
__prior suicide attempt_____
(psychiatric problems)
    *depression / bipolar disorder*
    *schizophrenia   other* _____
    anxiety
__other problems  Deongua _____

**Surgeries:**
__tonsillectomy_____
__cholecystectomy_____

__cardiac disease_____
__hypertension_____
__diabetes  insulin / o
__lung disease_____
__+HIV / AIDS_____

__appendectomy_____
__hysterectomy_____

Medications    __none  ✓see nurses note
_____
_____
_____

Allergies ✓
__see nurses

**SOCIAL HX**    __smoker ⊙ yes __drugs_____
__recent alcohol use / binge drinking / alcoholism  hard
*marital status:* __single __married __children:_____
**FAMILY HX**    ✓mental illness depression

| LIST OF SUBSTANCES INGESTED (*if applicable*) | | | |
|---|---|---|---|
| name | strength | # taken | when taken |
| acetaminophen  Y / N | | | |
| aspirin         Y / N | | | |
| ethanol         Y / N | | | |
| | | | |
| | | | |

☑ Nursing Assessment Reviewed   ☑ Vitals Reviewed

**PHYSICAL EXAM**   __Alert __Lethargic __Obtunded
_Distress-_ __NAD ☑mild __moderate __severe
__uncooperative for exam

**EENT**
__nml ENT inspection      __depressed / absent gag reflex_____
__pharynx nml             __abnormal TM ( R / L )_____
_if obtunded:_            __dry mucosa_____
__nml gag reflex          __gag reflexed  diminished / absent_____

**EYES**                  __nystagmus_____
__pupils equal, round     __disconjugate gaze_____
  & reactive to light     __mydriasis / meiosis / anisocoria_____
__EOM's intact            R Pupil_____mm   L Pupil_____mm

**NEURO / PSYCH**         __slow / no  response to commands_____
_mental status_             __withdraws to pain   no response to pain
__mood / affect nml       __depressed affect_____
                          __tearful / hostile / non-communicative_____
                          __suicidal ideation_____

_For suicide attempts:_  On direct query, patient _ADMITS / DENIES_
continued consideration  of suicide as an option.
_If denies why?_ _____

_orientation_             __uncooperative / cannot determine_____
☑normal x3                __disoriented_____
                          to:  day-of-week  day-of-month
                               month  year  place  person

_cranial nerves_
_sensory, motor_
__CN's intact as tested   __facial droop / CN abnormality_____
__nml motor response      __motor / sensory deficit_____
__nml sensory response
__nml reflexes            __abnormal gait_____
__nml gait

**NECK / BACK**           __cerv. lymphadenopathy ( R / L )_____
__normal inspection       __thyromegaly / meningismus_____
__neck supple

**RESPIRATORY**           __wheezing_____
__no resp. distress       __rales / rhonchi_____
__breath sounds nml

**CVS**                   __irregularly irregular rhythm_____
__regular rate, rhythm    __extrasystoles ( occasional / frequent )_____
__heart sounds normal     __tachycardia / bradycardia_____
                          __MD_____

**ABDOMEN**               __guarding_____
__non-tender              __hepatomegaly / splenomegaly_____
__nml bowel sounds
__no organomegaly

**SKIN**                  __cyanosis / diaphoresis / pallor_____
__color nml, no rash      __skin rash_____
__warm, dry

**EXTREMITIES**           __laceration_____
__non-tender              __pedal edema_____
__normal ROM
__no signs of injury
__no pedal edema

**PROCEDURES:**  ☐ Restraints
☐ Intubated __by ED physician  nasal / oral  #____ET tube
  __breath sounds equal  __tube position confirmed w CXR
☐ Gastric Lavage  __pill fragments recovered
☐ Charcoal_____gm given   Sorbitol_____oz given

_Psych Disorder; Overdose-52_

---

H00047694690    ED.HF
07/25/03

PIZZUTO,PAUL J
M  39   01/03/1964  HF00639563
Trombly,Claudia G MD

## LABS, EKG, XRAYS and PROGRESS

| CBC | Chemistries | ABGs | Toxicology |
|---|---|---|---|
| normal except | normal except | time: | normal except |
| WBC_____ | Gluc_____ | | acetamin.-_____ |
| Hgb_____ | BUN_____ | pH_____ | aspirin-_____ |
| Hct_____ | Creat_____ | pCO2_____ | ETOH-_____ |
| Platelets_____ | Na_____ | pO2_____ | |
| segs_____ | K_____ | __RA | Triage™ urine |
| bands_____ | Cl_____ | __O2 _____L | drug screen- |
| lymphs_____ | CO2_____ | | |

EKG MONITOR STRIP  __NSR   __Rate_____

**EKG**  __NML  ☐Interp. by me  ☑Reviewed by me  Rate_____
  __NSR  __nml intervals  __nml axis  __nml QRS  __nml ST/T
not / changed from:_____
**CXR**  ☐Interp. by me  ☐Reviewed by me  ☐Discsd w/ radiologist
  __nml/NAD  __no infiltrates  __nml heart size  __nml mediostinum
not / changed from:_____
Pulse Ox  95 % on (RA)  _____L / __% at (time)_____
_Time_____unchanged __improved __re-examined_____

__Rx given_____
__Discussed with Dr._____   Time_____
__Discussed with Dr._____   Time_____
__Discussed with Dr._____   Time_____
__will see patient in:  office / ED / hospital_____

INTERVIEW WITH OTHER RESPONSIBLE ADULT:
Name:_____   Relationship:_____
_Considers ongoing suicide risk:_  high  low  uncertain
_Capable / comfortable with observing patient at home?_  Yes  No  N/A
MEDICAL CLEARANCE FOR PSYCHIATRIC REFERRAL (if needed)
Back-slash to indicate that diagnosis is unlikely based on H&E and, when needed, lab testing.
• Toxic  (PCP, Amphetamines, Hallucinogens, Acetaminophen, ASA, ETOH, Other)
• Infectious  (Meningitis, Encephalitis, Sepsis)
• Metabolic  (Thyroid, Hypoglycemia, Drug Withdrawal, Hypoxemia, Electrolytes)
• CNS  Vascular and Other  (CVA, TIA, Seizure, Trauma)
• Other Unstable Co-morbidities  ☑cleared medically for psych referral

__Counseled patient / family regarding:  __CRIT CARE- 30-74 min
  lab results  diagnosis  need for follow-up   75-104 min _____min
__Admit orders written                      _____Additional history from:
__Prior records ordered                     family  caretaker  paramedics

## CLINICAL IMPRESSION:

Ethanol Intoxication    Psychosis  Schizophrenia - acute exac.
(Depression)            Drug Overdose (Intentional / accidental)
__major  manic          Suicide Attempt / Ideation
_anxiety_

DISPOSITION-  ☑home ☐admitted ☐transfer_____
CONDITION-    ☐unchanged ☐improved ☑stable

Copy to PCP / Dr. :_____

RONALD E. TEITLER, M.D.              NP / PA
AT 7:25 PM                           (MD)/ DO

☑ Template Complete  ☐ ___Addendum  ☐ Progress Sheet

MED 00111

HOLY FAMILY HOSPITAL ... D MEDICAL CENTER
EMERGENCY DEPARTMENT
Psychiatric Emergency Caremap
2/01

H00047694690    ED.HF
0    /03

PIZZUTO,PAUL J
M    39    01/03/1964    HF00639563
Trombly,Claudia G MD

ADDRESSOGRAPH

## TRIAGE

| Safety & Risk Factors | | | |
|---|---|---|---|
| Current Suicidal Ideation and/or Attempt | | ✓ | Fuels depress... |
| Previous History of Suicidal Activity | | ✓ | anger + losing... |
| Hallucinations: Auditory and/or Visual Delusions | | ✓ | Denis SI |
| Homicidal Ideation and/or Assaultive Behavior | | ✓ | Dmion... |
| Current and/or Past Treatment for Depression | ✓ | | |
| Medications: per list | ✓ | | |
| Last Counsel Session: prev. counselor Tewksbury | ✓ | | DMH Counselor: |
| Provider: | | | |
| Previous Hospitalization: Denies | | | Legal Guardian: |
| Substance Use/Abuse: Last Use: Denies | | ✓ | |
| ETOH Use/Abuse: Last Use: Denies | | ✓ | |
| Accompanied to ED by: self | | | |
| Disposition to/with: | | | |
| Time: | | | |
| RN Signature: Dmion | | | |

| Monitoring | | | |
|---|---|---|---|
| Patient is Oriented Time/Place/Person | — | — | |
| Patient is Compliant and Cooperative | — | — | |
| Patient Safety Search Performed | — | — | |
| Belongings Removed, Bagged Outside of Room and Patient Placed in Hospital Gown | — | — | |
| One on One Required | — | — | |
| ED MD Notified: | — | — | |

| Assessment | | | |
|---|---|---|---|
| ED MD Exam and Evaluation | — | — | Time: |
| Medical Admission | — | — | |
| Section 12A Completed and Signed | — | — | |
| Restraint Protocol Initiated | — | — | |
| Lab - Toxicology Screen HCG, CBC, ED7 | — | — | |
| Drug Levels: | | | |
| Consult   Agency: | — | — | Time: |

DATE: 7/25/03    ARRIVAL TIME: 0905

H00047880890
07/25/03

Trombly

PIZZUTO, PAUL J
M   39   01/03/1964   HF00639663
Trombly, Claudia G MD                    3-64

## TRIAGE ASSESSMENT

ARRIVED BY:    ☑ WALKED   ☐ CARRIED   ☐ WHEEL CHAIR
☐ AMBULANCE _____
☐ POLICE _____   ☐ HELICOPTER
ACCOMPANIED ☐ SELF   ☐ FRIEND   ☐ FAMILY
☐ OTHER _____

TRIAGE INDEX:   ☐ EMERGENT  ☑ URGENT   ☐ ELECTIVE
LANGUAGE:       ☑ Eng.           ☐ INTERPRETER CALLED

CHIEF COMPLAINT  Feeling depressed/angry
States was "discharge from job
TRIAGE ASSESSMENT INCLUDING PRE-HOSPITAL INTERVENTIONS:

TIME: today" - Denies SI in HI -
Prev. seen by counselor in Tewksbury
Denies substance abuse - Denies
by psych admissions - 0' Alert
Neat, cooperative, crying

PAIN #

VITAL SIGNS:   BP 158/99   P 68   R 20   T 97⁹⁹
POx 98   Wgt ___ Kg
V.A. OD ___ OS ___ OU ___   ☐ CORRECTED
LMP       N/A           Peak Flow ____
IMMUNIZATION: ☐ UP TO DATE   ☑ UNKNOWN   ☐ Last dT: ____
IF UNKNOWN, PLAN: _____

## CURRENT MEDICATIONS

Prilosec
Rimadore
PAXIL
Provail

## PAST MEDICAL HISTORY
TB POTENTIAL HIS ☐ YES ☐ NO
Anxiety
Sleep apnea / CPAP @ noc

ALLERGIES:       ☑ NKDA       ☐ ALLERGIC TO LATEX

ALLEGED/SUSPECTED ABUSE ASSESSMENT:
DOMESTIC VIOLENCE:   ☐ YES  ☑ NO   ELDER ABUSE ☐ YES ☑ NO
CHILD ABUSE/NEGLECT   ☐ YES  ☑ NO
OTHER: _____
ARE THERE ANY CULTURAL/RELIGIOUS PRACTICES THAT WOULD INFLUENCE
YOUR CARE?   ☐ YES  ☑ NO
SPECIFY: _____
TRIAGE INTERVENTIONS:
☐ XR _____   OTHER: _____
☐ DIRECT TO TREATMENT ROOM
☑ CORE   ☐ PEDI   ☐ PEDI FT   ☐ ADULT FT

SIGNATURE:  Dm1 one                      RN
EDNURREC  10/01

## SECONDARY ASSESSMENT

### RESPIRATORY  ☐ N/A          ### CARDIAC
AIRWAY              BREATH SOUNDS          MONITOR PATTERN: ____
                        L    R
☐ PATENT          ☐ CLEAR      ☐    EDEMA  ☐ YES  ☐ NO
☐ COUGH           ☐ RALES      ☐       WHERE? ____
☐ DYSPNEA         ☐ WHEEZES    ☐    PAIN  ☐ YES ___ /10  ☐
☐ OTHER           ☐ DIMINISHED ☐       LOCATION? ____

### NEUROLOGICAL ASSESSMENT      ☐ N/A
GLASGOW COMA SCALE

|  | Arrival | PUPILS |
|---|---|---|
| Eye Opening |  | R   size |
| Verbal React |  |  |
| Motor |  |  react |
| Total |  | L   size |
|  |  | react |

EYE OPENING                VERBAL RESPONSE
4. SPONTANEOUSLY      5. ORIENTED AND CONVERSES
3. TO VERBAL COMMAND  4. DISORIENTED AND CONVERSES
2. TO PAIN            3. INAPPROPRIATE WORDS
1. NO RESPONSE        2. INCOMPREHENSIBLE SOUNDS
                     1. NO RESPONSE
                     V. NO RESPONSE BECAUSE OF INJURY

MOTOR RESPONSE
6. OBEYS VERBAL COMMAND      NOTE:
5. LOCALIZES PAIN           ADD "T" (INTUBATED)
4. FLEXION WITHDRAWAL        AND.OR
3. ABNORMAL FLEXION DECORTICATE  "P" (PARALYTIC DRUGS)
2. ABNORMAL EXTENSION DECEREBRATE  TO TOTAL SCORE
1. NO RESPONSE

PUPILS (mm)
N = NORMAL;  S = SLUGGISH;  F = FIXED
2mm   3mm   4mm   5mm   6mm   7mm   8mm

### GI / GU  ☐ N/A                         ☐ Dysuria
ABD:   ☐ Flat   ☐ Obese   ☐ Distended   ☐ Bowel Sounds
Pain on Palpitation: ☐ Yes   ☐ No   Where ____
Incontinent:   ☐ Yes   ☐ No   ☐ Urine   ☐ Stool

### MUSCULOSKELETAL          ☐ N/A   Pain on Palpation: ____
Deformity ____    Swelling: ____
Rom/Sensation: ____

| Pulses |  | L | R | | PULSES | CAPILLARY REF |
|---|---|---|---|---|---|---|
| DP |  |  |  | | 4. Bounding | NORMAL < 2 SEC. |
| PT |  |  |  | | 3. Normal | DELAYED > 2 SEC |
| Radial |  |  |  | | 2. Weak, Thready |  |
| Femoral |  |  |  | | 1. Doppler only | |
| Carotid |  |  |  | | 0. Absent | |

|  | L | R |
|---|---|---|
| Fingers |  |  |
| Toes |  |  |

### SKIN  ☐ N/A   ☐ Color: ____   ☐ Temperature: ____
☐ Laceration: ____   ☐ Rash: ____   ☐ Lesion: ____
☐ Abrasion: ____   ☐ Puncture: ____
☐ Erythema: ____   ☐ Other: ____

### BEHAVIORAL ASSESSMENT           ### GENERAL ASSESSMENT
☐ Anxious       ☐ Cooperative    ☐ Healthy Appearance   ☐ Thin
☐ Depressed     ☐ Uncooperative  ☐ Obese                ☐ Unkempt
☐ Hostile       ☐ Agitated       ☐ Cachectic
☐ Other: ____                     ☐ Other: ____

< 18 YRS. AT APPROPRIATE DEVELOPMENTAL LEVEL:  ☐ YES  ☐ NO
IF NOT, WHY? ____

### PAIN ASSESSMENT
PAIN   ☐ No   ☐ Yes   Adult 1 - 10   /10 Location: ____
PAIN FOR NON ENGLISH SPEAKING PATIENTS OR CHILD
0   1   2   3   4

SIGNATURE: ____

MED 00114

Page 3

Pages:   1 - 121
Exhibits: 1 - 39

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. NO. 04-12492GAO

PAUL PIZZUTO,                    )
         Plaintiff,          )
                                )
                                )
  v.                            )
                                )
                                )
AIRBORNE EXPRESS, INC.,         )
et al.,                         )
         Defendants.        )

DEPOSITION OF JOSEPH M. HAMILTON, Jr.,
called as a Witness by Counsel for the Plaintiff,
pursuant to the applicable provisions of the
Massachusetts Rules of Civil Procedure, before Ann
M. Lavoie, Court Reporter and Notary Public in and
for the Commonwealth of Massachusetts, taken at the
Law Office of Richard A. Mulhearn, 41 Elm Street,
Worcester, Massachusetts 01609, on Tuesday, June 5,
2007, commencing at 10:10 a.m.

*************************

FLYNN REPORTING ASSOCIATES
Professional Court Reporters
One Exchange Place
Worcester, Massachusetts 01608
(508) 755-1303 * (617) 536-2727
TOLL FREE: (888) 244-8858
FAX: (508) 752-4611
*************************

### INDEX

1
2
3   Deposition of:                          Pages
4
    Joseph M. Hamilton, Jr.
5
    By Mr. Mulhearn                          9
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 2

### A P P E A R A N C E S

LAW OFFICES OF RICHARD A. MULHEARN
By:  Richard A. Mulhearn, Esq
    41 Elm Street
    Worcester, Massachusetts 01609
    508-753-9999

Appearing for the Plaintiff

SULLIVAN WEINSTEIN & MCQUAY, P.C.
By:  C. Max Perlman, Esq.
    Two Park Plaza
    Boston, Massachusetts 02116
    617-348-4300

Appearing for the Defendants

Exhibit 25

Page 4

### E X H I B I T S

| No. | Description | Page |
|---|---|---|
| 1 | Resume of Joseph M. Hamilton | 7 |
| 2 | Pizzuto Coaching/Disciplinary Action Log | 7 |
| 3 | Paul Pizzuto Suspension/Discharge | 7 |
| 4 | Driver Fitness Determination | 7 |
| 5 | Airborne Express/Memorandum for Record, Dated 6/18/03 | 7 |
| 6 | 2003 Attendance Controller Calendar | 8 |
| 7 | Paul Pizzuto Probable Suspicion Test July 16, 2003 | 8 |
| 8 | Union Contract Excerpt: Probable Suspicion Testing for Drugs and Probable Suspicion for Alcohol | 8 |
| 9 | Affidavit Joe Hamilton | 8 |
| 10 | Email from Michael Trudeau to Joe Hamilton, Arthur Leveris | 8 |
| 11 | Email from Christopher Demmons to Joe Hamilton, Dated 7/16/2003 | 8 |
| 12 | Bill McLellan to Joe Hamilton Dated 7/16/2003 | 8 |
| 13 | Email from Ben Brown to Joe Hamilton, Dated 7/16/2003 | 8 |
| 14 | Email from Arthur Leveris to Joe Hamilton, Dated July 16, 2003 | 8 |
| 15 | Email from Joe Hamilton to Joe Hamilton, Dated July 16, 2003 | 9 |

Exhibit 25

8c884a5e-9c79-4df0-99de-098465bd4b19

Page 61

1    Q. It related to drugs or alcohol compared to
2  something else?
3    A. Yeah.
4    Q. I'm just trying to identify this piece of
5  information in front of us.
6        This email from Trudeau, Exhibit 10 here,
7  was one of the incidents that was being relayed to
8  you; correct?
9    A. Yeah. It was an incident of a threat being
10  relayed to me.
11    Q. There's a phrase there; the bald guy with
12  glasses who was doing something -- allegedly doing
13  something to Mr. Pizzuto.
14        That reference you understood?
15    A. No.
16    Q. I'm looking at you.
17        It wasn't you.
18    A. No.
19    Q. That was nonsense to you?
20    A. Absolutely no sense.
21    Q. Let me show you Exhibit 11.
22        MR. MULHEARN: For the record,
23  it's an email dated July 16, 2003 from Christopher
24  Demmons to the witness.

Page 62

1    A. Alright.
2        MR. PERLMAN: Can we take a quick
3  break?
4        MR. MULHEARN: Sure.
5    Q. (By Mr. Mulhearn) Looking at Exhibit 11, is
6  that something you received from Mr. Demmons?
7    A. Yes.
8    Q. Demmons was a supervisor that worked for
9  you?
10    A. Yes.
11    Q. Was he also a supervisor that was
12  supervising Mr. Pizzuto?
13    A. Yes.
14    Q. As you can see in the first sentence or two
15  of that email, there's talk there about Pizzuto
16  being out on worker's compensation for seven months
17  due to various physical and mental health issues.
18        See that?
19    A. Yup.
20    Q. Was that something that was news to you at
21  this time; in other words, that he had been out of
22  worker's compensation for physical and mental health
23  issues?
24    A. Again, it's something I was never -- I had

Page 63

1  150 employees that, at various stages, were out on
2  different reasons.
3        This wouldn't be anything that would jump
4  out at me as not normal. In the course of a day, I
5  would be getting reports on lots of things.
6    Q. By virtue of this email of you being told
7  by Demmons that Pizzuto was out for mental health
8  issues; is that fair to say?
9        MR. PERLMAN: Objection.
10    A. Yes. Chris's first sentence, that's what
11  he says.
12    Q. In answer to my question before you --
13  whether you considered it important or not, I'm not
14  really asking that -- is that something that you
15  were already aware of; that he had been out on a
16  mental health issue before?
17    A. I don't recall ever focusing on it or
18  knowing it.
19        I knew him and multiple other employees
20  have had different times off.
21    Q. Is it fair to say that mental health issues
22  might be an explanation of someone acting in a
23  paranoid way?
24        MR. PERLMAN: Objection.

Page 64

1    A. I don't remember.
2    Q. This email was something that was sent to
3  you by Demmons that led to the drug and alcohol
4  testing of Mr. Pizzuto; correct?
5        MR. PERLMAN: Objection.
6    A. I would say -- again, let me make sure I've
7  got my times here.
8        This is something that focused again on
9  this very specific threats being made to Chris. And
10  there were threats made to Mike and threats made to
11  me, and there was very loud and boisterous behavior.
12        So taken as a whole, there's probably
13  pieces of this that could have led to that and
14  really focused around the threats and it just being
15  really unsafe and really knowing that this unsafe person
16  was going to get in a truck.
17    Q. I respect the answer. I'm really still
18  focused on this point of just your knowledge at all
19  that Pizzuto had had some mental health issues.
20        Did you have any such knowledge?
21    A. I don't recall any specific conversations
22  about it at all.
23        I mean, I see this email. I read it, so I
24  know I got it, but it doesn't jump out at me.

Page 109

1    Q. Basically the way that Mr. Pizzuto
2  responded to things said at the meeting led him to
3  be terminated instead of going off on disability;
4  correct?
5    A. He didn't want to take our discipline.
6    Q. Is it fair to say it was based on his
7  response to what you said at that meeting you
8  decided to terminate him --
9    MR. PERLMAN: Objection.
10   Q. (By Mr. Mulhearn) -- rather than just issue
11  the written warnings?
12   A. The warnings — I had just cause to
13  terminate him at that point, based on what I had at
14  that morning.
15   It just was beyond — it was beyond a
16  progression in discipline. It was, This is now a
17  major, major safety, and I really felt that this
18  could lead to a catastrophe.
19   Q. Just a couple of questions about what you
20  said here in the email.
21   It is something where, at the bottom of the
22  first page, he's asking you if you were telling him
23  to punch out, because he's going to leave and go
24  directly to the doctor.

Page 110

1    See that?
2    It continues on the next page as well.
3    A. What's the question?
4    Q. Is this accurate as to what he was saying
5  to you?
6    A. If I wrote it in this summary, then that's
7  what was summarized.
8    Q. Let me go as to your understanding.
9    A. That's what happened.
10   Q. Your understanding was that he was saying
11  he was going to leave, go to his doctor, get the
12  doctor to get a note saying it was okay to come back
13  to work.
14   A. And I told him that he was fired. He was
15  terminated.
16   Q. That was your understanding of what he was
17  saying to you; right?
18   A. That's what he said. Yeah.
19   Q. The next sentence, I don't understand what
20  it means.
21   It says, He then said he would be going on
22  FMLA under stress.
23   A. Right.
24   Q. Did you understand what he was saying?

Page 111

1    A. No.
2    MR. PERLMAN: Objection.
3    A. You'd have to ask him. I just summarized a
4  quote.
5    Q. Does that make any sense to you then or
6  now?
7    A. No. I don't even recall him saying that at
8  this thing. I'm sure he did. I wrote it.
9    Q. So had you told him that you were going to
10  put him out on FMLA?
11   A. No.
12   Q. You were telling him that you were firing
13  him; correct?
14   A. I told him he was terminated.
15   Q. I'm showing you Exhibit 33, which appears
16  to be the termination or discharge notice of July
17  25, 2003.
18   Is this something that was issued that day?
19   A. Yes.
20   Q. Was this something that had been prepared
21  before that meeting that we've just been discussing?
22   A. Probably minutes before.
23   Q. This was ready to go if the meeting didn't
24  go one way.

Page 112

1    This was the other way; correct?
2    A. My recollection is is that as soon as I was
3  reported that he drove up on the dock that I had
4  this drawn up.
5    Q. I'll show you Exhibit 34. I want to ask
6  you to look at Section 5 of this. It's a page from
7  the contract.
8    My question to you, before I ask anything
9  else about this document, is whether he had any
10  other options available to him at the time, other
11  than what has been stated; termination or he goes
12  off on a voluntary medical leave?
13   Did you have the option, also, of putting
14  him out involuntarily on a medical leave?
15   A. I don't recall ever investigating that.
16   Q. You don't recall if you had that option?
17   A. Yeah. Again, my mindset at this particular
18  point in time is that I have a bunch of people
19  basically in fear of the threats.
20   They had been threatened. I've been
21  threatened. I'm getting ready to confront someone
22  who I'm afraid of.
23   There was a lot of things going through my
24  mind. But it was more around how do I keep this

8c884a5e-9c79-4df0-99de-098465bd4b19

Page 113

1  situation so it doesn't escalate to a catastrophe
2  and defuse it.
3      Q. Understood.
4      But this idea of a third option of putting
5  him out involuntary on leave, not firing him but
6  just putting him out on leave as a danger, that
7  never occurred to you at the time?
8      A. I don't recall ever thinking of that.
9      Q. This Section 5 --
10     A. What is this?
11     Q. Article 51, Section 5 of the supplemental
12 agreement.
13     A. Let's call it a contract.
14     Q. This is where it comes from.
15         MR. PERLMAN: Let me see what
16 the --
17     A. Page 175.
18     Q. Does it appear that there was the ability
19 of Airborne to require an employee to have a medical
20 exam reporting that he was unfit for duty?
21         MR. PERLMAN: Objection. This
22 only talks about being physically qualified.
23     Q. (By Mr. Mulhearn) If you look at Section 5,
24 Examinations, it talks about someone being

Page 114

1  physically qualified to work, if a dispute develops
2  there's a process of sending someone to an impartial
3  doctor, et cetera.
4      Did you know that you had an option, at
5  least with regard to a physical inability to work,
6  to do that?
7          MR. PERLMAN: Objection.
8      A. What I know that morning is that what I was
9  mainly focused on was him being off my property to
10 defuse a catastrophe here.
11     Again, my focus is purely on him
12 threatening me, threatening my supervisors, being
13 loud, boisterous, and really behaving badly.
14     And I did not want that to escalate to
15 something that I couldn't turn the clock back on.
16 So my strategy was to get him off the property in a
17 very nonconfrontational matter, if possible,
18 because, guess what, we're all afraid of this guy.
19     And we're sitting in an environment just
20 like this, and he's sitting there, and I'm going to
21 be the one to tell him that he's terminated.
22     And what's going through my mind is if I
23 have an option, before that, it would be, The union
24 can defuse this, I will use that option.

Page 115

1      I don't know what's wrong with him. All I
2  know is that I'm afraid, and all my supervisors were
3  afraid. That's all that was on my mind.
4      I wasn't thinking anything other than that.
5  So the options were he was getting off the property.
6      Q. Had you ever sent any employee for a
7  fit-for-duty exam, involuntarily, to that?
8      A. Specifically, I don't recall. I've heard
9  of it.
10     I was there 13 years. It was standard
11 after, say, worker's comp that they would do that.
12     Do I ever remember pulling someone off the
13 line and doing it? No.
14     Q. I'll show you Exhibit 35, which is another
15 piece of the contract, Article 47, Discharge and
16 Suspension.
17     Are you generally familiar with this
18 provision?
19     A. Generally.
20     Q. Is it fair to say, with regard to
21 discharging an employee under the contract, that
22 normally you had to get at least one warning notice
23 or written warning with regard to the conduct, with
24 some exceptions?

Page 116

1      A. Every situation is different. Every
2  situation is different.
3      There's a progression in some situations;
4  other situations, it's just.
5      Q. Can you tell me how you complied with
6  Article 47 in discharging Pizzuto on July 25?
7      A. I probably added one extra step in here
8  that I didn't need to because of that morning; an
9  incident where it really escalated to a whole new
10 level of people looking for exit routes. And now
11 I'm really saying, You know what, this could be a
12 real possibility.
13     I could have done that -- I could have
14 moved at this stage right to termination. I had a
15 warning already set up from the day before, so we
16 issued them both that day.
17     But the whole idea at this stage, at this
18 time in the morning, was that he was leaving the
19 building.
20     Q. Just under the technicalities of it -- I
21 know the substance you already described -- but
22 technically speaking, under this Article 47, he
23 needed to be given a written warning for the conduct
24 he was let go for before you could let him go;

Page 117

1  correct?
2    A. That's not correct, actually.
3    I had just cause the minute I really felt
4  that this person was -- I felt at that stage, that
5  morning, that this person was a real threat. And I
6  wanted to prevent a catastrophe, that I need him out
7  of here.
8    So, yes, you know, I have just cause. I
9  didn't need a warning.
10   Q. This particular provision does require the
11  warning and puts forth some very specific --
12   A. This is very general. It covers a lot of
13  different things from --
14   Q. Sure.
15   But it gives very specific exceptions where
16  you can discharge someone without that warning if
17  there's dishonesty, drunkenness, recklessness that
18  results in a serious accident or carrying
19  unauthorized passengers and two other examples that
20  are specifically listed.
21   The question to you is: Is it true that
22  none of those applied?
23   A. They are not written in there.
24   Q. Is it fair to say that you believed you had

Page 118

1  the right to fire for just cause or terminate for
2  just cause regardless of any prior written warning?
3    A. Yeah. I felt that this was a huge safety
4  issue that needed to be addressed.
5    Q. I'll show you Exhibit 36.
6    MR. MULHEARN: For the record, it
7  is a packet of information sent by Mr. Pizzuto to
8  Steve Crossken.
9    Q. (By Mr. Mulhearn) I'll note there in the
10  exhibit there's attached an FMLA and medical
11  information.
12   Do you see that?
13   A. Yup.
14   Q. Was this something that you yourself ever
15  received?
16   A. This was to Steve Crossken.
17   Q. But did you ever receive it yourself?
18   A. I don't recall seeing it.
19   Q. Let me show you Exhibit 37, which is the
20  underlying FMLA paperwork that's part of the
21  previous exhibit.
22   Did you ever see this?
23   A. I don't recall it. I imagine these are all
24  in his file.

Page 119

1    Q. Let me show you Exhibit No. 38.
2    MR. MULHEARN: For the record, it
3  is an October 28, 2002 memo to Mr. Pizzuto from
4  Labor Relations confirming his medical or Family
5  Medical Leave being allowed.
6    I'll note for the record it's cc'd to S.
7  Crossken.
8    Q. (By Mr. Mulhearn) Is this something you
9  received yourself, too?
10   A. I don't recall seeing that.
11   Q. Is it typical for the district manager to
12  get a copy of the FMLA confirmation when someone
13  goes on?
14   A. It's typical that this confirmation would
15  come in and, more than likely, my admin would have
16  received that.
17   Q. Operations does get a copy of the FMLA
18  confirmation?
19   MR. PERLMAN: Objection.
20   A. Yes.
21   Q. You are, if they are approved on leave?
22   A. Yeah. I don't recall if it goes to us or
23  Labor Relations.
24   Q. Last, but not least, Exhibit 39.

Page 120

1    MR. MULHEARN: For the record,
2  this is a series of copies of photographs of an
3  individual, which appears to be Mr. Pizzuto.
4    Have you seen these photographs before?
5    A. I can't make out these photographs, but I
6  know it was him.
7    Q. After he was let go, did he picket in front
8  of the facility?
9    A. There were days he would show up. Yes.
10   Q. Does this appear to be pictures of that
11  activity?
12   A. That's what it looks like.
13   Q. Do you know how long he did that for?
14   A. I don't recall. I know we hired a security
15  guard on the days he did it.
16   Q. It was just him out there?
17   A. Again, I would drive by, but I was not
18  looking at him or insighting him.
19   MR. MULHEARN: I have no further
20  questions.
21   MR. PERLMAN: And I have no
22  questions.
23   (Whereupon the deposition was
24  concluded at 1:22 p.m.)

8c884a5e-9c79-4df0-99de-098465bd4b19

COMPRESSED COPY

```
  1              UNITED STATES DISTRICT COURT

  2         FOR THE DISTRICT OF MASSACHUSETTS

  3    - - - - - - - - - - - -x

  4    PAUL PIZZUTO,                    :

  5              Plaintiff,             :

  6         vs.                         :   Civil Action

  7    CROSSKEN EXPRESS, INC.,          :   No. 04-12492 GAO

  8    STEVEN CROSSKEN, JOSEPH          :

  9    HAMILTON, GREG SWEATT,           :

 10    and ARTHUR LEVERIS,              :

 11              Defendants.            :

 12    - - - - - - - - - - - -x

 13                        Raleigh, North Carolina

 14                        Thursday, June 28, 2007

 15              TELEPHONIC DEPOSITION OF CHRISTOPHER

 16    MICHAEL DEMMONS, a witness herein, by counsel for

 17    the Defendants in the above-entitled matter,

 18    pursuant to notice, the witness being duly sworn

 19    by VIRGINIA E. LEWIS, a Notary Public in and for

 20    the State of North Carolina, taken at Your

 21    Office USA, 2501 Blue Ridge Road, Raleigh, North

 22    Carolina, at 1:00 p.m., on Thursday, June 28,

 23    2007, and the proceedings being taken down by

 24    Stenotype by VIRGINIA E. LEWIS, and transcribed

 25    under her direction.
```

Exhibit 26

Exhibit 26

62

1  lay person might?
2    A.  No, negative.  You know, bottom line is
3  it didn't matter if it was me as an ex-military
4  manager or a civilian manager.  Insubordination
5  is insubordination.  Stepping toe to toe with
6  your boss, threatening him physically, I don't
7  know, I don't care where you're from.  A threat's
8  a threat.
9    Q.  And when you say "major disruptive force
10  in the workplace," what did you mean?
11    A.  Day to day, you've got a job to do.
12  We've got to sort freight, we've got to get it
13  out to customers, make level of service.  So
14  disruptive from the fact of, you know, trying to
15  get the job done.  I've got other drivers to
16  manage besides Paul Pizzuto, going back to my 90
17  percent, 10 percent analogy.  You know, it's a
18  business.  You've got to come in there with a
19  solid work ethic, take a little pride in your
20  job, get the work done, go to the house.
21    Q.  Right.  And it is your testimony that you
22  have absolutely no recollection of Pizzuto's drug
23  and alcohol test on July 16, 2003?
24    MR. PERLMAN:  Objection; asked and
25  answered.

63

1      You can answer.
2    A.  Yeah.  Yeah, no recollection.
3    Q.  All right.  And you have no recollection
4  of him having any conversation with you on that
5  day?
6    A.  No, no recollection.
7    Q.  Do you remember him saying something to
8  you to the effect the police will get you?
9    A.  I just remember him stepping toe to toe
10  to me, and him looking at me and threatening.  I
11  don't remember him saying anything about the
12  police are going to get me.
13    Q.  All right.  Do you remember Jim O'Brien?
14    A.  Yeah, I know Jim O'Brien.  He used to be
15  one of my drivers as well.
16    Q.  All right.  And was he not often a union
17  rep as well?
18    A.  No, he wasn't a union rep.
19    Q.  All right.  Do you remember Michael Ray?
20    A.  Yes, I know Michael Ray.
21    Q.  Do you remember Jim O'Brien and Michael
22  Ray coming up to you or approaching you asking
23  you why, or what the probable suspicion was for
24  Pizzuto's drug and alcohol test?
25    A.  No, I don't recollect that.

64

1    Q.  Did you have any conversations with
2  Mr. Hamilton with regard to your concerns about
3  Pizzuto's mental health?
4    A.  Do not recollect any.  We had
5  conversations references job performance.
6    Q.  Do you remember -- strike that.
7      You mentioned that you were there on the
8  day that Pizzuto was fired, right?
9    A.  I believe so.
10    Q.  And do you remember where you were
11  compared to -- I mean, where were you physically
12  at the time that he drove into the station?
13    A.  The North Shore belt, which is the belt
14  closest to the entryway where you could drive a
15  vehicle up from the outside parking lot.  When he
16  stopped his privately owned vehicle, he was
17  probably no more than 15, 20 feet from me.
18    Q.  And you say that you had fear for your
19  physical safety at that time?
20    A.  Yes, I did.
21    Q.  And you described it before.  You said
22  you thought he was going to go postal, come out
23  shooting, words to that effect?
24    A.  Yeah, sure.
25    Q.  And what made you think that he was going

65

1  to come out shooting?
2    A.  Once again, going back to the original
3  statement we were talking about, he had
4  manifested a lot of anger and rage issues.  When
5  I see a car screaming at a high rate of speed
6  into the facility within about 15 or 20 feet of
7  my proximity, I get a little concerned.
8    Q.  And how fast do you think he was going?
9    A.  I couldn't even venture a guess.  I'd --
10  I'd -- I'd say when you're pulling vehicles out
11  of there, you're going less than under five miles
12  an hour.  He had to be a good ten miles plus over
13  that.
14    Q.  And did you see him get out of the car?
15    A.  Yes, I did.
16    Q.  And what did you see at that time?
17    A.  I believe he got out.  We all were
18  sitting there, jaws dropped to the ground.  He
19  went in, and he punched in.
20    Q.  And then what did he do?
21    A.  What did he do?
22    Q.  Yes.
23    A.  You know, I haven't got a clue.  I think
24  he got in his car and drove out.  I know what I
25  did.  I went back, took care of my -- supervised

COMPRESSED COPY

66

1    my guys, and turned it over to the two IC of the
2    building to adjudicate.
3      Q.  Right.  So you told Hamilton about this?
4      A.  I believe, I want to say it was Leveris
5    out there; and him, as he's second in command for
6    the station, I let him deal with it.  I had
7    enough of dealing with it.
8      Q.  All right.  Were you ever asked to
9    prepare a statement with regard to what you saw?
10     A.  You know, honestly, I think that day I
11   went out on the road.  So I might have introduced
12   a statement, I'm not even sure.  I don't
13   recollect.  I know there was other managers
14   present during this, and they were going to
15   handle it.
16     Q.  All right.  Now, this incident took place
17   at the beginning of the shift, did it not?
18     A.  Yes, it did.
19     Q.  And were you aware that there was at
20   least a -- somewhat of a practice at that station
21   that if employees were running late that they
22   might drive up, punch in before they parked their
23   cars?
24     A.  I've never seen that before.  When they
25   drive up, they drive up, park outside the ramp

67

1    outside the building, walk up and punch in.  I've
2    never seen a driver drive his POV up to the time
3    clock to punch in.
4      Q.  At the time in like July 2003 time frame,
5    wasn't there an ongoing investigation at that
6    station with regard to employees -- well,
7    suspected to be employee theft?
8      A.  Could have been.
9      Q.  Do you remember that specifically?
10     A.  There was always an ongoing examination
11   of loss prevention issues in that building.
12     Q.  You don't remember any particular
13   investigation going on?
14     A.  Like I said, there was an ongoing
15   investigation probably from the time I set foot
16   in that building till the time I left.
17     Q.  All right.  So if a driver were concerned
18   that freight were being stolen from his truck,
19   that would be a legitimate concern, wouldn't it?
20     MR. PERLMAN:  Objection.
21     MR. PERLMAN:  You can answer if you
22   understand the question.
23     THE WITNESS:  Yeah, I understand the
24   question.
25     A.  I don't think it's a legitimate concern.

68

1      Q.  If freight was being stolen?
2      A.  I mean, it wasn't freight being stolen.
3    It was freight being stolen from the company, not
4    from the drivers.
5      Q.  Okay.  But didn't Mr. Pizzuto report to
6    you that he thought someone was stealing his
7    freight?
8      A.  Yeah, when he was out on the road.
9      Q.  That was in your memo, right?
10     A.  Yeah.  When he was out on the road, he
11   thought he was being followed and somebody was
12   stealing his freight while he was out on the road
13   out doing his route in Andover, Massachusetts.
14     Q.  All right.  Just to be straight with you,
15   I mean, if somebody was concerned about theft or
16   freight being stolen, that would be a legitimate
17   concern, but you didn't believe Pizzuto's claim
18   of theft?
19     MR. PERLMAN:  Objection.
20     Q.  Would you buy into that?
21     A.  No.
22     Q.  All right.  So what was it about Pizzuto
23   that -- where you said if his freight was being
24   stolen that didn't raise a concern with you?
25     A.  I'd been out with him on the road before,

69

1    watched his habits, watched how he conducted his
2    business.  And I was trying to figure out where
3    in the world, number one, we as the management
4    team were -- were somehow surreptitiously
5    pursuing him and, number two, taking freight off
6    his truck.  That's what it was directed at, the
7    management team within the building.  We were
8    stealing the freight off his truck.
9      Q.  All right.  So you discounted his
10   allegation?
11     A.  I think I just explained myself.
12     Q.  Well, you didn't believe him, did you?
13     A.  What's that?
14     Q.  You didn't believe someone was stealing
15   his freight, did you?
16     A.  No, I didn't believe him.  I went out on
17   the road with him to check to see if we were
18   doing something where the locks on his trucks
19   were failing or if he was doing something
20   procedurally; i.e., leaving his truck open when
21   he went to make deliveries that could facilitate
22   any freight being stolen from him.
23     Q.  And you thought he was delusional,
24   correct?
25     A.  No.

Exhibits 86-88                Volume 1, Pages 1-95

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-12492-GAO

PAUL PIZZUTO

    Plaintiff

    v.

CROSSKEN EXPRESS, INC.

STEVEN CROSSKEN

JOSEPH HAMILTON

GREGORY SWEATT

ARTHUR LEVERIS

          DEPOSITION of GREGORY J. SWEATT

 Thursday, July 19, 2007, 10:42 a.m. to 1:08 p.m.

        Sullivan, Weinstein & McQuay, PC

          Two Park Plaza, Suite 610

           Boston, Massachusetts


    ----------JONATHAN H. YOUNG, RDR/CRR----------

          FARMER ARSENAULT BROCK LLC

        50 Congress Street, Suite 415

       Boston, Massachusetts 02109

       617.728.4404Fax 617.728.4403

         www.fabreporters.com                Exhibit 27

Exhibit 27

70

1    A. Yes.
2    Q. And the end of the ramp puts you inside the
3  building?
4    A. Yes. There's a dock door right here that
5  closes. The ramp is outside, and then the door
6  closes, and then inside here you'd call that the
7  dock too.
8    Q. Now, at the top of the page of Exhibit 88
9  you have sort of an oblong figure there. Are those
10  the belts?
11   A. Yes. That's the belt where the freight
12  goes down.
13   Q. Could you write the word Belts in there?
14       And then, on the diagram you have to the
15  right of the ramp an area with a yellow TC in a box,
16  right?
17   A. Time Clock.
18   Q. Can you put the letter A there in a big
19  circle?
20   A. Yes.
21   Q. Now, the area A is the area of the time
22  clock?
23   A. Yes.
24   Q. Can you show us, without marking yet, on

71

1  Exhibit 88 where you were at the time stated in
2  Exhibit 30 when you were walking on the dock when
3  you first observed this car?
4    A. Right here.
5    Q. So can you put a B in a circle?
6        The B location is where you were when
7  you heard a car coming up the ramp?
8    A. That's when I looked; because I heard a car
9  coming around the corner, and that's when I looked.
10  I was right there.
11   Q. Now, when you say around the corner, that
12  means what?
13   A. Well, I don't want to draw on that.
14  I don't know if I'm allowed to or not.
15       Well, the building, the corner of the
16  building, if I kept drawing it, I guess the building
17  goes like this, really; you know what I'm saying?
18   Q. Can you put another line where the building
19  might be ending?
20   A. Yes. It's probably actually beyond, like
21  more down here, I'd say.
22   Q. All right.
23       So to come up the ramp, a vehicle would
24  have to...

72

1    A. Come around.
2    Q. The front of the building?
3    A. The front of the building. You'd have to
4  come down around the front of the building and then
5  turn the corner.
6    Q. And when you were at Location B, you heard
7  what?
8    A. I heard a car coming around the corner, and
9  I took a look.
10   Q. And what did you see?
11   A. I saw Paul Pizzuto's red Volkswagen with
12  him driving in it coming up the ramp.
13   Q. Did you know his car?
14   A. Yes.
15   Q. And can you put a C where you think that
16  vehicle was when you first saw it?
17   A. I guess I should have draw it bigger.
18   Q. You can put a C with an arrow down.
19   A. Somewhere down there.
20   Q. And at that time his vehicle was coming
21  around the building?
22   A. Yes.
23   Q. And what did you see right after that?
24   A. It came around the corner. I looked and

73

1  saw it was his car and him, and he drove right into
2  the building.
3        When I saw him, I moved out of the way.
4  I got out of the way.
5    Q. Now, did you make any observations at that
6  time as to how fast he was going?
7    A. Yes. I thought he was going pretty fast
8  coming around the corner; a lot faster than I would
9  have been. There's a lot of people that walk in
10  this area.
11   Q. Can you estimate in miles per hour how fast
12  he was going?
13   A. No, not really.
14   Q. Were the tires squealing or anything like
15  that?
16   A. I don't remember that.
17   Q. Did he look like he was going too fast?
18   A. I thought it was too fast.
19   Q. And from the point where you saw him to
20  where you were, how far was that, approximately?
21   A. I don't know. From inside there to the
22  corner of the building, probably 50 yards maybe,
23  40 yards, maybe a hundred or so feet.
24   Q. Did you continue to walk from Point B to

74

1    some other point?
2        A. Yes. I moved over here to this dock,
3    because there was a truck parked there.
4        Q. And did you stop there?
5        A. Yes. I went over here and kind of...
6        Q. Can you put a D where you stopped?
7        A. I want to say I'm like this, like that.
8        Q. That's your best recollection of about
9    where you were when you stopped; correct?
10       A. Yes.
11       Q. And what happened with Paul Pizzuto in the
12   meantime towards Points B and D?
13       A. Well, I wouldn't say I ran, but I moved
14   very fast.
15           And I went over to here; and then I
16   observed him drive into the building, and then he
17   jumped out of his car very quickly.
18           And I just was kind of looking over
19   there keeping an eye on him to see what was going
20   to happen; and then he went around the corner, and
21   I would assume he scanned in the time card.
22           And then he went back, got in his car,
23   and then backed out kind of fast, backed down the
24   ramp and disappeared.

75

1            And when he pulled out, I came back over
2    like to here, to kind of look to see that he went
3    away.
4        Q. Can you draw a little vehicle, or a box or
5    something representing a vehicle, as to where
6    Pizzuto pulled up to?
7        A. Where he stopped?
8        Q. Where he stopped
9        A. I'd say like right in this area here.
10       Q. Put a little E inside a circle there.
11           So E is where you think he finally
12   stopped before getting out of the car; correct?
13       A. Yes.
14       Q. Now, up to that point was there something
15   about that incident that caused concern to you?
16       A. Well, yes. Prior to this I had had him
17   make threatening remarks; and when he came around
18   the corner driving in at a high rate of speed, I
19   thought, I don't know, maybe today is the day,
20   or something was going to happen bad.
21           I just felt like, I don't know, maybe
22   he's going to get out with a gun and start shooting
23   people. I don't know.
24       Q. What was it about what he did that day up

76

1    to the point that he stopped his car?
2        A. He come around the corner fast, high rate
3    of speed, drove up the ramp and went right into the
4    building.
5            To me, that's not a common thing.
6    Nobody in my mind does that. I've seen people
7    drive their vehicles up to here or onto the edge
8    of the ramp, or even just on the ramp a little bit,
9    and stop and park and get out and run inside to scan
10   in and then run back out and get in their car and
11   leave; but I have not had anybody actually come
12   flying right into the building.
13           I was concerned about my own safety, but
14   at the same time I was thinking what if someone was
15   walking around the corner too.
16           After I thought about it, he could have
17   hit somebody too. That wasn't a very smart thing
18   to do.
19       Q. This is an area where other vehicles are in
20   and out; correct?
21       A. Trucks, yes.
22       Q. Trucks?
23       A. Yes. That's what the ramp is for.
24       Q. And when he stopped the car, did he stop

77

1    short? Did he leave like marks?
2        A. Right. There wasn't like a skid mark on
3    the pavement that I remember seeing there. He just
4    came up the ramp and the car stopped and he popped
5    the door out, jumped out real quick; and I was just
6    kind of like looking over there, like I don't know
7    what to expect.
8            I was kind of thinking, if he's
9    getting out and he's going to do some bodily harm,
10   I'm thinking about how am I going to get out.
11           There was a tractor-trailer parked
12   here that was empty, so I was kind of at a dead
13   end myself. I was in my mind out of the way; but
14   if he went over here I was kind of contemplating,
15   well, where am I going next.
16       Q. Now, according to Exhibit 30, you say there
17   that he first thought he was planning on jumping out
18   of his car and starting shooting?
19       A. That's the first thing that came to my
20   mind, when I see him come around the corner; jeez,
21   he's going to jump out and start shooting.
22       Q. And what led you to that conclusion?
23       A. Prior threats that he's made against us.
24           I don't know; you watch the news and you

78

1  see it happen, you know. For whatever reason,
2  workplace violence does exist, unfortunately.
3    Q. Is it fair to say that there was something
4  about your interactions with Pizzuto before this
5  that led you to jump to the conclusion that he
6  was going to come out and start shooting?
7    A. Yes.
8    Q. That you were in danger?
9    A. Yes.
10   Q. And what was that something?
11   A. Instances of altercations where he's
12  making threats to me to say You're going to get
13  it, You guys are going to get yours, to that effect.
14  Just having been there for a couple months, and just
15  having observed his behavior.
16   Q. And did you look for some sort of cover at
17  that time?
18   A. I did. That's when I was over here. I was
19  looking for someplace that would afford me
20  protection.
21   Q. And was there any other supervisor in the
22  area at the time?
23   A. At the moment when it happened, I had just
24  come out of here, and I didn't see anybody.

79

1        I wasn't aware. I thought at that
2  moment it was just me. I had been in here to get
3  something, come out, walk across, seen the car and
4  ran to get some cover, and that was it.
5    Q. What actually happened, though, was Pizzuto
6  got out, punched in, went back down the ramp and
7  parked; right?
8    A. Yes.
9    Q. He didn't start shooting, did he?
10   A. No.
11   Q. Did you consider that you overreacted?
12   A. No. Not considering his threats towards
13  myself, I don't think so. I'm just concerned about
14  my own behavior.
15        Like I've said, I've worked here five
16  years, and I hadn't had anybody make those kinds of
17  threats toward me.
18   Q. But more specifically, on this occasion you
19  were wrong when you thought he was going to get out
20  of the car and start shooting?
21   A. Obviously I was wrong, because he didn't.
22   Q. He was punching in?
23   A. Obviously. He punched in.
24   Q. And you referred to before that drivers

80

1  have punched in before parking their car on prior
2  occasions; correct?
3    A. I've seen people that have driven over here
4  and parked, but in my mind it was at the foot of the
5  ramp. I don't remember seeing anybody drive into
6  the building.
7        I've seen them park on the ramp,
8  like drive up and pull over to the side; because
9  they would realize that this is a working dock area.
10       Vehicles were coming in from the
11  airport that have to park here, they have to get
12  in there; they don't want to be parking in a way
13  that's going to block the dock off.
14       These trucks aren't leaving, but there
15  are people that are going to come from the airport
16  that are going to drive in with a DHL vehicle.
17  They just pull over to the side. That was
18  the purpose of it.
19       MS. EISENBERG: Can I ask that the
20  record reflect that the area that Mr. Sweatt is
21  pointing to where he has seen other people drive
22  up and park falls outside the doorway, outside the
23  building area?
24       MR. MULHEARN: Fine.

81

1    Q. Why don't you draw a little box and put an
2  F in it as to the furthest you've seen a car drive
3  up before that to punch in like that.
4        Okay; and what you've just drawn is
5  somewhere on the ramp toward the lower part?
6    A. Yes.
7    Q. So Pizzuto drives up, as you say, goes
8  out, goes toward the time clock, gets back in his
9  vehicle, and backs out and goes to park; correct?
10   A. Yes.
11   Q. Do you remember that there was laughter in
12  the vicinity when this was occurring?
13   A. No, because there weren't like 10 or 20
14  guys standing here.
15        I think there might have been like
16  one or two people, because there is an operation
17  of something, a sorting operation goes on over here,
18  and there were a few people working there.
19        I don't remember sitting there laughing
20  about anything, to tell you the truth.
21   Q. You remember there may have been someone in
22  the vicinity?
23   A. I think there might have been, because
24  there were people over here at their vehicles.

Volume 1, Pages 1-82

Exhibits: 89-97

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - -

PAUL PIZZUTO

        Plaintiff

vs.               Docket No. 04-12492 GAO

CROSSKEN EXPRESS, INC., STEVEN

CROSSKEN, JOSEPH HAMILTON, GREG

SWEATT, AND ARTHUR LEVERIS

        Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF CLAUDIA TROMBLY, M.D.

Wednesday, July 25, 2007, 1:02 p.m.

Happy 'n' Healthy Family Practice

7 Stiles Road

Salem, New Hampshire

- - - - - - - Reporter: David Arsenault, RPR - - - - - - -

darsenault@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404  Fax 617.728.4403

Exhibit 28

Exhibit 28

**6**

1    Q. Prior to your current practice here at
2 Happy 'n' Healthy, did you practice anywhere else?
3    A. I practiced at Salem Family Practice, which
4 used to be in this building, for a year and a half.
5 Before that I worked at the Greater Lawrence Family
6 Health Center in Lawrence, Massachusetts. The year
7 before that I lived in Romania and did work with
8 orphans through a Christian mission. The year
9 before that I was working at Boston Medical Center
10 going out to homeless sites taking care of homeless
11 women and children for three years. That was my
12 very first job.
13    Q. How long have you been practicing?
14    A. About ten years.
15    Q. You mentioned that you had been at Salem
16 Family Practice. Were you practicing with Dr. Chang
17 at that time?
18    A. Yes.
19    Q. Did you take over Mr. Pizzuto's care from
20 Dr. Chang?
21    A. Yes.
22    Q. So would it be correct to say that
23 Dr. Chang was his primary care physician and then
24 you became his primary care physician?

**7**

1    A. Yes. When Dr. Chang left the Salem Family
2 Practice, he handed Mr. Pizzuto's care to me.
3    Q. Do you remember when that was?
4    A. It was April of 2003. Actually, the exact
5 date I have here is 6/17/2003. We just found his
6 old Salem Family Practice record. I asked my office
7 manager to look in our archives, because this was
8 coming up. She actually handed it to me on Monday,
9 I believe. If you guys need copies of any of this
10 stuff, you can have it. There are some things from
11 Dr. Chang that are handwritten and signed. So this
12 is new information for you guys right now. I
13 apologize.
14    Q. I appreciate it. Forgive me, I have to
15 ask; I'm just doing my job here. Have you ever been
16 suspended?
17    A. No.
18    Q. Subject to any license revocations?
19    A. No.
20    Q. Application denials?
21    A. No.
22    Q. Ever been a party to a malpractice suit?
23    A. No.
24    Q. In your current practice are you on staff

**8**

1 at any hospitals?
2    A. Yes, affiliated with Holy Family, Lawrence
3 General and the Elliot.
4    Q. Where is the Elliot?
5    A. It is up in Exeter. I don't actually
6 physically go there. If I have a patient that's
7 that far up in New Hampshire, I have to have an
8 affiliation for them to go to. I don't physically
9 admit there.
10    Q. By Holy Family, you mean Holy Family in
11 Methuen?
12    A. Yes, that's my main hospital that I go to.
13       MS. EISENBERG: For the record, I'm
14 going to ask this be put into evidence. This is a
15 copy of the subpoena that was served on you.
16       (Marked, Exhibit 89, subpoena.)
17    Q. I am going to give you a set of documents
18 and ask you if you recognize them, if you wouldn't
19 mind just taking a look at those.
20    A. Yes, I do recognize these.
21       (Marked, Exhibit 90, records.)
22    Q. Can you tell me what these are? The top
23 page is marked MED 00115 at the bottom.
24    A. This is from Holy Family Hospital Medical

**9**

1 Center from their emergency room. This is the
2 discharge paper given to someone with the diagnosis
3 and where someone is referred to follow up after an
4 emergency room visit.
5    Q. You mentioned a few minutes ago that you
6 started seeing Mr. Pizzuto in April of '03, correct?
7    A. When Dr. Chang left. It was June when
8 Dr. Chang left Salem Family Practice. I had started
9 my practice down the road. He gave a lot of his
10 patients to me to follow.
11    Q. So had you already seen Mr. Pizzuto prior
12 to this emergency room visit?
13    A. I don't believe so. I don't believe I did.
14 I think Dr. Chang was the only one who saw him.
15 Yeah. I had never met him before.
16    Q. So as of July 25, '03, you had not actually
17 met him in person?
18    A. Correct.
19    Q. So who would have entered this information
20 on this top page here where it says, for example,
21 patient was treated in the emergency department
22 blah-blah-blah for depression?
23    A. This was at the hospital. Dr. Ronald
24 Teitler, the treating provider, was the one in the

58

1    A. I believe it was the last note, I guess
2 August of -- I don't remember. I don't know.
3    Q. If you look at Exhibit 93, which is your
4 compilation of notes, would that help?
5    A. August 10 of '06.
6    Q. Now, is it fair to say that throughout that
7 time that Mr. Pizzuto had given a history of having
8 some mental issues?
9    A. Yes.
10   Q. And is it fair to say that initially you
11 described those issues as being depression and
12 anxiety?
13   A. Yes.
14   Q. And at some point in time he was diagnosed
15 with bipolar, correct?
16   A. Yes.
17   Q. Do you know what doctor made that
18 diagnosis?
19   A. I would say the official person who made
20 that diagnosis was Dr. Bob Moverman.
21   Q. And he's the clinical psychologist?
22   A. Yes.
23   Q. Do you know whether Dr. Sadowski, the
24 psychiatrist, agreed with that diagnosis?

59

1    A. Yes, he did. By the medicines he put him
2 on, you can tell he agreed.
3    Q. When we see drugs related to lithium, it is
4 apparent that there's a bipolar diagnosis?
5    A. Yes.
6    Q. With regard to Mr. Pizzuto, those drugs are
7 being prescribed when?
8    A. They are being prescribed by Dr. Sadowski
9 and he sees him, I believe, every four to eight
10 weeks.
11   Q. Can you tell me the time frame as to when
12 he's diagnosed bipolar?
13   A. It appears that it would be in the fall of
14 2005.
15   Q. Throughout the course of your treatment of
16 Mr. Pizzuto, has he presented with similar symptoms
17 as far as a mental health standpoint throughout that
18 time?
19       MS. EISENBERG: Objection.
20   A. Yes.
21   Q. Do you have any opinion as to whether or
22 not his bipolar condition existed for him before he
23 was officially diagnosed in 2005?
24   A. I did not see evidence of it, but there was

60

1 a suspicion, especially because he was weaning
2 himself off of medicines without his counselor and
3 his psychiatrist being involved at one point. That
4 is very typical of bipolar.
5    Q. Beyond that, was there any difference in
6 the symptoms of mental health that he was reporting
7 to you from June of 2003 until last year?
8    A. The difference in the symptoms, as his
9 illness got worse, were the fear of going out, the
10 paranoid thoughts. Those really were indications
11 that his condition was getting a lot worse. He did
12 not exhibit those back in 2003, that he was paranoid
13 and that he couldn't leave the house. Those are a
14 definite worsening of his condition in 2005.
15   Q. And do you know whether he suffered from
16 bipolar in, say, July of 2003?
17   A. I don't know that.
18   Q. You testified on direct examination that,
19 in effect agreeing with counsel's characterization,
20 that there was a fluctuation in Mr. Pizzuto's mental
21 health throughout the course of your treatment with
22 him?
23   A. Yes.
24   Q. Sometimes he would be better and sometimes

61

1 worse, correct?
2    A. Yes.
3    Q. And did you associate that with him weaning
4 himself off of medications, that that was causing
5 the worsening?
6    A. I believe it caused the worsening, yes.
7    Q. So when he was weaning himself off of Paxil
8 to the point where he discontinued Paxil altogether,
9 you believe that was the cause of his worsening
10 mental health?
11   A. Yes.
12   Q. Did I understand you correctly that that
13 worsening was somehow, that you couldn't recover
14 from that? I think you said he was on three
15 medications and still having suicidal thoughts, I
16 think is what you said. Is the worsening something
17 that you can't go back and get better?
18   A. Not necessarily. It is a case-by-case
19 basis. I honestly cannot tell you how much and to
20 what degree his cocaine use played into this. I
21 don't know. That could also have made him worse,
22 made him paranoid.
23   Q. What you are saying is that he aggravated
24 his underlying bipolar condition perhaps through

62

1  cocaine use?
2      A. As well as weaning off his meds. It is
3  hard to tell which one or to what degree each of
4  them played into it.
5      Q. Is Paxil something that is prescribed for
6  someone with bipolar?
7      A. Not necessarily. It is more for people who
8  have anxiety and depression.
9      Q. Assuming that he had bipolar disorder, and
10  as you mentioned genetic-related condition and he
11  had that back in 2003, is it fair to say that he had
12  not been diagnosed that in 2003?
13      A. Correct.
14      Q. So that it was a misdiagnosis in 2003 for
15  anxiety and depression rather than bipolar, correct?
16      MS. EISENBERG: Objection.
17      A. I wouldn't call it a misdiagnosis. Bipolar
18  is a very difficult diagnosis to make. You actually
19  have to have someone become manic to make that
20  diagnosis. Most people who are bipolar do present
21  as depressed and anxious. It is a very difficult
22  diagnosis. The people at Greater Lawrence Mental
23  Health who treated him for depression and anxiety, I
24  couldn't say that they made a misdiagnosis or we

63

1  did, because you can't make it until someone goes
2  manic or off the deep end.
3      Q. I wasn't throwing stones so much.
4      A. I understand.
5      Q. But that he was at least incorrectly
6  diagnosed. Would you agree with that?
7      MS. EISENBERG: Objection.
8      A. I still have a hard time saying incorrect.
9  It is one of the most -- it is one of the hardest
10  diagnoses to make in mental health as a
11  psychiatrist. It is a label that people try not to
12  make until you are absolutely certain. Usually you
13  wouldn't give that diagnosis until they hit a
14  rock-bottom situation like he did, because you don't
15  floridly manifest it.
16      Q. Assuming Mr. Pizzuto was diagnosed with
17  bipolar in 2003, 2002, what kind of medication would
18  normally have been prescribed for him at that point?
19      A. Honestly, because he was doing well with
20  the Wellbutrin and the Paxil, if he was doing well,
21  I am not so sure that a psychiatrist would have
22  changed it. Even a trained psychiatrist could have
23  said: You're doing well, stay on this, stay in
24  therapy and we'll see how it goes. If you are

64

1  having a problem, we can had lithium, Lamictal or
2  other things. If a patient is doing well, you don't
3  add new medication because of a diagnosis. Only if
4  someone is clinically needing it do you change the
5  medication.
6      Q. These lithium and related medications, what
7  do those do?
8      A. Lamictal in and of itself is a mood
9  stabilizer. That helps people not be anxious or
10  angry. It keeps the mood swings to a minimum. The
11  lithium has been used for many years for bipolar to
12  keep people from going manic. There were several
13  points. The two hospital records did show that his
14  lithium levels were very, very low, which indicated
15  he was not taking his lithium. That's one of the
16  most important medicines for someone who has bipolar
17  to keep them out of these life stress situations.
18  It keeps them more stable.
19      Q. And is it clear to you from your review of
20  the records and your own knowledge that Mr. Pizzuto
21  needs the lithium now?
22      A. Yes.
23      Q. And do you know whether he needed it back
24  in 2002, 2003?

65

1      A. He was not having the mood swings that he
2  was having in 2005, he did not have those in 2003.
3  I would not have thought it a useful thing for him
4  to be on lithium, because it does have side effects
5  too.
6      Q. I know you didn't start treating him until
7  June or so of 2003. Were you aware that he had been
8  out of work for a number of months, from October of
9  '02 to sometime in February '03, totally out of work
10  for mental health reasons?
11      MS. EISENBERG: Objection.
12      A. No, I was not aware.
13      Q. Would that have been good to know?
14      A. Yes.
15      Q. And I also heard your testimony that as far
16  as things that were going on between him and work,
17  those are things that he chose not to discuss with
18  you, correct?
19      A. Correct.
20      Q. So if you had history given to you back in
21  that time frame, June of '03, that he believed there
22  was some grand conspiracy against him at work,
23  people sabotaging his work records, following him
24  around on his route to steal packages, things of

66

1  that nature, that would have been important for you
2  to know as to whether or not he might be suffering
3  from bipolar, correct?
4      A. Correct.
5      Q. Is paranoia behavior one of the symptoms of
6  bipolar?
7      A. It can be, yes.
8      Q. Give me some other examples of behavior.
9      A. Also, flight of ideas. If you're talking
10  to someone and they go from idea to idea and they
11  are flipping around, that's a sign of a manic mind.
12  If they talk really fast and you can't keep up with
13  them, that's mania. And grandiose thoughts, like
14  you think you are much more important than you
15  really are, the classic example of bipolar mania is
16  Napoleon who went to conquer all of Europe, the
17  entire world, because he was so important. People
18  who go manic think they are the center of the
19  universe and everyone is against them or for them,
20  one or the other.
21      Q. What about emotional outbursts?
22      A. Anger outbursts, inability to modulate your
23  feelings is also a sign of mania as well as some
24  other psychiatric disorders, but it can be part of

67

1  it, yes.
2      Q. What about difficulty coping with others?
3      A. Yes. Also, high-anxiety disorders. It is
4  hard to tease out in the diagnosis where the anxiety
5  piece comes in. It is not as typical of bipolar but
6  it can be there.
7      Q. One final one, what about difficulty
8  performing tasks as far as being able to concentrate
9  long enough?
10      A. That can definitely be a part of it when
11  you're not on your medications and not doing well,
12  yes.
13      Q. There was testimony about an extramarital
14  affair that had come up. A question on that. You
15  testified that Mr. Pizzuto had associated that
16  mistake in his life, let's say, as a symptom arising
17  out of his bipolar condition. Does that make sense
18  to you that he did that?
19      A. There is a part of bipolar disease in which
20  people do rash things without really thinking. Road
21  rage, getting traffic violations, extramarital
22  affairs, not really thinking through the
23  consequences of their actions. When you are in a
24  more manic state, that happens.

68

1          Also, spending money that you don't
2  have. A lot of people with bipolar have financial
3  problems because they spend money they don't have.
4  They go into the zone and they don't see money as
5  real and the world is their oyster and they can do
6  whatever they want. They usually get in trouble
7  with the law, their spouse, or work or something.
8  That kind of stops their mania and they have to deal
9  with life. They push it so far that something snaps
10  and they have to deal with some kind of negative
11  consequence. An affair is a classic example.
12      Q. Now, you had testified on direct as far as
13  overall with regard to people who have bipolar that
14  it may be an underlying condition that is
15  aggravated, I think was the word you used, by
16  something, some life circumstance or whatever, that
17  brings out the symptoms. Is that fair to say?
18      A. Yes.
19      Q. With regard to your knowledge of
20  Mr. Pizzuto, what brought that out, according to
21  him?
22      A. He feels that his depression started with
23  problems at work before he became my patient.
24      Q. Assuming that that is so, that the history

69

1  is correct, something that happened at work,
2  something about unfounded accusations by a
3  supervisor and so forth, is that the kind of thing
4  that could exacerbate someone's underlying bipolar
5  disorder?
6      A. Yes.
7      Q. Did you reach any conclusions regarding
8  Mr. Pizzuto's ability to work during the course of
9  your treatment of him?
10      A. Yes. When he came in for the SSI
11  paperwork, at that point he was so anxious and so
12  depressed and so scattered in his thoughts, he
13  really was not able to work. That's why Rosalyn
14  Kenney filled out all of the papers for the SSI aid
15  that he needed.
16      Q. And that was approximately the end of 2005?
17      A. Correct.
18      Q. So by that point he had progressed to the
19  point of disability from work?
20      A. Yes.
21      Q. Was there overall a pattern towards that
22  throughout your seeing him?
23      A. Yes.
24      Q. And were you aware that at some point in

70

1  time in that time frame that he did try to work
2  someplace?
3      A. Yes. With family is all we heard, but he
4  might have tried somewhere else. He was not very
5  forthcoming in giving personal information to me or
6  my staff that he didn't want to give.
7      Q. Has Mr. Pizzuto been responsive to
8  treatment for the bipolar?
9      A. He has responded well to certain
10 medications at certain times.
11     Q. With regard to this alleged cocaine use, to
12 put it that way, that was shown in those medical
13 records, is resort to something like that, something
14 like cocaine, something that also is not atypical?
15     A. Yes. It is not a surprise. A lot of
16 people with bipolar self-medicate to feel better.
17 They will use alcohol, marijuana, cocaine, instead
18 of their medications to feel well or feel better,
19 even though it is not a good choice.
20     Q. Understood. The cocaine use, if you would,
21 to make that the example, would that be something
22 that someone might resort to stupidly if they are
23 feeling low?
24     A. Yes.

71

1      Q. So on the down part of the cycle?
2      A. Yes.
3      Q. Do you have any opinion on Mr. Pizzuto's
4  prognosis with regard to bipolar?
5      A. I think it can be very good if he continues
6  with his therapist consistently, with his
7  medications consistently, and with his appointments
8  consistently.
9          (Marked, Exhibit 96, patient message.)
10     Q. Doctor, you indicated on or off the record
11 that as far as the records that were produced in
12 this case that there may have been some records not
13 produced that would have represented notes,
14 interoffice notes?
15     A. Yes, correct.
16     Q. Showing you what's been marked as Exhibit
17 96, is that one such note?
18     A. Yes.
19     Q. Could you just go through the circumstances
20 and the content of that note, please.
21     A. Yes. My nurse practitioner, Rosalyn
22 Kenney, sent me an interoffice message on 4/26/05
23 asking me to read her note from last Friday. She
24 says. "You know him better than I do. When he

72

1  comes in next visit, I want him to fill out
2  surveys."
3          I read the note. My response was that I
4  did not get details from his wife either about how
5  ugly things were from the Teamsters, but I would
6  encourage her when she follows up with him to see a
7  counselor because meds will not fix all of the
8  traumas that he's going through.
9          My guess is that he also has some PTSD,
10 posttraumatic stress disorder, from his mom's
11 suicide that he needs to work through which he never
12 did as a child. My suggestion to her was to get him
13 back on Wellbutrin, and we could give him some
14 samples so he wouldn't have to spend a whole lot of
15 money. I guess this was when he was out of work and
16 hard up for money. He definitely needs close
17 follow-up within the next three to four weeks. I
18 agreed with her, giving him a bipolar survey and a
19 Beckman score to see where he is. I can give her
20 the files for those. He has a lot going on.
21     Q. Okay. It is fair to say from that note
22 that you did, as you say, suspect that there were
23 other mental conditions that played beyond anxiety
24 and depression?

73

1      A. Yes.
2      Q. And you had some suspicion that bipolar was
3  one of those?
4      A. Yes.
5      Q. Do you know what precipitated that thought
6  that it was bipolar?
7      A. She asked me to read her note from April
8  26, '05. In her note she talks about him feeling as
9  though he always has to keep an extra eye out
10 because people are trying to kill him, he feels very
11 paranoid and that he's weaning himself off meds
12 again. And he's feeling as though he cannot -- that
13 he feels that he has a good handle on things. That
14 was the tipoff to me. All of this is going on and
15 he thinks people are trying to kill him but yet he
16 says he has a handle on things. That is pretty
17 classic bipolar.
18         I'm not a psychiatrist. I don't label
19 people with bipolar diagnosis. That's a big
20 diagnosis to give someone. That made me very
21 suspicious and concerned for him.
22     Q. I think you mentioned that what that meant
23 had something to do with someone in a euphoric or
24 manic state?

Volume 1, Pages 1-85

Exhibits: 113-116

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - -

PAUL PIZZUTO

       Plaintiff

vs.                    Docket No. 04-12492 GAO

CROSSKEN EXPRESS, INC., STEVEN

CROSSKEN, JOSEPH HAMILTON, GREG

SWEATT, AND ARTHUR LEVERIS

       Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF MARC M. SADOWSKY, M.D.

Thursday, August 9, 2007, 3:36 p.m.

New England Neurological Associates

Merrimac Street, Building

Lawrence, Massachusetts

- - - - - - - Reporter: PATRICIA A. BUCKO - - - - - - -

www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404  Fax 617.728.4403

Exhibit 29

Exhibit 29

Marc M. Sadowsky, M.D.
Volume 1 - August 9, 2007

16 (Pages 58 to 61)

58

1      A. And we checked blood work and that was
2  okay. And he continued to periodically use drugs
3  and alcohol.
4      Q. All right, just a few general questions
5  about bipolar disorder.
6      A. Sure.
7      Q. Is it typically an inherited disease?
8      A. I think it's frequently inherited. I
9  don't, I don't -- I think people are still trying to
10 work to understand the genetics of this, but there
11 does seem to be some degree of inheritability.
12     Q. I guess my question is, can it appear
13 suddenly? Can someone who is basically fine one
14 day, no symptoms of depression, no symptoms, no mood
15 variability, suddenly become bipolar?
16     A. Well, I think it's unlikely. I mean, there
17 are -- that is not a typical scenario. I mean, I
18 can't tell you that that could never happen, but I
19 don't recall that having happened.
20         I think that sometimes it can, it can be
21 induced by substances or medicines that people have
22 been given, you know, without there having been any
23 previous history of mood difficulties.
24     Q. And I think you indicated before that it

59

1  can exist in mild form for a while, so that others
2  around the person might not realize that someone has
3  a disorder, or....
4      A. Yes. Well, I mean, I didn't speak to that
5  specifically, but, because that was when we were
6  talking about the global assessment of functioning.
7          You know, bipolar disorder is often
8  considered to be an illness with a course to it.
9  You know, that is, that it can get worse over time,
10 and that is one of the important aspects of
11 treatment. That is that we believe, that treatment
12 can help prevent that from happening.
13     Q. Okay.
14         Can it worsen over time even without
15 some outside stressing events?
16     A. Yes.
17     Q. Okay.
18     A. Yes. I mean, I think, I'm saying with,
19 with just in general, you know, I mean, I think
20 it's, at the same time, not to get, not to be too
21 semantic about this, but it's difficult to envision
22 sort of a life without any stressful, you know,
23 things happening in someone's life.
24         So it's not like we could isolate

60

1  somebody in a laboratory. You know, probably
2  isolating him in a laboratory would be a stressful
3  event. So it's not -- but I mean, when people look
4  at this in general, when you look at the natural
5  progression, it seems to be getting worse over time,
6  and the mood stabilizing medicines seem to help with
7  it. Antidepressants can make it worse, and, you
8  know, other drugs and alcohol could make it worse.
9      Q. Okay, okay.
10         MS. EISENBERG: I have no more
11 questions. Do you have any questions?
12         MR. MULHEARN: I have a few.
13         THE WITNESS: Okay.
14         MS. EISENBERG: Do you need a break?
15         THE WITNESS: No.
16         MR. MULHEARN: It won't be too long.
17         THE WITNESS: Okay, good.
18         EXAMINATION
19 BY MR. MULHEARN:
20     Q. Doctor, I don't know if you were asked if
21 you are Board certified?
22     A. Yes, I am Board certified.
23     Q. Since when?
24     A. Let's see. I think 1990. No, '91. I

61

1  think you have to be in practice for a year. So I
2  finished residency in 1989. I think I sat for the
3  written boards in 1990, and then I think I took the
4  oral boards in '91. Because you have to pass the
5  written boards and then you can take the oral
6  boards. So I think since 1991.
7      Q. And that certification would be in
8  psychiatry?
9      A. Right, adult psychiatry.
10     Q. You were referred to Mr. Pizzuto by Dr.
11 Moverman, correct?
12     A. Yes.
13     Q. And did you have the benefit of Mr.
14 Moverman's recollections, clinical notes to review?
15     A. Yes.
16     Q. And those were provided to you, and you
17 reviewed them?
18     A. I believe so.
19     Q. I gather from direct testimony, that at
20 some point in time there was a bipolar diagnosis
21 actually made with regard to Mr. Pizzuto?
22     A. Yes.
23     Q. Could you tell, approximately, when that
24 was, when that actual diagnosis was made?

62

1    A. I believe -- well, as I said, we, when we
2  had first met, that was, that was a possible
3  diagnosis, so that is September 2005. And then I
4  think I became increasingly convinced of that in the
5  fall of 2005.
6    Q. And the thing that, you have spoken to this
7  somewhat, the symptoms that led to that diagnosis of
8  him, you testified somewhat, but I just wanted to,
9  perhaps, stand on that, was maybe you could just
10  tell me.
11    A. Well, I think that the symptoms that he was
12  talking about, the irritability, racing thoughts,
13  episodes of euphoria, and then the worsening on the
14  antidepressant medication, you know, and I think a
15  history of not having responded well to
16  antidepressants in general, those were some of the
17  factors involved in this.
18    Q. All right, all right.
19       Now, the hallmark --
20    A. And I'm sorry, let me just add, the family
21  history.
22    Q. Sure.
23    A. Was another, was another factor.
24    Q. Now, would his, the mood swings, that

63

1  finding with regard to him, would that be a major
2  part of the diagnosis?
3    A. Well, yes, his report of mood swings. We,
4  we, you know, we do like to try to get some
5  perspective evidence of the mood charts, but we
6  never seem to be able to get that. But, yes, I
7  mean, the reports of mood swings, ups and downs,
8  yes.
9    Q. And this idea of rapid, or pressured
10  speech?
11    A. Yes.
12    Q. Could you define what that is?
13    A. Rapid, loud speech, basically.
14    Q. That's what "pressured" means?
15    A. Yes.
16    Q. Is it like someone going into some sort of
17  a rant?
18    A. Could be, sure, yes.
19    Q. And that was something that he had denied,
20  and something that you had not observed in him?
21    A. Correct.
22    Q. Would impaired judgment also be a symptom
23  of the bipolar?
24    A. It can be, sure, and impulsivity. I mean,

64

1  I think that sort of goes along with it.
2    Q. So impulsive meaning --
3    A. Well, I, I just sort of think of impulsive
4  as acting before you think.
5    Q. Okay. And perhaps doing something
6  inappropriate as a result?
7    A. Right.
8    Q. And things like inappropriate humor might
9  be --
10    A. Could be, sure.
11    Q. What about paranoia, would that be
12  something that would be consistent with bipolar?
13    A. It can be, sure.
14    Q. And in Mr. Pizzuto's case, he did have
15  signs of paranoia, correct?
16    A. I'm -- I mean, I talked about that in the
17  initial evaluation. I think that that was my
18  impression. But, again, that has to be tempered by
19  the fact that when people report things to me, I
20  don't have any real way to verify --
21       You know, when someone says they are
22  being harassed at work, they may be harassed at
23  work; I don't have a way to know that. So, I mean,
24  when people are telling me that they are being

65

1  followed in black helicopters, you know, I, I pretty
2  much think that that, that's not actually happening.
3    Q. Okay.
4    A. But when, you know -- so I mean, I suppose
5  I am making a distinction between what may be
6  happening in the normal course of events, and what
7  seems to be a bit less likely to be happening.
8    Q. On its face?
9    A. Right, on the face of it. But, again, I,
10  I'm making clinical interpretations about what's
11  going on because, as I said before, I'm not a
12  factfinder. That is, I don't have a way to go into
13  the workplace and see if people are being harassed
14  or not.
15    Q. Now, in Mr. Pizzuto's case, he had talked
16  about someone trying to run him over when he was
17  with his dog; the dog got killed?
18    A. Right, right.
19    Q. And is it fair to say that even throughout
20  the course of treatment after that initial
21  consultation, that he continued to speak of things
22  like that, that people were out to get him?
23    A. Well, I think that -- well, I mean, I think
24  he had a sense of, you know, at work, particularly,

Marc M. Sadowsky, M.D.
Volume 1 - August 9, 2007

18 (Pages 66 to 69)

66

1  of people harassing him. And, you know, he talked
2  about having been fired, I think, in the initial
3  evaluation. He said that he had been fired several
4  times before he was finally fired. You know, I'm, I
5  am not entirely sure what that entails, but a sense
6  about that he, you know, he didn't feel like he was
7  being treated fairly.
8      Q. But if, for example, the things he was
9  complaining of, someone trying to run him down, had
10 no basis in reality, would that have been a symptom
11 of paranoia?
12     A. Well, if it had no basis in reality, then
13 it would have been a delusion.
14     You know, a false belief, or a
15 hallucination. You know, I think that the paranoia
16 part is what the intent of the driver is.
17     You know, that is that -- you know, the
18 way that I was looking at it was that there was a
19 traffic accident; his dog was killed, and he was
20 injured. But generally, people aren't trying to run
21 people down, you know.
22     I mean, it's a possibility, but that was
23 the part that might have been paranoid. That is
24 that if he felt that there was a person out there

67

1  that was trying to do him harm when, you know, with
2  no basis, and, you know, that is, and, again, I
3  mean, I -- we're getting into speculation here,
4  because I didn't ask him if he knew the driver,
5  what -- you know, I didn't go into --
6      Q. That is very helpful. The paranoia would
7  be misinterpreting whether the driver intended this?
8      A. Right, exactly, right.
9      Q. And a delusion would be, this never even
10 happened?
11     A. Right, or, yes. I mean, I mean, yes, if --
12 a delusion is fixed false belief. Paranoia can be,
13 I mean if this was a systematized thing, then you
14 would say it was delusional. If it was maybe just
15 one episode that I got into a car accident, the
16 person was trying to hit me, but there was not, I
17 mean, again this is a semantic distinction, but is,
18 I mean, paranoia is often delusional, too, but....
19     Q. Forgive me, but paranoia could be a symptom
20 of bipolar?
21     A. Sure.
22     Q. As well as any symptoms that you might
23 associate with depression?
24     A. Correct.

68

1      Q. Is it typical or let's say not unusual for
2  someone with bipolar disorder to be noncompliant
3  with their medications?
4      A. Yeah, we see that frequently.
5      Q. Is there a reason for that, or commonly
6  understood reason for that?
7      I don't know if there is a commonly, I
8  don't know that there is a commonly understood
9  reason. I know there are a variety of reasons. He
10 expressed some of those reasons.
11     I think, I think that oftentimes, you
12 know, one thought with people on stabilizing
13 medicine is that people like the feeling of the
14 mania, and the mood-stabilizing medicines are more
15 effective, actually, of stemming the mania than they
16 are at preventing depression, so they may back off
17 on the mood-stabilizing medicines or not take them,
18 because they like being manic or hypomanic, which is
19 an attenuated form of mania.
20     Q. And was Mr. Pizzuto's reported drug use,
21 cocaine use, was that something that was somehow
22 connected with his disease?
23     A. Well, I think that there is frequently a
24 comorbid use of substances in mood disorders. And

69

1  you know, as he noted, he was using it to escape.
2  And, you know, I think part of what he was trying to
3  escape was how he was feeling. So I, you know, all
4  I could say is that there was, you know, there is
5  evidence that these things often can go together;
6  that the people with bipolar disorder are more
7  likely to have substance abuse problems.
8      You know, I think that knowing -- to say
9  there was a direct cause and effect relationship in
10 this case, I am not able to say that. But we know
11 that there is frequent co-occurrence of these
12 illnesses.
13     Q. And as I say, with him, it was trying to
14 escape his depression by getting high on cocaine?
15     A. Well, I think depression and anxiety is
16 what he was, you know, trying to escape.
17     Q. Is it typical with patients with bipolar,
18 to be in a state of denial that they have a mental
19 illness, or that they need treatment?
20     I was talking about generally, with
21 people with mental illness.
22     A. Yes. Well, I think that, I think that the,
23 people with manic depression tend to come in more
24 when they are depressed. And when they are manic

70

1  they, unless they get brought into the hospital or
2  something like that, they are not generally seeking
3  treatment, because they feel really good.
4      So I guess to that extent, they deny
5  that there is anything wrong with them.
6      Q.  And --
7      MR. MULHEARN:  Strike that, my beginning
8  of a question, because I think you already answered
9  it.
10     Q.  Now, you didn't treat him back in 2003,
11  correct?
12     A.  Correct.
13     Q.  But you did have a history given to you
14  that he had been fired from work because he was
15  driving, trying to run somebody down, a supervisor
16  down or something to that effect?
17     A.  Correct, that's what he told me.
18     Q.  Now, if, in that timeframe, in July of 2003
19  or thereabouts, before he was let go, Mr. Pizzuto
20  had emotional outbursts at work, yelling at
21  supervisors, making threats, things of that nature,
22  would that be consistent with him having bipolar, at
23  that time?
24     A.  It could be.  It could be consistent, sure.

71

1      Q.  And if you were to add to that that he had
2  a, expressed feeling of being harassed, persecuted,
3  sabotaged, some conspiracy of the supervisors to
4  make him look bad to get him fired, would that also
5  be consistent?
6      A.  It could be consistent, sure.
7      Q.  And if he had problems at work in the sense
8  of inability to actually do a relatively simple
9  task, which in this case he was delivering freight,
10  was, and was having difficulty scanning the freight
11  with an electronic device to make sure what's in the
12  truck is accounted for, to the point he had to count
13  and recount things and so forth, to the point of a
14  spectacle, would that be consistent with a bipolar
15  condition?
16     A.  Again, it could be.  I mean, it, the things
17  that you are describing, I don't have a way,
18  obviously, I wasn't, I'm not aware of these things
19  until you are telling me about them, and I mean, I
20  could say that they are not necessarily inconsistent
21  with it.  But, you know, but, yes, I mean, all those
22  things, I mean, because, because again, this is
23  speculation, but, you know, I mean, people can have
24  problems with anxiety or concentration or, you know,

72

1  and may be unable to do those kind of things.
2      Q.  Did you have some sense, with Mr. Pizzuto,
3  that he was in an undiagnosed --
4      (Cell phone rings.)
5      MR. MULHEARN:  Strike that.
6      Q.  That he was undiagnosed with bipolar; that
7  that diagnosis had not been made before he saw you?
8      A.  Well, yes.  As I said before, he had been
9  treated for depression.  At least that's what he had
10  told me.  He had been treated for depression on and
11  off for three or four years prior to that, and I, I
12  mean, I wouldn't be surprised that, that he, that he
13  had had bipolar disorder from before then.
14     Q.  So you wouldn't be surprised if that was a
15  condition that existed back in 2003?
16     A.  Correct.
17     Q.  I think you have answered this a bit, but
18  I'll just ask you a little bit more, maybe a little
19  bit differently.
20     In your experience in dealing with
21  people who have bipolar disorder, do you get a sense
22  that they're perceived by others, lay people with
23  whom you deal on a regular basis, as being something
24  wrong with them, like mentally ill, or threatening

73

1  or anything like that?
2      A.  I wouldn't say that sort of a rule.  I
3  mean, I, you know, because I have a, you know, a
4  relatively-varied patient population.  I think some
5  people may be better received as sort of, you know,
6  irritable, and easily agitated, and other people are
7  not, you know.
8      And I suppose it speaks to the magnitude
9  of the illness, the effectiveness of the treatment,
10  combines with treatment.  If I am correct about the
11  diagnosis, you know, and things like that.  Because
12  there are, you know, I don't have a way of sort of
13  objectively -- I mean, I can take the criteria, but
14  there is not a lab test that I can do to verify the
15  diagnosis.
16     Q.  Is it typical and normal that there is a
17  good response to treatment by someone with bipolar?
18     A.  Well, we would like to think that, but I
19  mean that there, and I don't know off the top of my
20  head, but I think there is a significant proportion
21  of people who don't respond to treatment, so....
22     Q.  In this particular case, Mr. Pizzuto's
23  case, I will just ask you to assume a few things.
24     A.  Yes.

Marc M. Sadowsky, M.D.
Volume 1 - August 9, 2007

20 (Pages 74 to 77)

74

1    Q. That he was working for Airborne; he was
2  exhibiting some conduct that has been the subject of
3  this suit, paranoia, inappropriate statements and
4  threats to supervisors and that kind of thing, to
5  the point where he was sent to a drug and alcohol
6  test which was negative, but then within a week
7  after that another incident takes place and he is
8  fired, because they are afraid of him, okay?
9        If, instead of being fired, there had
10 been, say, a medical leave, involuntary medical
11 leave at that time, and resort to treatment at that
12 time, would that, in your opinion, have been helpful
13 for Mr. Pizzuto?
14    A. Well, I think it, it's clearly a
15 possibility that it would have been helpful, sure.
16    Q. And the nature of the treatment, assuming
17 he was diagnosed correctly, given the proper
18 medications, would it be medication and something
19 else?
20    A. Well, yes. I mean -- well, I don't know
21 what other people might recommend. I was
22 recommending medication and psychotherapy, yes.
23    Q. And just with regard to your own course of
24 treatment, have you seen improvement with certain

75

1  medications that have been prescribed?
2    A. For Mr. Pizzuto?
3    Q. Yes.
4    A. Yes, I have.
5    Q. And in particular?
6    A. In particular, what kind of improvements?
7    Q. No, sorry, which medications?
8    A. I think that he's doing better on the
9  medicines that he's on, which are Lithium, Lomectol
10 and Effexor.
11    Q. And, certainly, his use of alcohol or drugs
12 that were mentioned, they are something that would
13 be counterproductive?
14    A. Correct.
15    Q. Correct?
16        Did you have an opinion with regard to
17 his ability to work during this timeframe of your
18 treatment? Has there been something consistent; has
19 there been a change in that ability, better, worse,
20 any idea of that?
21    A. I haven't really rendered an opinion about
22 that. So, I mean, I think he had been working, and
23 then I think he hasn't been working. And I haven't
24 talked to him directly about that.

76

1    Q. What about his prognosis?  Do you have an
2  opinion about that as to how he might fare?
3    A. I'd say it's, you know, between guarded and
4  good. I mean, I think in large part it depends on
5  his ability to maybe follow through on some of the
6  things that I have recommended to him.
7        You know, I still think that abstaining
8  from drugs and alcohol and working with a therapist
9  would be helpful.
10    Q. Now, just a few more.
11        You had mentioned on direct examination,
12 factors that could bring on symptoms of the bipolar
13 disorder.  If I could flush that out just a little
14 bit with you.
15        Is there, like Mr. Pizzuto, do you think
16 that he has had bipolar disorder for a long period
17 of time, not symptomatic, for example, or do you
18 think he has developed it later, or what do you
19 think?
20    A. Well, it's, it's kind of hard to say.  I
21 mean, you know, I think that, you know, with a lot
22 of the illnesses that we treat in psychiatry, I
23 think we sort of think about the idea that people
24 have a predisposition, and then there's some type of

77

1  event, stress, or something happens, that may, that
2  may precipitate this.  And as I was referring to
3  before, could be, you know, drugs, medicines,
4  traumatic events in one's life; all sorts of
5  different things can do it.
6        I don't have a good sense, particularly
7  with him, I mean, I didn't get sort of a
8  blow-by-blow history, except to the extent that he,
9  when we had first met, he said that he had been in
10 and out of treatment and on and off medications for
11 three to four years prior to my having seen him,
12 which puts that in early 2001, 2002, something like
13 that.  So, I don't have, I don't have a way to
14 really get really good retrospective information.
15        You know, if a person has been in
16 treatment, if there is some kind of treatment
17 documentation, then that makes it a little easier to
18 establish these things.
19    Q. And at least -- well, he reported to you
20 that he had this very traumatic situation with his
21 mother committing suicide, correct?
22    A. Right.
23    Q. Something that happened long ago, but
24 something that is still obviously a great pain to

78

1  him, true?
2      A. Uh-huh, yes.
3      Q. But beyond that, there were concerns about
4  his brother. Would it be fair to say that what he
5  was reporting to you as what was bothering him was
6  his work situation?
7      A. Well, I think, I think that that was, that
8  was part of it.
9          As I said, he had alluded to, you know,
10 the big picture, which I don't know exactly what,
11 what that means. He also kind of alluded to a past
12 with people, that prevented him from going to
13 various gyms, and I don't know what that meant. I
14 mean, I don't know what the problems were.
15         So, you know, part of what makes it
16 difficult is that there is, before he has been
17 somewhat cryptic about some of this stuff and, you
18 know, has not wanted to divulge much information
19 about it.
20     Q. So, then, for you to actually form an
21 opinion that you would be comfortable with as to
22 whether these work stressors and firings and so
23 forth, and the treatment at work, brought on these
24 symptoms, you would need to have some more facts and

79

1  certainly medical records of treatment at that time?
2      A. That would certainly help. I mean, I
3  could -- it, it had an adverse effect on his mood.
4  I mean, I don't have a way to tell you that it was a
5  cause of it. I think clearly it has exacerbated
6  things for him.
7          MR. MULHEARN: I have no further
8  questions.
9          MS. EISENBERG: Okay, just a few.
10         I just want to clarify something that
11 we, we have been touching on.
12         EXAMINATION
13 BY MS. EISENBERG:
14     Q. On the one hand there are, you testified
15 to, and in response to Mr. Mulhearn's questioning,
16 you testified that certain behaviors were consistent
17 with depression or bipolar disorder: inappropriate
18 humor, impulsivity, impaired judgment, paranoia.
19 Is it also the case that people can possess any one
20 or combination of those traits, and not necessarily
21 be bipolar or depressed?
22     A. Yes.
23     Q. Okay.
24         Also, you, back in September, I guess

80

1  your first visit, September 15, '05 where you listed
2  the DSM IV diagnoses and the Axis 5 70, which you
3  indicated was sort of a, his point on a scale of
4  zero to a hundred, given that 70 points, did I
5  understand you to say correctly that it was possible
6  that Mr. Pizzuto could have been functioning out
7  there in the workplace, in the world, socially,
8  whatever, at a level that would, where it would not
9  have been obvious that he was experiencing some sort
10 of bipolar disorder or depression?
11     A. Yeah, I think that is a possibility.
12     Q. Okay.
13         Do people with Mr. Pizzuto's disorder,
14 do they have the wherewithal to abstain from
15 substance abuse, or does the disorder rob them of
16 that ability to use whatever self-control they need
17 to use?
18     A. Well, I mean --
19     Q. If it's impossible to answer, you could say
20 so.
21     A. I think that, you know, I've seen, I've
22 seen people who have been successful in abstaining
23 from drugs and alcohol, and I have seen some people
24 who haven't been successful. So it's hard to make a

81

1  generalization. I mean, you know, you would like to
2  think so, but it doesn't always happen.
3      Q. Okay. And then finally, one last question.
4  I know you testified that you, there was no way you
5  could independently confirm whether or not somebody
6  was actually trying to run Mr. Pizzuto down, but I
7  believe you testified earlier that it was
8  nonetheless your, your clinical impression that he
9  was prone to paranoia. Is that, did I understand
10 that correctly?
11     A. Yes.
12     Q. Okay, one last thing.
13         In your handwritten notes, on the first
14 page, you mention a suicide attempt in July of '03.
15     A. Yeah, that is what he told me.
16     Q. Okay. Were there ever any hospital records
17 or anything that would indicate --
18     A. No. As I said, he had never been
19 hospitalized. And I didn't, obviously, lock down
20 the details of what that was.
21     Q. And in the middle of that first page is he
22 saying, "I had some issues to which I probably
23 overreacted"?
24     A. Right.